**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

**Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

**MOTION INFORMATION STATEMENT**

Docket Number(s): 23-467, 23-469 _____     _____ Caption [use short title] _____

Motion for: vacatur of stay

_____

_____

Set forth below precise, complete statement of relief sought:

emergency motion to vacate stay of bankruptcy

reorganization plan entered by district court

_____

In re: Voyager Digital Holdings, Inc.

MOVING PARTY: Official Committee of Unsecured Creditors     OPPOSING PARTY: United States et al.

☐ Plaintiff            ☐ Defendant

☑ Appellant/Petitioner ☐ Appellee/Respondent

MOVING ATTORNEY: Paul W. Hughes     OPPOSING ATTORNEY: Peter Aranoff

[name of attorney, with firm, address, phone number and e-mail]

McDermott Will & Emery LLP          US Attorney's office for SDNY

500 North Capitol St., NW, Washington DC 20001     86 Chambers St, New York, NY 10007

(202) 756-8981, phughes@mwe.com

Court- Judge/ Agency appealed from: S.D.N.Y. - Hon. Jennifer H. Rearden

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes ☐ No (explain): _____

_____

Opposing counsel's position on motion:
☐ Unopposed ☑ Opposed ☐ Don't Know
Does opposing counsel intend to file a response:
☑ Yes ☐ No ☐ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:**

Has this request for relief been made below? ☐ Yes ☑ No
Has this relief been previously sought in this court? ☐ Yes ☑ No
Requested return date and explanation of emergency: _____
Return date April 12, 2023. If the stay is not lifted by April 13, the transaction on
which the Chapter 11 plan is premised may fall through, which would destroy
$100 million in value for creditors.

_____

Is oral argument on motion requested? ☐ Yes ☑ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set? ☐ Yes ☑ No If yes, enter date: _____

**Signature of Moving Attorney:**

/s/ Paul W. Hughes _____ Date: 4/3/2023 _____ Service by: ☑ CM/ECF ☐ Other [Attach proof of service]

Form T-1080 (rev.12-13)

# Nos. 23-467, 23-469

*In the*

# United States Court of Appeals

*for the*

# Second Circuit

IN RE VOYAGER DIGITAL HOLDINGS, INC., et al., *Debtors*

OFFICIAL COMMITTEE OF UNSECURED CREDITORS
OF VOYAGER DIGITAL HOLDINGS, INC,
*Appellant*,

– v. –

UNITED STATES OF AMERICA, et al.

*Appellees.*

On appeal from the United States District Court for
the Southern District of New York

**EMERGENCY MOTION OF THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS TO
VACATE THE DISTRICT COURT'S STAY**

**Action requested by or before April 12, 2023**

DARREN AZMAN
JOSEPH B. EVANS
   *McDermott Will & Emery LLP*
   *One Vanderbilt Avenue*
   *New York, NY 10017-3852*
   *(212) 574-5400*

PAUL W. HUGHES
ANDREW A. LYONS-BERG
CHARLES SEIDELL
   *McDermott Will & Emery LLP*
   *500 North Capitol Street NW*
   *Washington, DC 20001*
   *(202) 756-8000*

*Counsel for the Official Committee of Unsecured Creditors*

## TABLE OF CONTENTS

Table of Authorities...............................................................................ii

Introduction...........................................................................................1

Background............................................................................................5

    A.  Factual background......................................................5

    B.  Procedural background. ...............................................6

Jurisdiction.........................................................................................17

Argument............................................................................................22

  I.  The Government has no likelihood of success on the merits. .........................................................................................24

    A.  The bankruptcy court had authority to issue the Exculpation Provision. .............................................24

    B.  The district court's specific objections are also wrong. ...................................................................31

  II.  The equitable factors overwhelmingly cut against a stay. .........38

    A.  The government has not shown that is *likely* to suffer *actual and imminent* irreparable injury. .....................39

    B.  The debtors and creditors will face "significant and immediate" injuries if the stay is not lifted. ...........44

    C.  The public interest strongly weighs in favor of effectuating the Plan. .............................................48

Conclusion ..........................................................................................50

# TABLE OF AUTHORITIES

## Cases

*In re A & F Enterprises, Inc. II*,
742 F.3d 763 (7th Cir. 2014) ....................................................18

*In re Adelphia Commc'ns Corp.*,
361 B.R. 337 (S.D.N.Y. 2007)..............................................44, 49

*In re Aegean Marine Petroleum Network Inc.*,
599 B.R. 717 (Bankr. S.D.N.Y. 2019) .................................. 28, 30, 31, 32

*In re Airadigm Commcn's, Inc.*
519 F.3d 640 (7th Cir. 2008) ............................................29, 30

*In re AMR Corp.*,
2021 WL 5016606 (Bankr. S.D.N.Y. 2021) ............................47

*In re Anderson*,
884 F.3d 382 (2d Cir. 2018)...................................................25

*Baretta v. Wells Fargo Bank, N.A.*,
693 Fed. App'x 26 (2d Cir. 2017) ........................................23

*Barretta v. Wells Fargo Bank, N.A.*,
693 F. App'x 26 (2d Cir. 2017) .......................................18, 19

*Belya v. Kapral*,
45 F.4th 621 (2d Cir. 2022) ..................................................21

*Bennett v. Williams*,
892 F.2d 822 (9th Cir. 1989) .................................................31

*In re BGI, Inc.*,
504 B.R. 754 (S.D.N.Y. 2014)................................................49

*In re Bogdanovich*,
292 F.3d 104 (2d Cir. 2002)...................................................25

*Boullion v. McClanahan*,
639 F.2d 213 (5th Cir. 1981) .................................................31

*In re Calpine Corp.*,
2008 WL 207841 (S.D.N.Y. 2008)........................................44

*In re Canter*,
229 F.3d 1150 (3d Cir. 2002)................................................22

## Cases—continued

*Caribbean Trading & Fid. Corp. v. Nigerian Nat'l Petroleum Corp.*,
948 F.2d 111 (2d Cir. 1991)........................................................................21

*Carson v. American Brands, Inc.*,
450 U.S. 79 (1981) ...................................................................................18

*In re Charter Co.*,
72 B.R. 70 (M.D. Fla. 1987)......................................................................48

*In re Chemtura Corp.*,
439 B.R. 561 (S.D.N.Y. 2010)..................................................................50

*Cheney v. U.S. Dist. Court*,
542 U.S. 367 (2004) .................................................................................22

*City of New York v. Anglebrook Ltd. Partnership*,
891 F. Supp. 908 (S.D.N.Y. 1995)...........................................................40

*Clonus Associates v. DreamWorks, LLC*,
417 F. Supp. 2d 248 (S.D.N.Y. 2005)......................................................41

*Connecticut Nat'l Bank v. Germain*,
503 U.S. 249 (1992) .................................................................................18

*Czyzewski v. Jevic Holding Corp.*,
580 U.S. 451 (2017) ...........................................................................25, 26

*In re Dakota Rail, Inc.*,
111 B.R. 818 (D. Minn. 1990)..................................................................47

*Dexter 345 Inc. v. Cuomo*,
663 F.3d 59 (2d. 2011) .............................................................................39

*In re DJK Residential, LLC*,
2008 WL 650389 (S.D.N.Y. 2008)...........................................................44

*In re Enron Corp.*,
326 B.R. 497 (S.D.N.Y. 2005)..................................................................29

*In re Fairmont Communications Corp.*,
1993 WL 428710 (Bankr. S.D.N.Y. 1993) .........................................48, 49

*In re Financial Oversight and Management Board for Puerto Rico*,
588 F. Supp. 3d 191 (D.P.R. 2022)...........................................................46

iii

## Cases—continued

*Matter of Forty-Eight Insulations, Inc.*,
115 F.3d 1294 (7th Cir. 1997) ...................................................18, 20

*In re Frantz*,
534 B.R. 378 (Bankr. D. Idaho 2015) ......................................47

*In re Fremont Sheep Co.*,
110 F.3d 73 (10th Cir. 1997) ....................................................18

*Garvin v. Cook Invs. NW, SPNWY, LLC*,
922 F.3d 1031 (9th Cir. 2019) .................................................36

*In re Grabis*,
2020 WL 7346467 (Bankr. S.D.N.Y. 2020) .............................36

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
481 F.3d 60 (2d Cir. 2007).......................................................41

*In re Granite Broad. Corp.*,
369 B.R. 120 (S.D.N.Y. 2007)..................................................29

*Gross v. Rell*,
965 F.3d 211 (2d Cir. 2012)......................................................30

*Hilton v. Braunskill*,
481 U.S. 770 (1987) ...................................................................24

*Hong Mai Sa v. Doe*,
406 F.3d 155 (2d Cir. 2005)......................................................21

*JTH Tax, LLC v. Agnant*,
__ F4th__, 2023 WL 2467363 (2d Cir. 2023)........................ 23, 39, 41, 46

*In re LATAM Airlines Group S.A.*,
2022 WL 2657345 (Bankr. S.D.N.Y. 2022) .............................49

*In re LATAM Airlines Grp. S.A.*,
2022 WL 2206829 (Bankr. S.D.N.Y. 2022) .............................31

*In re LATAM Airlines Grp. S.A.*,
2022 WL 2811904 (Bankr. S.D.N.Y. 2022) .............................24

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ...................................................................41

*In re Martin*,
91 F.3d 389 (3d. Cir. 1996).......................................................50

iv

**Cases—continued**

*Metro Transp. Co. v. North Star Reinsurance Co.*,
   912 F.2d 672 (3d Cir. 1990)........................................................20

*In re Momentum Mfg. Corp.*,
   25 F.3d 1132 (2d Cir. 1994)......................................................28

*Matter of New York, N.H. & H.R. Co.*,
   632 F.2d 955 (2d. Cir. 1980).....................................................50

*Nken v. Holder*,
   556 U.S. 418 (2000) ..........................................................24, 38

*In re Oneida Ltd.*,
   351 B.R. 79 (S.D.N.Y. 2006).....................................................29

*In re Public Service Co. of New Hampshire*,
   116 B.R. 347 (D.N.H. 1990)................................................46, 48

*Ritzen Grp., Inc. v. Jackson Masonry, LLC*,
   140 S. Ct. 582 (2020) ......................................................20, 21

*RSS WFCM2018-C44-NY LOD, LLC v. 1442*
   *Lexington Operating DE LLC*,
   59 F.4th 586 (2d Cir. 2023)................................................19, 20

*In re Sabine Oil & Gas Corp.*,
   548 B.R. 674 (S.D.N.Y. 2016)............................... 39, 44, 46, 47

*In re Savage & Associates, P.C.*,
   2005 WL 488643 (S.D.N.Y. 2005)...........................................49

*Silva v. Farrish*,
   47 F.4th 78 (2d Cir. 2022) ......................................................41

*In re Sonnax Indus.*,
   907 F.2d 1280 (2d Cir. 1990)...................................................20

*Taggart v. Lorenzen*,
   139 S. Ct. 1795 (2019) ...........................................................29

*Tecnimed SRL v. Kidz-Med, Inc.*,
   462 Fed. App'x 31 (2d Cir. 2012) ...........................................23

*Toibb v. Radloff*,
   501 U.S. 157 (1991) ................................................................26

## Cases—continued

*TransUnion LLC v. Ramirez*,
 141 S. Ct. 2190 (2021) ...............................................................41

*In re TWA*,
 2001 Bankr. LEXIS 723 (Bankr. D. Del. 2001) .....................................47

*Uniformed Fire Officers Ass'n v. De Blasio*,
 973 F.3d 41 (2d Cir. 2020) .........................................................25

*In re United States*,
 945 F.3d 616 (2d Cir. 2019) ........................................................22

*United States v. Doe*,
 562 F. App'x 20 (2d Cir. 2014) ....................................................22

*United States v. Mikula*,
 218 F. App'x 12 (2d Cir. 2007) ....................................................22

*United States v. Spallone*,
 399 F.3d 415 (2d Cir. 2005)........................................................43

*In re W.R. Grace & Co.*,
 475 B.R. 34 (D. Del. 2012)..........................................................50

*In re Windstream Holdings, Inc.*,
 2020 WL 4481933 (S.D.N.Y. 2020)....................................................44

*In re World Trade Center Disaster Site Litig.*,
 503 F.3d 167 (2d Cir. 2007)........................................................24

*Zanghi v. Callegari*,
 2023 WL 1097560 (2d Cir. 2023) ....................................................21

*Zervos v. Verizon N.Y., Inc.*,
 252 F.3d 163 (2d Cir. 2001).........................................................23

**Statutes and rules**

11 U.S.C.

§ 105 ..............................................................................27, 31

§ 727 ......................................................................................25

§ 944 ......................................................................................25

§ 1121 ....................................................................................25

§ 1123 ..............................................................................25, 28

§ 1129 ..............................................................................25, 26

§ 1129(a)(3) ..........................................................................2, 33

§ 1129(a)(7) ............................................................................26

§ 1141 ....................................................................................25

§ 1142(b) ................................................................................26

§ 1192 ....................................................................................25

§ 1228 ....................................................................................25

§ 1328 ....................................................................................25

28 U.S.C.

§ 158(d)(1)..............................................................................20

§ 1292(a) ................................................................................18

§ 1292(a)(1)..................................................................18, 19, 20

L.R. 27.1(b) ................................................................................5

**Other Authorities**

11 Charles A. & Arthur R. Miller, Fed. Prac. & Proc. Civ. 3d §
2904 (2022).............................................................................24

7 *Collier on Bankruptcy* ¶ 1103.05 [4] (16th ed. 2023) ................28

*Good Faith*, Black's Law Dictionary (11th ed. 2019) ...................38

*Statement Regarding SEC Staff Views*, SEC (Sept. 13, 2018) ...................10

## INTRODUCTION

**1.** This is an emergency motion by the Official Committee of Unsecured Creditors (Committee) in the Chapter 11 cases of Voyager Digital Holdings, Inc., *et al.* (Voyager or Debtors). The Committee seeks imminent relief from this Court vacating the stay entered by the district court. Unless certain events occur **on April 13**, the unsecured creditors risk losing approximately *$100 million* of value. The Committee thus requests that the Court vacate the stay **by or before Wednesday, April 12**.

The Committee represents more than one million customers of Voyager, a cryptocurrency brokerage. The government's attempted delay not only risks loss of $100 million in assets to be distributed to creditors, but it would also preclude prompt fiat and cryptocurrency distributions to over one million unsecured creditors, most of whom are retail customers who badly need their crypto returned. The bankruptcy court specifically found that "many of those customers invested significant portions of their life savings or retirement savings" with Voyager. App'x 196a.[1]

At issue here is the court-approved, Chapter 11 plan (the Plan) and the confirmation order approving the Plan (the Confirmation Order). Under that Plan, BAM Trading Services, Inc. (Binance.US)—a crypto exchange—

---

[1] For the Court's convenience, where possible this motion cites to the Appendix filed by Voyager in No. 23-467.

1

will acquire Voyager's assets. After a two-week long contested confirmation hearing, the bankruptcy court approved the Plan. Further, it found the government's stay request entirely without merit and denied it.

But the district court entered a temporary stay. Because that stay risks destruction of the entire Plan, the district court's action should be vacated and creditors should be able to receive distributions now.

**2.** The issue at the center of this motion is the government's objection to an exculpation provision contained in the Plan.

As part of this court-ordered restructuring, certain cryptocurrency transactions must be made by the parties or others working at their direction. The bankruptcy court included an exculpation provision in the Plan providing that—so long as parties do not act fraudulently or with gross negligence or willful misconduct—they cannot be held liable for performing the actions required by the Court.

The government objects. As noted by Judge Michael E. Wiles, who oversaw the bankruptcy, the government has had every opportunity to assert that the crypto transactions or other activities required by the Plan are unlawful. It has not done so. After all parties, including the government, had the opportunity to present evidence or argument, the bankruptcy court ruled that the crypto transactions and other activities required under the Plan have "been proposed in good faith and not by any means forbidden by

2

law." App'x 20a. *See* 11 U.S.C. § 1129(a)(3). And, as the bankruptcy court has made clear, the government at any time in the future may inform the bankruptcy court that actions contemplated under the Plan should be stopped or paused because of concerns about illegality.

Rather than taking either of these readily available alternatives, the government maintains that it may lie in wait: It takes the position that, even though parties must act according to the precise letter of the Plan—including executing the crypto transactions necessary to effectuate it—the government must retain the ability to bring criminal or civil actions against parties who do nothing more than take the steps required to effectuate the court-ordered Plan. The bankruptcy court had little trouble rejecting that extraordinary claim. But the district court entered a stay, which—if left undisturbed by this Court—may scuttle the entire purchase by Binance.US of Voyager's assets. The evidence is uncontroverted that, if the deal is not completed, Voyager's creditors will lose roughly $100 million in value. And April 13, 2023 is the critical date for the transaction to proceed.

Accordingly, the Court should immediately vacate the district court's stay, which will allow the Plan to become effective. The exculpation provision at issue here is well within the bankruptcy court's broad equitable powers, and it is a common feature of Chapter 11 plans within this Circuit. The

3

exculpation provision is narrow: It has no bearing whatsoever on pre-reorganization activity of any entity, it does not exculpate any individuals who engage in fraudulent, willfully unlawful, or grossly negligent conduct in executing the Plan, and it does not prevent the government from later asking the bankruptcy court to stop certain contemplated transactions or other actions, if it claims (unlike its position now) that those actions would be somehow illegal. Thus, as the bankruptcy court put it, the government's protestations about its ability to protect the public are "red herrings." App'x 193a.

Although the exculpation provision is plainly lawful, and consummation of the Plan by April 13 is necessary to preserve massive creditor value, the government has essentially no equities in favor of its requested stay. As the government flatly admits, its interests in this case are purely "hypothetical"—it rests on the speculation that it might, at some later date, take the position that the conduct ordered by the bankruptcy court here warrants criminal or civil charges. That hypothetical concern cannot qualify as imminent injury—most especially when the government has a host of other mechanisms at its disposal to protect any claimed sovereign interest. The district court's holding to the contrary was flatly wrong and must be vacated.

For all these reasons, the Committee respectfully requests that the Court vacate the stay entered by the district court on an emergency basis,

with a decision requested by April 12, to allow for notices which *must* be provided on April 13.[2]

## BACKGROUND

### A.    Factual background.

**1.** Voyager was once one of the most popular crypto brokerages for retail customers. Specifically, Voyager "operate[d] as a cryptocurrency 'agency broker,' matching its customers with counterparties who can facilitate the customer's desired trade." Bankr. Dkt. 15, at 6 ¶ 12. Instead of matching trades on its own order book, as would a typical crypto exchange, Voyager filled its customers' trade orders "by survey[ing] more than a dozen exchanges and liquidity providers and execut[ing] trades through a proprietary algorithm that evaluates the price, certainty of execution, reliability of the trading venue, and speed of execution." *Id.* at 11 ¶ 22.

Voyager offered customers lucrative rewards programs—but in order to fund those programs, Voyager lent the crypto that customers deposited on its platform to third parties in the form of risky high-yield loans. *Id.* at 11-12, ¶¶ 23-29. Ultimately, this practice of seeking out high-risk loans to realize the returns necessary to fund its rewards program was one of the

---

[2]    Counsel for the Committee has conferred with counsel for the government, which opposes the relief requested and intends to file a response. L.R. 27.1(b).

practices that led to Voyager's demise. As a result of the default of just one of its lending partners, Voyager found itself suffering from significant liquidity issues. *Id.* at 21 ¶ 57. On July 1, 2022, Voyager "froze all withdrawals and trading activity on its platform." *Id.* at 24 ¶ 64. Four days later, it filed for bankruptcy.

Voyager's creditors consist of mostly retail customers. Many of them have filed letters with the court describing the harm they have suffered as a result of Voyager's bankruptcy. *See* D. Ct. Dkt. 57 (March 23, 2023 Hearing Tr.), at 31:2–3. Since July 2022, they have been unable to access their assets stored on Voyager's platform. Many of these retail customers relied on the assets they stored with Voyager for mortgage payments, college funds for children, and basic necessities such as car loan payments. *Id.* at 31:3-5. These retail customers desperately need to have their crypto returned to them as soon as possible. *See* App'x 196a (bankruptcy court stay opinion) ("The automatic stay and other provisions of the bankruptcy code have had the effect of delaying customers' access to their investments since July 2022, and many of those customers invested significant portions of their life savings or retirement savings in cryptocurrencies held by the Debtors.").

### B. Procedural background.

**1.** On July 5, 2022 the Debtors filed a voluntary Chapter 11 petition in bankruptcy court; they continue to operate their businesses and manage

6

their properties as debtors in possession pursuant to bankruptcy code sections 1107(a) and 1108. On July 19, 2022, the U.S. Trustee appointed the Committee pursuant to bankruptcy code section 1102(a). *See* Bankr. Dkt. 106.

**2.** To maximize recovery to creditors, the Debtors sought to sell their assets at a premium through a bankruptcy court-ordered auction process. Initially, on September 28, 2022, the now infamous crypto exchange FTX won the auction—but after FTX itself filed for bankruptcy, the Debtors were forced to restart their bid procedures to find a new purchaser.

On December 18, 2022, the Debtors and Binance.US entered into an asset purchase agreement (the APA) and, on December 21, 2022, the parties sought bankruptcy court authorization to enter into the APA. *See* Bankr. Dkt. 775. On January 9, 2023, the Debtors filed an amended version of the APA (the First Amended APA) (Bankr. Dkt. 835), reflecting certain modifications including, among other things, extensions of certain milestones contained therein. On January 13, 2023, the bankruptcy court entered an order authorizing the Debtors' entry into the First Amended APA. Bankr. Dkt. 860.

Under the First Amended APA, the outside effective date for the closing of the sale to Binance.US is April 18, 2023, with a possible 30-day ex-

tension. Bankr. Dkt. 835, § 8.1(c). The First Amended APA gives Binance.US the option to terminate the sale if the "[c]losing shall not have occurred on or before the date that is four months following the date hereof," which is April 18, 2023. *Id.*; *see also id.* at ECF page 5, ¶ 2 (providing that terms like "the date hereof" continue to mean December 18, 2022, the date the original APA was signed).

However, the First Amended APA also provides that closing shall occur "on the third (3rd) Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such conditions) of the closing conditions set forth in Article VII" of the First Amended APA. *See id.* § 2.3. Thus, all the conditions precedent to closing of the sale must be satisfied (or waived, to the extent the law permits a waiver) by April 13, 2023 to preclude this termination right from maturing on April 19.

In plain terms, this means that Binance.US will have the ability to rescind the First Amended APA and back out of the acquisition if the closing does not occur by April 18—which requires that the parties provide certain notices by April 13. Because of this April 13 notice date, the Committee requests action no later than April 12.

**3.** The Plan, as proposed and ultimately approved by the bankruptcy court, includes a number of key provisions. For example, the sale of Voyager's assets to Binance.US is a key aspect of the Plan. *See* App'x 89a-90a.

8

The Plan also requires Voyager and Binance.US to undertake certain crypto transactions.

First, the Plan requires that the Debtors engage in "rebalancing" transactions prior to the sale of their assets to Binance.US. *See* Bankr. Dkt. 835, at § 6.11(a)-(d). These transactions require the Debtors to balance their crypto portfolio so that it contains the appropriate amounts of certain crypto to ensure that creditors will receive *pro rata* in-kind distributions of the crypto that they originally held on Voyager's platform. Second, the Plan requires the eventual distribution of crypto to creditors, which, pending the Plan becoming effective and the closing of the sale to Binance.US, will be completed by Binance.US. *See id.* § 7.1(a)-7.4; App'x 89a-90a. The Plan also provides the exculpation provision at issue in this appeal, which is discussed in more detail *infra*.

**4.** Beginning on March 2, 2023, the bankruptcy court held a hearing to consider confirmation of the Plan, which included multiple days of witness testimony and oral argument.

At the hearing, the Securities and Exchange Commission (SEC) objected to confirmation of the Plan on the basis that certain of its provisions may be violative of the securities law. *See* Bankr. Dkt. 1047. However, the SEC would not provide any basis for *why* it believed the Plan may be unlawful. When the bankruptcy court requested that the SEC provide further

9

details regarding its position, the SEC only offered the statements of SEC staff members, which "do not reflect the view of the Commission, which has not taken a position with respect to Voyager or Binance." March 3, 2023 Bankr. Hearing Tr., 230:14–16.

The SEC staff members stated that: (1) the Plan's contemplated transactions involving VGX, the cryptocurrency native to Voyager's platform, "have the attributes of a securities transactions," and (2) it was their belief "that Binance.US is operating an unregistered securities exchange in the United States." *Id.* at 230:18-22. The SEC provided no further reasoning to support either of these two statements. In a statement specifically addressing the views of SEC staff members, former SEC Chairman Jay Clayton noted that the "Commission's longstanding position is that all staff statements are nonbinding and create no enforceable legal rights or obligations of the Commission or other parties." Jay Clayton, *Statement Regarding SEC Staff Views*, SEC (Sept. 13, 2018), https://www.sec.gov/news/public-statement/statement-clayton-091318#.

On March 6, 2023, the government filed an objection to confirmation of the Plan alleging that the Plan and Confirmation Order "contain improperly broad exculpation language that purports to bind the Government from exercising its police and regulatory powers against the Debtors and various third parties." Bankr. Dkt. 1144. The government, however, presented no

10

evidence, called no witnesses, and did not cross-examine any witnesses during the confirmation hearing. In fact, the government did not even take an actual position that any conduct required under the Plan would violate the law.

**5.** On March 7, 2023, the bankruptcy court issued a bench ruling confirming the Plan (subject to certain modifications), which was subsequently memorialized in a written opinion issued by the bankruptcy court on March 11, 2023. *See generally* App'x 130a-179a (Bankr. Dkt. 1170). On March 8, 2023, the bankruptcy court entered the Confirmation Order (Bankr. Dkt. 1157), which was subsequently corrected and amended on March 10, 2023 and March 11, 2023. *See* App'x 1a-129a.

The Confirmation Order replaced previous versions of exculpatory language with a four-paragraph exculpation provision. *See* App'x 7a-8a. The key language is as follows:

> Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and **each Exculpated Party is hereby exculpated from, any liability for damages based on the negotiation, execution and implementation of any transactions or actions approved by the Bankruptcy Court** in the Chapter 11 Cases, except for Causes of Action related to any act or omission that is determined in a Final Order to have constituted **actual fraud, willful misconduct, or gross negligence**[.] . . .

11

[T]he Plan contemplates certain rebalancing transactions and the completion of distributions of cryptocurrencies to creditors. **The Exculpated Parties shall have no liability for, and are exculpated from, any claim for fines, penalties, damages, or other liabilities based on their execution and completion of the rebalancing transactions** and the distribution of cryptocurrencies to creditors in the manner provided in the Plan.

For the avoidance of doubt, the foregoing paragraph reflects the fact that Confirmation of the Plan requires the Exculpated Parties to engage in certain rebalancing transactions and distributions of cryptocurrencies and the fact that no regulatory authority has taken the position during the Combined Hearing that such conduct would violate applicable laws or regulations. Nothing in this provision shall limit in any way the powers of any Governmental Unit to contend that any rebalancing transaction should be stopped or prevented, or that any other action contemplated by the Plan should be enjoined or prevented from proceeding further. …

*Id.*

As the bankruptcy court later explained, this exculpatory language is "specifically limited to the fact that the parties must buy and sell cryptocurrencies as part of the portfolio rebalancing that the plan requires, and must distribute cryptocurrencies to customers. The point is to protect the parties from belated allegations that those very activities are somehow violative of law and that parties should be penalized just for doing what I have ordered them to do." App'x 187a (bankruptcy court stay opinion).

The Plan, as modified by the Confirmation Order, defines "Exculpated Parties" as follows:

12

(a) each of the Debtors; (b) the Committee, and each of the members thereof, solely in their capacity as such; (c) each of the Released Professionals; (d) each of the Released Voyager Employees; (e) the Plan Administrator; (f) the Distribution Agent; (g) each of the Independent Directors; and (h) any other person acting in a fiduciary capacity on behalf of the Debtors in connection with the negotiation, execution, and implementation of any transactions or actions approved by the Bankruptcy Court in the Chapter 11 Cases.

App'x 9a.

**6.** The government appealed the Confirmation Order, and it sought a stay pending appeal in the bankruptcy court. In its motion, the government again did not take the position that any of the Plan's contemplated transactions violated the law. Instead of giving concrete examples of how the provisions of the Plan violated the law, the government simply argued that "[o]ne can imagine any number of laws or regulations [the] Debtors and others may violate after the Plan's effective date—tax laws, environmental laws, securities laws, and criminal laws, among others, in connection with whatever steps they take to effectuate the Plan." Bankr. Docket No. 1182, at 31.

The bankruptcy court denied the motion for stay. The court explained that, pursuant to bankruptcy code section 1142(a), the effect of the Confirmation Order is that "certain parties will be obligated to do what the plan calls for regarding the rebalancing of cryptocurrency portfolios and the distribution of cryptocurrencies to customers." App'x 184a-185a. In addressing

13

the government's argument that it was likely to succeed on the merits of its appeal, the bankruptcy court plainly stated: "the Government's papers exaggerate and in some places mischaracterize what I have done and the authorities on which I have relied, and in other instances rely on hyperbole or on 'straw man' arguments." App'x 183a. With regards to the government's argument that the Confirmation Order infringed on the government's police powers, the bankruptcy court stated as follows:

> I have not "enjoined" the Government's exercises of police and regulatory powers, I have not "prospectively immunized" the parties from enforcement actions, and I have not barred regulatory actions to stop the contemplated transactions. The Government's arguments to the contrary are just hyperbole. I have made it quite clear that the Government can step in at any time if (due to changing or evolving regulatory views) the Government thinks the rebalancing transactions or cryptocurrency distributions should be stopped. My order also made quite clear that I have not purported to limit the liability of any person for anything they have done that I have not explicitly authorized and/or directed them to do. The Order that I have entered is narrow in scope and is limited to the protection of people who, at least for now and in the absence of regulatory action, will have to do what my order requires.

App'x 192a.

The bankruptcy court also noted the harm to creditors that would result from a stay of the Confirmation Order, explaining that "[a] stay could threaten the availability of" the Binance.US Deal, which "would lead to a reduction of approximately $100 million in assets available for distribution

14

to creditors," and that "[e]very delay in these cases means that further administrative expenses will be incurred, which just further reduces creditor recoveries." App'x 186a.

Finally, with regard to the government's argument that a stay of the Confirmation Order was in the public interest, the bankruptcy court reiterated:

> Notwithstanding the Government's efforts to manufacture ambiguities or excesses, (a) the first paragraph of the modified exculpation provision that I approved is almost identical to what the U.S. Trustee requested in its written objection, and (b) the last two paragraphs make clear that they do not prohibit any regulatory action, including actions to stop the cryptocurrency sales and distributions that the plan contemplates. The only thing my order does in that regard is to say that the parties who will engage in those activities under the authority and direction of my order – after the Government stated that it did not contend that the activities were illegal – should not in the interim be liable for doing what my order requires. I cannot imagine any "public interest" or equitable consideration that would require a different result.

App'x 197a.

**7.** The government next sought a stay from the district court. During oral argument, when the district court asked the government to specify exactly what type of conduct purportedly authorized under the Plan that it was concerned about in bringing its appeal, the government responded that it "can't say one way or the other" and admitted that it was "trying to come

15

up with hypotheticals, because this is future conduct." March 23, 2023 District Court Hearing Transcript, at 12:15, 22–23. Again, at no point during the oral argument did the government actually contend that any conduct required under the Plan would violate the law.

On March 27, 2023, the district court issued an order staying the execution of the Plan, without providing reasoning. App'x 198a. On March 31, 2023, the district court issued an opinion outlining its reasoning. App'x 199a-218a. In its opinion, the district court held that "the Government has demonstrated a substantial case on the merits and irreparable harm in the absence of a stay." App'x 211a. The district court noted that, due to the time constraints posed by the emergency nature of the government's appeal, it would "not engage herein in an extensive analysis of the merits." App'x 211a n.5. Rather, with regard to the merits of the bankruptcy court's statutory and constitutional authority to approve the Exculpation Provision, the district court opined that "the Government's application centers on potentially novel and admittedly difficult legal questions" which weighed in favor of granting a stay. App'x 215a. The opinion concluded that, "while each side is threatened with unquantifiable and irreparable injury in the event a stay is wrongly granted or denied, the Court concludes that the balance of hardship lies with the government." App'x 218a.

16

## JURISDICTION

The district court entered its order granting a stay pending appeal on March 27, 2023. App'x 198a. It released its accompanying opinion at 10 p.m. on March 31, and issued a corrected opinion on April 1. *See* D. Ct. Dkt. 45, 51, 53. Appellants timely filed their notice of appeal on April 1, 2023, immediately following the district court's opinion.

**1.** 28 U.S.C. § 1292(a)(1) provides federal courts of appeal with jurisdiction over appeals from "orders of the district courts . . . granting, continuing, modifying, refusing or dissolving injunctions." The Supreme Court has confirmed that Section 1292 permits appeals of interlocutory orders in bankruptcy cases. *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992). And this Court has recognized that, in the bankruptcy context, the "denial of [a] motion for a stay pending appeal is akin to the denial of a preliminary injunction." *Barretta v. Wells Fargo Bank, N.A.*, 693 F. App'x 26, 27 (2d Cir. 2017) (summary order).

Thus, the courts of appeals have held that interlocutory appellate jurisdiction over a stay order is appropriate on this basis. *See Matter of Forty-Eight Insulations, Inc.*, 115 F.3d 1294, 1300 (7th Cir. 1997) (holding that the denial of a stay of a bankruptcy court order was appealable under Section 1292(a)(1) because it "has . . . the effect of an injunction and has 'serious, perhaps irreparable, consequences.'") (indirectly quoting *Carson v.*

17

*American Brands, Inc.*, 450 U.S. 79, 83-84 (1981)); *In re A & F Enterprises, Inc. II*, 742 F.3d 763, 766 (7th Cir. 2014) ("An unusual twist here is that the stay issue comes to us in the context of a bankruptcy appeal to the district court. But our jurisdiction is secure under 28 U.S.C. § 1292(a)."); *In re Fremont Sheep Co.*, 110 F.3d 73 (Table), at *1 (10th Cir. 1997) ("Here, the stay, had it been granted, would have enjoined implementation of the reorganization plan pending appeal, conveying with it the threat of sanctions. Further, as the stay would have halted proceedings in a court other than the court from which it issued, it would have been an 'injunction' within the meaning of 28 U.S.C. § 1292(a)(1).").

This Court has suggested the same (though it ultimately did not decide the jurisdictional question): "[I]t could be argued that we have jurisdiction to review the district court's order, which is essentially a denial of an injunction as encompassed by 28 U.S.C. § 1292(a)(1)." *Barretta*, 693 F. App'x at 27. That is to say, orders "that have the practical effect of granting or denying injunctions and have serious, perhaps irreparable consequence" are appealable under Section 1292(a)(1). *Id.* (collecting authorities holding as much); *see also, e.g.*, *RSS WFCM2018-C44-NY LOD, LLC v. 1442 Lexington Operating DE LLC*, 59 F.4th 586, 593 n.5 (2d Cir. 2023) (applying the "'practical effect' of an injunction" test outside the bankruptcy context).

18

That standard is plainly met here: As discussed in depth below, the district court's stay order—if not promptly vacated—will have the "serious, perhaps irreparable, consequence" (*1442 Lexington*, 59 F.4th at 593 n.5) of risking the failure of the Binance.US acquisition, with a corresponding loss of $100 million to Voyager's creditors. *See* pages 45-46, *infra*. And because those irreparable harms will come to pass long before the district court's resolution of the merits can be appealed, "the [stay] order can be effectively challenged only by an immediate appeal." *Id.*; *see, e.g.*, *Matter of Forty-Eight Insulations*, 115 F.3d at 1300 (this standard was met by order denying stay of "an interim distribution that would seriously deplete the [bankruptcy] Trust pending the Claimants' appeal"). Section 1292(a)(1) thus provides a firm basis for this Court's jurisdiction over the district court's stay order.

**2.** This Court also has jurisdiction under 28 U.S.C. § 158(d)(1), which allows appeals from "final decisions" of the district courts in bankruptcy cases. But "[t]he standards for determining finality in bankruptcy differ from those applicable to ordinary civil litigation." *In re Sonnax Indus.*, 907 F.2d 1280, 1283 (2d Cir. 1990); *cf. Metro Transp. Co. v. North Star Reinsurance Co.*, 912 F.2d 672, 676 (3d Cir. 1990) (recognizing the "more pragmatic and less technical" application of the finality requirement in bankruptcy cases). Because "a bankruptcy proceeding is umbrella litigation often cover-

ing numerous actions that are related only by the debtor's status as a litigant," this Court has explained "that Congress intended to allow for immediate appeal in bankruptcy cases of orders that 'finally dispose of discrete disputes within the larger case.'" *Sonnax*, 907 F.2d at 1283; *accord Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 140 S. Ct. 582, 586 (2020) ("Orders in bankruptcy cases qualify as 'final' when they definitively dispose of discrete disputes within the overarching bankruptcy case.").

Just so here—the district court's order would, if left undisturbed, finally determine whether the Plan could immediately go into effect. This is *the* critical issue in the case at this juncture, and hundreds of millions of dollars of relief turns on its resolution. The "discrete dispute[]" over the issuance of the stay is therefore final for appellate purposes. *Cf. Ritzen Grp.*, 140 S. Ct. at 587-590 (denial of motion for relief from automatic stay was "a discrete 'proceeding'" within the bankruptcy, and therefore final for appellate purposes).[3]

---

[3] For similar reasons, if the issuance of the stay were not final under the bankruptcy-specific finality doctrine, it would constitute a collateral order and be appealable on that basis. *See generally, e.g.*, *Belya v. Kapral*, 45 F.4th 621, 629 (2d Cir. 2022) (collateral order doctrine permits appeal of non-final orders "that (1) are conclusive; (2) resolve important questions separate from the merits; and (3) are effectively unreviewable on appeal from the final judgment in the underlying action.").

20

**3.** Alternatively, while there should be no doubting jurisdiction whatsoever, the Committee additionally requests that the Court construe its request as a petition for a writ of mandamus. The Second Circuit has "often deemed it appropriate to treat an appeal dismissed for lack of jurisdiction as a petition for a writ of mandamus." *Caribbean Trading & Fid. Corp. v. Nigerian Nat'l Petroleum Corp.*, 948 F.2d 111, 115 (2d Cir. 1991); *accord Hong Mai Sa v. Doe*, 406 F.3d 155, 158 (2d Cir. 2005) ("Where appropriate, this Court may construe an appeal as a petition for mandamus."); *see also Zanghi v. Callegari*, 2023 WL 1097560 (2d Cir. 2023); *United States v. Doe*, 562 F. App'x 20, 21 (2d Cir. 2014) ("Alternatively, we may construe Doe's appeal as a petition for a writ of mandamus."); *United States v. Mikula*, 218 F. App'x 12, 13 (2d Cir. 2007) ("[W]e construe Mikula's appeal, in the alternative, as a petition for mandamus."); *In re Canter*, 229 F.3d 1150, 1153 (3d Cir. 2002) (granting in a bankruptcy matter "Appellants' request to treat their appeal as a petition for a writ of mandamus, over which [the court had] jurisdiction.").[4]

---

[4]  For largely the same reasons explained below, the Committee is entitled to relief under the mandamus standard. A petitioner for mandamus must satisfy three conditions: "(1) the petitioner must 'have no other adequate means to attain the relief [it] desires;' (2) the petitioner must satisfy 'the burden of showing that [its] right to issuance of the writ is clear and indisputable;' and (3) the issuing court 'must be satisfied that the writ is appropriate under the circumstances.'" *In re United States*, 945 F.3d 616, 623 (2d

21

One way or another, this Court's jurisdiction is secure.

## ARGUMENT

The stay issued by the district court—which has the effect of enjoining consummation of the Plan, precluding over one million creditors from accessing their needed assets, and threatening to destroy $100 million of value for Voyager's creditors by foreclosing the Binance.US deal if not immediately lifted—was an abuse of discretion, and must be urgently vacated.

Because the stay functions essentially as a preliminary injunction against implementation of the approved bankruptcy Plan, this Court reviews the district court's decision for abuse of discretion. *See, e.g.*, *Baretta v. Wells Fargo Bank, N.A.*, 693 Fed. App'x 26, 27 (2d Cir. 2017) (summary order) ("Because the district court's denial of Baretta's motion for stay pending appeal [from the bankruptcy court] is akin to the denial of a preliminary injunction, we review the denial for abuse of discretion."). Under that standard, "[a] district court abuses—or more precisely, exceeds—its discretion when its decision rests on an 'error of law' or a 'clearly erroneous factual finding,' or 'cannot be located within the range of permissible decisions.'"

---

Cir. 2019) (quoting *Cheney v. U.S. Dist. Court*, 542 U.S. 367, 380-81 (2004)). If the Court concludes it lacks jurisdiction, the Committee has no other avenue from relief from the district court's order. The Court can and must overturn the stay, as the district court legally erred in granting it. *See infra*, at 24-39. And the writ is appropriate to avoid irreparable harm to the debtors and their creditors. *See infra*, at 44-48.

*JTH Tax, LLC v. Agnant*, __ F.4th ___, 2023 WL 2467363, at *5 (2d Cir. 2023) (quoting *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 167 (2d Cir. 2001)) (reviewing denial of preliminary injunction).

The district court's decision both "rests on an error of law" and "cannot be located within the range of permissible decisions" given the equities at stake. *JTH Tax*, 2023 WL 2467363, at *5. As the movant in the district court, the government bore the burden of "demonstrat[ing] its entitlement to a stay pending appeal." *Tecnimed SRL v. Kidz-Med, Inc.*, 462 Fed. App'x 31, 35 (2d Cir. 2012). That required it to demonstrate that the familiar four-factor test for injunctive relief was satisfied: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *In re World Trade Center Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

"The burden of meeting the standard is a heavy one," and "more commonly stay requests will be found not to meet this standard and will be denied." 11 Charles A. & Arthur R. Miller, Fed. Prac. & Proc. Civ. 3d § 2904 (2022). The government's burden was especially heavy "where, as here, [it] [sought] to stay the Confirmation Order" imposed by the bankruptcy court

23

after a hearing. *In re LATAM Airlines Grp. S.A.*, 2022 WL 2811904, at *2 (Bankr. S.D.N.Y. 2022).

## I. The Government has no likelihood of success on the merits.

The Supreme Court has explained that a strong showing of likelihood of success on the merits is "critical" for the issuance of a stay. *Nken*, 556 U.S. at 434. Notably, the district court did not hold that the government actually is likely to succeed on its claims that the exculpation provision is unlawful—instead holding only that the government "has raised substantial questions" on the merits. App'x 211a. In reality, though, the government has not demonstrated even a plausible chance it will clear this hurdle—and "when," as here, "likelihood of success is 'totally lacking, the aggregate assessment of the factors bearing on issuance of a stay pending appeal cannot possibly support a stay." *Uniformed Fire Officers Ass'n v. De Blasio*, 973 F.3d 41, 49 (2d Cir. 2020).

### A. The bankruptcy court had authority to issue the Exculpation Provision.

**1.** The "central purpose of the bankruptcy code" is to allow debtors a "fresh start in life and a clear field unburdened by the existence of old debts." *In re Anderson*, 884 F.3d 382, 389 (2d Cir. 2018) (quoting *In re Bogdanovich*, 292 F.3d 104, 107 (2d Cir. 2002). To this end, the code provides several chapters under which debtors can discharge their obligations. *See*

24

11 U.S.C. §§ 727, 944, 1192, 1228, 1328. Here, Voyager filed bankruptcy under Chapter 11, by which a "debtor and creditors try to negotiate a plan that will govern the distribution of valuable assets from the debtor's estate and often keep the business operating as a going concern." *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 455 (2017); *see* 11 U.S.C. §§ 1121, 1123, 1129, 1141.

The principal goal in Chapter 11 proceedings is to reach a plan that can be approved by the bankruptcy court. *Czyzewski*, 580 U.S. at 455. This is a desirable outcome both for the debtor—a corporation that can continue to operate—and for the creditors, who must "all . . . accept the plan or . . . receive not less than they would receive under a Chapter 7 liquidation." *Toibb v. Radloff*, 501 U.S. 157, 164 (1991) (citing 11 U.S.C. § 1129(a)(7)). Because conversion to a Chapter 7 liquidation is the result when the parties "confess[] an inability to find a plan," *Czyzewski*, 580 U.S. at 456, and because "creditors cannot be expected to approve a plan in which they would receive less than they would from an immediate liquidation of the debtor's assets," *Toibb*, 501 U.S. at 164, the creditors are almost always better off under a court-approved Chapter 11 plan. Chapter 11 plans must also meet a variety of other statutory requirements, including being "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129.

Once the bankruptcy court adopts and imposes a Chapter 11 plan, the bankruptcy code provides that "the debtor and any entity organized or to be organized for the purpose of carrying out the plan *shall* carry out the plan and *shall* comply with any orders of the court" "[n]otwithstanding any otherwise applicable nonbankruptcy law, rule or regulation relating to financial condition." 11 U.S.C. § 1142(a) (emphasis added). The same statute permits the bankruptcy court to "direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act . . . necessary for the consummation of the plan." *Id.* § 1142(b).

That is what the bankruptcy court did here, approving a Plan that authorized the Debtors to "rebalance their Cryptocurrency portfolio to ensure that the Debtors can effectuate *pro rata* in-kind distributions" of the same types of crypto that the creditors held on the Voyager platform. Plan 32; *accord* App'x 163a ("[C]onfirmation of the plan will require the Debtors and their respective personnel and representatives . . . to complete the rebalancing transactions that the Plan contemplates and to make the distributions of cryptocurrencies that the Plan contemplates.").

On the petition date, Voyager did not have enough crypto to satisfy its creditors and did not have the right types of crypto to satisfy its creditors.

26

For example, on the petition date, Voyager had a shortage of Bitcoin and USDC (a stablecoin tied to the price of the U.S. dollar) but a surplus of other less popular crypto, often referred to as "altcoins." This imbalance was largely due to the fact that the key loans that went badly for Voyager were denominated in Bitcoin and USDC.

**2.** To ensure that plans adopted to advance the common interests of debtors and creditors alike can be effectuated, the bankruptcy code grants the bankruptcy court authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105. Similarly, another provision allows bankruptcy courts to authorize plans which "include any other appropriate provision not inconsistent with the applicable provisions of this title." 11 U.S.C. § 1123(b)(6). Under these statutory provisions, "[i]t is well settled that bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process." *In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994).

Exculpation provisions like the provision at issue here are clear and well-recognized applications of these statutes. An exculpation provision "is a protection not only of court-supervised fiduciaries, but also of court-supervised and court-approved transactions." *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 721 (Bankr. S.D.N.Y. 2019). Because Section 1142

27

obligates parties to carry out the bankruptcy court's orders, allowing liability flowing from performance of that duty would permit others to "undermine or second-guess th[e] Court's determinations." *Id.* What is more, the parties themselves would be placed in an untenable position of having to constantly double check the bankruptcy court's work and to weigh their own legal and factual judgments regarding the legality of certain conduct against those of the court, chilling them in the exercise of their appointed duties. And if carrying out a bankruptcy court's orders to facilitate a plan can expose an individual to civil or criminal liability, "it will be extremely difficult to find members to serve" in that capacity. 7 *Collier on Bankruptcy* ¶ 1103.05 [4] (16th ed. 2023); *cf. Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019) (bankruptcy courts are empowered to enforce their orders through civil contempt).

To avoid these negative outcomes, "[i]n the absence of gross negligence or intentional wrongdoing, parties should not be liable for doing things that the Court authorized them to do and that the Court decided were reasonable things to do." *Collier on Bankruptcy*, *supra*, ¶ 1103.05 [4]. Courts within this Circuit have thus routinely approved Chapter 11 plans containing exculpation provisions like the one at issue here. *See, e.g.*, *In re Enron Corp.*, 326 B.R. 497, 504 (S.D.N.Y. 2005) (noting that such provisions are "reasonable and customary and in the best interests of the estates"); *In re Oneida Ltd.*,

28

351 B.R. 79, 94 n.22 (S.D.N.Y. 2006) (noting that an exculpation provision was "standard in this district"); *In re Granite Broad. Corp.*, 369 B.R. 120, 139 (S.D.N.Y. 2007) (approving an exculpation provision that "generally follows the text that has become standard in this district").

Or, as the Seventh Circuit put it, the bankruptcy court's "residual authority" under Sections 105(a) and 1123(b)(6) enabled it to limit the liability *to a government agency* of a third party whose financing was necessary to the reorganization, where "the limitation [on liability] applies only to claims arising out of or in connection with the reorganization itself and does not include willful misconduct." *In re Airadigm Commcn's, Inc.* 519 F.3d 640, 657-658 (7th Cir. 2008); *see also id.* ("Given how narrow the limitation is and how essential [the released party] was for the reorganization, the release is 'appropriate' and thus within the bankruptcy court's powers.").

Just so here: Individuals and entities performing court-authorized and court-ordered transactions are released from liability *only* with respect to those transactions and *only* to the extent there is no fraud, willful misconduct, or gross negligence. And just as in *Airadigm*, the government here *retains* the power to intervene to prevent future transactions it deems to be unlawful—it just cannot stand mute now, and prosecute later for conduct to which it has not objected during the bankruptcy. 519 F.3d at 657-658 (noting that "other provisions  of the plan . . . expressly preserve[] the FCC's

29

regulatory power with respect to the licenses," preventing parties from "skirting the FCC's regulations").

**3.** These widely accepted, forward-looking exculpation provisions are consistent with—and may be viewed as an application of—another body of law holding that individuals or entities acting as agents of the bankruptcy court, such as bankruptcy trustees, "are generally immune to the extent that they are acting with the approval of the court." *Gross v. Rell*, 965 F.3d 211, 216 (2d Cir. 2012) (collecting cases); *see also* App'x 160a (confirmation order) (noting that exculpation provisions are "based on" this quasi-judicial immunity); *Aegean*, 599 B.R. at 720 (same).

That is, court agents like bankruptcy trustees "are entitled to broad immunity from suit when acting within the scope of their authority and pursuant to court order." *Id.* (quoting *Bennett v. Williams*, 892 F.2d 822, 823 (9th Cir. 1989)); *Boullion v. McClanahan*, 639 F.2d 213, 214 (5th Cir. 1981) ("[A]n arm of the Court [who] sought and obtained court approval of his actions . . . is entitled to derived immunity"). And "[i]t is well settled that" this protection extends to "estate fiduciaries like a committee, its members, and estate professionals"—and even to non-fiduciaries to the extent necessary based on the specific facts of a plan—in addition to bankruptcy trustees. *In re LATAM Airlines Grp. S.A.*, 2022 WL 2206829, at *50 (Bankr. S.D.N.Y. 2022) (collecting cases).

30

In short, the "basis" in the bankruptcy code and decisional law for exculpation provisions like this one is clear (*contra* App'x 211a (asserting that no such basis exists)): The court is empowered to "issue any order, process, or judgment that is necessary or appropriate" for carrying out a restructuring plan. 11 U.S.C. § 105. And, when the plan requires individuals and entities to carry out transactions, it is "necessary" that those "parties should not be liable for doing things that the Court authorized them to do and that the Court decided were reasonable things to do"—because otherwise no one would participate in restructuring proceedings like these, to the ultimate detriment of the debtor and its creditors. *Aegean*, 599 B.R. at 721 Such provisions simply implement well-accepted doctrines of derived, quasi-judicial immunity. Accordingly, there is ample authority for the action taken by the bankruptcy court here.

### B. The district court's specific objections are also wrong.

**1.** The district court appears to have distinguished the exculpation provision here from the litany of similar provisions courts routinely approve on the basis that *this* provision does not contain any special treatment of the government's claims. But that is no basis for finding the provision unlawful.

It is worth pausing to recall what the bankruptcy court actually approved here. The exculpation provision is not a broad license to ignore state

or federal laws. To the contrary, the bankruptcy court explained that where "different regulatory requirements and licenses in . . . different states" prevent the Debtors and Binance.US from "mak[ing] in kind distributions to customers as soon as they become customers of Binance.US," the "plan itself does not have the power to sweep away the different regulations that apply in different states." App'x 171a. The clause does not exculpate any criminal wrongdoing that might have led to Voyager's collapse. And it does not apply to conduct that constitutes actual fraud, willful misconduct, or gross negligence.

Of course, the exculpation provision does none of those things—because it cannot. The bankruptcy court can confirm only a plan that is "proposed in good faith and *not by any means forbidden by law*." 11 U.S.C. § 1129(a)(3) (emphasis added). After a four-day confirmation hearing, the court here determined that this condition was satisfied. In particular, the court noted that "[t]he SEC and all other government agencies have had a full and fair opportunity to object if they believe the rebalancing transactions that I have previously approved and that are contemplated by the plan are illegal in any way, or if they believe that the distributions of cryptocurrencies and cash that are contemplated by the plan are violative in any way of any applicable statute, rule, or regulation." App'x 141a. "The plain fact is, however, that" these agencies have "not actually made any objection." *Id.*

32

That fact remains as true now as it was when the bankruptcy court first wrote it. That is, the only basis for the government's objection appears to be a desire to be able to prosecute individuals for court-ordered activities that the government has *never claimed are illegal*.

This approach is inconsistent with the structure of the Plan and the bankruptcy code. The court can approve a plan only if it is not illegal. 11 U.S.C. § 1129(a)(3). There are at least three ways for the government to ensure compliance with this criterion. First, it can object prior to confirmation; it did not do so here. Second, it can appeal the confirmation by identifying some provision of law that the plan would violate; it has not done so here. Finally, the plan *itself* leaves open the possibility that "the Government can step in any time if (due to changing or evolving regulatory views) the Government thinks the rebalancing transactions or cryptocurrency distributions should be stopped." App'x 192a. The government has bountiful options to compel whatever it believes the law to require.

Discontent with these options, the government's contrary approach is nothing short of terrifying—it brandishes the threat of unidentified criminal sanctions *tethered to the performance of court-ordered actions*, even though it is unwilling or unable to articulate what conduct it believes objectionable so that the bankruptcy court and those it orders can conduct them-

33

selves accordingly. Unsurprisingly, courts have not adopted the government's approach—they routinely approve exculpation provisions that contain no special carve-out for claims by the government.[5] The government's only explanation for the myriad cases where bankruptcy courts have approved provisions with the exact feature the government now claims is a vast intrusion on its prerogative is that it never before bothered to object. This response defies credulity; the government was on notice and participated in each of these cases.

---

[5] *See, e.g.*, Order Confirming Chapter 11 Plan of Reorganization, Ex. A, Plan, Art. VIII.F, *In re Lakeland Tours, LLC*, No. 20-11647 (JLG) (Bankr. S.D.N.Y. Sept. 15, 2020) [Docket No. 191-1]; Order Confirming Chapter 11 Plan, Ex. A, Plan, Art. VIII.F, *In re Barneys New York, Inc.*, No. 19-36300 (CGM) (Bankr. S.D.N.Y. Feb. 5, 2020) [Docket No.789-1]; Order Confirming Chapter 11 Plan of Reorganization, Ex. A, Plan § 8.4, *In re Deluxe Entertainment Services Group Inc.*, No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 25, 2019) [Docket No. 96]; Order Confirming Chapter 11 Plan, Ex. 1, Plan, Art. VIII.E, I*n re Hollander Sleep Products, LLC*, No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sep. 5, 2019) [Docket No. 356]; Order Confirming Chapter 11 Plan of Reorganization, Ex. A, Plan, Art. IX.D, *In re Fullbeauty Brands Holdings Corp.*, No. 19-22185 (RDD) (Bankr. S.D.N.Y. Feb. 5, 2019) [Docket No. 39]; Order Confirming Chapter 11 Plan of Reorganization, Ex. 1, Plan, Art. VIII.E, *In re Cenveo, Inc.*, No. 18-22178 (RDD) (Bankr. S.D.N.Y. Aug. 21, 2018) [Docket No. 685]; Order Confirming Chapter 11 Plan of Reorganization, Ex. 1, Plan, Art. IX.D, *In re Sbarro LLC*, No. 14-10557 (MG) (Bank. S.D.N.Y. May 19, 2014) [Docket No. 238]; Order Confirming Plan of Liquidation, Ex. A, Plan, Art. IX.F, *In re United Retail Group*, Inc. No 12-10405 (SMB) (Bank. S.D.N.Y. Sept. 18, 2012) [Docket No. 776]; Order Confirming Chapter 11 Plan of Reorganization, Ex. 1, Plan, Art. X.G, *In re FGIC Corp.*, No. 10-14215 (SMB) (Bankr. S.D.N.Y. Apr. 23, 2012) [Docket No. 314].

The government's refusal to take a firm position on which of the crypto transactions required by the Plan are illegal is consistent with how the government has been regulating crypto since its rise in popularity. For over a decade, the government has largely refused to make clear what conduct it believes is unlawful, favoring enforcement actions over legislation, tailored regulations, or clear policy guidance. The government is continuously auditioning new theories of criminality or regulatory violations concerning crypto activities—activities that have been occurring for years without incident. The government's inability to inform the public which crypto activities are illegal has raised the stakes of this exculpation provision. Here, the SEC, the Department of Justice, and a series of state regulators have voiced "concerns" or issued non-binding "staff statements" without ever revealing (or deciding) whether the actions ordered by the bankruptcy court would violate the law. Professionals charged with executing the crypto transactions required under the Plan understandably want—and deserve—exculpation. That is precisely why Judge Wiles issued the exculpation provision.

**2.** The district court also reasoned that "a bankruptcy court has limited, if any, jurisdiction over criminal cases" (App'x 212a)—but that is beside the point. The cases cited by the government, and on which the district court indirectly relied, *id.*, simply provide that bankruptcy courts "lack[] subject matter jurisdiction to enforce state or federal criminal laws." Gov't D. Ct.

35

Br. 23 (quoting *In re Grabis*, 2020 WL 7346467, at \*12 n.71 (Bankr. S.D.N.Y. 2020)). That a bankruptcy court is not a valid forum for enforcing the criminal law and meting out criminal penalties says nothing about whether its equitable powers extend to exculpating those it orders to take action (essentially, the agents of the court) from liability for those very actions.[6]

**3.** Despite granting the stay, the district court acknowledged that it is "likely that some species of quasi-judicial immunity applies to at least some parties executing the rebalancing transactions." App'x 213a. The court nevertheless found the exculpation provision objectionable, on the basis that it "appears to go further than the quasi-judicial immunity doctrine allows." App'x 214a.

But the bases on which the district court distinguished the exculpation provision from quasi-judicial immunity do not withstand review. The court first reasoned that "[j]udicial immunity often does not, for example, bar injunctive relief," while the exculpation provision here "limits claims for

---

[6] The district court also quoted case law for the proposition that "confirmation of a plan does not insulate debtors from prosecution for criminal activity, even if that activity is part of the plan itself" (App'x 213a (quoting *Garvin v. Cook Invs. NW, SPNWY, LLC*, 922 F.3d 1031, 1036 (9th Cir. 2019))—but that is similarly beside the point: We do not argue that confirmation of a plan, without more, precludes prosecution; our point is that an exculpation provision can, and no exculpation provision was involved in the case cited by the district court.

36

'fines, penalties, damages, or other liabilities.'" App'x 214a. Those two propositions, however, are entirely consistent: No item in the list of "fines, penalties, damages, or other liabilities" encompasses injunctive relief—and indeed, the plan *expressly contemplates* that the government may seek injunctive relief to stop a transaction before it takes place: "Nothing in this provision *shall limit in any way* the powers of any Governmental Unit to contend that any rebalancing transaction should be stopped or prevented, or that any other action contemplated by the Plan should be enjoined or prevented from proceeding further." App'x 7a-8a (emphasis added); *see also* App'x 195a ("I could not have said any more clearly that the Government is free at any time to take action to stop the Debtors' cryptocurrency trades and/or cryptocurrency distributions if the Government decides that those activities should be stopped.").[7]

Finally, the district court observed that judicial immunity "must be raised as an affirmative defense," and that "[u]sing generic equity principles

---

[7]   The district court also acknowledged that courts have applied judicial immunity even to criminal liability where acts were taken in good faith, but suggested that the exculpation provision goes further because "a criminal act that was not done in good faith also might fall short of willful misconduct or gross negligence," and thus still be within the scope of the exculpation provision. App'x 214a-215a. It is difficult to understand how an act could be "not done in good faith" but also "fall short of willful misconduct." *See Good Faith*, Black's Law Dictionary (11th ed. 2019) ("A state of mind consisting in . . . absence of intent to defraud or seek unconscionable advantage").

to enjoin a future criminal prosecution" is generally not permitted. App'x 215a. But again, these observations do not actually support the court's stay, because the exculpation provision *does not enjoin anything*. Its text does not operate on the government, prohibiting it from taking action (for example, by instituting a prosecution). *Cf. Nken*, 556 U.S. at 428 ("[A]n injunction is a judicial process or mandate operating *in personam* . . . . [T]he order is directed at someone, and governs that party's conduct."). Instead, the exculpation provision simply provides that "[t]he Exculpated Parties *shall have no liability for*" claims "based on their execution and completion of the rebalancing transactions." Bankr. Dkt. 1166 at 8 (emphasis added). That language does not enjoin; it extinguishes liability, and it is perfectly natural that it could be raised as a defense to a prosecution.

In sum, the district court's flawed merits reasoning cannot justify the stay imposed here.

## II. The equitable factors overwhelmingly cut against a stay.

The district court also abused its discretion because its evaluation of the equities "cannot be located within the range of permissible decisions." *JTH Tax*, 2023 WL 2467363, at \*5. In sum, the government's admittedly hypothetical harm from the exculpation provision taking effect cannot possibly outweigh the concrete harms that the stay imposes on Voyager's creditors—thousands of retail investors whose savings are drained every day

38

the Plan is not consummated, and who stand to lose $100 million if the stay is not lifted by April 15.

**A.    The government has not shown that is *likely* to suffer *actual and imminent* irreparable injury.**

To establish irreparable harm, the moving party must demonstrate "an injury that is not remote or speculative but actual and imminent." *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d. 2011); *see also In re Sabine Oil & Gas Corp.*, 548 B.R. 674, 681 (S.D.N.Y. 2016). In other words, the government must show that it is facing "some *actual*, viable, *presently-existing* threat of serious harm." *City of New York v. Anglebrook Ltd. Partnership*, 891 F. Supp. 908, 925 (S.D.N.Y. 1995) (emphases added). The government has not done so here.

*First*, the government has conceded that the purported harm relied on by the district court—harm to the "enforcement of the democratically enacted laws of the United States" (App'x 216a)—is hypothetical. In its brief before the district court, the Government asserted that "[d]etermining whether [the exculpation] exception will apply to a *hypothetical future claim is impossible at this time*." D. Ct. Dkt. 4, at 29 (emphasis added). And as the bankruptcy court observed, "during argument today the Government stated that it would not likely seek to impose penalties upon people for things they had already done in reliance on my order, and that any suggestion to the contrary *was merely hypothetical*." App'x 195a (emphasis added). As the

39

court put it, "[i]f that is so, then the Government's entire argument . . . is merely hypothetical, because the Government cannot identify anything that it actually would want to do, or should be allowed to do," that the exculpation provision would prevent it from doing. *Id.*

It is fundamental that such hypothetical harms are insufficient to justify injunctive or stay relief under the traditional equitable balancing factors: "Those claiming a 'risk of future harm' may seek 'forward-looking, injunctive relief to prevent the harm from occurring' but *only* if 'the risk of harm is sufficiently imminent and substantial," rather than "conjectural or hypothetical." *Silva v. Farrish*, 47 F.4th 78, 86 (2d Cir. 2022) (emphasis added) (quoting *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 (2021), and *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)); *see also, e.g.*, *JTH Tax*, 2023 WL 2467363, at *10 ("To satisfy their burden to show irreparable harm, '[p]laintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is *neither remote nor speculative*.'") (emphasis added) (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)); *Clonus Associates v. DreamWorks, LLC*, 417 F. Supp. 2d 248, 254 (S.D.N.Y. 2005) ("Courts in this Circuit have frequently rejected such speculative arguments in deciding whether to issue a preliminary injunction.") (collecting cases).

40

The government has admittedly chosen to rely on conjecture despite the uniform admonishment in case authority that a party seeking injunctive relief may not raise a potential harm that is "remote or speculative." Because such hypothetical harms are insufficient to support an injunction as a matter of law, the district court exceeded its discretion in relying on them here.

*Second*, even setting aside that its purported harms are admittedly hypothetical, the government's assertions of harm are also baseless on their merits.

The bankruptcy court was clear that its approval of the exculpation provision does not preclude liability for misconduct that is merely *in connection with* the transactions required by the Plan; it exculpates parties from liability for *carrying out* those transactions, full stop:

> The third and fourth paragraphs of the exculpation provisions that I approved are specifically limited to the fact that the parties must buy and sell cryptocurrencies as part of the portfolio rebalancing that the plan requires, and must distribute cryptocurrencies to customers. The point is to protect the parties from belated allegations that *those very activities* are somehow violative of law and that parties should be penalized just for doing *what I have ordered them to do*.

App'x 187a (emphasis added); *see also id.* ("Although the plan and the Confirmation Order require the parties to sell cryptocurrencies, they certainly do not require (or permit) anyone to commit fraud in the course of doing so,

41

or to engage in theft in the course of doing so. (Govt. Mem. at 27-28.) Similarly, there is nothing in the Plan that requires or permits the Debtors to evade their tax obligations, and there is nothing in my Order that reasonably could be construed to mean that the Debtors do not have to pay taxes. (Govt. Mem. at 26-7.) Nor is there anything in the Plan that requires or permits the parties to violate environmental laws, or that could be reasonably construed as having done so.").

Similarly, the bankruptcy court explained:

I could not have said any more clearly that the Government is free at any time to take action to stop the Debtors' cryptocurrency trades and/or cryptocurrency distributions if the Government decides that those activities should be stopped. My Order just says that in the meantime the people and entities who do what my order requires will not themselves be liable for having done so. I fail to see how that possibly threatens the public health, safety or welfare, or how it ties the Government's hands in any way.

App'x 195a.

Those interpretations of the exculpation language, by the bankruptcy court itself, are entitled to significant deference in determining the meaning of that language. *See, e.g.*, *United States v. Spallone*, 399 F.3d 415, 423 (2d Cir. 2005) (collecting cases) ("When an issuing judge interprets his own orders, we accord substantial deference to the draftsman, and we will not reverse the judge's construction of an ambiguity in his own words except for abuse of discretion.").

42

Thus, all the exculpation provision does is prevent the government from imposing *ex post* liability on the transactions *mandated* by the bankruptcy court-ordered restructuring Plan—and even with respect to those transactions, "the Government is free at any time to take action to stop [them]" before the occur. App'x 195a. Contrary to the district court's assumption, therefore, there simply is no meaningful harm to the "enforcement of the democratically enacted laws of the United States." App'x 216a.

*Finally*, the district court was wrong as a matter of law to rely on the risk of equitable mootness as an independent harm that could justify the stay. App'x 217a. It is certainly true that equitable mootness can prevent appellate review of a consummated bankruptcy—but it is well settled in this Circuit that the risk of mootness is not *itself* irreparable harm justifying a stay absent actual, real-world harm.[8] Equitable mootness therefore forms no independent basis for the grant of the stay, in the absence of actual and

---

[8]  *See In re Windstream Holdings, Inc.*, 2020 WL 4481933, at *3 (S.D.N.Y. 2020) (finding that a risk of mootness, standing alone, does not constitute irreparable harm); *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 347 (S.D.N.Y. 2007) ("A majority of courts have held that a risk of mootness, standing alone, does not constitute irreparable harm.")*; Sabine*, 548 B.R. at 682 (noting "a risk of mootness, standing alone, does not constitute irreparable harm"); *In re Calpine Corp.*, 2008 WL 207841, at *4 (S.D.N.Y. 2008) ("[M]erely invoking equitable mootness . . . —a risk that is present in any post-confirmation appeal of a chapter 11 plan—is not sufficient to demonstrate irreparable harm."); *DJK Residential, LLC*, 2008 WL 650389, at *3 (S.D.N.Y. 2008) ("[T]here is no reason why the majority view that the risk of mootness does not constitute irreparable harm should not apply.

43

imminent harm to the government from the Plan being executed. And as discussed above, no such harm exists. The district court's contrary analysis was an abuse of its discretion.

## B. The debtors and creditors will face "significant and immediate" injuries if the stay is not lifted.

By contrast, as the bankruptcy court held, the harm that a stay would pose to Voyager and creditors is "quite significant and immediate." App'x 196a. This actual and immediate harm far outweighs the hypothetical and remote arguments articulated by the government, and the district court's contrary conclusion exceeds its discretion.

**1.** The district court's decision was premised on the conclusion that "each side is threatened with unquantifiable and irreparable injury in the event a stay is wrongly granted or denied." App'x 218a. But that is simply not true: Not only is the government not threatened with non-hypothetical injury (*see* pages 40-43, *supra*), but the harm to Voyager, and ultimately to its creditors, from the stay is certainly "[]quantifiable"—and massive.

The district court appears to have completely disregarded the fact that its stay—unless it is lifted on or before April 13—permits Binance.US to unilaterally pull out of its acquisition of Voyager, resulting in a *$100 million* loss to the bankruptcy estate. *See* pages 7-8, *supra*. The First Amended APA submitted to the bankruptcy court provides Binance the ability to void the

44

transaction if it does not close by April 18—and closing requires certain actions to be taken three business days in advance of closing (*i.e.*, on April 13). Bankr. Dkt. 835, §§ 2.3, 8.1(c); *id.* at ECF page 5, ¶ 2. And as the bankruptcy court explicitly found, "the uncontroverted evidence before me at the confirmation hearing is that a loss of the Binance.US transaction would lead to *a reduction of approximately $100 million in the assets available for distribution to creditors*." App'x 196a (emphasis added).

The district court did not evaluate or overturn this explicit finding of a $100 million harm—indeed, it appears to have disregarded it entirely. *See generally* App'x 216a-218a (evaluating harms to parties, and not mentioning the $100 million failure of the Binance transaction). That obvious failing, alone, is sufficient to render the district court's analysis outside "the range of permissible decisions" (*JTH Tax*, 2023 WL 2467363, at *5), requiring vacatur.

Unsurprisingly, courts frequently reject stays when they would threaten the consummation of a reorganization plan. *See, e.g.*, *Sabine*, 548 B.R. at 683 ("[P]lacing plan settlements in jeopardy" is a significant injury that militates toward denying a stay.); *In re Public Service Co. of New Hampshire*, 116 B.R. 347, 350 (D.N.H. 1990) ("Other courts have found the possible failure of any plan of reorganization as a consequence of a stay a

***significant injury*** to appellees.") (emphasis added); *In re Financial Oversight and Management Board for Puerto Rico*, 588 F. Supp. 3d 191, 207-08 (D.P.R. 2022).

**2.**  In addition to the massive harm from the failure of the Binance.US transaction, the district court's stay forces Voyager to continue incurring vast administrative expenses, thus rapidly depleting monies that should go to the creditors under the court-approved Plan. Indeed, even the district court acknowledged that its stay requires them to continue "burn[ing] more than $10 million per month" in such expenses. App'x 216a.

Such continued expenses are well recognized as harms relevant to the stay analysis. *See Sabine*, 548 B.R. at 683 (recognizing that the "incurrence of administrative and professional expenses" is one of the "numerous harms resulting from the postponement of reorganization proceedings"); *In re Dakota Rail, Inc.*, 111 B.R. 818, 822 (D. Minn. 1990) (holding that appellees would be injured because the "cash reserve would be further depleted by ongoing administrative expenses"); *In re Frantz*, 534 B.R. 378, 390 (Bankr. D. Idaho 2015) ("Imposing a stay will result in potential harm and prejudice to the creditors of the estate" because, in part, a "stayed sale will also expose the estate to additional costs to secure and maintain the Property for the duration of the appeal."); *In re TWA*, 2001 Bankr. LEXIS 723, at *30 (Bankr. D. Del. 2001) (noting the grave harm to the debtor from a potential stay due

46

to the "cash burn of $3 million per day"); *In re AMR Corp.*, 2021 WL 5016606, at *4 (Bankr. S.D.N.Y. 2021).

**3.** Finally, any further delay to the creditors receiving their payments under the Plan is itself a significant harm that should strongly weigh the equities against the government. The bankruptcy court correctly referred to any further delay in disbursements to the creditors as "a massive issue" and noted that many of the creditors are individuals who "invested significant portions" of their "life savings or retirement savings in cryptocurrencies held by the Debtors." App'x 196a. The district court's stay, thus "completely disregard[] well settled precedent that the delay caused to creditors receiving their payments is also a *significant harm* in warranting denial of a stay." *In re Fairmont Communications Corp.*, 1993 WL 428710, at *4 (Bankr. S.D.N.Y. 1993) (emphasis added); *accord, e.g.*, *In re Public Service Co. of New Hampshire*, 116 B.R. 347, 350 (Bankr. D.N.H. 1990) ("It has also been stated that the delay caused to creditors receiving their payments is also a *significant harm* warranting denial of a stay.") (emphasis added); *In re Charter Co.*, 72 B.R. 70, 72 (M.D. Fla. 1987) ("The Dioxin Claimants will also suffer *substantial harm* as a result of a stay because of the resulting delay in their receipt of settlement funds under the Settlement Agreement.") (emphasis added).

47

## C.   The public interest strongly weighs in favor of effectuating the Plan.

Finally, the public interest also cuts against the stay issued here. As noted above, the primary factor cited by the district court—the supposed risk to the government's ability to enforce the laws—is specious. To the contrary, the public interest would be served by denying a stay and distributing cryptocurrencies owed to Voyager's creditors for two primary reasons: (1) public interest favors the expedient administration of bankruptcy proceedings, and (2) settlements of long-standing matters are favored in complex bankruptcy proceedings.[9]

Bankruptcy and district courts throughout this Circuit "recognize that the public interest disfavors stays because the public interest favors the expedient administration of the bankruptcy proceedings." *In re LATAM Airlines Group S.A.*, 2022 WL 2657345, at *11 (Bankr. S.D.N.Y. 2022) (citations and internal quotation marks omitted).[10] This bankruptcy has "had the effect of delaying customers' access to their investments since July 2022" and

---

[9]   Public policy further weighs against a stay because an overwhelming majority of voting creditors (97%) approved the Plan. *See Fairmont Communications*, 1993 WL 428710, at *5 (holding that "public interest will not be served if a stay is issued" where, inter alia, "the Plan was overwhelmingly accepted by creditors").

[10]   *See also Adelphia Commc'ns*, 361 B.R. at 349 ("The 'public interest favors the expedient administration of the bankruptcy proceedings.'"); *In re BGI,*

48

a "stay would adversely affect many thousands of customers." App'x 196a-197a. The public interest would clearly be served by consummating the Plan and allowing these thousands of creditors to receive "significant portions" of their "life savings or retirement savings." App'x 196a. The government does not address this argument and case authority or provide any concrete reason why the standard rule of expediency should not apply. Instead, the government seeks an indefinite stay that would continue to obstruct thousands of United States citizens from receiving significant portions of their retirement savings during uncertain economic times. That cannot be in the public interest.

Moreover, the public interest in settlements and finality weighs against granting a stay. The bankruptcy cases have been proceeding for almost a year and Voyager, its creditors, and the bankruptcy court all wish to enact the Plan, which has been carefully crafted over the span of months (indeed, with ample input from federal and state agencies). The government should not be permitted to further delay implementation of the Plan with its baseless hypothetical concerns. *See In re W.R. Grace & Co.*, 475 B.R. 34, 208 (D. Del. 2012) ("In the bankruptcy context, there is a general public policy weighing in favor of affording finality to bankruptcy judgments."); *In*

_____

*Inc.*, 504 B.R. 754, 764 (S.D.N.Y. 2014) (same); *In re Savage & Associates, P.C.*, 2005 WL 488643, at *2 (S.D.N.Y. 2005) ("Finally, the public interest favors the expedient administration of the bankruptcy proceedings.").

*re Chemtura Corp.*, 439 B.R. 561, 595 (S.D.N.Y. 2010) ("As a general matter, settlements or compromises are favored in bankruptcy and, in fact, encouraged.") (citing *Matter of New York, N.H. & H.R. Co.*, 632 F.2d 955, 959-60 (2d. Cir. 1980)); *In re Martin*, 91 F.3d 389, 393 (3d. Cir. 1996).

\* \* \*

In sum, the district court's stay cannot be upheld: The district court completely disregarded the massive, $100 million harm that will befall the creditors unless the stay is promptly lifted; the court failed to account for the substantial equities favoring returning personal investments to the more than a million individual creditors; allowing the Plan cannot in any appreciable way injure the government's sovereign interests; and the court's analysis of the merits is flatly wrong. The Court should vacate the stay to avoid this catastrophic result for Voyager's creditors.

## CONCLUSION

The Court should vacate the stay entered by the district court.

50

Dated: April 3, 2023                    Respectfully submitted,


                                        /s/ Paul W. Hughes

DARREN AZMAN                            PAUL W. HUGHES
JOSEPH B. EVANS                         ANDREW A. LYONS-BERG
    McDermott Will & Emery LLP          CHARLES SEIDELL
    One Vanderbilt Avenue                   McDermott Will & Emery LLP
    New York, NY 10017-3852                 500 North Capitol Street NW
    (212) 574-5400                          Washington, DC 20001
                                            (202) 756-8000

                                        Counsel for the Official Committee
                                        of Unsecured Creditors

51

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the under-signed counsel for Appellant certifies that this motion:

(i)     complies with Rule 27(d)(2), on the assumption the Court grants Appellant's motion for an expansion of the word limit, because it contains 11,976 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii)     complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2016 and is set in New Century Schoolbook font in a size equivalent to 14 points or larger.


Dated: April 3, 2023                          */s/ Paul W. Hughes*

## CERTIFICATE OF SERVICE

I hereby certify that that on April 3, 2023, I filed the foregoing brief via the Court's CM/ECF system, which effected service on all registered parties to this case.

Dated: April 3, 2023                    /s/ *Paul W. Hughes*