# 23-467(L)
## 23-469(M)

### United States Court of Appeals for the Second Circuit

IN RE VOYAGER DIGITAL HOLDINGS, INC., ET AL.

————————

VOYAGER DIGITAL HOLDINGS, INC.,

*Debtor-Appellant,*

OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF
VOYAGER DIGITAL HOLDINGS, INC.,

*Intervenor-Appellant*

v.

UNITED STATES OF AMERICA,

*Appellee,*

UNITED STATES TRUSTEE FOR REGION 2

*Appellee*

———————————————————

United States District Court for the Southern District of New York,
No. 23 Civ. 2171 (Hon. Jennifer Rearden)

———————————————————

### APPENDIX
### (A-1 - A-223)

———————————————————

Christine A. Okike, P.C.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, N.Y. 10022
(212) 446-4900
christine.okike@kirkland.com

George W. Hicks, Jr., P.C.
KIRKLAND & ELLIS LLP
1301 Penn. Ave., N.W.,
Washington, D.C. 20004
(202) 389-5000
george.hicks@kirkland.com

April 3, 2023

# TABLE OF CONTENTS

**Page**

Bankruptcy Court Plan Confirmation Order (March 10, 2023) .......... A-1

Bankruptcy Court Plan Confirmation Opinion (March 11, 2023) ... A-130

Bankruptcy Court Stay Opinion (March 15, 2023) .......................... A-180

District Court Stay Order (March 27, 2023) .................................... A-198

District Court Stay Opinion (April 1, 2023) ................................... A-199

Unsecured Creditors' Committee Notice of Appeal (April 1, 2023) . A-219

Debtors' Amended Notice of Appeal (April 3, 2023) ........................ A-221

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**CORRECTED AND AMENDED ORDER (I) APPROVING THE SECOND AMENDED DISCLOSURE STATEMENT AND (II) CONFIRMING THE THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Voyager Digital Holdings, Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors")[2] having:

a.   commenced, on July 5, 2022 (the "Petition Date"), these chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions for relief in the United States Bankruptcy Court for the Southern District of New York (the "Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code");

b.   continued to operate their business and manage their property during these Chapter 11 Cases as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

c.   filed,[3] on July 21, 2022, the *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 126];

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital, Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan, the Disclosure Statement, the Asset Purchase Agreement, or the Bankruptcy Code (each as defined herein), as applicable.  The rules of interpretation set forth in Article I.B. of the Plan apply.

[3]   Unless otherwise indicated, use of the term "filed" herein refers also to the service of the applicable document filed on the docket in these Chapter 11 Cases, as applicable.

d.      obtained, on August 5, 2022, the entry of the *Order (I) Approving the Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, (IV) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation and (V) Granting Related Relief* [Docket No. 248] (the "Bidding Procedures Order") approving the *Bidding Procedures for the Submission, Receipt, and Analysis of Bids in Connection with the Sale of the Debtors*, attached to the Bidding Procedures Order as Exhibit 1 (the "Bidding Procedures");

e.      commenced, on September 13, 2022, the Auction for the sale of substantially all of the Debtors' assets in accordance with the Bidding Procedures;

f.      selected West Realm Shires Inc. ("FTX US") as the Winning Bidder (as defined in the Bidding Procedures);

g.      obtained, on October 20, 2022, entry of the *Order (I) Authorizing Entry of the Asset Purchase Agreement and (II) Granting Related Relief* [Docket No. 581], which authorized entry into that certain asset purchase agreement by and between Voyager Digital, LLC and West Realm Shires Inc. (together with its affiliates, "FTX US," and the asset purchase agreement, the "FTX US Asset Purchase Agreement");

h.      filed, on December 9, 2022, the *Stipulation and Agreed Order* [Docket No. 717] by and between FTX US and the Debtors (the "FTX US APA Stipulation"), terminating the FTX US Asset Purchase Agreement;

i.      filed, on December 21, 2022, the *Debtors' Motion for Entry of an Order (I) Authorizing Entry into the Binance US Purchase Agreement and (II) Granting Related Relief* [Docket No. 775] and that certain asset purchase agreement by and between Voyager Digital, LLC and BAM Trading Services Inc. d/b/a Binance.US (together with its affiliates, "Binance.US," and the asset purchase agreement, the "Asset Purchase Agreement");

j.      filed, on December 22, 2022, the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 777] (as amended, modified, or supplemented from time to time, the "Plan"), the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 778] (as amended, modified, or supplemented from time to time, the "Disclosure Statement"), and the *Debtors' Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes, and (D) Procedures for Objections, and (IV) Granting Related Relief* [Docket No. 779];

k.    filed, on January 9, 2023, the first amendment to the Asset Purchase Agreement [Docket No. 835];

l.    obtained, on January 10, 2023, approval of the FTX US APA Stipulation [Docket No. 849];

m.    filed, on January 10, 2023, the revised Plan [Docket No. 852];

n.    filed, on January 13, 2023, the revised Disclosure Statement [Docket No. 863];

o.    obtained, on January 13, 2023, entry of the *Order (I) Authorizing Entry into the Asset Purchase Agreement and (II) Granting Related Relief* [Docket No. 775], which granted entry into the asset purchase agreement with Binance.US (the "<u>Asset Purchase Agreement Order</u>");

p.    obtained, on January 13, 2023, entry of the *Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections* [Docket No. 861] (the "<u>Conditional Disclosure Statement Order</u>") conditionally approving the Disclosure Statement, solicitation procedures (the "<u>Solicitation Procedures</u>"), and solicitation materials, including notices, forms, and ballots (collectively, the "<u>Solicitation Packages</u>");

q.    caused the Solicitation Packages and notice of the Combined Hearing and the deadline for objecting to the Disclosure Statement and to confirmation of the Plan ("<u>Confirmation</u>") to be distributed on or before January 25, 2023 (the "<u>Solicitation Date</u>"), in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), the Local Bankruptcy Rules for the Southern District of New York (the "<u>Local Rules</u>"), the Disclosure Statement Order, and the Solicitation Procedures, as evidenced by, among other things, the *Affidavit of Service* [Docket No. 926] and the *Supplemental Affidavit of Service* [Docket Nos. 927 and 1016] (collectively, the "<u>Affidavit of Solicitation</u>");

r.    filed, on February 1, 2023, the *Plan Supplement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* [Docket No. 943] (the "<u>Initial Plan Supplement</u>") and caused notice of the filing of the Initial Plan Supplement to be distributed in accordance with paragraph 12 of the Disclosure Statement Order, as evidenced by, among other things, the *Affidavit of Service* [Docket No. 951];

s.    published, on February 3, 2023, notice of the Combined Hearing (the "<u>Combined Hearing Notice</u>") in the *The New York Times* (National Edition) and *Financial Times* (International Edition), as evidenced by the *Affidavits of Publication* [Docket Nos. 954 and 955] (the "<u>Publication Affidavits</u>" and, together with the Affidavit of Solicitation, the "<u>Affidavits</u>");

t.  filed, on February 8, 2023, the *First Amended Plan Supplement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* [Docket No. 986] (the "<u>First Amended Plan Supplement</u>") and caused notice of the filing of the First Amended Plan Supplement to be distributed in accordance with paragraph 12 of the Disclosure Statement Order, as evidenced by, among other things, the *Affidavit of Service* [Docket No. 992];

u.  filed, on February 15, 2023, the *Second Amended Plan Supplement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* (the "<u>Second Amended Plan Supplement</u>") [Docket No. 1006] and caused notice of the filing of the Second Amended Plan Supplement to be distributed in accordance with paragraph 12 of the Disclosure Statement Order, as evidenced by, among other things, the *Affidavit of Service* [Docket No. 1037];

v.  filed, on February 21, 2023, the *Third Amended Plan Supplement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* (the "<u>Third Amended Plan Supplement</u>") [Docket No. 1035] and caused notice of the filing of the Third Amended Plan Supplement to be distributed in accordance with paragraph 12 of the Disclosure Statement Order, as evidenced by, among other things, the *Affidavit of Service* [Docket No. 1058];

w.  filed, on February 28, 2023, the *Declaration of Leticia Sanchez Regarding the Solicitation and Tabulation of Votes on the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1108];

x.  filed, on February 28, 2023, the *Debtors' Memorandum of Law in Support of (I) Final Approval of the Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code and (II) an Order Confirming the Debtors' Third Amended Joint Chapter 11 Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* [Docket No. 1110] (the "<u>Confirmation Brief</u>");

y.  filed, on February 28, 2023, the *Declaration of Timothy R. Pohl, Independent Director and Member of the Special Committee of the Board of Directors of Voyager Digital, LLC, in Support of Confirmation of the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1111] (the "<u>Pohl Declaration</u>"), which was admitted into evidence at the Combined Hearing;

z.  filed, on February 28, 2023, the *Declaration of Brian Tichenor in Support of Confirmation of the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1113] (the "<u>Tichenor Declaration</u>"), which was admitted into evidence at the Combined Hearing;

aa. filed, on February 28, 2023, the *Fourth Amended Plan Supplement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* (the "Fourth Amended Plan Supplement") [Docket No. 1115] and will cause notice of the filing of the Fourth Amended Plan Supplement to be distributed in accordance with paragraph 12 of the Disclosure Statement Order;

bb. filed, on February 28, 2023, the revised version of the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1117];

cc. filed, on February 28, 2023, the *Declaration of Mark A. Renzi in Support of Confirmation of the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1119] (the "Renzi Declaration"), which was admitted into evidence at the Combined Hearing for certain limited purposes;

dd. filed, on March 1, 2023, the revised version of the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1125];

ee. filed, on March 1, 2023, the *Amended Declaration of Leticia Sanchez Regarding the Solicitation and Tabulation of Votes on the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1127] (the "Voting Report" and, together with the Pohl Declaration, the Tichenor Declaration and the Renzi Declaration, the "Declarations");

ff. filed, on March 5, 2023, the revised version of the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1138];

gg. filed, on March 6, 2023, the *Fifth Amended Plan Supplement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* [Docket No. 1143]; and

hh. filed, on March 7, 2023, a revised *Fifth Amended Plan Supplement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* (the "Fifth Amended Plan Supplement") (together with the Initial Plan Supplement, First Amended Plan Supplement, Second Amended Plan Supplement, Third Amended Plan Supplement, and Fourth Amended Plan Supplement, and as may be modified, amended, or supplemented from time to time, the "Plan Supplement") [Docket No. 1149] and will cause notice of the filing of the Fifth Amended Plan Supplement to be distributed in accordance with paragraph 12 of the Disclosure Statement Order.

The Court having:

a. entered the Bidding Procedures Order on August 5, 2022 [Docket No. 248];

b.      entered the Asset Purchase Agreement Order on January 13, 2023 [Docket No. 775];

c.      entered the Conditional Disclosure Statement Order on January 13, 2023 [Docket No. 861];

d.      set February 22, 2023, at 4:00 p.m. (prevailing Eastern Time) as the deadline to object to the Disclosure Statement and the Plan and to object to proposed cure costs and any assumption of an Executory Contract or Unexpired Lease pursuant to the *Schedule of Assumed Executory Contracts and Unexpired Leases* (the "Assumed Contract Schedule"), filed as Exhibit A to the Plan Supplement (the "Plan Objection Deadline");

e.      set February 22, 2023, at 4:00 p.m. (prevailing Eastern Time) as the deadline for voting on the Plan (the "Voting Deadline");

f.      set March 2, 2023 at 10:00 a.m. (prevailing Eastern Time) as the date and time for the commencement of the Combined Hearing, pursuant to Bankruptcy Rules 3017 and 3018 and sections 1126, 1128, and 1129 of the Bankruptcy Code;

g.      reviewed the Plan, the Disclosure Statement, the Plan Supplement, the Confirmation Brief, the Declarations, the Voting Report, the Combined Hearing Notice, the Affidavits, and all filed pleadings, exhibits, statements, and comments regarding Confirmation, including all objections, statements, and reservations of rights filed by parties in interest on the docket of the Chapter 11 Cases;

h.      held the Combined Hearing beginning March 2, 2023 at 10:00 a.m., prevailing Eastern Time and continuing on March 3, 2023, March 6, 2023, and March 7, 2023;

i.      heard the statements and arguments made by counsel with respect to final approval of the Disclosure Statement and Confirmation of the Plan;

j.      considered all oral representations, live testimony, written direct testimony, exhibits, documents, filings, and other evidence presented at the Combined Hearing; and

k.      dictated its decision with respect to disputed factual and legal issues at the conclusion of Combined Hearing, the text of which shall be revised as necessary and issued as the Court's formal decision with respect to Confirmation of the Plan and resolution of all outstanding objections thereto (the "Decision"),

NOW, THEREFORE, after due deliberation thereon and good cause appearing therefor,

the Court makes and issues the following findings of fact and conclusions of law, and orders:

## JURISDICTION, VENUE AND CORE PROCEEDING

The Court has jurisdiction over these Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, entered February 1, 2012. The Court has exclusive jurisdiction to determine whether the Disclosure Statement and the Plan comply with the applicable provisions of the Bankruptcy Code and should be approved and confirmed, respectively. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. Confirmation of the Plan is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

## MODIFICATIONS TO PROPOSED PLAN

The following modifications and amendments to the Plan and its supporting documents either have already been made or hereby are deemed to have been made. **All references herein to the "Plan" (including the copy of the Plan that is attached hereto) and to the "Asset Purchase Agreement" shall be interpreted as references to the Plan and the Asset Purchase Agreement as modified by the following provisions.**

A.      Article VIII.C of each filed versions of the Plan is hereby stricken in its entirety and Article VIII.C of the Plan is deemed to have been revised to state as follows:

> **"Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from, any liability for damages based on the negotiation, execution and implementation of any transactions or actions approved by the Bankruptcy Court in the Chapter 11 Cases, except for Causes of Action related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence;** *provided* **that nothing in**

the Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes.

In addition, the Plan contemplates certain rebalancing transactions and the completion of distributions of cryptocurrencies to creditors. The Exculpated Parties shall have no liability for, and are exculpated from, any claim for fines, penalties, damages, or other liabilities based on their execution and completion of the rebalancing transactions and the distribution of cryptocurrencies to creditors in the manner provided in the Plan.

For the avoidance of doubt, the foregoing paragraph reflects the fact that Confirmation of the Plan requires the Exculpated Parties to engage in certain rebalancing transactions and distributions of cryptocurrencies and the fact that no regulatory authority has taken the position during the Combined Hearing that such conduct would violate applicable laws or regulations. Nothing in this provision shall limit in any way the powers of any Governmental Unit to contend that any rebalancing transaction should be stopped or prevented, or that any other action contemplated by the Plan should be enjoined or prevented from proceeding further. Nor does anything in this provision limit the enforcement of any future regulatory or court order that requires that such activities either cease or be modified, or limit the penalties that may be applicable if such a future regulatory or court order is issued and is violated. Similarly, nothing herein shall limit the authority of the Committee on Foreign Investment of the United States to bar any of the contemplated transactions. Nor does anything in this provision alter the terms of the Plan regarding the compliance of the Purchaser with applicable laws in the Unsupported Jurisdictions before distributions of cryptocurrency occur in those Unsupported Jurisdictions.

And all references herein the approval, reasonableness, scope or applicability of Article VIII.C of the Plan. or of the "exculpation" provisions of the Plan, shall refer only to the exculpation provisions as set forth above.

B.     The following proviso is deemed to have been added to Article I.A.60 of the Plan:

"*provided* that any documents included in subsection (i) only include documents arising on or after the Petition Date but prior to the Effective Date and that are within the jurisdiction of the Bankruptcy Court";

C.      The following definition is deemed to have been added as Article I.A.98 of

the Plan:

> "'**_Independent Directors_**' means the independent directors at HoldCo, OpCo,
> and TopCo from the Petition Date forward, including, for the avoidance of
> doubt, following the Effective Date";

D.      The following definition is deemed to have been added as Article I.A.104

of the Plan:

> "'**_Investigated Matters_**' means (i) the Debtors' loans to third parties, including
> the 3AC Loan; (ii) the diligence performed in connection with the loans
> described in (i); (iii) the formation and function of the Debtors' Risk
> Committee; (iv) the Debtors' staking of cryptocurrency assets; (v) the Debtors'
> regulatory compliance; (vi) the Debtors' communications with the public; and
> (vii) the Debtors' pre-petition transfers to Released Voyager Employees
> (including customer withdrawals) within one (1) year of the Petition Date";

E.      Article I.A.77 of the Plan is deemed to have been revised to state:

> "'**_Exculpated Parties_**' means, collectively, and in each case in its capacity as
> such:  (a) each of the Debtors; (b) the Committee, and each of the members
> thereof, solely in their capacity as such; (c) each of the Released Professionals;
> (d) each of the Released Voyager Employees; (e) the Plan Administrator;
> (f) the Distribution Agent; (g) each of the Independent Directors; and (h) any
> other person acting in a fiduciary capacity on behalf of the Debtors in
> connection with the negotiation, execution and implementation of any
> transactions or actions approved by the Bankruptcy Court in the Chapter 11
> Cases";

F.      Article I.A.140 of the Plan is deemed to have been revised to state:

> "'**_Released Voyager Employees_**' means the following directors, officers, and
> members of senior management of the Debtors serving in such capacity on or
> after the Petition Date whose conduct was reviewed as part of the Special
> Committee Investigation: Jennifer Ackert, David Brill, Brian Brooks, David
> Brosgol, Jonathan Brosnahan, Dan Constantino, Stephen Ehrlich, Philip
> Eytan, Rakesh Gidwani, Gerard Hanshe, Marshall Jensen, Pam Kramer,
> Manisha Lalwani, Brian Nistler, Ashwin Prithipaul, Evan Psaropoulos, Brian
> Silard, Glen Stevens, Krisztian Toth, and Ryan Whooley (subject to the
> limitations contained in Article IV.F and Article IV.G of the Plan)";

G.    The following language is deemed to have been removed from Article

VIII.A:

**"in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party" and replaced with "the Investigated Matters";**

H.    Article IV.H.5(c) of the Plan is deemed to have been revised to state:

**"appointing an independent director at each Debtor to act as a fiduciary for such Debtor entity solely in connection with matters that may implicate actual or potential intra-Debtor conflicts of interests between the Plan Administrator and the applicable Debtor(s) or Wind-Down Debtor including (i) the Intercompany Claims; (ii) the Alameda Loan Facility Claims; (iii) the Signatory Governmental Claims (as defined in the Governmental Claimant Stipulation) asserted against TopCo; and (iv) any matter involving the transfer or allocation of value, claims, or costs between or among the Debtors, but only to the extent that such issues continue to implicate actual or potential intra-Debtor conflicts of interests between the Plan Administrator and the applicable Debtor(s) or Wind-Down Debtor";**

I. Article VI.C.6 of the Plan is deemed revised to state:

**"In the event that any distribution to any Holder is returned as undeliverable and/or otherwise remains unclaimed, the Plan Administrator shall use reasonable efforts to contact such Holder; *provided* that no further distributions to such Holder shall be made unless and until the Plan Administrator has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, *further*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the applicable Distribution Date. After such date, all unclaimed property or interests in property shall revert to the Wind-Down Debtor automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder to such property or interest in property shall not be entitled to any distributions under the Plan.**

**A distribution shall be deemed unclaimed if a Holder has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Wind-Down Debtor of an intent to accept a particular distribution; (c) responded to the Wind-Down Debtor's**

10

requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution";

J.      All references to section 1145 of the Bankruptcy Code and related provisions in the Plan have been removed;

K.      References to "Confirmation Date" in Article II.B.1 of the Plan are deemed revised to state "Effective Date"; and

L.      The Asset Purchase Agreement has been and is deemed to be amended to contain the following provisions:

   1.   **There will be a two-week period for Account Holders to opt out of transferring (i) selfies, (ii) uploaded IDs or bank statements and (iii) bank account information to the Purchaser. Any opted out information would not be acquired by the Purchaser in the Sale Transaction. The opt out notice will be provided by the Debtors at the Debtors' expense;**

   2.   **The Seller Expense Start Date will be moved back to April 1, 2023 (from March 18, 2023);**

   3.   **If the Purchaser is ready to close by April 1, 2023 (assuming closing conditions are satisfied or waived by the Purchaser) and the Seller is not (including because the Seller declines to waive any Closing conditions, other than breaches or defaults by the Purchaser), then the Seller will cease to have Seller Expense reimbursement protection thereafter;**

   4.   **Each of the Seller and Purchaser acknowledge that (i) the closing condition relating to entry and finalization of the Asset Purchase Agreement Order has been satisfied and (ii) to its knowledge, there is no breach of the Asset Purchase Agreement by the other party as of the date that this Confirmation Order is entered.**

## FINDINGS OF FACT[4]

1.      The findings of fact set forth in the Decision are incorporated herein by reference.

---

[4]   The findings of fact and the conclusions of law set forth herein and in the Decision of the Court announced at the conclusion of the Combined Hearing constitute the Court's findings of fact and its conclusions of law under rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014. Many issues raised in connection with Confirmation of the Plan are mixed issues of law and fact, so to the extent any of the listed finding of fact constitute conclusions of law, or vice versa, they are adopted as such.

2. The Disclosure Statement contains (a) sufficient information of a kind necessary to satisfy the disclosure requirements of all applicable nonbankruptcy laws, rules, and regulations, including the Securities Act, and (b) "adequate information" (as such term is defined in section 1125(a) of the Bankruptcy Code and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Plan, and the transactions contemplated therein. All objections to the contents of the Disclosure Statement are overruled.

3. The Debtors provided due, adequate, and sufficient notice of the Disclosure Statement, the Conditional Disclosure Statement Order, the Plan, the Plan Supplement, the Solicitation Packages, the Combined Hearing Notice, the proposed assumption and rejection of Executory Contracts and Unexpired Leases and the proposed cure amounts, and all the other materials distributed by the Debtors in connection with Confirmation of the Plan, together with the Plan Objection Deadline, the Voting Deadline, and the Combined Hearing, and any applicable bar dates and hearings described in the Conditional Disclosure Statement Order, in compliance with the Bankruptcy Rules, Local Rules, and the procedures set forth in the Disclosure Statement Order.

4. Prior to the Combined Hearing, the Debtors filed the Voting Report. The Voting Report was admitted into evidence during the Combined Hearing. As described in the Voting Report, the solicitation of votes on the Plan complied with the Solicitation Procedures.

5. The Solicitation Packages, the Plan Supplement, and the Combined Hearing Notice were transmitted and served in compliance with this Court's orders, and such transmission and service was timely, adequate, and sufficient.

6.      The period during which Holders in the Voting Classes were required to submit acceptances or rejections to the Plan was reasonable and sufficient for such Holders to make an informed decision to accept or reject the Plan.

7.      Holders of Claims in Class 1 (Secured Tax Claims) and Class 2 (Other Priority Claims) (collectively, the "Presumed Accepting Classes") are Unimpaired and conclusively presumed to accept the Plan and, therefore, did not vote to accept or reject the Plan.  Holders of Claims in Class 7 (Intercompany Claims) and Interests in Class 8 (Intercompany Interests) either are Unimpaired and conclusively presumed to have accepted the Plan (to the extent reinstated) or Impaired and conclusively deemed to have rejected the Plan, and, therefore, are not entitled to vote to accept or reject the Plan.  Holders of Claims in Class 5 (Alameda Loan Facility Claims) and Class 6 (Section 510(b) Claims) and Interests in Class 9 (Existing Equity Interests) (collectively, the "Deemed Rejecting Classes") are Impaired under the Plan and are deemed to have rejected the Plan.

8.      As evidenced by the Voting Report, Class 3 (Account Holder Claims), Class 4A (OpCo General Unsecured Claims), Class 4B (HoldCo General Unsecured Claims), and Class 4C (TopCo General Unsecured Claims) voted to accept the Plan in accordance with section 1126 of the Bankruptcy Code.

9.      Based on the foregoing, and as evidenced by the Voting Report, at least one Impaired Class of Claims (excluding the acceptance by any insiders of any of the Debtors) has voted to accept the Plan.

10.     The Filing and notice of the documents included in the Plan Supplement were adequate and proper and in compliance with this Court's orders.

11.     Any modifications to the Plan since the commencement of Solicitation described or set forth herein constitute technical changes or changes with respect to particular Claims or Interests made pursuant to the agreement of the Holders of such Claims or Interests and do not materially and adversely affect or change the treatment of any other Claims or Interests.

12.     The Plan and all modifications thereto are dated and identify the Entities submitting them, thereby satisfying Bankruptcy Rule 3016(a).  The Debtors appropriately filed the Disclosure Statement and the Plan with the Court, thereby satisfying Bankruptcy Rule 3016(b).  The injunction, release, and exculpation provisions in the Disclosure Statement and the Plan describe, in bold font and with specific and conspicuous language, all acts to be enjoined and identify the entities that will be subject to the injunction, thereby satisfying Bankruptcy Rule 3016(c).

13.     The Debtors' decisions to assume or reject certain Executory Contracts and Unexpired Leases, as provided in Article V of the Plan and in the Plan Supplement, are reasonable exercises of the Debtors' business judgment.  The Debtors have demonstrated adequate assurance of future performance of the assumed Executory Contracts and Unexpired Leases within the meaning of section 365(b)(1)(C) of the Bankruptcy Code by the Wind-Down Debtor.

14.     Consummation of the Sale Transaction is in the best interests of the Debtors, their Estates, and their creditors.  The Debtors have exercised sound business judgment in selecting the Purchaser and the Debtors have done so without collusion and in good faith.  The Purchaser is consummating the Sale Transaction in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code.  The Purchaser has proceeded in good faith and without collusion in all respects in connection with the Sale Transaction.

15.    The consideration provided by the Purchaser pursuant to the Asset Purchase Agreement (a) is fair and reasonable, (b) constitutes the best offer for the Acquired Assets, and (c) represents reasonably equivalent value for the assets being acquired.

16.    As explained more fully in this Court's Decision, the Debtors' decision to effectuate the Sale Transaction or the Liquidation Transaction, as applicable, is an appropriate exercise of their business judgment.

17.    The D&O Settlement constitutes a good-faith compromise and settlement of all Claims, Causes of Action, disputes, and controversies released, settled, compromised, or otherwise resolved between the Debtors and the CEO and CCO.  The D&O Settlement is fair, equitable, and reasonable and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests.

## CONCLUSIONS OF LAW

18.    The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code.

(a)    In accordance with sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article III of the Plan provides for the separate classification of Claims and Interests into eleven Classes.  Valid business, factual, and legal reasons exist for the separate classification of such Classes of Claims and Interests.  The classifications were not implemented for any improper purpose and do not unfairly discriminate between, or among, Holders of Claims or Interests.  Each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.  Accordingly, the Plan satisfies the requirements of sections 1122(a), 1122(b), and 1123(a)(1) of the Bankruptcy Code.

(b)    Article III of the Plan specifies that Claims in Class 1 (Secured Tax Claims) and Class 2 (Other Priority Claims) are Unimpaired under the Plan and Claims and Interests in Class 7 (Intercompany Claims) and Class 8 (Intercompany Interests), respectively, are either Impaired or Unimpaired under the Plan.  Article II of the Plan specifies that Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, and all fees due and payable pursuant to section 1930 of title 28 of the United States Code before the Effective Date will be paid in full in accordance with the terms of the Plan, although these Claims are not separately classified under the Plan.  Accordingly, the Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

(c)    Article III of the Plan specifies that Claims and Interests, as applicable, in the following Classes (collectively, the "Impaired Classes") are Impaired under the Plan

within the meaning of section 1124 of the Bankruptcy Code, and describes the treatment of such Classes, in compliance with section 1123(a)(3) of the Bankruptcy Code:

| Class | Designation |
|---|---|
| 3 | Account Holder Claims |
| 4A | OpCo General Unsecured Claims |
| 4B | HoldCo General Unsecured Claims |
| 4C | TopCo General Unsecured Claims |
| 5 | Alameda Loan Facility Claims |
| 6 | Section 510(b) Claims |
| 9 | Existing Equity Interests |

(d)     The Plan provides for the same treatment by the Debtors for each Claim or Interest in each respective Class unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest, and complies with section 1123(a)(4) of the Bankruptcy Code.

(e)     The provisions in Article IV and elsewhere in the Plan and the Plan Supplement, and in the exhibits and attachments to the Disclosure Statement provide, in detail, adequate and proper means for the Plan's implementation, in satisfaction of the requirements of section 1123(a)(5) of the Bankruptcy Code.

(f)     On the Effective Date the Wind-Down Debtor Assets shall, subject to the Plan Administrator Agreement, be transferred to and vest in the Wind-Down Debtor. The Wind-Down Debtor shall be managed by the Plan Administrator and shall be subject to a Wind-Down Debtor Oversight Committee. On or prior to the Effective Date, the Wind-Down Debtor's organizational documents will be amended to prohibit the issuance of non-voting equity securities. Accordingly, the Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code.

(g)      The Debtors have disclosed that the independent director at (i) Voyager Digital, LLC shall be Timothy R. Pohl and/or Jill Frizzley, (ii) Voyager Digital Holdings, Inc. shall be Scott Vogel, and (iii) Voyager Digital Ltd. shall be Matthew D. Ray. Article IV.J of the Plan provides that, upon filing of the certificate of dissolution (or equivalent document), the Wind-Down Debtor will be dissolved.  Article IV.H of the Plan provides for the formation of the Wind-Down Debtor for the benefit of the Wind-Down Debtor Beneficiaries.  Paul R. Hage will serve as Plan Administrator.  The Wind-Down Debtor shall be managed by the Plan Administrator and shall be subject to a Wind-Down Debtor Oversight Committee, which will consist of Russell Stewart, Richard Kiss, and Melissa Freeman.  The selection of the Plan Administrator and the appointment of the independent directors, and the provisions of the Plan and the Plan Administrator Agreement regarding the potential selection of successors to such persons, is consistent with the interests of Holders of Claims and Interests and public policy.  Accordingly, the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

(h)      Article III of the Plan specifies that some Classes of Claims are Impaired and others are not Impaired, as permitted by section 1123(b)(1) of the Bankruptcy Code.

(i)      As permitted by section 1123(b)(2) of the Bankruptcy Code, Article V of the Plan provides that, on the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease:  (1) is specifically described in the Plan as to be assumed in connection

with Confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the Sale Transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (5) is a D&O Liability Insurance Policy other than the Side-A Policy.

(j)     The Plan provides for the settlement of certain potential claims against Mr. Ehrlich and Mr. Psaropolous, as permitted by section 1123(b)(3) of the Bankruptcy Code. It also provides for the retention of various causes of action as permitted by section 1123(b)(3).

(k)     The Plan provides for a sale of assets as permitted by section 1123(a)(4) of the Bankruptcy Code.

(l)     The Plan includes other discretionary provisions that are approved in various parts of this Confirmation Order.  The inclusion of such provisions is consistent with section 1123(b)(6) of the Bankruptcy Code.

19.     The Debtors have complied with the applicable provisions of the Bankruptcy Code and satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.  Specifically, each Debtor:

(a)     is an eligible debtor under section 109 of the Bankruptcy Code and a proper proponent of the Plan under section 1121(a) of the Bankruptcy Code; and

(b)     complied with the applicable provisions of the Bankruptcy Code, including sections 1125 and 1126, the Bankruptcy Rules, the Local Rules, any applicable

nonbankruptcy law, rule, and regulation, the Conditional Disclosure Statement Order, and all other applicable law, in transmitting the Solicitation Packages and related documents and notices, and in soliciting and tabulating the votes on the Plan.

20. The Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code. The Debtors have proposed the Plan in good faith and not by any means forbidden by law.

21. Any payment made or to be made by the Debtors for services or for costs and expenses in or in connection with these Chapter 11 Cases, or in connection with the Plan and incident to these Chapter 11 Cases, shall be subject to the approval of the Court for reasonableness, in compliance with section 1129(a)(4) of the Bankruptcy Code.

22. The Debtors have disclosed the names of the individuals who will serve as independent directors, as Plan Administrator, and as members of the Wind-Down Debtor Oversight Committee, and the appointment of such persons is consistent with the interests of creditors and equityholders and with public policy.

23. Section 1129(a)(6) of the Bankruptcy Code is not applicable to these Chapter 11 Cases. The Plan does not propose any rate change subject to the jurisdiction of any governmental regulatory commission.

24. The Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code. The liquidation analysis attached to the Disclosure Statement and the other evidence related thereto in support of the Plan that was proffered or adduced in the Declarations or at, prior to, or in connection with the Combined Hearing: (a) are reasonable; (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been controverted by other evidence; and (d) establish that Holders of Allowed Claims and Interests in each Class will recover at least as much under the Plan on account of such Claim or Interest, as of the Effective Date, as such Holder

would receive if the Debtors were liquidated, on the Effective Date, under chapter 7 of the Bankruptcy Code.

25.     No Class of voting creditors voted to reject the Plan.  However, Class 5 (Alameda Loan Facility Claims), Class 6 (Section 510(b) Claims), and Class 9 (Existing Equity Interests) are impaired under the Plan and are deemed to reject the Plan.  Because the Plan has not been accepted by the Deemed Rejecting Classes, the Debtors seek Confirmation under section 1129(b), solely with respect to the Deemed Rejecting Classes, rather than section 1129(a)(8) of the Bankruptcy Code.  Although section 1129(a)(8) has not been satisfied with respect to the Deemed Rejecting Classes, the Plan is confirmable because the Plan does not discriminate unfairly and is fair and equitable with respect to the Deemed Rejecting Classes and thus satisfies section 1129(b) of the Bankruptcy Code with respect to such Classes as described further below.

26.     The treatment of Allowed Administrative Claims, Allowed Professional Fee Claims, and Allowed Priority Tax Claims under Article II of the Plan, and of Allowed Other Priority Claims under Article III of the Plan, satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.

27.     The Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.  As evidenced by the Voting Report, the Voting Classes voted to accept the Plan by the requisite numbers and amounts of Claims, determined without including any acceptance of the Plan by any insider (as that term is defined in section 101(31) of the Bankruptcy Code), specified under the Bankruptcy Code.

28.     The Plan satisfies section 1129(a)(11) of the Bankruptcy Code.  The evidence supporting the Plan proffered or adduced by the Debtors at or before the Combined Hearing is reasonable, persuasive, and credible, has not been controverted by other persuasive evidence, and

establishes that the Plan is feasible and Confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization except as contemplated by the Plan itself.

29.     The Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code. Article XII.C of the Plan provides for the payment of all fees due and payable under 28 U.S.C. § 1930 by each of the Wind-Down Debtor (or the Distribution Agent on behalf of the Wind-Down Debtor).

30.     The Debtors do not have any remaining obligations to pay retiree benefits (as defined in section 1114 of the Bankruptcy Code).    Therefore, section 1129(a)(13) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases or the Plan.

31.     Sections 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to these Chapter 11 Cases.    The Debtors owe no domestic support obligations, are not individuals, and are not nonprofit corporations.

32.     The Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. Notwithstanding the fact that the Deemed Rejecting Classes have not accepted the Plan, the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code.    *First*, all of the requirements of section 1129(a) of the Bankruptcy Code other than section 1129(a)(8) have been met.    *Second*, the Plan is fair and equitable with respect to Class 5 (Alameda Loan Facility Claims), Class 6 (Section 510(b) Claims), and Class 9 (Existing Equity Interests).    The Plan has been proposed in good faith, is reasonable, and meets the requirements that (a) no Holder of any Claim or Interest that is junior to each such Class will receive or retain any property under the Plan on account of such junior Claim or Interest, and (b) no Holder of a Claim or Interest in a Class senior to such Classes is receiving more than payment in full on account of its Claim or Interest.

Specifically, to the extent Class 8 (Intercompany Interests) are Reinstated, such treatment is provided for administrative convenience and efficiency, and not on account of such Interests, and will not alter the treatment provided for any other Holder of any Claim or Interest. Further, Class 7 (Intercompany Claims) will receive the treatment as determined by the Court. Accordingly, the Plan is fair and equitable towards all Holders of Claims and Interests in the Deemed Rejecting Classes. *Third*, the Plan does not discriminate unfairly with respect to the Deemed Rejecting Classes because similarly situated Claim and Interest Holders will receive substantially similar treatment on account of their Claims or Interests, as applicable, in such class. Therefore, the Plan may be confirmed despite the fact that not all Impaired Classes have voted to accept the Plan.

33.    The Plan satisfies the requirements of section 1129(c) of the Bankruptcy Code. The Plan is the only chapter 11 plan filed in each of these Chapter 11 Cases.

34.    The Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code. The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.

35.    The Chapter 11 Cases are not small business cases and, accordingly, section 1129(e) of the Bankruptcy Code does not apply to the Chapter 11 Cases.

36.    The Debtors have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all of their respective activities relating to support and consummation of the Plan, including the solicitation and receipt of acceptances of the Plan, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

37.    For the reasons set forth in the Decision, the exculpation provisions of the Plan (as modified herein) are reasonable in scope and consistent with applicable authority.

38.     Based on the foregoing, the Plan satisfies the requirements for Confirmation set forth in section 1129 of the Bankruptcy Code.

## **ORDER**

BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:

39.     **Approval of the Disclosure Statement.**  The Disclosure Statement, the Solicitation Packages, and the Solicitation Procedures are approved on a final basis pursuant to section 1125 of the Bankruptcy Code.

40.     **Solicitation.**  To the extent applicable, the solicitation of votes on the Plan complied with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018, all other provisions of the Bankruptcy Code, and all other applicable rules, laws, and regulations, and was appropriate and satisfactory and is approved in all respects.

41.     **Notice of Combined Hearing.**  The Notice of Combined Hearing was appropriate and satisfactory and is approved in all respects.

42.     **Confirmation of the Plan.**  The Plan (as it has been modified by the parties, including any modifications set forth herein) is approved in its entirety and CONFIRMED under section 1129 of the Bankruptcy Code.

43.     **Objections.**  All objections and all reservations of rights pertaining to Confirmation of the Plan and approval of the Disclosure Statement that have not been withdrawn, waived, or consensually resolved are overruled on the merits unless otherwise indicated in this Confirmation Order.

44.     **Plan Modifications.**  The Plan Modifications do not materially adversely affect the treatment of any Claim against or Interest in any of the Debtors under the Plan.  Pursuant to Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125

of the Bankruptcy Code or the resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that the Holders of Claims or Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan. Accordingly, the Plan Modifications are hereby approved pursuant to section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019. After giving effect to the Plan Modifications, the Plan continues to meet the requirements of sections 1122 and 1123 of the Bankruptcy Code.

45. **Deemed Acceptance of Plan.** In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all Holders of Claims and Interests who voted to accept the Plan or who are conclusively presumed to accept the Plan are deemed to have accepted the Plan, as modified by the Plan Modifications. No Holder of a Claim or Interest shall be permitted to change its vote as a consequence of the Plan Modifications.

46. **Restructuring Transactions**. On or before the Effective Date, the applicable Debtors will take any action as may be necessary or advisable to effectuate the Restructuring Transactions described in the Plan, the Restructuring Transactions Memorandum, and the Customer Onboarding Protocol, including, without limitation, the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the transfer or distribution of any Cryptocurrency or Cash pursuant to the Asset Purchase Agreement and the Plan, as applicable, and the execution and delivery of the Plan Administrator Agreement

47. **The Sale Transaction.** The Sale Transaction and the Asset Purchase Agreement, all other ancillary documents, and all of the terms and conditions thereof, are hereby approved, pursuant to sections 105, 363, 364, and 554 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and 9014, each as applicable. Entry of this Confirmation Order shall authorize the

Debtors, the Purchaser, and the Wind-Down Debtor, as applicable, to undertake the transactions contemplated by the Asset Purchase Agreement, as applicable, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

48.     Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Debtors are authorized and empowered to take any and all actions necessary or appropriate to (a) consummate the Sale Transaction pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement, (b) close the Sale Transaction as contemplated in the Asset Purchase Agreement, and (c) execute and deliver, perform under, consummate, implement, and fully close the Asset Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement and the Sale Transaction.

49.     Pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, the Debtors are authorized to transfer the Acquired Assets in accordance with the terms of the Asset Purchase Agreement and such transfer shall constitute a legal, valid, binding, and effective sale of the Acquired Assets and shall vest Purchaser with title to the Acquired Assets subject to the Asset Purchase Agreement, and to the fullest extent permitted by sections 363(f) and 1123(b)(4) of the Bankruptcy Code the Acquired Assets shall be free and clear of all Liens, Claims, Encumbrances, and other interests of any kind or nature whatsoever (other than as expressly permitted under the Asset Purchase Agreement), with all such Liens, Claims, or other interests to attach to the cash proceeds of the Purchase Price ultimately attributable to the property against or in which such Liens, Claims, or other interests are asserted, subject to the terms thereof, with the same validity, force, and effect, and in the same order of priority, which such Liens, Claims, or

other interests had prior to the Sale Transaction, subject to any rights, claims, and defenses the Debtors or their estates, as applicable, may possess with respect thereto.

50.     Except as otherwise permitted by the Asset Purchase Agreement, the Plan, or this Confirmation Order, all persons and entities holding Claims against or other interests in the Debtors, or any Liens against the Acquired Assets arising prior to the Effective Date, are hereby forever barred, estopped, and permanently enjoined from asserting such Claims, interests, or Liens against the Purchaser, any of the foregoing's affiliates, successors, or assigns, their property or the Acquired Assets.

51.     The Purchaser has acted in good faith and is entitled to the protections afforded under section 363(m) of the Bankruptcy Code.  No evidence has been presented to this Court indicating that the Sale Transaction may be avoided pursuant to section 363(n) of the Bankruptcy Code.

52.     Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.  A certified copy of this Confirmation Order may be filed with the appropriate clerk or recorded with the recorder of any state, county, or local authority to act to cancel any of the Liens, Claims, and other encumbrances of record.

53.     The Debtors and the Purchaser are each authorized to file a copy of this Confirmation Order, which, upon filing, shall be conclusive evidence of the release and termination of any Claim, Lien, or interest that is terminated under the terms of the Plan.

54.     This Confirmation Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title

companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.

55.    All persons and entities that are presently, or on the Closing may be, in possession of some or all of the Acquired Assets pursuant to the Asset Purchase Agreement are hereby directed to surrender possession of the Acquired Assets to the Purchaser unless such person or entity was a good faith, bona fide purchaser of the Acquired Assets without notice of the Debtors' rights in such property.  Subject to the terms, conditions, and provisions of this Confirmation Order, all persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and/or transfer the Acquired Assets to the Purchaser in accordance with the terms of the Asset Purchase Agreement and this Confirmation Order.

56.    To the fullest extent permitted by sections 363(f) and 1123(b)(4) of the Bankruptcy Code, and except as otherwise specified in the Asset Purchase Agreement, the Purchaser shall acquire the Acquired Assets free of any claim that it is liable for liabilities of the Debtors under theories of successor liability, *de facto* merger, substantial continuity or other similar theory.  For the avoidance of doubt, (i) nothing herein shall release the Purchaser with respect to its obligations as Distribution Agent of Cryptocurrency and Cash to Holders of Account Holder Claims and OpCo General Unsecured Creditor Claims as provided in, and subject to the terms and conditions of, the

Asset Purchase Agreement and the Plan, and (ii) notwithstanding the transfer to Purchaser, pursuant to the Asset Purchase Agreement, of any Acquired Assets that constitute Coins or Cash, each User and Eligible Creditor shall retain, from and after the Closing of the Sale Transaction, all right, title, and interest in and to such Coins and Cash allocated to it on the Binance.US Platform in accordance with the Asset Purchase Agreement (notwithstanding any terms and conditions of the Binance.US Platform to the contrary, if any) through and including such time as such Coins and Cash are returned or distributed to Seller or such User and Eligible Creditor, as applicable, and such Coins and Cash shall be held by Purchaser solely in a custodial capacity in trust and solely for the benefit of Seller or the applicable User or Eligible Creditor thereafter.

57.     The Asset Purchase Agreement and any related documents or other instruments may be modified, amended, or supplemented by the parties thereto in non-material ways in accordance with the terms thereof, without further order of the Court.  Any material changes require the approval of this Court.

58.     Paragraphs 47–57 of this Confirmation Order shall be deemed to be excised from this Confirmation Order in the event that the Asset Purchase Agreement is terminated prior to Closing.  For the avoidance of doubt, subject to the requirements set forth in the Asset Purchase Agreement (including, without limitation, Sections 6.22 and 5.2(c) thereof), the Debtors may exercise the "fiduciary out" in Section 8.1(g) of the Asset Purchase Agreement at any time prior to Closing.

59.     **Actions by the Wind-Down Debtor.**  As soon as practicable after the Effective Date, the Wind-Down Debtor shall take such actions as the Wind-Down Debtor may determine to be necessary or desirable to carry out the purposes of the Plan.  Any certificate of dissolution or equivalent document may be executed by the Wind-Down Debtor on behalf of any Wind-Down

Debtor without need for any action or approval by the shareholders or board of directors or managers of such Debtor; *provided*, that, no Debtor shall be dissolved while the independent director(s) at such Debtor remains in place. On and after the Effective Date, the Debtors or the Wind-Down Debtor (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal (2) shall be deemed to have cancelled pursuant to the Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. Pursuant to the terms of the Plan, any Money Transmitter Licenses that have not been terminated shall be deemed withdrawn and no further action is required to be taken by the Debtors or the Wind-Down Debtor to effectuate such withdrawal; *provided* that, following the Effective Date, the Debtors or the Wind-Down Debtor, as applicable, shall use commercially reasonable efforts to comply with all state banking department requirements for the surrender of a Money Transmitter License. Notwithstanding such Debtors' dissolution, such Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

60. **[Reserved]**

61. **[Reserved]**

62. **[Reserved]**

63. **Binding Effect.** Upon the occurrence of the Effective Date, the terms of the Plan are immediately effective and enforceable and deemed binding on the Debtors, the Wind-Down Debtor, any and all Holders of Claims or Interests (regardless of whether such Holders of Claims

or Interests have, or are deemed to have, accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or this Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

64.    Pursuant to section 1141 of the Bankruptcy Code, subject to the occurrence of the Effective Date and subject to the terms of the Plan and this Confirmation Order, all prior orders entered in these Chapter 11 Cases and all documents and agreements executed by the Debtors as authorized and directed thereunder as of the Effective Date shall be binding upon and shall inure to the benefit of the Debtors, the Purchaser, or the Wind-Down Debtor, as applicable, and their respective successors and assigns.

65.    **Vesting of Assets.**  Except as otherwise provided in the Plan, this Confirmation Order, the Asset Purchase Agreement, the Schedule of Retained Causes of Action, or in any agreement, instrument, or other documented incorporated herein or therein, or in any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, on the Effective Date, all property constituting Wind-Down Debtor Assets, including all Vested Causes of Action of the Debtors (unless otherwise released, waived, compromised, settled, satisfied, or transferred pursuant to the Plan) shall vest in the Wind-Down Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.

66.    Prior to the Effective Date, any and all of the Debtors' assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date

the Wind-Down Debtor Assets shall, subject to the Plan Administrator Agreement, be transferred to and vest in the Wind-Down Debtor. For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned, or sold pursuant to a prior order or the Plan, the Plan Administrator specifically retains and reserves the right to assert, after the Effective Date, any and all of the Vested Causes of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing, subject to the terms of the Plan, including without limitation Article IV.F.

67.     On the Effective Date, the Debtors or Plan Administrator, as applicable, may establish one or more accounts or funds to hold and dispose of certain assets, pursue certain litigation (including the Vested Causes of Action), and/or satisfy certain Claims (including Claims that are contingent or have not yet been Allowed).

68.     **Effectiveness of All Actions**. All actions required to implement the Plan, including all actions in connection with the Sale Transaction or the Liquidation Transaction, as applicable, are hereby effective and authorized to be taken on, prior to, or after the Effective Date, as applicable, under this Confirmation Order, without further application to, or order of the Court, or further action by the respective officers, directors, managers, members, or equity holders of the Debtors or the Wind-Down Debtor and with the effect that such actions had been taken by unanimous action of such officers, directors, managers, members, or equity holders.

69.     **Cancellation of Notes, Instruments, Certificates, and Other Documents.** On the later of the Effective Date and the date on which distributions are made pursuant to the Plan (if not made on the Effective Date), except for the purpose of evidencing a right to and allowing Holders of Claims and Interests to receive a distribution under the Plan or to the extent otherwise specifically provided for in the Plan, this Confirmation Order, or any agreement, instrument, or

other document entered into in connection with or pursuant to the Plan or the Restructuring Transactions, all notes, bonds, indentures, certificates, Securities, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors, giving rise to any Claims against or Interests in the Debtors or to any rights or obligations relating to any Claims against or Interests in the Debtors shall be deemed cancelled without any need for a Holder to take further action with respect thereto.

70.     For the avoidance of doubt, cancellation of Existing Equity Interests pursuant to the Plan shall not affect the rights of the Holders of Existing Equity Interests to receive distributions, if any, under the Plan on account of such Existing Equity Interests. Holders of Existing Equity Interests shall continue to possess all rights, powers, privileges, and standing associated with such Existing Equity Interests as if those Existing Equity Interests continue to exist subject to the terms of the Plan and this Confirmation Order.

71.     **Distributions.** The procedures governing distributions contained in Article VI of the Plan shall be, and hereby are, approved in their entirety. Except as otherwise set forth in the Plan or this Confirmation Order, the Plan Administrator shall make all distributions required under the Plan and the timing of distributions required under the Plan or this Confirmation Order shall be made in accordance with and as set forth in the Plan, this Confirmation Order, or the Plan Administrator Agreement, as applicable; *provided* that, if a creditor does not timely provide the Plan Administrator with its taxpayer identification number in the manner and by the deadline established by the Plan Administrator and/or the Plan, the creditor shall be deemed to have forfeited its right to any current, reserved or future distributions provided for under the Plan and

such creditor's Claim or Interest shall be disallowed and expunged without further order of the Court. Any such forfeited distribution shall be deemed to have reverted back to the Wind-Down Debtor for all purposes, including for distributions to other holders of Allowed Claims or Allowed Interests (as applicable) against the particular Debtor in respect of which the forfeited distribution was made, notwithstanding any federal, provincial or state escheat, abandoned or unclaimed property law to the contrary.

72.     **Claims Register.**  Any Claim or Interest that has been paid, satisfied, amended, superseded, cancelled, or otherwise expunged (including pursuant to the Plan) may be adjusted or expunged, as applicable, on the Claims Register at the direction of the Debtors or Wind-Down Debtor without the Debtors or Wind-Down Debtor having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Court.

73.     **Preservation of Rights of Action.**  In accordance with section 1123(b) of the Bankruptcy Code, the Wind-Down Debtor shall succeed to all rights to commence and pursue any and all Vested Causes of Action of the Debtors, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action other than Causes of Action released, waived, settled, compromised, or transferred.  Such rights shall be preserved by the Debtors and Wind-Down Debtor and shall vest in the Wind-Down Debtor, with the Wind-Down Debtor's rights to commence, prosecute, or settle such Causes of Action preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action expressly released, waived, settled, compromised, or transferred by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII

34

of the Plan or pursuant to the Asset Purchase Agreement, which shall be deemed released and waived by the Debtors and the Wind-Down Debtor as of the Effective Date.

74.     No Entity may rely on the absence of a specific reference in the Schedules of Assets and Liabilities or Statement of Financial Affairs, the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Debtors or the Wind-Down Debtor will not pursue any and all available Causes of Action against it.   The Wind-Down Debtor, on behalf of the Debtors and the Wind-Down Debtor, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including Article VIII of the Plan.   Unless any Cause of Action of the Debtors is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Wind-Down Debtor, on behalf of the Debtors and Wind-Down Debtor and in accordance with the Plan Administrator Agreement, expressly reserves all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action as a consequence of Confirmation.

75.     **Subordination.**  Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Wind-Down Debtor reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

76.     **Release of Liens.**  Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan or this Confirmation Order on the Effective Date, and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other

security interests against any property of the Estates shall be fully released, settled, and compromised, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors shall automatically revert to the applicable Debtor or Wind-Down Debtor, as applicable, and their successors and assigns, in each case, without any further approval or order of the Court and without any action or Filing being required to be made by the Debtors. The presentation or filing of this Confirmation Order to or with any local, state, federal, or foreign agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

77. **Intercompany Claims.** For the avoidance of doubt, nothing in this Confirmation Order or the Plan shall have any impact on the validity, extent, priority, or treatment of the Intercompany Claims. Any determination as to the validity, extent, priority, or treatment of the Intercompany Claims shall be determined by the Court in a separate matter on proper notice to parties in interest. Notwithstanding anything to the contrary in this Confirmation Order or the Plan, the rights of the ad hoc group of equityholders (the "AHG") to continue or participate in any adjudication of the Intercompany Claims are preserved, and any party reserves any and all rights, claims, and defenses in connection therewith, including without limitation, the Debtors and/or the Wind-Down Debtor's right to challenge the AHG's standing with respect thereto; *provided* that such right, claim, or defense is not based on any provision in this Confirmation Order or the Plan.

78. **Reserve for FTX Preference Claims.** The Debtors shall reserve and hold the amount of $445 million in Cash on account of the preference claims asserted by FTX, Alameda, and their estates in the FTX Bankruptcy Proceeding, until such time as this Court rules upon the Debtors' pending motion for approval of a stipulation with FTX and Alameda.

79.     **Third-Party Releases.**   For the avoidance of doubt, any party that did not affirmatively "opt in" to the Third-Party Releases contained in the Plan shall not be deemed to grant such Third-Party Releases contained in the Plan.

80.     **Contributed Third Party Claims.**   For the avoidance of doubt, any party that did not affirmatively "opt in" to contribute their Contributed Third-Party Claims to the Wind-Down Debtor shall not be deemed to contribute their claims to the Wind-Down Debtor; *provided*, *however*, that any party may contribute their Contributed Third-Party Claims to the Wind-Down Debtor on or after the Effective Date by separate agreement with the Plan Administrator and Wind-Down Debtor. Any such agreement shall be valid to the same extent as if the party affirmatively opted in to contribute their Contributed Third-Party Claims to the Wind-Down Debtor.

81.     **Operations After Closing.**   On and after the Effective Date, expect as otherwise provided in the Plan, the Debtors or the Wind-Down Debtor may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

82.     **Assumption and Rejection of Executory Contracts and Unexpired Leases.**   On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (a) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (b) is subject to a pending motion to assume such Unexpired Lease or Executory

Contract as of the Effective Date; (c) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the Sale Transaction; (d) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (e) is a D&O Liability Insurance Policy other than the Side-A Policy. Entry of this Confirmation Order constitutes approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise provided in this Confirmation Order, any and all objections or reservations of rights in connection with the rejection of an Executory Contract or Unexpired Lease under the Plan, if any, are overruled on their merits.

83.     Except with respect to the Executory Contracts and Unexpired Leases discussed in the following paragraph of this Confirmation Order, the amounts set forth in the Plan Supplement (the "Cure Amounts") are the sole amounts necessary to be paid upon assumption of the associated Executory Contracts and Unexpired Leases under section 365(b)(1)(A) and (B) of the Bankruptcy Code, and the payment of such amounts will effect a cure of all defaults existing under such Executory Contracts and Unexpired Leases and compensate the counterparties to such Executory Contracts and Unexpired Leases for any actual pecuniary loss resulting from all defaults existing under such Executory Contracts and Unexpired Leases as of the Effective Date.

84.     The objections of counterparties to the assumption of their Executory Contracts and Unexpired Leases, to the extent that such objection was timely raised in accordance with Article V.C of the Plan, are preserved and will be considered by the Court at a date and time to be scheduled. As provided in the Conditional Disclosure Statement Order and the Solicitation Packages, the Debtors and the Wind-Down Debtor have reserved the right to (a) add any Executory

Contract or Unexpired Lease to the Assumed Contract Schedule and assume such Executory

Contract or Unexpired Lease pursuant to the terms of the Plan, or remove any Executory Contract

or Unexpired Lease from the Assumed Contract Schedule, in each case, up until the Effective Date

and (b) contest any Claim asserted in connection with rejection of any Executory Contract or

Unexpired Lease.

85.    **Insurance Policies and Surety Bonds.**  The Debtors shall continue to satisfy their

obligations under their insurance policies in full and continue such programs in the ordinary course

of business.    Each of the Debtors' insurance policies, and any agreements, documents, or

instruments relating thereto shall be treated as Executory Contracts under the Plan.  Without ruling

as to whether the assumption of an insurance policy was required, for the avoidance of doubt, on

the Effective Date:  (a) the Debtors shall be deemed to have assumed, to the extent necessary, each

D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all

agreements, documents, or instruments related thereto) other than the Side-A Policy, with the

Wind-Down Debtor being authorized to pursue any proceeds thereof on behalf of the Debtors or

the Wind-Down Debtor; and (b) such insurance policies and any agreements, documents, or

instruments relating thereto shall revest in the applicable Wind-Down Debtor(s) unaltered.  The

Side-A Policy shall remain in effect, with all insureds retaining the right to coverage (subject to

the D&O settlement); *provided*, however, that Wind-Down Debtor preserves all avoidance and

other actions against the D&O Carriers in connection with the premium paid thereunder.  All

beneficiaries under the D&O Insurance Policies reserve their rights under such D&O Insurance

Policies (including the Side-A Policy) subject to the limitations set forth in the Plan.

86.    Subject to their rights to pursue claims against the D&O Carriers to seek avoidance

of the policy premium paid for the Side-A Policy, as detailed in Paragraph 85 herein, the Debtors

39

or the Wind-Down Debtor, as applicable, shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) in effect prior to the Effective Date, and subject in all respects to the D&O Settlement, any current and former directors, officers, managers, and employees of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy subject to the terms thereof regardless of whether such directors, officers, managers, and employees remain in such positions after the Effective Date. Notwithstanding anything to the contrary in the Plan, the Debtors or the Wind-Down Debtor shall retain the ability to supplement such D&O Liability Insurance Policy as the Debtors or Wind-Down Debtor may deem necessary, subject to the prior written consent of the Wind-Down Debtor.

87. Nothing in paragraphs 85–86 shall be read to alter, impair, waive, or otherwise limit the Debtors' and the Wind-Down Debtors' rights to pursue claims against the D&O Carriers to seek avoidance of the policy premium for the Side-A Policy.

88. **Authorization to Consummate.** The Debtors are authorized to consummate the Plan at any time after the entry of this Confirmation Order subject to satisfaction or waiver (by the required parties) of the conditions precedent to consummation as set forth in Article IX of the Plan.

89. **Professional Compensation.** All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than sixty (60) days after the Effective Date. The Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and Bankruptcy Rules. The Wind-Down Debtor shall pay Professional Fee Claims in Cash to such Professionals in the amount the Court

allows, including from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Court; *provided* that the Debtors' and the Wind-Down Debtor's obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

90.     No later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors or the Wind-Down Debtor. When all Professional Fee Claims Allowed by the Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Court, any remaining funds held in the Professional Fee Escrow Account shall be turned over to the Wind-Down Debtor without any further notice to or action, order, or approval of the Court or any other Entity.

91.     The Professionals shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no later than five Business Days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Professional's final

request for payment of Professional Fee Claims Filed with the Court, and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; provided that the Wind-Down Debtor shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

92.     Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtors and/or the Wind-Down Debtor, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Wind-Down Debtor. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Wind-Down Debtor may employ and pay any Professional in the ordinary course of business for the period after the Confirmation Date without any further notice to or action, order, or approval of the Court.

93.     **Return of Deposits.** All utilities, including, but not limited to, any Person or Entity that received a deposit or other form of adequate assurance of performance under section 366 of the Bankruptcy Code during these Chapter 11 Cases, must return such deposit or other form of adequate assurance of performance to the Wind-Down Debtor promptly following the occurrence of the Effective Date, if not returned or applied earlier.

94.     **Release, Exculpation, and Injunction Provisions.**  The release and exculpation provisions set forth in the Plan and as modified herein (including as set forth in sections VI.B.1, VIII.A, VIII.B, and VIII.C of the Plan) are approved and authorized, and such provisions are effective and binding on all Persons and Entities to the extent provided therein except as otherwise provided in this Confirmation Order, *provided*, *however*, that nothing in the exculpation related provisions of the Plan shall release the Debtors from the provisions of the Plan governing satisfaction of Allowed Claims including Allowed Administrative Expense Claims or change the standard for liability on Allowed Claims or Allowed Administrative Expense Claims, subject to any applicable bankruptcy and non-bankruptcy law.

95.     As set forth in Article VIII.C of the Plan, the assets of the Debtors and of the Wind-Down Debtor shall be used for the satisfaction of expense obligations and the payment of Claims and Interests only in the manner set forth in this Plan and shall not be available for any other purpose.  All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Debtor, or the Debtors' Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan.

96.     In addition, as of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in this Plan or the Confirmation Order, all Persons and Entities who have held, hold, or may hold Claims or Interests that are fully satisfied pursuant to the Plan or any Claim or Interest that is subject to the releases and exculpations set forth in Article VIII.B and Article VIII.C of this Plan shall be precluded and permanently enjoined on and

after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claims or Interests, except for the receipt of the payments or distributions that are contemplated by this Plan.

97.     Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from, any liability for damages based on the negotiation, execution and implementation of any transactions or actions approved by the Bankruptcy Court in the Chapter 11 Cases, except for Causes of Action related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence; *provided* that nothing in the Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

98.     The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes.

99.     In addition, the Plan contemplates certain rebalancing transactions and the completion of distributions of cryptocurrencies to creditors.  The Exculpated Parties shall have no liability for, and are exculpated from, any claim for fines, penalties, damages, or other liabilities based on their execution and completion of the rebalancing transactions and the distribution of cryptocurrencies to creditors in the manner provided in the Plan.  For the avoidance of doubt, this paragraph reflects the fact that Confirmation of the Plan requires the Exculpated Parties to engage in certain rebalancing transactions and distributions of cryptocurrencies and the fact that no regulatory authority has taken the position during the Combined Hearing that such conduct would

violate applicable laws or regulations. Nothing in this provision shall limit in any way the powers of any Governmental Unit to contend that any rebalancing transaction should be stopped or prevented, or that any other action contemplated by the Plan should be enjoined or prevented from proceeding further. Nor does anything in this provision limit the enforcement of any future regulatory or court order that requires that such activities either cease or be modified, or limit the penalties that may be applicable if such a future regulatory or court order is issued and is violated. Similarly, nothing herein shall limit the authority of the Committee on Foreign Investment of the United States to bar any of the contemplated transactions. Nor does anything in this provision alter the terms of the Plan regarding the compliance of the Purchaser with applicable laws in the Unsupported Jurisdictions before distributions of cryptocurrency occur in those Unsupported Jurisdictions.

100.    For the avoidance of doubt, the Debtors are not entitled to a discharge under section 1141(d).

101.    **Governmental Units.** Except as set forth in the exculpation provisions set forth in the Plan (including sections VI.B.1 and VIII.C of the Plan) and in this Confirmation Order, nothing in this Confirmation Order or the Plan shall release or restrict any claim by the United States, the States or any of their agencies of any claim arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any rules or regulations enforced by the United States, the States or any of their agencies against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States or the States from bringing any claim, suit, action or other proceedings against the Released Parties for any liability for any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any

rules or regulations enforced by the United States, the States or any of their agencies, nor shall anything in the Confirmation Order or the Plan exculpate any such party from any liability to the United States, the States or any of their agencies, arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any rules or regulations enforced by the United States, the States or any of their agencies; *provided*, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order.

102.    Except as set forth in the exculpation provisions set forth in the Plan (including sections VI.B.1 and VIII.C of the Plan) and in this Confirmation Order, nothing in this Confirmation Order, the Disclosure Statement, the Plan, or the Asset Purchase Agreement releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit") that is not a "claim" as defined in 11 U.S.C. § 101(5) ("Claim"); (ii) any Claim of a Governmental Unit arising on or after the Effective Date; or (iii) any liability to a Governmental Unit on the part of any non-Debtor (except to the extent set forth in paragraphs 49 and 56 herein); *provided*, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order.

103.    **Securities and Exchange Commission Provisions.**  Notwithstanding anything to the contrary in this Confirmation Order, or any findings announced at the Combined Hearing, nothing in this Confirmation Order, or announced at the Combined Hearing, constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the SEC to challenge transactions involving crypto tokens on any basis is expressly reserved.

104.     Notwithstanding any provision herein to the contrary, nothing in this Confirmation Order or the Plan grants this Court jurisdiction over any police and regulatory actions by the SEC, and the SEC shall retain the power and authority to commence and continue any such actions against any person or entity, including without limitation, the Debtors, in any forum with jurisdiction; *provided*, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order.

105.     Upon the occurrence of the Effective Date, the Debtors' books and records shall be transferred to the Wind-Down Debtor, which shall continue to preserve all financial books and records, emails, and other financial documents relating to the Debtors' business that are currently in the Debtors' possession. The Wind-Down Debtor shall not destroy or otherwise abandon any such documents or records without providing advance notice to the SEC (c/o Therese Scheuer, U.S. Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549, ScheuerT@SEC.GOV) and seeking further authorization from this Court.  Nothing in the Plan or this Confirmation Order shall affect the obligations of the pre-Effective Date Debtors, the Wind-Down Debtor, and/or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

106.     Notwithstanding any language to the contrary herein, no provision in the Plan or this Confirmation Order shall (a) preclude the OSC or the SEC from enforcing its police or regulatory powers or conducting any investigations of any person or entity, or (b) subject to the exculpation provisions set forth in the Plan (including sections VI.B.1 and VIII.C of the Plan) and in this Confirmation Order, enjoin, limit, impair or delay the OSC or SEC from commencing or

continuing any claims, causes of action or proceeding against any non-Debtor person or non-Debtor entity in any forum.

107. **Employee Transition Plan.** The Employee Transition Plan, the terms of which are included in the Plan Supplement as <u>Exhibit H</u>, will be implemented following the Effective Date and is not subject to the Court's approval.

108. **Compliance with Tax Requirements.** In connection with the Plan, to the extent applicable, the Debtors, the Wind-Down Debtor, any Distribution Agent, and any other applicable withholding and reporting agents shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors, the Wind-Down Debtor, the Distribution Agent, and any other applicable withholding and reporting agents shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including winding-down a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms that are reasonable and appropriate; *provided* that the Wind-Down Debtor and the Distribution Agent, as applicable, shall request appropriate documentation from the applicable distributees and allow such distributees a reasonable amount of time to respond. The Debtors, the Wind-Down Debtor, the Distribution Agent, and any other applicable withholding and reporting agents reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

109.    **Exemption from Certain Taxes and Fees.**  To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Debtor, the Wind-Down Debtor, the Purchaser, or to any other Entity) of property under the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Wind-Down Debtor; (b) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment, or recording of any lease or sublease; or (d) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, including the Asset Purchase Agreement, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of this Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

110. **Termination of Asset Purchase Agreement.** If the Asset Purchase Agreement is terminated and the Sale Transaction is not consummated, all provisions in this Confirmation Order relating to the Asset Purchase Agreement, the Sale Transaction, and the Purchaser shall be of no force and effect, and the Debtors are authorized to consummate the Liquidation Transaction without further order of the Court.

111. **The Liquidation Transaction.** If the Asset Purchase Agreement is terminated, the Debtors shall pursue the Liquidation Transaction contemplated under the Plan and shall provide all Holders of Claims and Interests with the treatment afforded to such Holders under the Plan. In the event that the Debtors determine to pursue the Liquidation Transaction contemplated under Article IV of the Plan, the Debtors shall promptly notify the Court and all parties in interest. The Plan shall be deemed to satisfy all requirements under the Bankruptcy Code with respect to either the Sale Transaction or the Liquidation Transaction pursuant to this Confirmation Order.

112. **Documents, Mortgages, and Instruments.** Each federal, state, commonwealth, local, foreign, or other governmental agency is authorized to accept any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the Plan, including the Restructuring Transactions, and this Confirmation Order.

113. **The BNY Objection.** This Confirmation Order confirms that the Deed of Trust and Assignment of Rents recorded January 5, 2023 Official Records of Orange County (the "Deed") transferring title of 37 Black Hawk, Irvine, California 92603 (the "Property") from Michael G. Beason and Mickey L. Wiebeis (collectively, the "Property Borrowers") to Voyager Digital, LLC is void. This Confirmation Order may be recorded against the Property as evidence and confirmation that the Deed is void. The Bank Of New York Mellon f/k/a the Bank Of New York, As Trustee For The Certificateholders Of CWALT, Inc., Alternative Loan Trust 2005-38,

Mortgage Pass-Through Certificates, Series 2005-38 as Serviced by Shellpoint Mortgage Servicing ("Shellpoint") shall be permitted to take any other the necessary actions to void the Deed. To the extent necessary, the automatic stay is lifted solely as it pertains to Shellpoint's rights to take action against the Property and shall be effective immediately upon entry of this Confirmation Order. The Debtor(s) shall not be party to any foreclosure or other proceeding related to the Property as they lack any interest in the Property. Shellpoint shall release the Debtors and the Wind-Down Debtor of any costs and claims incurred on account of the Property, including any actions taken in any foreclosure or other proceeding or associated with voiding the Deed. This Confirmation Order shall in no way prevent Shellpoint from pursuing any and all lawful rights and remedies as to the Property Borrowers.

114. **Continued Effect of Stays and Injunction.** Unless otherwise provided in the Plan or this Confirmation Order, all injunctions or stays arising under or entered during these Chapter 11 Cases under section 362 of the Bankruptcy Code or otherwise and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

115. **Notice of Subsequent Pleadings.** Except as otherwise provided in the Plan or in this Confirmation Order, notice of all subsequent pleadings in these Chapter 11 Cases after the Effective Date will be limited to the following parties: (a) the Wind-Down Debtor and its counsel; (b) the U.S. Trustee; (c) counsel to the Purchaser; (d) any party known to be directly affected by the relief sought by such pleadings; and (e) any party that has previously requested notice or who files a request for notice under Bankruptcy Rule 2002 after the Effective Date. The Claims, Noticing, and Solicitation Agent shall not be required to file updated service lists.

116.   **Choice of Law.**   Unless a rule of law or procedure is supplied by federal law
(including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the
laws of the State of New York, without giving effect to the principles of conflict of laws, shall
govern the rights, obligations, construction, and implementation of the Plan and any agreements,
documents, instruments, or contracts executed or entered into in connection with the Plan (except
as otherwise set forth in those agreements, documents, instruments, or contracts, in which case the
governing law of such agreement shall control); provided that corporate, limited liability company,
or partnership governance matters relating to the Debtors or the Wind-Down Debtor, as applicable,
shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant
Debtor or Wind-Down Debtor, as applicable.

117.   **Protection Against Discriminatory Treatment.**   As provided by section 525 of
the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States
Constitution, no Entity, including Governmental Units, shall discriminate against any Wind-Down
Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other
similar grant to, condition such a grant to, or discriminate with respect to such a grant against, any
Wind-Down Debtor, or any Entity with which a Wind-Down Debtor has been or is associated,
solely because such Wind-Down Debtor was a debtor under chapter 11 of the Bankruptcy Code or
may have been insolvent before the commencement of the Chapter 11 Cases (or during the
Chapter 11 Cases).

118.   **Notices of Confirmation and Effective Date.**   The Debtors or the Wind-Down
Debtor, as applicable, shall serve notice of entry of this Confirmation Order, of the occurrence of
the Effective Date, and of applicable deadlines (the "Notice of Confirmation") in accordance with
Bankruptcy Rules 2002 and 3020(c) on all parties served with the Combined Hearing Notice seven

Business Days after the Effective Date; *provided* that no notice of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed notice of the Combined Hearing, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address," or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address. For those parties receiving electronic service, filing on the docket is deemed sufficient to satisfy such service and notice requirements.

119.    No later than ten Business Days after the Effective Date, the Wind-Down Debtor shall cause the Notice of Confirmation, modified for publication, to be published on one occasion in *The New York Times* (national edition) and *USA Today* (national edition). Mailing and publication of the Notice of Confirmation in the time and manner set forth in this paragraph will be good, adequate, and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c). No further notice is necessary.

120.    **Dissolution of Statutory Committees.** On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided*, *however*, that such committees will remain in existence for the limited purposes of (a) pursuing, supporting, or otherwise participating in, any outstanding appeals in the Chapter 11 Cases; and (b) filing, objecting, or otherwise participating in, any final fee applications of Professionals.

121.    **Exemption from Registration.** The Plan Administrator shall hold the equity of Voyager Digital Ltd., to the extent that any new equity is issued, in an agency capacity, for the

benefit of and to facilitate the rights of Holders of Interests provided under the Plan; *provided* that such equity, if issued, shall be uncertificated and non-transferable.

122.     **Effect of Non-Occurrence of Conditions to Confirmation.**  If the Effective Date does not occur within 120 days after the Confirmation Date, then the Plan will be null and void in all respects, any and all compromises or settlements not previously approved by Final Order of the Court embodied in the Plan (including with respect to the fixing, limiting, or treatment of any Claim or Interest), shall be deemed null and void, and nothing contained in the Plan or the Disclosure Statement shall:  (a) constitute a waiver or release of any Claims, Interests, or Causes of Action held by any Debtor or any other Entity; (b) prejudice in any manner the rights of any Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity in any respect.

123.     **Substantial Consummation.**  On the Effective Date, the Plan shall be deemed to have been substantially consummated or shall be anticipated to be substantially consummated concurrent with the occurrence of the Effective Date.

124.     **Waiver of Stay.**   For good cause shown, the stay of this Confirmation Order provided by the Bankruptcy Rules shall terminate at the end of the day on March 13, 2023, and this Confirmation Order shall be effective and enforceable immediately thereafter.

125.     **Headings.**  Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

126.     **Effect of Conflict.**  This Confirmation Order supersedes any Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order.  If there is any inconsistency between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order shall govern and control.  For the avoidance of doubt, the

54

*Stipulation and Agreed Order Between the Debtors and Metropolitan Commercial Bank* [Docket No. 821] remains in effect and is not superseded by this Confirmation Order.

127. **Final, Appealable Order.** This Confirmation Order is a final judgment, order, or decree for purposes of 28 U.S.C. § 158(a), and the period in which an appeal must be filed shall commence upon the entry hereof.

128. **Retention of Jurisdiction.** The Court may properly, and upon the Effective Date shall, to the full extent set forth in the Plan, retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including (i) the matters set forth in Article XI of the Plan and (ii) as set forth in Section 10.13 of the Asset Purchase Agreement.

Dated: New York, New York
       March 10, 2023

/s/ **Michael E. Wiles**
THE HONORABLE MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

---

**NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE, COMMITMENT, OR LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST, AND THIS PLAN IS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS.  THIS PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES.**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital, LTD. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

## TABLE OF CONTENTS

Page

Introduction ........................................................................................................................................ 1

**Article I. Defined Terms, Rules of Interpretation, Computation of Time, Governing Law, and
Other References** ....................................................................................................................... 1

    A.    Defined Terms ................................................................................................................... 1
    B.    Rules of Interpretation ..................................................................................................... 17
    C.    Computation of Time ....................................................................................................... 18
    D.    Governing Law ................................................................................................................ 18
    E.    Reference to Monetary Figures ....................................................................................... 18
    F.    Reference to the Debtors or the Wind-Down Debtor ..................................................... 18
    G.    Nonconsolidated Plan ..................................................................................................... 18

**Article II. Administrative and Priority Claims** ......................................................................... 18

    A.    Administrative Claims ..................................................................................................... 19
    B.    Professional Fee Claims .................................................................................................. 19
    C.    Priority Tax Claims ......................................................................................................... 21

**Article III. Classification, Treatment, and Voting of Claims and Interests** .......................... 21

    A.    Classification of Claims and Interests ............................................................................ 21
    B.    Summary of Classification .............................................................................................. 21
    C.    Treatment of Classes of Claims and Interests ................................................................ 22
    D.    Special Provision Governing Unimpaired Claims .......................................................... 28
    E.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes ............ 29
    F.    Subordinated Claims ....................................................................................................... 29
    G.    Intercompany Interests .................................................................................................... 29
    H.    Controversy Concerning Impairment .............................................................................. 29
    I.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy
        Code ................................................................................................................................ 29

**Article IV. Provisions for Implementation of the Plan** ............................................................ 30

    A.    General Settlement of Claims and Interests .................................................................... 30
    B.    Restructuring Transactions .............................................................................................. 30
    C.    The Sale Transaction ...................................................................................................... 30
    D.    The Liquidation Transaction ........................................................................................... 31
    E.    Employee Transition Plan ............................................................................................... 32
    F.    Non-Released D&O Claims ............................................................................................. 32
    G.    The D&O Settlement ....................................................................................................... 33
    H.    The Wind-Down Debtor .................................................................................................. 35
    I.    Sources of Consideration for Plan Distributions ............................................................ 42
    J.    Corporate Existence and Dissolution ............................................................................. 42
    K.    Corporate Action ............................................................................................................ 43
    L.    Vesting of Assets in the Wind-Down Debtor ................................................................. 44
    M.    Cancellation of Notes, Instruments, Certificates, and Other Documents ...................... 44
    N.    Effectuating Documents; Further Transactions .............................................................. 44
    O.    Section 1146(a) Exemption ............................................................................................. 45

P.      Preservation of Rights of Action.................................................................... 45
Q.      Election to Contribute Third-Party Claims ...................................................... 46
R.      Contribution of Contributed Third-Party Claims ............................................. 46
S.      Closing the Chapter 11 Cases ........................................................................ 46

**Article V. Treatment of Executory Contracts and Unexpired Leases** ...................................... **47**

A.      Assumption and Rejection of Executory Contracts and Unexpired Leases...................... 47
B.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired
        Leases ........................................................................................................... 47
C.      Claims Based on Rejection of Executory Contracts or Unexpired Leases ..................... 47
D.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed .................. 48
E.      Insurance Policies ........................................................................................... 49
F.      Reservation of Rights....................................................................................... 50
G.      Nonoccurrence of Effective Date...................................................................... 50
H.      Contracts and Leases Entered into After the Petition Date ................................... 50

**Article VI. Provisions Governing Distributions** .................................................................... **50**

A.      Timing and Calculation of Amounts to Be Distributed ......................................... 50
B.      Rights and Powers of Distribution Agent .......................................................... 51
C.      Delivery of Distributions and Undeliverable or Unclaimed Distributions ................... 51
D.      Compliance Matters ........................................................................................ 54
E.      Foreign Currency Exchange Rate ...................................................................... 54
F.      Claims Paid or Payable by Third Parties ............................................................ 54
G.      Setoffs and Recoupment ................................................................................... 55
H.      Allocation between Principal and Accrued Interest............................................... 55

**Article VII. Procedures for Resolving Disputed, Contingent, and Unliquidated Claims and
Interests**........................................................................................................................ **55**

A.      Disputed Claims Process .................................................................................. 55
B.      Objections to Claims or Interests ...................................................................... 56
C.      Estimation of Claims ....................................................................................... 57
D.      No Distributions Pending Allowance ................................................................. 57
E.      Distributions After Allowance .......................................................................... 57
F.      No Interest...................................................................................................... 57
G.      Adjustment to Claims and Interests without Objection .......................................... 58
H.      Time to File Objections to Claims ..................................................................... 58
I.      Disallowance of Claims or Interests ................................................................... 58
J.      Amendments to Proofs of Claim ....................................................................... 58

**Article VIII. Effect of Confirmation of the Plan** ................................................................ **59**

A.      Releases by the Debtors ................................................................................... 59
B.      Releases by Holders of Claims and Interests ...................................................... 59
C.      Exculpation .................................................................................................... 60
D.      Injunction ...................................................................................................... 61
E.      Release of Liens ............................................................................................. 61
F.      OSC and SEC................................................................................................. 62
G.      Protection against Discriminatory Treatment ...................................................... 62
H.      Document Retention ........................................................................................ 62
I.      Reimbursement or Contribution ........................................................................ 62

J.    Term of Injunctions or Stays ................................................................................ 62

**Article IX. Conditions Precedent to the Effective Date** ................................................ 63

A.    Conditions Precedent to the Effective Date ......................................................... 63
B.    Waiver of Conditions Precedent .......................................................................... 63
C.    Effect of Non-Occurrence of Conditions to Consummation ............................... 64

**Article X. Modification, Revocation, or Withdrawal of the Plan** ................................ 64

A.    Modification of Plan ............................................................................................. 64
B.    Effect of Confirmation on Modifications ............................................................. 64
C.    Revocation or Withdrawal of Plan ....................................................................... 64

**Article XI. Retention of Jurisdiction** ............................................................................. 65

**Article XII. Miscellaneous Provisions** ............................................................................ 67

A.    Immediate Binding Effect .................................................................................... 67
B.    Additional Documents .......................................................................................... 67
C.    Payment of Statutory Fees ................................................................................... 67
D.    Dissolution of Statutory Committees ................................................................... 67
E.    Reservation of Rights ........................................................................................... 67
F.    Successors and Assigns ........................................................................................ 68
G.    Service of Documents .......................................................................................... 68
H.    Entire Agreement; Controlling Document ........................................................... 68
I.    Plan Supplement .................................................................................................. 69
J.    Non-Severability .................................................................................................. 69
K.    Votes Solicited in Good Faith .............................................................................. 69
L.    Waiver or Estoppel .............................................................................................. 69

## INTRODUCTION

Voyager Digital Holdings, Inc. and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (each a "Debtor" and, collectively, the "Debtors") propose this third amended joint plan (the "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan and not otherwise defined shall have the meanings set forth in Article I.A of the Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of this Plan, and certain related matters.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.

### DEFINED TERMS, RULES OF INTERPRETATION,
### COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

**A.    Defined Terms**

Capitalized terms used in this Plan have the meanings ascribed to them below.

1.    "*3AC*" means Three Arrows Capital, Ltd and any of its Affiliates or subsidiaries.

2.    "*3AC Claims*" means the claims or causes of action asserted or assertable by the Debtors against 3AC, whether in the 3AC Liquidation Proceeding or otherwise.

3.    "*3AC Liquidation Proceeding*" means that certain liquidation proceeding captioned *In the Matter of Three Arrows Capital Ltd. and in the Matter of Sections 159(1) and 162(1)(a) and (b) of the Insolvency Act 2003*, Claim No. BVIHC(COM)2022/0119 before the Eastern Caribbean Supreme Court in the High Court of Justice in the British Virgin Islands and the chapter 15 foreign recognition proceeding captioned *In re Three Arrows Capital, Ltd.*, No. 22-10920 (Bankr. S.D.N.Y. Jul. 1, 2022).

4.    "*3AC Loan*" means that loan of 15,250 Bitcoins and 350 million USDC to 3AC pursuant to that certain master loan agreement dated March 4, 2022 by and between 3AC, as borrower, and OpCo and HTC Trading, Inc., as lenders.

5.    "*3AC Recovery*" means the recovery, if any, of the Debtors from 3AC on account of the 3AC Claims.

6.    "*Account*" means any account at OpCo held by an Account Holder relating to Cryptocurrency, which Account is identified in the Debtors' books and records as holding Cryptocurrency as of the Petition Date.

7.      "*Account Holder*" means any Person or Entity who holds an Account with OpCo as of the Petition Date.

8.      "*Account Holder Claim*" means any Claim against the Debtors that is held by an Account Holder on account of such Holder's Account.

9.      "*Acquired Assets*" has the meaning ascribed to it in the Asset Purchase Agreement.

10.     "*Acquired Coins*" has the meaning ascribed to it in the Asset Purchase Agreement.

11.     "*Acquired Coins Value*" has the meaning ascribed to it in the Asset Purchase Agreement.

12.     "*Additional Bankruptcy Distribution*" has the meaning ascribed to it in the Asset Purchase Agreement.

13.     "*Administrative Claim*" means a Claim against a Debtor for the costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and prior to the Effective Date pursuant to section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business and (b) Allowed Professional Fee Claims.

14.     "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims (other than requests for payment of Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), which:  (a) with respect to Administrative Claims other than Professional Fee Claims, shall be thirty days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be forty-five days after the Effective Date.

15.     "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.  With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

16.     "*Alameda*" means Alameda Ventures Ltd., along with its Affiliates and subsidiaries.

17.     "*Alameda Claims*" means the claims or causes of action asserted or assertable by the Debtors against Alameda, whether in the FTX Bankruptcy Proceeding or otherwise.

18.     "*Alameda Loan Agreement*" means that certain unsecured loan agreement, dated as of June 21, 2022, as amended, restated, amended and restated, modified, or supplemented from time to time, by and among HoldCo, as the borrower, TopCo, as the guarantor, and Alameda, as the lender thereto.

19.     "*Alameda Loan Facility*" means that certain unsecured loan facility provided for under the Alameda Loan Agreement.

20.     "*Alameda Loan Facility Claims*" means any Claim against any Debtor derived from, based upon, or arising under the Alameda Loan Agreement and any fees, costs, and expenses that are reimbursable by any Debtor pursuant to the Alameda Loan Agreement.

21.     "*Alameda Recovery*" means the recovery, if any, of the Debtors from Alameda on account of the Alameda Claims.

22.     "*Allowed*" means, with respect to any Claim or Interest, except as otherwise provided herein:  (a) a Claim or Interest that is evidenced by a Proof of Claim timely Filed by the Bar Date or a request for payment of Administrative Claim timely Filed by the Administrative Claims Bar Date (or for which Claim or Interest under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a Proof of Claim or a request for payment of Administrative Claim is not or shall not be required to be Filed); (b) a Claim or Interest that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; (c) a Claim or Interest Allowed pursuant to the Plan, any stipulation approved by the Bankruptcy Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Bankruptcy Court, or (d) a Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court; *provided* that, with respect to a Claim or Interest described in clauses (a) and (b) above, such Claim or Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or if such an objection is so interposed, such Claim or Interest shall have been Allowed by a Final Order.  Any Claim or Interest that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes. A Proof of Claim Filed after and subject to the Bar Date or a request for payment of an Administrative Claim Filed after and subject to the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.  "Allow" and "Allowing" shall have correlative meanings.

23.     "*Asset Purchase Agreement*" means that certain asset purchase agreement dated as of December 18, 2022 by and between BAM Trading Services Inc. (d/b/a Binance.US) as Purchaser and Voyager Digital, LLC as Seller.

24.     "*Assumed Liabilities*" has the meaning ascribed to it in the Asset Purchase Agreement.

25.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended.

26.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York, or any other court having jurisdiction over the Chapter 11 Cases, including to the extent of the withdrawal of reference under section 157 of the Judicial Code, the United States District Court for the Southern District of New York.

27.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated by the United States Supreme Court under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

28.     "*Bar Date*" means the applicable deadline by which Proofs of Claim must be Filed, as established by:  (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

29.     "*Bar Date Order*" means the *Order (I) Setting Deadlines for Submitting Proofs of Claims, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* [Docket No. 218].

30.     "*Binance.US Platform*" has the meaning ascribed to it in the Asset Purchase Agreement.

31.     "*Binance US*" means BAM Trading Services Inc. (d/b/a Binance.US).

32.     "*Binance US Account*" means a customer account opened with the Purchaser by an Account Holder or a Holder of an Allowed OpCo General Unsecured Claim.

33.     "*Business Day*" means any day, other than a Saturday, Sunday, or a "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

34.     "*Cash*" or "*$*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

35.     "*Causes of Action*" mean any action, Claim, cross-claim, third-party claim, damage, judgment, cause of action, controversy, demand, right, suit, obligation, liability, debt, account, defense, offset, power, privilege, license, Lien, indemnity, interest, guaranty, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, in contract or in tort, at law or in equity, or pursuant to any other theory of law in accordance with applicable law.  For the avoidance of doubt, "Causes of Action" includes:  (a) any right of setoff, counterclaim, or recoupment and any claim arising from any contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any right to object to or otherwise contest Claims or Interests; (d) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; and (e) any claim or defense, including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

36.     "*CCO*" means Evan Psaropoulos.

37.     "*CEO*" means Stephen Ehrlich.

38.     "*Certificate*" means any instrument evidencing a Claim or an Interest.

39.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor in the Bankruptcy Court under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated cases filed for the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

40.     "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

41.     "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) (i) with respect to Administrative Claims (other than Professional Fee Claims and Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), sixty days after the Administrative Claims Bar Date or (ii) with respect to all other Claims (other than Professional Fee Claims), 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Wind-Down Debtor, as applicable, as approved by an order of the Bankruptcy Court for objecting to such Claims.

42.     "*Claims Register*" means the official register of Claims against and Interests in the Debtors maintained by the Clerk of the Bankruptcy Court or the Claims, Noticing, and Solicitation Agent.

43.     "*Claims, Noticing, and Solicitation Agent*" means Bankruptcy Management Solutions, Inc. d/b/a Stretto, in its capacity as the claims, noticing, and solicitation agent in the Chapter 11 Cases for the Debtors and any successors appointed by an order of the Bankruptcy Court.

44.     "*Class*" means a class of Claims against or Interests in the Debtors as set forth in Article III of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

45.     "*Committee*" means the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases.

46.     "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

47.     "*Confirmation Date*" means the date on which Confirmation occurs.

48.     "*Confirmation Hearing*" means the hearing before the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code at which the Debtors will seek Confirmation of the Plan.

49.     "*Confirmation Order*" has the meaning ascribed to it in the Asset Purchase Agreement.

50.     "*Consummation*" means the occurrence of the Effective Date.

51.     "*Contributed Third-Party Claims*" means all direct Causes of Action that any Contributing Claimant has against any Person (other than a Debtor) that had a direct relationship with the Debtors, their predecessors, or respective affiliates and that harmed such Contributing Claimant in the claimant's capacity as a creditor of Voyager, including (a) all Causes of Action based on, arising out of, or related to the marketing, sale, and issuance of Cryptocurrency that at any point was held or offered on Voyager's platform; (b) all Causes of Action based on, arising out of, or related to the alleged misrepresentation of any of the Debtors' financial information, business operations, or related internal controls; and (c) all Causes of Action based on, arising out of, or related to any alleged failure to disclose, or actual or attempted cover up or obfuscation of, any of the Debtors' conduct prior to the Petition Date; *provided*, *however*, that Contributed Third-Party Claims do not include (i) any derivative claims of the Debtors; (ii) any direct claims against the Released Parties; (iii) any direct Causes of Action that any Contributing Claimant has against Mark Cuban, Dallas Basketball Limited d/b/a Dallas Mavericks, the National Basketball Association, and any of their Related Parties; or (iv) any direct Causes of Action that any Contributing Claimant, in its capacity as an equity holder of Voyager Digital Ltd., has that are asserted in the currently filed complaint, dated as of July 6, 2022, in the Ontario Superior Court of Justice by Francine De Sousa, against Voyager Digital Ltd., Stephen Ehrlich, Philip Eytan, Evan Psaropoulos, Lewis Bateman, Krisztian Toth, Jennifer Ackart, Glenn Stevens, and Brian Brooks.

52.     "*Contributing Claimants*" means any Holders of Claims or Interests that elect on their ballots or opt-in forms to contribute their Contributed Third-Party Claims to the Wind-Down Debtor.

53.     "*Cryptocurrency*" means a digital currency or crypto asset in which transactions are verified and records maintained by a decentralized system using cryptography, rather than by a centralized authority, including stablecoins, digital coins and tokens, such as security tokens, utility tokens and governance tokens.

54.    "*Cure*" or "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's default under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

55.    "*Customer Onboarding Protocol*" means the protocol describing the process of onboarding Account Holders and Holders of OpCo General Unsecured Claims onto the Binance.US Platform, the form of which shall be included in the Plan Supplement and filed no later than by February 8, 2023, and which shall be in a form acceptable to the Purchaser.

56.    "*D&O Carriers*" means the insurance carriers of the D&O Liability Insurance Policies.

57.    "*D&O Liability Insurance Policies*" means all unexpired insurance policies maintained by the Debtors, the Wind-Down Debtor, or the Estates as of the Effective Date that have been issued (or provide coverage) regarding directors', managers', officers', members', and trustees' liability (including any "tail policy"), including but not limited to the Management Liability Policy, the Excess Policies, and the Side-A Policy, and all agreements, documents, or instruments relating thereto.

58.    "*D&O Settlement*" means the settlement between the Debtors and CEO and CCO as set forth in Article IV.G of the Plan.

59.    "*Debtors*" means, collectively, each of the following:  Voyager Digital Holdings, Inc.; Voyager Digital Ltd.; and Voyager Digital, LLC.

60.    "*Definitive Documents*" means (a) the Plan (and any and all exhibits, annexes, and schedules thereto); (b) the Confirmation Order; (c) the Disclosure Statement and the other Solicitation Materials; (d) the Disclosure Statement Order; (e) all pleadings filed by the Debtors in connection with the Chapter 11 Cases (or related orders); (f) the Plan Supplement; (g) the Asset Purchase Agreement; (h) the Customer Onboarding Protocol; and (i) any and all other deeds, agreements, filings, notifications, pleadings, orders, certificates, letters, instruments or other documents reasonably desired or necessary to consummate and document the transactions contemplated by the Restructuring Transactions (including any exhibits, amendments, modifications, or supplements made from time to time thereto); *provided* that any documents included in subsection (i) only include documents arising on or after the Petition Date but prior to the Effective Date and that are within the jurisdiction of the Bankruptcy Court.

61.    "*Disclosure Statement*" means the *Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, as may be amended, supplemented, or otherwise modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan.

62.    "*Disclosure Statement Order*" means the order entered by the Bankruptcy Court approving the Disclosure Statement.

63.    "*Disputed*" means a Claim or an Interest or any portion thereof:  (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order; and (c) with respect to which a party in interest has Filed a Proof of Claim, a Proof of Interest, or otherwise made a written request to a Debtor for payment.

64.    "*Disputed Claims Reserve*" means an appropriate reserve in an amount to be determined by the Wind-Down Debtor for distributions on account of Disputed Claims that are subsequently Allowed after the Effective Date, in accordance with Article VII.D hereof.

65.     "*Distributable Cryptocurrency*" means all Cryptocurrency held on the Voyager platform or that is otherwise property of any Debtor on the Effective Date after payment in full of, or reserve for, all Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims.

66.     "*Distributable HoldCo Cash*" means HoldCo's Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at HoldCo in full; and (y) to fund HoldCo's Pro Rata share of the Wind-Down Budget.

67.     "*Distributable OpCo Cash*" means OpCo's Cash, including the Purchase Price Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at OpCo in full; and (y) to fund OpCo's Pro Rata share of the Wind-Down Budget.

68.     "*Distributable TopCo Cash*" means TopCo's Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at TopCo in full; and (y) to fund TopCo's Pro Rata share of the Wind-Down Budget.

69.     "*Distribution Agent*" means, as applicable, the Purchaser, the Debtors, the Wind-Down Debtor or any Entity or Entities designated by the Purchaser, the Debtors, or the Wind-Down Debtor to make or to facilitate distributions that are to be made pursuant to the Plan, Definitive Documents, and Asset Purchase Agreement.

70.     "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the Wind-Down Debtor, on or after the Effective Date, upon which the Distribution Agent shall make distributions to Holders of Allowed Claims or Allowed Interests entitled to receive distributions under the Plan.

71.     "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims and Interests against the Debtors are eligible to receive distributions under the Plan, which date shall be the Effective Date, or such other date as is determined by the Debtors or designated by an order of the Bankruptcy Court.

72.     "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan, (b) no stay of the Confirmation Order is in effect, and (c) the Debtors declare the Plan effective.

73.     "*Employee Transition Plan*" has the meaning set forth in Article IV.E of the Plan, and which shall be in form and substance reasonably acceptable to the Committee.

74.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

75.     "*Estate*" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtor after the Petition Date through and including the Effective Date.

76.     "*Excess Policies*" means, collectively, the Excess Insurance Policy, No. EFI1203041-01, issued by Euclid Financial on behalf of Certain Underwriters of Lloyd's, London, the Excess Insurance Policy, No. RILEDOA3392022, issued by Relm Insurance Ltd., both for the February 22, 2022 to

February 22, 2023 period, and the Excess Policy, No. ELU184180-23, issued by XL Specialty Insurance Company, for the February 22, 2022 to July 1, 2023 period.

77.    "*Exculpated Parties*" means, collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) the Committee, and each of the members thereof, solely in their capacity as such; (c) each of the Released Professionals; (d) each of the Released Voyager Employees; (e) the Plan Administrator; and (f) the Distribution Agent.

78.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

79.    "*Existing Equity Interests*" means any Interest in TopCo existing immediately prior to the occurrence of the Effective Date.

80.    "*Extended Outside Date*" has the meaning set forth in the Asset Purchase Agreement.

81.    "*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

82.    "*File*," "*Filed*," or "*Filing*" means file, filed, or filing, respectively, in the Chapter 11 Cases with the Bankruptcy Court or its authorized designee, or, with respect to the filing of a Proof of Claim or Proof of Interest, file, filed, or filing, respectively, with the Claims, Noticing, and Solicitation Agent.

83.    "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

84.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, reargument, reconsideration, or rehearing has been timely taken or filed, or as to which any appeal that has been or may be taken or any petition for certiorari or any motion for a new trial, reargument, reconsideration, or rehearing that has been or may be made or filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the motion for a new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order (if any such motion has been or may be granted), or have otherwise been dismissed with prejudice; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

85.    "*FTX*" means FTX Trading, Ltd. and any of its Affiliates or subsidiaries, including West Realm Shires Inc (d/b/a "FTX.US").

86.    "*FTX Bankruptcy Proceeding*" means that certain chapter 11 proceeding captioned *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022).

87.    "*FTX Claims*" means the claims or causes of action asserted or assertable by the Debtors against FTX, whether in the FTX Bankruptcy Proceeding or otherwise.

88.    "*FTX Recovery*" means the recovery, if any, of the Debtors from FTX on account of the FTX Claims.

89.     "*FTX Settlement*" means the settlement between the Debtors, the Committee, FTX, Alameda, and the official committee of unsecured creditors in the FTX Bankruptcy Proceeding, pursuant to the terms set forth in the *Debtors' Motion for Entry of an Order Approving the Joint Stipulation and Agreed Order Between the Voyager Debtors, the FTX Debtors, and Their Respective Official Committees of Unsecured Creditors* [Docket No. 1106].

90.     "*General Unsecured Claim*" means, collectively, any HoldCo General Unsecured Claim, OpCo General Unsecured Claim, or TopCo General Unsecured Claim.

91.     "*Governmental Claimant Stipulation*" means the *Joint Stipulation and Agreed Order Between the Debtors and Governmental Claimants* [Docket. No. 1100].

92.     "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

93.     "*Government Bar Date*" means the applicable deadline by which Proofs of Claim by a Governmental Unit must be Filed, as established by:  (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

94.     "*HoldCo*" means Voyager Digital Holdings, Inc.

95.     "*HoldCo General Unsecured Claim*" means any Claim against HoldCo that is not Secured and is not:  (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Alameda Loan Facility Claim; or (h) an Intercompany Claim.  For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation, against HoldCo are HoldCo General Unsecured Claims.

96.     "*Holder*" means an Entity holding a Claim against or an Interest in any Debtor.

97.     "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

98.     "*Insurance Policies*" means any and all insurance policies entered into by the Debtors, including the D&O Insurance Policies.

99.     "*Intercompany Claim*" means any Claim held by a Debtor or a Debtor's Affiliate against a Debtor.

100.    "*Intercompany Interest*" means, other than an Interest in Voyager, an Interest in one Debtor held by another Debtor or a Debtor's Affiliate.

101.    "*Interest*" means any equity security (as such term is defined in section 101(16) of the Bankruptcy Code) including all issued, unissued, authorized, or outstanding shares of capital stock and any other common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profit interests of an Entity, including all options, warrants, rights, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in an Entity whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, and including any Claim against

9

the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to the foregoing.

102. "*Interim Compensation Order*" means the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals and (II) Granting Related Relief* [Docket No. 236].

103. "*Investigated Matters*" means (i) the Debtors' loans to third parties, including the 3AC Loan; (ii) the diligence performed in connection with the loans described in (i); (iii) the formation and function of the Debtors' Risk Committee; (iv) the Debtors' staking of cryptocurrency assets; (v) the Debtors' regulatory compliance; (vi) the Debtors' communications with the public; and (vii) the Debtors' pre-petition transfers to Released Voyager Employees (including customer withdrawals) within one (1) year of the Petition Date.

104. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001 and the rules and regulations promulgated thereunder, as applicable to the Chapter 11 Cases.

105. "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

106. "*Liquidation Procedures*" means, in the event the Sale Transaction is not consummated by the Outside Date, such procedures filed by the Wind-Down Debtor identifying the mechanics and procedures to effectuate the Liquidation Transaction.

107. "*Liquidation Transaction*" means, in the event the Sale Transaction is not consummated by the Outside Date, the distribution of the Debtors' Cryptocurrency, Cash and other assets pursuant to Article IV.D of this Plan.

108. "*Management Liability Policy*" means the Executive and Corporate Securities Liability Insurance Policy, No. ELU181214-22, issued by XL Specialty Insurance Company for the February 22, 2022 to February 22, 2023 period.

109. "*Money Transmitter License*" means any consent, license, certificate, franchise, permission, variance, clearance, registration, qualification, authorization, waiver, exemption or other permit issued, granted, given or otherwise made available by or under the authority of any Governmental Unit pursuant to state money transmission or similar laws.

110. "*Net Owed Coins*" has the meaning ascribed to it in the Asset Purchase Agreement.

111. "*Non-Released D&O Claims*" has the meaning set forth in Article IV.F of the Plan.

112. "*Non-Released D&O Claim Budget*" means the amount allocated to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims, which amount shall be agreed upon between the Debtors and the Committee prior to the Confirmation Hearing.

113. "*Non-Released Insurance Claims*" has the meaning set forth in Article IV.F of the Plan.

114. "*OpCo*" means Voyager Digital, LLC.

115. "*OpCo General Unsecured Claim*" means any Claim against OpCo that is not Secured and is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim;

(f) a Professional Fee Claim; (g) an Account Holder Claim; or (h) an Intercompany Claim. For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation against OpCo are OpCo General Unsecured Claims.

116. "*OSC*" means the Ontario Securities Commission.

117. "*Other Priority Claim*" means any Claim against a Debtor, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

118. "*Outside Date*" has the meaning set forth in the Asset Purchase Agreement. All references herein to the "Outside Date" shall be deemed to include the "Extended Outside Date" to the extent the Outside Date is extended in accordance with Section 8.1(c) of the Asset Purchase Agreement.

119. "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

120. "*Petition Date*" means July 5, 2022.

121. "*Plan*" means this joint chapter 11 plan and all exhibits, supplements, appendices, and schedules hereto, as may be altered, amended, supplemented, or otherwise modified from time to time in accordance with Article X.A hereof, including the Plan Supplement (as altered, amended, supplemented, or otherwise modified from time to time), which is incorporated herein by reference and made part of the Plan as if set forth herein.

122. "*Plan Administrator*" means the Person or Persons selected by the Committee, after consultation with the Debtors, subject to the approval of the Bankruptcy Court and identified in the Plan Supplement, to serve as the administrator(s) of the Wind-Down Debtor, and any successor thereto, appointed pursuant to the Plan Administrator Agreement.

123. "*Plan Administrator Agreement*" means that certain agreement by and among the Debtors, the Committee, the Plan Administrator and the Wind-Down Debtor, which shall be included in the Plan Supplement in a form reasonably acceptable to the Committee.

124. "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may thereafter be amended, supplemented, or otherwise modified from time to time in accordance with the terms of the Plan, the Bankruptcy Code, the Bankruptcy Rules, and applicable law), to be Filed by the Debtors no later than seven days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court, and additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement. The Plan Supplement may include the following, as applicable: (a) the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) the Schedule of Retained Causes of Action; (c) the Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases; (d) the Customer Onboarding Protocol; (e) the Restructuring Transactions Memorandum; (f) the Plan Administrator Agreement; (g) the Employee Transition Plan; and (h) any additional documents necessary to effectuate or that is contemplated by the Plan, including any compensation program for any of the Debtors' employees to be established as contemplated in the Plan and the Definitive Documents to facilitate the transfer of Acquired Assets pursuant to the Asset Purchase Agreement and the wind-down of the Debtors' Estates; *provided* that the Schedule of Retained Causes of Action shall be filed no later than 14 days before the Voting Deadline. The Plan Supplement (and the contents thereof) shall be (x) subject to Purchaser's consent rights solely to the extent

set forth under the Asset Purchase Agreement (and shall otherwise be consistent with the Asset Purchase Agreement) and (y) reasonably acceptable to the Committee.

125.    "*Priority Tax Claim*" means any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code.

126.    "*Pro Rata*" means the proportion that (i) an Allowed Claim or an Allowed Interest in a particular Class bears to (ii) the aggregate amount of Allowed Claims or Allowed Interests in that Class and, solely with respect to Claims in Classes 3 and 4(a), the proportion that an Allowed Claim in either such Class bears to the aggregate amount of Allowed Claims in Classes 3 and 4(a) in the aggregate, unless otherwise indicated.   For purposes of calculating Pro Rata distributions if the Sale Transaction is consummated by the Outside Date, the Pro Rata shares of all Holders of Allowed Claims or Allowed Interests shall be calculated taking into account the Acquired Coins Value of the Net Owed Coins distributed to each of the Account Holders.

127.    "*Professional*" means an Entity:  (a) employed in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code or (b) for which compensation and reimbursement has been Allowed by Final Order of the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

128.    "*Professional Fee Claim*" means any Administrative Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

129.    "*Professional Fee Escrow Account*" means an escrow account funded by the Debtors with Cash no later than the Effective Date in an amount equal to the Professional Fee Escrow Amount.

130.    "*Professional Fee Escrow Amount*" means the aggregate amount of quarterly U.S. Trustee fees, Professional Fee Claims, and other unpaid fees and expenses the Professionals have incurred or will incur in rendering services in connection with the Chapter 11 Cases prior to and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, which shall be estimated pursuant to the method set forth in Article II.B of the Plan.

131.    "*Proof of Claim*" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

132.    "*Proof of Interest*" means a written proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

133.    "*Purchase Price Cash*" means the Cash paid by the Purchaser to OpCo pursuant to the Asset Purchase Agreement.

134.    "*Purchaser*" means Binance US.

135.    "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

136.    "*Related Party*" means, with respect to any Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

137.    "*Released Parties*" means, collectively, in each case solely in its capacity as such: (a) the Debtors; (b) the Committee, and each of the members thereof; (c) each of the Released Professionals; (d) Purchaser and each of its Related Parties; and (e) each of the Released Voyager Employees (subject to the limitations contained in Article IV.F and Article IV.G of the Plan); *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Released Parties" under the Plan.

138.    "*Released Professionals*" means the following professionals retained by the Debtors, the Committee, or the Purchaser (as applicable):  (i) Kirkland & Ellis LLP; (ii) Moelis & Company LLC; (iii) Berkeley Research Group, LLC; (iv) Bankruptcy Management Solutions, Inc. d/b/a Stretto; (v) Quinn Emanuel Urquhart & Sullivan LLP; (vi) Deloitte Tax LLP; (vii) Deloitte & Touche LLP; (viii) ArentFox Schiff LLP; (ix) Katten Muchin Rosenman LLP; (x) Fasken Martineau DuMoulin LLP; (xi) Campbells Legal (BVI); (xii) McDermott Will & Emery LLP; (xiii) FTI Consulting, Inc.; (xiv) Epiq Corporate Restructuring, LLC; (xv) Cassels, Brock & Blackwell LLP; (xvi) Paul Hastings LLP; (xvii) Harney Westwood & Riegels LP (BVI); (xviii) Day Pitney LLP (solely in their capacity as counsel to the Debtors); (xix) Jenner & Block LLP; (xx) Seyfarth Shaw LLP; (xxi) Alvarez & Marsal Canada Inc.; (xxii) Blake, Cassels & Graydon LLP; (xxiii) Jaffe Raitt Heuer & Weiss; (xxiv) Latham & Watkins LLP; (xxv) Lowenstein Sandler LLP; (xxvi) Kramer Levin LLP; and (xxvii) Acura Law Firm; *provided* that if the Asset Purchase Agreement is terminated, Latham & Watkins LLP shall not be a "Released Professional" under the Plan.

139.    "*Released Voyager Employees*" means the following directors, officers, and members of senior management of the Debtors serving in such capacity on or after the Petition Date whose conduct was reviewed as part of the Special Committee Investigation: Jennifer Ackert, David Brill, Brian Brooks, David Brosgol, Jonathan Brosnahan, Dan Constantino, Stephen Ehrlich, Philip Eytan, Rakesh Gidwani, Gerard Hanshe, Marshall Jensen, Pam Kramer, Manisha Lalwani, Brian Nistler, Ashwin Prithipaul, Evan Psaropoulos, Brian Silard, Glen Stevens, Krisztian Toth, and Ryan Whooley (subject to the limitations contained in Article IV.F and Article IV.G of the Plan).

140.    "*Releasing Parties*" means, collectively, in each case solely in its capacity as such:  (a) the Debtors; (b) the Committee, and each of the members thereof; (c) each of the Released Professionals; (d) each of the Released Voyager Employees; (e) Purchaser and each of its Related Parties to the extent Purchaser is able to bind such Related Parties; (f) all Holders of Claims that vote to accept the Plan and affirmatively opt into the releases provided by the Plan; (g) all Holders of Claims that vote to reject the Plan and affirmatively opt into the releases provided by the Plan; and (h) all Holders of Claims or Interests that abstain from voting (or are otherwise not entitled to vote) on the Plan and affirmatively opt into the releases provided by the Plan; *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Releasing Parties" under the Plan.

141.    "*Restructuring Transactions*" means those mergers, amalgamations, consolidations, reorganizations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors and the Committee jointly

determine to be necessary to implement the transactions described in this Plan, as described in more detail in Article IV.B herein and the Restructuring Transactions Memorandum.

142.     "*Restructuring Transactions Memorandum*" means that certain memorandum as may be amended, supplemented, or otherwise modified from time to time, describing the steps to be carried out to effectuate the Restructuring Transactions, the form of which shall be included in the Plan Supplement, and which shall be in a form reasonably acceptable to the Committee.

143.     "*Robertson Class Action*" means that certain putative class action litigation filed in the United States District Court for the Southern District of Florida, captioned *Robertson, et al. v. Cuban, et al.*, No. 1:22-cv-22538-RKA (S.D. Fla. Aug. 10, 2022).

144.     "*Sale Transaction*" means the sale of certain of the Debtors' assets and all other transactions pursuant to the Asset Purchase Agreement.

145.     "*Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases*" means a schedule that may be Filed as part of the Plan Supplement, which shall be in form and substance acceptable to the Purchaser and in all respects consistent with the terms of the Asset Purchase Agreement, of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors and assigned to the Purchaser pursuant to the Plan and Asset Purchase Agreement, as the same may be amended, modified, or supplemented from time to time by the Debtors or Wind-Down Debtor, as applicable, in accordance with the Plan.

146.     "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means a schedule that may be Filed as part of the Plan Supplement, which shall be in form and substance reasonably acceptable to the Committee, of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors or Wind-Down Debtor, as applicable, in accordance with the Plan.

147.     "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, settled, compromised, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors and/or the Wind-Down Debtor, which shall be included in the Plan Supplement.  For the avoidance of doubt, any failure to specifically list any Causes of Action on the Schedule of Retained Causes of Action shall not be deemed a waiver or admission that any such Cause of Action does not constitute Vested Causes of Action.

148.     "*Schedules*" means, collectively, the schedules of assets and liabilities, Schedule of Assumed Executory Contracts and Unexpired Leases, Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by each of the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules and statements may have been or may be amended, modified, or supplemented from time to time.

149.     "*SEC*" means the United States Securities and Exchange Commission.

150.     "*Section 510(b) Claim*" means any Claim against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code.

151.     "*Secured*" means, when referring to a Claim:  (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's

interest in such property or to the extent of the amount subject to setoff, as applicable, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a secured Claim.

152. "*Secured Tax Claim*" means any Secured Claim against a Debtor that, absent its Secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

153. "*Securities Act*" means the U.S. Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

154. "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

155. "*Side-A Policy*" means the Cornerstone A-Side Management Liability Policy, ELU184179-22, issued by XL Specialty Insurance Company, for the July 1, 2022 to July 1, 2023 period.

156. "*Solicitation Materials*" means all solicitation materials with respect to the Plan.

157. "*Special Committee*" means the special committee established at OpCo, comprised of two independent directors, to conduct the Special Committee Investigation.

158. "*Special Committee Investigation*" means that certain investigation undertaken by the Special Committee into certain historical transactions, as more fully described in the Disclosure Statement.

159. "*Supported Jurisdiction*" has the meaning ascribed to it in the Asset Purchase Agreement.

160. "*TopCo*" means Voyager Digital Ltd., a Canadian corporation that is publicly traded on the Toronto Stock Exchange.

161. "*TopCo General Unsecured Claim*" means any Claim against TopCo that is not Secured and is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Alameda Loan Facility Claim; (h) an Intercompany Claim; or (i) a Section 510(b) Claim. For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation, other than 510(b) Claims, against TopCo are TopCo General Unsecured Claims.

162. "*Transferred Creditors*" means Account Holders and Holders of Allowed OpCo General Unsecured Claims who have completed all documentation and "KYC" processes reasonably required by Purchaser in the ordinary course of Purchaser's business with respect to similarly situated clients and who have opened a Binance US Account as of the date that is three (3) months following the later of the Closing Date (as defined in the Asset Purchase Agreement) or such later date as may be specified in the Customer Onboarding Protocol, and the successors and assigns of such Holders.

163. "*Transferred Cryptocurrency Value*" means the aggregate VWAP of any Cryptocurrency that is the subject of an Additional Bankruptcy Distribution as of the date that is two Business Days prior to such Additional Bankruptcy Distribution.

164. "*U.S. Trustee*" means the Office of the United States Trustee for Region 2.

165. "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a Holder that, after the expiration of six months after the Effective Date, has not: (a) accepted a distribution, (b) given notice to the Wind-Down Debtor of an intent to accept a particular distribution, (c) responded to the Debtors' or Wind-Down Debtor's requests for information necessary to facilitate a particular distribution, or (d) taken any other action necessary to facilitate such distribution.

166. "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

167. "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

168. "*Unsupported Jurisdiction*" has the meaning ascribed to it in the Asset Purchase Agreement.

169. "*Unsupported Jurisdiction Approval*" has the meaning ascribed to it in the Asset Purchase Agreement.

170. "*Vested Causes of Action*" means the Causes of Action vesting in the Wind-Down Debtor pursuant to Article IV.L of the Plan, including, but not limited to, those Causes of Action enumerated on the Schedule of Retained Causes of Action, which shall be included in the Plan Supplement and in all respects consistent with the terms of the Asset Purchase Agreement.

171. "*VGX*" means Voyager Token, that certain Cryptocurrency issued by the Debtors.

172. "*Voting Deadline*" means February 22, 2023.

173. "*Voyager*" means Voyager Digital Ltd. and its direct and indirect Affiliates.

174. "*VWAP*" means, with respect to any type of Cryptocurrency and as of any date of determination, an amount equal to the volume weighted average price in U.S. dollars for such type of Cryptocurrency for the consecutive 24-hour period immediately prior to 8:00 a.m. New York Time on such date of determination, as reported on https://coinmarketcap.com.

175. "*Wind-Down Debtor*" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, and as described in Article IV.H to, among other things, effectuate the wind-down of the Debtors and the Wind-Down Debtor, commence, litigate and settle the Vested Causes of Action that are not released, waived, settled, compromised, or transferred under the Plan and make distributions pursuant to the terms of the Plan and the Plan Administrator Agreement; *provided* that, for the avoidance of doubt, the Wind-Down Debtor shall not conduct any business operations or continue the Debtors' business operations after the Effective Date.

176. "*Wind-Down Debtor Assets*" means any assets of the Debtors transferred to, and vesting in, the Wind-Down Debtor pursuant to the Plan Administrator Agreement, which, in the event the Sale Transaction is consummated, shall exclude the Acquired Assets, and which shall include, without limitation but only to the extent the following are not Acquired Assets, (a) the Wind-Down Reserve, (b) the Net-Owed Coins to be distributed to Account Holders in Supported Jurisdictions until such Account Holders complete the Purchaser's onboarding requirements in accordance with the Asset Purchase Agreement, (c) the Net-Owed Coins to be distributed to Account Holders in Unsupported Jurisdictions to the extent the Purchaser has not obtained the applicable Unsupported Jurisdiction Approval in accordance with Section 6.12 of the

Asset Purchase Agreement, (d) any distributions to Account Holders or Holders of OpCo General Unsecured Claims that are returned to the Wind-Down Debtor pursuant to Section 6.12(e) of the Asset Purchase Agreement, (e) 3AC Claims and 3AC Recovery, (f) FTX Claims and FTX Recovery, (g) Alameda Claims and Alameda Recovery, (h) the Non-Released D&O Claims, and (i) the Vested Causes of Action.

177. "*Wind-Down Debtor Beneficiaries*" means the Holders of Allowed Claims or Allowed Interests that are entitled to receive distributions pursuant to the terms of the Plan, whether or not such Claims or Interests are Allowed as of the Effective Date.

178. "*Wind-Down Debtor Expenses*" means all actual and necessary costs and expenses incurred by the Wind-Down Debtor or Plan Administrator in connection with carrying out the obligations of the Wind-Down Debtor pursuant to the terms of the Plan and the Plan Administrator Agreement.

179. "*Wind-Down Debtor Oversight Committee*" means the oversight committee tasked with overseeing the Wind-Down Debtor in accordance with the Plan and the Plan Administrator Agreement.

180. "*Wind-Down Budget*" means the budget to fund the Wind-Down Debtor, which will be included in the Plan Supplement.

181. "*Wind-Down Reserve*" means the amount set forth in the Wind-Down Budget to fund the Wind-Down Debtor.

## B. Rules of Interpretation

For purposes of this Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender; (2) capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form; (3) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (4) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed, shall mean that document, schedule, or exhibit, as it may thereafter have been or may thereafter be validly amended, amended and restated, supplemented, or otherwise modified; (5) unless otherwise specified, any reference to an Entity as a Holder of a Claim or Interest, includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (7) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (8) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) unless otherwise specified, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases; (14) any effectuating provisions may be interpreted by the Debtors or the Wind-Down Debtor in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (15) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably

practicable thereafter; (16) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; (17) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; and (18) the use of "include" or "including" is without limitation unless otherwise stated.

## C.      Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

## D.      Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, documents, instruments, or contracts, in which case the governing law of such agreement shall control); *provided* that corporate, limited liability company, or partnership governance matters relating to the Debtors or the Wind-Down Debtor, as applicable, shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or Wind-Down Debtor, as applicable.

## E.      Reference to Monetary Figures

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

## F.      Reference to the Debtors or the Wind-Down Debtor

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Wind-Down Debtor mean the Debtors and the Wind-Down Debtor, as applicable, to the extent the context requires.

## G.      Nonconsolidated Plan

Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against and Interests in the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors.

## ARTICLE II.

## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

## A.    Administrative Claims

Except as otherwise provided in this Article II.A and except with respect to Administrative Claims that are Professional Fee Claims or subject to 11 U.S.C. § 503(b)(1)(D), unless previously Filed, requests for payment of Allowed Administrative Claims (other than Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code) must be Filed and served on the Wind-Down Debtor pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed satisfied as of the Effective Date without the need for any objection from the Wind-Down Debtor or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity. Objections to such requests, if any, must be Filed and served on the Wind-Down Debtor and the requesting party by the Claims Objection Bar Date for Administrative Claims. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order of the Bankruptcy Court.

Except with respect to Administrative Claims that are Professional Fee Claims, and except to the extent that an Administrative Claim or Priority Tax Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive an amount of Cash equal to the amount of the unpaid or unsatisfied portion of such Allowed Administrative Claim in accordance with the following: (1) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than thirty (30) days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Wind-Down Debtor, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court. Any Cryptocurrency inadvertently deposited to the Debtors' account(s) after the Petition Date shall be returned to the sender in full.

Objections to requests for payment of such Administrative Claims, if any, must be Filed with the Bankruptcy Court and served on the Wind-Down Debtor and the requesting Holder no later than the Claims Objection Bar Date for Administrative Claims. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order that becomes a Final Order of the Bankruptcy Court.

## B.    Professional Fee Claims

### 1.    Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than sixty (60) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and Bankruptcy

Rules. The Wind-Down Debtor shall pay Professional Fee Claims in Cash to such Professionals in the amount the Bankruptcy Court allows, including from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; *provided* that the Debtors' and the Wind-Down Debtor's obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

2.      Professional Fee Escrow Account

No later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and the U.S. Trustee and for no other Entities until all quarterly U.S. Trustee fees and all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the U.S. Trustee or to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors or the Wind-Down Debtor. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, and all U.S. Trustee quarterly fees plus statutory interest, if any, have been paid in full, any remaining funds held in the Professional Fee Escrow Account shall be turned over to the Wind-Down Debtor without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

3.      Professional Fee Escrow Amount

The Professionals shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no later than five Business Days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court, and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; *provided* that the Wind-Down Debtor shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

4.      Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtors and/or the Wind-Down Debtor, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Wind-Down Debtor. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Wind-Down Debtor may employ and pay any Professional in the ordinary course of business for the period after the Confirmation Date without any further notice to or action, order, or approval of the Bankruptcy Court.

For the avoidance of doubt, no Administrative Claims, Professional Fee Claims, or any other post-confirmation fees and expenses shall be paid prior to payment of any quarterly fees due and outstanding to the U.S. Trustee.

**C.      Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

**ARTICLE III.**

**CLASSIFICATION, TREATMENT,
AND VOTING OF CLAIMS AND INTERESTS**

**A.      Classification of Claims and Interests**

Except for the Claims addressed in Article II of the Plan, all Claims against and Interests in the Debtors are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

**B.      Summary of Classification**

A summary of the classification of Claims against and Interests in each Debtor pursuant to the Plan is set forth in the following chart.  The Plan constitutes a separate chapter 11 plan for each of the Debtors, and accordingly, the classification of Claims and Interests set forth below applies separately to each of the Debtors.  All of the potential Classes for the Debtors are set forth herein.  Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims or Interests shall be treated as set forth in Article III.E hereof.  Voting tabulations for recording acceptances or rejections of the Plan will be conducted on a Debtor-by-Debtor basis as set forth above.[1]

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

---

[1]      The Debtors reserve the right to separately classify Claims or Interests to the extent necessary to comply with any requirements under the Bankruptcy Code or applicable law.

21

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 3 | Account Holder Claims | Impaired | Entitled to Vote |
| 4A | OpCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4B | HoldCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4C | TopCo General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Alameda Loan Facility Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**C.     Treatment of Classes of Claims and Interests**

Subject to Article VI hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors or Wind-Down Debtor, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable.  In no event shall any Holder of a Claim receive more than such Holder's Allowed amount on account of such Claim.

1.     <u>Class 1 —Secured Tax Claims</u>

(a)     *Classification*:  Class 1 consists of all Secured Tax Claims.

(b)     *Treatment*:  Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction of such Allowed Secured Tax Claim, at the option of the Wind-Down Debtor, payment in full in Cash of such Holder's Allowed Secured Tax Claim or such other treatment rendering such Holder's Allowed Secured Tax Claim Unimpaired.

(c)     *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Secured Tax Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Secured Tax Claims are not entitled to vote to accept or reject the Plan.

2.    Class 2 — Other Priority Claims

(a)    *Classification*:  Class 2 consists of all Other Priority Claims.

(b)    *Treatment*:  Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired.

(c)    *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.    Class 3 — Account Holder Claims

(a)    *Classification*:  Class 3 consists of all Account Holder Claims.

(b)    *Allowance*: Account Holder Claims shall be conclusively Allowed in the amount listed on OpCos's *Amended Schedules of Assets and Liabilities* (Case No. 22-10945) [Docket No. 18]; *provided* that the rights of any Holder of an Account Holder Claim to object to the scheduled amount shall be preserved.  To the extent an Account Holder Claim is Allowed in a greater amount than the scheduled amount of such Account Holder Claim, such Holder shall be entitled to a subsequent distribution such that it will receive its Pro Rata share of recoveries to Holders of Allowed Account Holder Claims.  Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code.

(c)    *Treatment*:  Each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim:

(i)    If the Sale Transaction is consummated by the Outside Date:

A.    its Net Owed Coins, as provided in and subject to the requirements of Sections 6.10 and 6.12 of the Asset Purchase Agreement and Article VI.C.8 of the Plan; *provided* that (i) for Account Holders in Supported Jurisdictions who do not complete the Purchaser's onboarding requirements within three (3) months following the Closing Date, (ii) Account Holders in Unsupported Jurisdictions who make a written election, in accordance with a notice to be issued by the Debtors and within three (3) months following the later of the Closing Date or the date which the terms and conditions for the Binance.US Platform are made available to such Account Holders to accept, to receive value in Cash on account of the Net Owed Coins allocable to such Account Holders, and (iii) Account Holders in Unsupported Jurisdictions who do not make the election in the prior clause only to the extent that the Purchaser does not obtain the Unsupported Jurisdiction Approval for the jurisdiction in

which such Account Holder resides within 6 months following the Closing Date (as defined in the Asset Purchase Agreement), such Account Holders shall receive, after expiration of such applicable time period (*i.e.*, (a) three (3) months following the Closing Date for the Account Holders described in subsection (i) of this paragraph, (b) three (3) months following the later of the Closing Date or the date which the terms and conditions for the Binance.US Platform are made available to such Account Holder to accept for the Account Holders described in subsection (ii) of this paragraph, and (c) six (6) months for the Account Holders described in subsection (iii) of this paragraph), value in Cash at which such Net Owed Coins allocable to such Account Holder are liquidated;

B. its Pro Rata share of any Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement;

C. its Pro Rata share of Distributable OpCo Cash; and

D. to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable to OpCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at OpCo;

*provided* that distributions made to any Account Holder pursuant to clauses (B), (C), and (D) above shall be made after taking into account the Acquired Coins Value of the Net Owed Coins or the value in Cash at which such Net Owed Coins are liquidated, as applicable, previously allocated to such Account Holder; or

(ii) If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated:

A. its Pro Rata share of Distributable OpCo Cash;

B. its Pro Rata share of Distributable Cryptocurrency, which such Account Holder shall be able to withdraw in kind, alternative Cryptocurrency, and/or Cash for a period of thirty (30) days after the Effective Date through the Voyager platform or, if elected by Seller pursuant to Section 6.12(d) of the Asset Purchase Agreement, through the Binance.US Platform; *provided* that if the applicable transfer is made through the Voyager platform and such Account Holder does not withdraw its Pro Rata share of Distributable Cryptocurrency available to such Account Holder from the Voyager platform within such

thirty (30) day period, such Account Holder will receive Cash in the equivalent value to its Pro Rata share of Distributable Cryptocurrency; and

C.  to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to OpCo; *provided* that any distributions on account of Wind-Down Debtor Assets attributable to OpCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at OpCo.

(d)  *Voting:* Class 3 is Impaired under the Plan.  Holders of Allowed Account Holder Claims are entitled to vote to accept or reject the Plan.

4.  <u>Class 4A — OpCo General Unsecured Claims</u>

(a)  *Classification*: Class 4A consists of all OpCo General Unsecured Claims.

(b)  *Treatment*:  Each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim:

(i)  If the Sale Transaction is consummated by the Outside Date:

A.  its Pro Rata share of Distributable Cryptocurrency in Cash;

B.  its Pro Rata share of Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement;

C.  its Pro Rata share of Distributable OpCo Cash; and

D.  to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable to OpCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at OpCo; or

(ii)  If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated:

A.  its Pro Rata share of Distributable Cryptocurrency in Cash;

B.  its Pro Rata share of Distributable OpCo Cash; and

        C.     to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable to OpCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at OpCo.

(c)    *Voting*: Class 4A is Impaired under the Plan. Holders of Allowed OpCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

5.    <u>Class 4B — HoldCo General Unsecured Claims</u>

(a)    *Classification*: Class 4B consists of all HoldCo General Unsecured Claims.

(b)    *Treatment*: Each Holder of an Allowed HoldCo General Unsecured Claim will receive in exchange for such Allowed HoldCo General Unsecured Claim:

    (i)    its Pro Rata share of Distributable HoldCo Cash; and

    (ii)    to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to HoldCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable to HoldCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at HoldCo.

(c)    *Voting*: Class 4B is Impaired under the Plan. Holders of Allowed HoldCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

6.    <u>Class 4C — TopCo General Unsecured Claims</u>

(a)    *Classification*: Class 4C consists of all TopCo General Unsecured Claims.

(b)    *Treatment*: Each Holder of an Allowed TopCo General Unsecured Claim will receive in exchange for such Allowed TopCo General Unsecured Claim:

    (i)    its Pro Rata share of Distributable TopCo Cash; and

    (ii)    to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to TopCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable at TopCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at TopCo.

(c)    *Voting*: Class 4C is Impaired under the Plan. Holders of Allowed TopCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

7.  Class 5 — Alameda Loan Facility Claims

    (a)    *Classification*:  Class 5 consists of all Alameda Loan Facility Claims.

    (b)    *Treatment*:  If the FTX Settlement becomes effective, each Holder of an Allowed Alameda Loan Facility Claim shall, at the election of the Debtors with the consent of the Committee, in their sole discretion, following written notice to counsel to FTX, Alameda and to the official committee of unsecured creditors in the FTX Bankruptcy Proceeding of such election, which written notice shall be given no later than the date that is thirty (30) days after the Confirmation Hearing, (a) withdraw its Alameda Loan Facility Claims in their entirety, with prejudice to FTX or any other party reasserting such claims, or (b) contribute the Alameda Loan Facility Claims to OpCo.  If the FTX Settlement does not become effective, the Alameda Loan Facility Claims shall be subordinated to all Allowed Claims at OpCo, HoldCo, and TopCo, including, but not limited to, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, Allowed Account Holder Claims, Allowed OpCo General Unsecured Claims, Allowed HoldCo General Unsecured Claims, and Allowed TopCo General Unsecured Claims; *provided, however*, if the Bankruptcy Court denies subordination of the Alameda Loan Facility Claims, then such Alameda Loan Facility Claims shall be *pari passu* with General Unsecured Claims at the applicable Debtor entity.

    (c)    *Voting*:  Class 5 is Impaired under the Plan.  Holders of Allowed Alameda Loan Facility Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Alameda Loan Facility Claims are not entitled to vote to accept or reject the Plan.

8.  Class 6 — Section 510(b) Claims

    (a)    *Classification*:  Class 6 consists of all Section 510(b) Claims against TopCo.

    (b)    *Allowance*:  Notwithstanding anything to the contrary herein, a Section 510(b) Claim against TopCo, if any such Section 510(b) Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.

    (c)    *Treatment*:  Each Holder of Allowed Section 510(b) Claims against TopCo will receive, to effectuate distributions, if applicable, from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to TopCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable to TopCo shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims at TopCo.

    (d)    *Voting*:  Class 6 is Impaired under the Plan.  Holders (if any) of Allowed Section 510(b) Claims against TopCo are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders (if any) of Allowed Section 510(b) Claims against TopCo are not entitled to vote to accept or reject the Plan.

9.      <u>Class 7 — Intercompany Claims</u>

   (a)     *Classification*:  Class 7 consists of all Intercompany Claims.

   (b)     *Treatment*:  Each Intercompany Claim shall receive the treatment for such Intercompany Claim as determined by the Bankruptcy Court.

   (c)     *Voting*:  Holders of Intercompany Claims are either Unimpaired or Impaired, and such Holders of Intercompany Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

10.     <u>Class 8 — Intercompany Interests</u>

   (a)     *Classification*:  Class 8 consists of all Intercompany Interests.

   (b)     *Treatment*:  On the Effective Date, all Intercompany Interests shall be, at the option of the Debtors, either (a) Reinstated in accordance with Article III.G of the Plan or (b) set off, settled, addressed, distributed, contributed, merged, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum.

   (c)     *Voting*:  Holders of Intercompany Interests are either Unimpaired or Impaired, and such Holders of Intercompany Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

11.     <u>Class 9 — Existing Equity Interests</u>

   (a)     *Classification*:  Class 9 consists of all Existing Equity Interests.

   (b)     *Treatment*:  Each Holder of Existing Equity Interests will receive, to effectuate distributions, if applicable, from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to TopCo; *provided* that any distributions on account of Wind-Down Debtor Assets attributable at TopCo shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims at TopCo.

   (c)     *Voting*:  Class 9 is Impaired under the Plan.  Holders of Existing Equity Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders of Existing Equity Interests are not entitled to vote to accept or reject the Plan.

**D.      Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Wind-Down Debtor's rights in respect of any Unimpaired Claim, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

E.    **Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.    **Subordinated Claims**

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims against and Allowed Interests in the Debtors and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Wind-Down Debtor reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

G.    **Intercompany Interests**

To the extent Reinstated under the Plan, distributions (if any) on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the corporate structure given the existing intercompany systems connecting the Debtors and their Affiliates, and in exchange for the Debtors' and Wind-Down Debtor's agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

H.    **Controversy Concerning Impairment**

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.    **Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code is satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims or Interests.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

# ARTICLE IV.

## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

### A.   General Settlement of Claims and Interests

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

### B.   Restructuring Transactions

On or before the Effective Date, the applicable Debtors will take any action as may be necessary or advisable to effectuate the Restructuring Transactions described in the Plan, the Restructuring Transactions Memorandum, and the Customer Onboarding Protocol, including:  (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (4) the transfer or distribution of any Cryptocurrency or Cash pursuant to the Asset Purchase Agreement, or the Liquidation Procedures, as applicable; (5) the execution and delivery of the Plan Administrator Agreement; (6) any transactions necessary or appropriate to form or convert into the Wind-Down Debtor; (7) such other transactions that are required to effectuate the Restructuring Transactions, including any sales, mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; (8) all transactions necessary to provide for the purchase of the Acquired Assets by Purchaser under the Asset Purchase Agreement; and (9) all other actions that the applicable Entities determine to be necessary or appropriate, or that are reasonably requested by the Purchaser in accordance with the Asset Purchase Agreement, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

### C.   The Sale Transaction

If the Sale Transaction is consummated by the Outside Date, pursuant to the terms of the Asset Purchase Agreement, then the following terms shall govern:

On or prior to the Effective Date, the Debtors shall have consummated the Sale Transaction, and, among other things, the Acquired Assets and Assumed Liabilities shall have transferred to the Purchaser free and clear of all Liens, Claims, Interests, charges, or other encumbrances, and the Purchaser shall pay to the Debtors or Holders of Account Holder Claims and Holders of OpCo General Unsecured Claims, as applicable, the proceeds from the Sale Transaction, as and to the extent provided for in the Asset Purchase Agreement, and this Plan. The Confirmation Order shall authorize the Debtors, the Purchaser, and the Wind-Down Debtor, as applicable, to undertake the transactions contemplated by the Asset Purchase Agreement, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

The Debtors and Purchaser shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Sale Transaction pursuant to the terms of the Asset Purchase Agreement the Customer Onboarding Protocol, and this Plan. The Debtors shall be authorized to sell any Cryptocurrency to satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. On and after the Effective Date, except as otherwise provided in the Plan and the Plan Administrator Agreement, the Wind-Down Debtor, or the Purchaser, as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; *provided*, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

Notwithstanding anything to the contrary in the Asset Purchase Agreement, this Plan, or any Definitive Document, the Debtors, each Account Holder or Holder of an Allowed OpCo General Unsecured Claim, as applicable, shall retain all right, title, and interest in and to any Cryptocurrency allocated to such Account Holder or Holder of an Allowed OpCo General Unsecured Claim pursuant to this Plan through and including such time as such Cryptocurrency is returned or distributed to the Debtors or such Account Holder or Holder of an Allowed OpCo General Unsecured Claim, as applicable, hereunder, and such Cryptocurrency shall be held by Purchaser solely in a custodial capacity in trust and solely for the benefit of the Debtors or Account Holder or Holder of an Allowed OpCo General Unsecured Claim, as applicable, thereafter.

Notwithstanding anything contained in this Plan and any Definitive Documents, if the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated, all provisions contained in this Plan and the Definitive Documents governing the Sale Transaction shall have no further force and effect, and the provisions governing the Liquidation Transaction shall govern. The rights and remedies of the Seller and Purchaser under the Asset Purchase Agreement and any related orders of the Bankruptcy Court shall be expressly preserved.

**D.  The Liquidation Transaction**

If the Sale Transaction is not consummated by the Outside Date, pursuant to the Asset Purchase Agreement, then the following terms shall govern:

1.  *The Liquidation Transaction*

On or after the Outside Date, the Debtors will pursue the Liquidation Transaction in accordance with the Liquidation Procedures. Pursuant to the Liquidation Transaction, the Debtors, the Wind-Down Debtor, or the Plan Administrator, as applicable, will distribute certain of the Cryptocurrency in-kind to Holders of Account Holder Claims in accordance with Article III.C of the Plan, transfer all Wind-Down

Debtor Assets to the Wind-Down Debtor, liquidate certain of the Cryptocurrency, distribute Cash to Holders of Claims, wind down and dissolve the Debtors, and pursue final administration of the Debtors' Estates pursuant to the Bankruptcy Code.

The Debtors, or the Wind-Down Debtor, as applicable, shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Liquidation Transaction pursuant to this Plan. On or before the date that is twenty-one days prior to the anticipated commencement of the Liquidation Transaction, the Debtors, or the Wind-Down Debtor, as applicable, shall file the Liquidation Procedures with the Bankruptcy Court. Parties in interest shall have ten days to object to the Liquidation Procedures, and if no objections are timely filed, the Liquidation Procedures shall be approved. In the event of a timely objection, the Bankruptcy Court shall adjudicate any objection to the Liquidation Procedures.

On and after the Effective Date, except as otherwise provided in the Plan, the Plan Administrator Agreement, and the Liquidation Procedures, the Debtors or the Wind-Down Debtor, as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; *provided*, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

2.    *Cryptocurrency Rebalancing*

Prior to the Effective Date the Debtors shall, in consultation with the Committee, be authorized to rebalance their Cryptocurrency portfolio to ensure that the Debtors can effectuate *pro rata* in-kind distributions of the Distributable Cryptocurrency according to Article III.C.3(c) of this Plan, *provided* that such rebalancing shall be in accordance with the Asset Purchase Agreement (if the Asset Purchase Agreement has not been terminated). The Debtors may effectuate such rebalancing by (i) selling such Cryptocurrency that cannot be distributed to Account Holders, (ii) purchasing Cryptocurrency supported by Voyager's or Binance.US Platform (as provided by the Asset Purchase Agreement) that shall be distributed to Account Holders, and (iii) engaging in any other transaction, including the execution of trades of Cryptocurrency, necessary or appropriate to effectuate distributions of the Distributable Cryptocurrency to Holders of Allowed Account Holder Claims.

**E.    Employee Transition Plan**

The Debtors shall be authorized to implement the Employee Transition Plan, the terms of which shall be reasonably acceptable to Purchaser and the Committee and included in the Plan Supplement. The Employee Transition Plan shall help ensure that employees are available to provide transition services to the Debtors and/or the Wind-Down Debtor to effectuate the Sale Transaction and to wind down the Debtors' Estates.

**F.    Non-Released D&O Claims**

Any Claims or Causes of Action held by the Debtors or their respective estates against the Debtors' CEO and/or CCO (regardless of any fiduciary capacity in which such individuals were acting) that are expressly related to approval of the 3AC Loan are not released pursuant to the Plan (collectively, the "Non-Released D&O Claims"), and shall be assigned and transferred to the Wind-Down Debtor to be pursued, settled, or resolved by the Wind-Down Debtor in accordance with the terms of Article IV.G of this Plan and subject to the Wind-Down Budget. Any claims against the D&O Carriers that the Debtors' insurance transactions within the 90 days prior to the Petition Date are avoidable under the Bankruptcy Code, applicable state law, or both (the "Non-Released Insurance Claims") shall be assigned and transferred to

the Wind-Down Debtor to be pursued, settled, or resolved solely by the Wind-Down Debtor in accordance with the terms of Article IV.G of this Plan. The Wind-Down Debtor shall be a successor to the Debtors' rights, title, and interest in any Non-Released D&O Claims and Non-Released Insurance Claims, and the Wind-Down Debtor shall have standing to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims in accordance with the terms of Article IV.G of this Plan; *provided* that: (i) any recovery by the Wind-Down Debtor (and the beneficiaries thereof) on account of any Non-Released D&O Claim, including in each case by way of settlement or judgment, shall be satisfied solely by and to the extent of the proceeds of the Debtors' available D&O Liability Insurance Policies (and/or from the D&O Carriers directly) after payment from such D&O Liability Insurance Policies of any and all covered costs and expenses incurred in connection with the defense of the Non-Released D&O Claims; (ii) any party, including any trustee or any beneficiary of the Wind-Down Debtor, seeking to execute, garnish, or otherwise attempt to collect on any settlement of or judgment in the Non-Released D&O Claims shall do so solely upon available insurance coverage from the Debtors' available D&O Liability Insurance Policies; and (iii) no party shall (a) record any judgment against the CEO or CCO, or (b) otherwise attempt to collect, directly or indirectly, from the personal assets of the CEO or CCO with respect to the Non-Released D&O Claims. For the avoidance of doubt, this provision does not enjoin, limit, or impair direct claims held by third parties against the Debtors' CEO or CCO (if any) other than any direct claims held by Holders of Claims or Interests that opt into the third-party release in Article VIII.B of this Plan. Only upon the occurrence of the earlier of (x) a release being given as part of any later settlement of the Non-Released D&O Claims; (y) final resolution of any coverage claims asserted against the Debtors' available D&O Liability Insurance Policies on account of the Non-Released D&O Claims; or (z) exhaustion of the available insurance coverage under the D&O Liability Insurance Policies on account of the Non-Released D&O Claims, the Non-Released D&O Claims shall be released and discharged without the need for further action or Bankruptcy Court order. For the avoidance of doubt, any release of the Non-Released D&O Claims shall not become effective until one of the three conditions stated in the preceding sentence above has been met.

## G.     The D&O Settlement

On the Effective Date, the terms of the D&O Settlement shall be effectuated as provided in this Article IV.G.

Pursuant to the D&O Settlement, CEO shall repay the $1,900,000 received from the Debtors on or around February 28, 2022, by paying the after-tax amount of such transfer (approximately $1,125,000) to OpCo in cash and assigning the right, if any, to any tax refund for the balance to the Wind-Down Debtor. CEO shall subordinate any Claims (including any indemnification claims asserted under this Art. IV.F) he holds against the Debtors until all other Holders of Claims are paid in full. CCO shall subordinate 50 percent of any Claims he holds other than indemnification claims (and 100% of any indemnification claims asserted under this Art. IV.F) against the Debtors until all other Holders of Claims are paid in full; *provided*, *however*, that in the event the D&O Carriers deny coverage to CEO or CCO under the D&O Insurance Policies on account of such subordination of any indemnification claim, then any indemnification claims by CEO or CCO shall not be so subordinated, but may be filed as an OpCo General Unsecured Claim.

CEO and CCO, each as insureds, under the D&O Liability Insurance Policies agree: (i) not to draw down on the Side-A Policy; *provided*, *however*, that should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind-Down Debtor's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise) such officer shall be entitled to seek coverage under the Side-A Policy to the extent any such coverage remains; and (ii) not to object to any settlement by the Debtors or the Wind-Down Debtor of avoidance claims under the Side-A Policy, even if such settlement results in termination of benefits under the Side-A Policy. For the avoidance of doubt, this agreement is not intended to and shall not alter or amend each of the insureds' duties under the D&O Liability Insurance Policies. In the event that any insurer under the D&O Liability

Insurance Policies denies coverage for any reason, the Wind-Down Debtor shall have the right to bring a coverage claim against the insurer(s) in the name of the insured, the insureds shall reasonably cooperate with respect to any such claim, and the insured may participate at their election (and at their sole cost). For the avoidance of doubt, nothing contained in this Plan is intended as a waiver or release of the Debtors' and/or Wind-Down Debtor's right to assert any Non-Released D&O Claim, but rather limits such recovery in the manner set forth above.

CEO and CCO shall be entitled to receive their salary and benefits for as long as they work for the Debtors and/or the Wind-Down Debtor and retain the right to assert claims for advancement and indemnification up to the limits of any available coverage in the event any of the insurers that issued the Management Liability Policy, the Excess Policy, or the Side-A Policy denies coverage to CEO and/or CCO based upon or arising out of the lack of a formal claim for indemnification; *provided*, *however*, that any such indemnification or advancement claims shall be subordinated in full unless and until all other Holders of Claims are paid in full; *provided*, *further*, that in the event that any of the D&O Carriers deny coverage to CEO or CCO under the D&O Insurance Policies on account of such subordination of any indemnification claim, then any indemnification claims by CEO or CCO shall not be so subordinated, but may be filed as an OpCo General Unsecured Claim.

CEO and CCO shall subordinate any and all rights and entitlements under the Cornerstone A-Side Management Liability Insurance Policy to Voyager Digital Ltd., Policy Number ELU184179-22, to any recovery by the Debtors and/or the Wind-Down Debtor on account of the Debtors' and/or Wind-Down Debtor's claims for the avoidance of the premium paid for the policy. For the avoidance of doubt, should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind-Down Debtor's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise), CEO and/or CCO shall be entitled to seek coverage under the Side-A Policy. CEO and CCO shall remain at, and continue performing the responsibilities of, their respective position(s) with the Debtors and assist with the Debtors' transition for at least 30 days from entry of the Confirmation Order; *provided* that CCO shall have no obligation to remain at his position with the Debtors beyond January 15, 2023 and the CEO shall have the right to pursue and engage in any employment opportunity, business venture, consulting arrangement, or investment that may become available; *provided*, *further*, that both the CEO and CCO shall be available to the Debtors and/or the Wind-Down Debtor for a maximum of five hours per month for the one year following the Effective Date.

In the event that the sworn financial disclosure statements under penalty of perjury provided to the Debtors, the Special Committee and the Committee by CEO and CCO are later determined at any time by Final Order of the Bankruptcy Court or other court of competent jurisdiction to be materially inaccurate, (a) the limitations on recovery by the Wind-Down Debtor under this Article IV.G shall no longer apply, (b) any and all release, exculpation and injunction provisions in Article VIII of this Plan with respect to CEO and/or CCO (as applicable) shall be deemed null and void, (c) all Releasing Parties' rights with respect to the CEO and/or CCO (as applicable) shall be fully intact and preserved, (d) amounts paid by CEO shall not be repaid by the Wind-Down Debtor, and (e) any applicable statute of limitations shall be deemed tolled from the Petition Date to the date of entry of the order referenced above. The Wind-Down Debtor, as successor to the Debtors, shall have standing to bring a motion seeking relief pursuant to this Article IV.G.

Entry of the Confirmation Order shall be deemed approval of the D&O Settlement and, to the extent not already approved by the Bankruptcy Court, the Debtors or the Wind-Down Debtor, as applicable, are authorized to negotiate, execute, and deliver those documents necessary or appropriate to effectuate the D&O Settlement, without further notice or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors, the Wind-Down Debtor, the Committee, and the Special Committee may deem to be necessary to effectuate the D&O Settlement.

H.    **The Wind-Down Debtor**

On the Effective Date, the Wind-Down Debtor shall be formed or converted into for the benefit of the Wind-Down Debtor Beneficiaries and each of the Debtors shall transfer the Wind-Down Debtor Assets for distribution in accordance with the terms of the Plan. The Confirmation Order shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

1.    Establishment of a Wind-Down Debtor

Pursuant to the Plan Administrator Agreement, the Wind-Down Debtor will be established, formed, merged, or converted. The Wind-Down Debtor shall be the successor-in-interest to the Debtors, and the Wind-Down Debtor shall be a successor to the Debtors' rights, title, and interest to the Wind-Down Debtor Assets. The Wind-Down Debtor will conduct no business operations and will be charged with winding down the Debtors' Estates. The Wind-Down Debtor shall be managed by the Plan Administrator and shall be subject to the Wind-Down Debtor Oversight Committee. The Wind-Down Debtor shall be administered in accordance with the terms of the Plan Administrator Agreement and shall be subject to the Wind-Down Budget and the Non-Released D&O Claim Budget. For the avoidance of doubt, the Wind-Down Debtor shall not have any right or interest in any Cause of Action or Claim constituting an Acquired Asset. The Wind-Down Debtor shall be administered in a manner consistent with the SEC's published guidance on liquidating trusts.

Prior to the Effective Date, any and all of the Debtors' assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date the Wind-Down Debtor Assets shall, subject to the Plan Administrator Agreement, be transferred to and vest in the Wind-Down Debtor. For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to a prior order or the Plan, the Wind-Down Debtor specifically retains and reserves the right to assert, after the Effective Date, any and all of the Vested Causes of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing, subject to the terms of the Plan, including without limitation Article IV.F and Article IV.G.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down Debtor and the Plan Administrator shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Plan Administrator Agreement, compromise or settle any Wind-Down Debtor Assets transferred to the Wind-Down Debtor. On and after the Effective Date, the Wind-Down Debtor and the Plan Administrator may, without further Bankruptcy Court approval, commence, litigate, and settle any Vested Causes of Action or Claims relating to any Wind-Down Debtor Assets transferred to the Wind-Down Debtor or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Wind-Down Debtor and the Plan Administrator on or after the Effective Date, except as otherwise expressly provided herein and in the Plan Administrator Agreement. All of the Wind-Down Debtor's activities shall be subject to the Wind-Down Budget and the Non-Released D&O Claim Budget. The Wind-Down Debtor shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

The Wind-Down Debtor shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the Debtors and the Committee, as applicable, in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Wind-Down Debtor Asset without the need for filing any motion for such relief. On the Effective Date, the Debtors and the Plan Administrator shall execute the Plan Administrator Agreement and shall have established the Wind-Down Debtor pursuant hereto. In the

event of any conflict between the terms of this Article IV.H and the terms of the Plan Administrator Agreement, the terms of the Plan Administrator Agreement shall control.

2.    Wind-Down Debtor Assets

Notwithstanding any prohibition on assignability under applicable non-bankruptcy law, on the Effective Date and thereafter if additional Wind-Down Debtor Assets become available, the Debtors shall be deemed, subject to the Plan Administrator Agreement, to have automatically transferred to the applicable Wind-Down Debtor all of their right, title, and interest in and to all of the Wind-Down Debtor Assets, in accordance with section 1141 of the Bankruptcy Code. All such assets shall automatically vest in the Wind-Down Debtor free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims and Interests as set forth herein and the expenses of the Wind-Down Debtor as set forth herein and in the Plan Administrator Agreement. Thereupon, the Debtors shall have no interest in or with respect to the Wind-Down Debtor Assets or the Wind-Down Debtor.

3.    Treatment of Wind-Down Debtor for Federal Income Tax Purposes; No Successor-in-Interest

The Wind-Down Debtor shall be established for the primary purpose of liquidating and distributing the Wind-Down Debtor Assets transferred to it, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Wind-Down Debtor. Accordingly, the Plan Administrator may, in an expeditious but orderly manner, liquidate the Wind-Down Debtor Assets, make timely distributions to the Wind-Down Debtor Beneficiaries and not unduly prolong its duration. The Wind-Down Debtor shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Wind-Down Debtor Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Wind-Down Debtor expressly for such purpose.

The Wind-Down Debtor is intended to qualify as a "grantor trust" for federal income tax purposes to the extent reasonably practicable, with the Wind-Down Debtor Beneficiaries treated as grantors and owners of the Wind-Down Debtor. However, with respect to any of the assets of the Wind-Down Debtor that are subject to potential disputed claims of ownership or uncertain distributions, *or* to the extent "liquidating trust" treatment is otherwise unavailable, the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

4.    Appointment of Plan Administrator

The Plan Administrator shall be selected by the Committee, in consultation with the Debtors, and shall be identified in the Plan Supplement. The appointment of the Plan Administrator shall be approved in the Confirmation Order, and the Plan Administrator's duties shall commence as of the Effective Date. The Plan Administrator shall administer the distributions to the Wind-Down Debtor Beneficiaries and shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Vested Causes of Action belonging to the Estates that are not released, waived, settled,

compromised, or transferred pursuant to the Plan and subject to the limitations set forth in the Plan, including Article IV.F and Article IV.G.

In accordance with the Plan Administrator Agreement, the Plan Administrator shall serve in such capacity through the earlier of (i) the date on which the Wind-Down Debtor is dissolved in accordance with the Plan Administrator Agreement, and (ii) the date on which a Plan Administrator resigns, is terminated, or is otherwise unable to serve; *provided*, *however*, that, in the event that a Plan Administrator resigns, is terminated, or is otherwise unable to serve, the Wind-Down Debtor Oversight Committee shall appoint a successor to serve as a Plan Administrator in accordance with the Plan Administrator Agreement. If the Wind-Down Debtor Oversight Committee does not appoint a successor within the time periods specified in the Plan Administrator Agreement, then the Bankruptcy Court, upon the motion of any party-in-interest, including counsel to the Wind-Down Debtor, shall approve a successor to serve as a Plan Administrator.

5.    Responsibilities of Plan Administrator

Responsibilities of the Plan Administrator shall be as identified in the Plan Administrator Agreement and shall include, but are not limited to:

(a)    implementing the Wind-Down Debtor, and making distributions contemplated by the Plan;

(b)    marshalling, marketing for sale, and winding down any of the Debtors' assets constituting Wind-Down Debtor Assets;

(c)    appointing an independent director at each Debtor to act as a fiduciary for such Debtor entity solely in connection with matters that may implicate actual or potential intra-Debtor conflicts of interests between the Plan Administrator and the applicable Debtor(s) or Wind-Down Debtor including (i) the Intercompany Claims; (ii) the Alameda Loan Facility Claims; (iii) the Signatory Governmental Claims (as defined in the Governmental Claimant Stipulation) asserted against TopCo; and (iv) any matter involving the transfer or allocation of value, claims, or costs between or among the Debtors, but only to the extent that such issues continue to implicate actual or potential intra-Debtor conflicts of interests between the Plan Administrator and the applicable Debtor(s) or Wind-Down Debtor;

(d)    overseeing the accounts of the Debtors and the Wind-Down Debtor and the wind down and dissolution of the Debtors and the Wind-Down Debtor, including effectuating the transactions described in the Restructuring Transactions Memorandum;

(e)    receiving, maintaining, conserving, supervising, prosecuting, collecting, settling, managing, investing, protecting, and where appropriate, causing the Wind-Down Debtor to abandon the Wind-Down Debtor Assets, including causing the Wind-Down Debtor to invest any moneys held as Wind-Down Debtor Assets;

(f)    opening and maintaining bank accounts on behalf of or in the name of the Debtors or the Wind-Down Debtor, including, in the Plan Administrator's discretion, separating bank accounts for each of the Debtors;

(g)     entering into any agreement or executing any document or instrument required by or consistent with the Plan, the Confirmation Order, or the Plan Administrator Agreement, and to perform all obligations thereunder;

(h)     collecting and liquidating all Wind-Down Debtor Assets, including the sale of any Wind-Down Debtor Assets;

(i)     protecting and enforcing the rights to the Wind-Down Debtor Assets (including any Vested Causes of Action and Contributed Third-Party Claims) vested in the Wind-Down Debtor and Plan Administrator by the Plan Administrator Agreement by any method deemed appropriate, including, without limitation, by judicial proceedings or otherwise;

(j)     investigating any Wind-Down Debtor Assets, and any other potential Vested Causes of Action and Contributed Third-Party Claims;

(k)     reviewing, reconciling, compromising, settling, objecting, or prosecuting Claims or Interests of any kind;

(l)     seeking the examination of any Person pursuant to Federal Rule of Bankruptcy Procedure 2004;

(m)     retaining professionals, disbursing agents, and other agents, independent contractors, and third parties pursuant to the Plan Administrator Agreement and paying the reasonable compensation thereof;

(n)     paying all lawful expenses, debts, charges, taxes, and other liabilities, and making all other payments relating to the Wind-Down Debtor Assets, solely out of Wind-Down Debtor Assets;

(o)     prosecuting and settling the Vested Causes of Action, including, without limitation, the 3AC Claims, FTX Claims, Alameda Claims, Contributed Third-Party Claims, and any causes of action not included in the Asset Purchase Agreement or released under the Plan;

(p)     reviewing, reconciling, pursuing, commencing, prosecuting, compromising, settling, dismissing, releasing, waiving, withdrawing, abandoning, resolving, or electing not to pursue all Vested Causes of Action and Contributed Third-Party Claims;

(q)     acquiring litigation and other claims related to the Debtors, and prosecuting such claims;

(r)     reviewing and compelling turnover of the Debtors or the Wind-Down Debtor's property;

(s)     calculating and making all Distributions to the holders of Allowed Claims against each Debtor and, solely to the extent of payment in full of Allowed Claims, to holders of Allowed Interests, as provided for in, or contemplated by, the Plan and the Plan Administrator Agreement; *provided* that because the Plan does not substantively consolidate the Debtors' Estates, the Plan Administrator shall make

Distributions from the Wind-Down Debtor Assets to the holders of Claims and Interests (if applicable) against that specific Debtor;

(t)     establishing, administering, adjusting, and maintaining the Wind-Down Reserve and the Disputed Claims Reserve;

(u)     withholding from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the Plan Administrator has determined, based upon the advice of his agents or professionals, may be required to be withheld from such Distribution under the income tax or other laws of the United States or of any state or political subdivision thereof;

(v)     in reliance upon the Debtors' Schedules, the official Claims Register maintained in the Chapter 11 Cases and the Debtors' filed lists of equity security holders, reviewing, and where appropriate, allowing or objecting to Claims and (if applicable) Interests, and supervising and administering the commencement, prosecution, settlement, compromise, withdrawal, or resolution of all objections to Disputed Claims and (if applicable) Disputed Interests required to be administered by the Wind-Down Debtor;

(w)     making all tax withholdings, filing tax information returns, filing and prosecuting tax refunds claims, making tax elections by and on behalf of the Debtors or the Wind-Down Debtor, and filing tax returns for the Debtors or the Wind-Down Debtor pursuant to and in accordance with the Plan, and paying taxes, if any, payable for and on behalf of the Debtors or the Wind-Down Debtor, as applicable; *provided, however*, that notwithstanding any other provision of the Plan Administrator Agreement, the Plan Administrator shall not have any responsibility or personal liability in any capacity whatsoever for the signing or accuracy of the Debtors' income tax returns that are due to be filed after the Effective Date or for any tax liability related thereto;

(x)     abandoning or donating to a charitable organization qualifying under IRC section 501(c)(3) any Wind-Down Debtor Assets that the Plan Administrator determines to be too impractical to distribute or of inconsequential value;

(y)     seeking a determination of tax liability or refund under Bankruptcy Code section 505;

(z)     establishing reserves for taxes, assessments, and other expenses of administration of the Debtors or the Wind-Down Debtor as may be necessary and appropriate for the proper operation of matters incident to the Debtors or the Wind-Down Debtor;

(aa)    paying Wind-Down Debtor Expenses;

(bb)    if the Plan Administrator deems appropriate in the Plan Administrator's sole discretion, seeking to establish a bar date for filing proofs of Interest in any Debtor or otherwise to determine the holders and extent of Allowed Interests in any Debtor;

(cc)    purchasing and carrying all insurance policies that the Plan Administrator deems reasonably necessary or advisable and paying all associated insurance premiums and costs;

(dd)    undertaking all administrative functions remaining in the Chapter 11 Cases to the extent necessary to carry out the Debtors', the Wind-Down Debtor's, or the Plan Administrator's duties under the Plan, including reporting and making required payments of fees to the U.S. Trustee and overseeing the closing of the Chapter 11 Cases;

(ee)    retaining, terminating, appointing, hiring, or otherwise employees, personnel, management, and directors at any of the Debtors to the extent necessary to carry out the purposes of the Plan Administrator Agreement and the Plan, including, without limitation, to address any disputes between the Debtors;

(ff)    exercising, implementing, enforcing, and discharging all of the terms, conditions, powers, duties, and other provisions of the Plan, the Confirmation Order, and the Plan Administrator Agreement; and

(gg)    taking all other actions consistent with the provisions of the Plan and the Plan Administrator Agreement that the Plan Administrator deems reasonably necessary or desirable to administer the Debtors and the Wind-Down Debtor.

6.    <u>The Wind-Down Debtor Oversight Committee</u>

The Wind-Down Debtor Oversight Committee shall consist of those parties selected by the Committee and identified in the Plan Supplement, and which, at no time shall consist of greater than seven members.

The Wind-Down Debtor Oversight Committee shall have the responsibility to review and advise the Plan Administrator with respect to the liquidation and distribution of the Wind-Down Debtor Assets transferred to the Wind-Down Debtor in accordance herewith and the Plan Administrator Agreement. For the avoidance of doubt, in advising the Plan Administrator, the Wind-Down Debtor Oversight Committee shall maintain the same fiduciary responsibilities as the Plan Administrator. Vacancies on the Wind-Down Debtor Oversight Committee shall be filled by a Person designated by the Plan Administrator, subject to the unanimous consent of the remaining member or members of the Wind-Down Debtor Oversight Committee. The Plan Administrator shall have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Wind-Down Debtor Oversight Committee for cause.

7.    <u>Expenses of Wind-Down Debtor</u>

The Wind-Down Debtor Expenses shall be paid from the Wind-Down Debtor Assets subject to the Wind-Down Budget and the Non-Released D&O Claim Budget.

8.    <u>Insurance; Bond</u>

The Plan Administrator may obtain insurance coverage (in the form of an errors and omissions policy or otherwise) with respect to the liabilities and obligations of the Plan Administrator and the Wind-Down Debtor Oversight Committee under the Plan Administrator Agreement. Unless otherwise agreed to by the Wind-Down Debtor Oversight Committee, the Plan Administrator shall serve with a bond, the terms

of which shall be agreed to by the Wind-Down Debtor Oversight Committee, and the cost and expense of which shall be paid by the Wind-Down Debtor.

9. <u>Fiduciary Duties of the Plan Administrator</u>

Pursuant hereto and the Plan Administrator Agreement, the Plan Administrator shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests that will receive distributions pursuant to Plan.

10. <u>Termination of the Wind-Down Debtor</u>

The Wind-Down Debtor will terminate on the earlier of: (a) (i) the final liquidation, administration and distribution of the Wind-Down Debtor Assets in accordance with the terms of the Plan Administrator Agreement and the Plan, and its full performance of all other duties and functions as set forth herein or in the Plan Administrator Agreement and (ii) the Chapter 11 Cases of the Debtors have been closed; or (b) the Plan Administrator determines in its reasonable judgment that the Wind-Down Debtor lacks sufficient assets and financial resources, after reasonable collection efforts, to complete the duties and powers assigned to him or her under the Plan, the Confirmation Order and/or the Plan Administrator Agreement. After (x) the final distributions pursuant hereto, (y) the Filing by or on behalf of the Wind-Down Debtor of a certification of dissolution with the Bankruptcy Court, and (z) any other action deemed appropriate by the Plan Administrator, the Wind-Down Debtor shall be deemed dissolved for all purposes without the necessity for any other or further actions.

11. <u>Liability of Plan Administrator; Indemnification</u>

Neither the Plan Administrator, the Wind-Down Debtor Oversight Committee, their respective members, employees, employers, designees or professionals, or any of their duly designated agents or representatives (each, a "<u>Wind-Down Debtor Party</u>" and collectively, the "<u>Wind-Down Debtor Parties</u>") shall be liable for losses, claims, damages, liabilities or expenses in connection with the affairs of the Wind-Down Debtor or for the act or omission of any other Wind-Down Debtor Party, nor shall the Wind-Down Debtor Parties be liable for any act or omission taken or omitted to be taken pursuant to the discretion, powers and authority conferred, or in good faith believed to be conferred by the Plan Administrator Agreement or the Plan other than for specific acts or omissions resulting from such Wind-Down Debtor Party's willful misconduct, gross negligence or actual fraud. Subject to the Plan Administrator Agreement, the Plan Administrator shall be entitled to enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee, and the Wind-Down Debtor Oversight Committee shall be entitled to enjoy all of the rights, powers, immunities and privileges of an official committee of unsecured creditors. The Plan Administrator or the Wind-Down Debtor Oversight Committee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing. Notwithstanding such authority, neither the Plan Administrator nor the Wind-Down Debtor Oversight Committee shall be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the Plan Administrator, the Wind-Down Debtor Oversight Committee, or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or actual fraud. The Wind-Down Debtor shall indemnify and hold harmless the Wind-Down Debtor Parties (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) that such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out

of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Wind-Down Debtor or the Plan or the discharge of their duties hereunder; *provided*, *however*, that no such indemnification will be made to such Persons for actions or omissions as a result of willful misconduct, gross negligence, or actual fraud. Persons dealing or having any relationship with the Plan Administrator shall have recourse only to the Wind-Down Debtor Assets and shall look only to the Wind-Down Debtor Assets to satisfy any liability or other obligations incurred by the Wind-Down Debtor or the Wind-Down Debtor Oversight Committee to such Person in carrying out the terms of the Plan Administrator Agreement, and neither the Plan Administrator nor the Wind-Down Debtor Oversight Committee, shall have any personal obligation to satisfy any such liability. The Plan Administrator and/or the Wind-Down Debtor Oversight Committee members shall not be liable whatsoever except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into the Plan Administrator Agreement against any of them. The Wind-Down Debtor shall promptly pay expenses reasonably incurred by any Wind-Down Debtor Party in defending, participating in, or settling any action, proceeding or investigation in which such Wind-Down Debtor Party is a party or is threatened to be made a party or otherwise is participating in connection with the Plan Administrator Agreement or the duties, acts or omissions of the Plan Administrator or otherwise in connection with the affairs of the Wind-Down Debtor, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise. Each Wind-Down Debtor Party hereby undertakes, and the Wind-Down Debtor hereby accepts his or her undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such exculpated party is not entitled to be indemnified therefor under the Plan Administrator Agreement. The foregoing indemnity in respect of any Wind-Down Debtor Party shall survive the termination of such Wind-Down Debtor Party from the capacity for which they are indemnified.

12. No Liability of the Wind-Down Debtor

On and after the Effective Date, the Wind-Down Debtor shall have no liability on account of any Claims or Interests except as set forth herein and in the Plan Administrator Agreement. All payments and all distributions made by the Plan Administrator hereunder shall be in exchange for all Claims or Interests against the Debtors.

**I.      Sources of Consideration for Plan Distributions**

Distributions under the Plan shall be funded by (i) the proceeds of Purchaser's payment obligations under Sections 2.1 and 2.2 of the Asset Purchase Agreement and distributions of Acquired Coins pursuant to Sections 6.12, and 6.14 of the Asset Purchase Agreement, (ii) the Wind-Down Debtor from the Wind-Down Debtor Assets; *provided*, *however*, that Allowed Professional Fee Claims shall be paid from the Professional Fee Escrow Account in the first instance. The Wind-Down Debtor Assets shall be used to pay the Wind-Down Debtor Expenses (including the compensation of the Plan Administrator and any professionals retained by the Wind-Down Debtor), and to satisfy payment of Allowed Claims and Interests as set forth in the Plan.

**J.      Corporate Existence and Dissolution**

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation documents) in effect

prior to the Effective Date, except to the extent such certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation documents) are amended pursuant to the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings under applicable state or federal law).

On and after the Effective Date, the Wind-Down Debtor will be authorized and directed to implement the Plan and any applicable orders of the Bankruptcy Court, and the Wind-Down Debtor shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates.

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all of its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtor shall be deemed to be dissolved without any further action by the Debtors or the Wind-Down Debtor, including the Filing of any documents with the secretary of state for the state in which the Wind-Down Debtor are formed or any other jurisdiction. The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Debtors or the Wind-Down Debtor in and withdraw the Wind-Down Debtor from applicable states.

As soon as practicable after the Effective Date, the Wind-Down Debtor shall take such actions as the Wind-Down Debtor may determine to be necessary or desirable to carry out the purposes of the Plan. Any certificate of dissolution or equivalent document may be executed by the Wind-Down Debtor on behalf of any Wind-Down Debtor without need for any action or approval by the shareholders or board of directors or managers of such Debtor. On and after the Effective Date, the Debtors or the Wind-Down Debtor (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have cancelled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. Pursuant to the terms of this Plan, any Money Transmitter Licenses that have not been terminated shall be deemed withdrawn and no further action is required to be taken by the Debtors or the Wind-Down Debtor to effectuate such withdrawal; *provided* that, following the Effective Date, the Debtors or the Wind-Down Debtor, as applicable, shall use commercially reasonable efforts to comply with all state banking department requirements for the surrender of a Money Transmitter License. Nothing in this Plan shall be construed to limit the rights of creditors, Debtors, the Wind-Down Debtor, or regulators to pursue recoveries against surety bonds maintained by the Debtors in connection with this Money Transmitter Licenses. Notwithstanding such Debtors' dissolution, such Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

## K. Corporate Action

Upon the Effective Date, all actions contemplated under the Plan, Definitive Documents, and Asset Purchase Agreement shall be deemed authorized and approved in all respects, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, managing-members, limited or general partners, or officers of the Debtors, the Wind-Down Debtor or any other Entity, including: (1) appointment of the directors, managers, members, and officers for the Wind-Down Debtor as provided herein; (2) the issuances, transfer, and distribution of the Wind-Down Debtor Assets; (3) the formation of the Wind-Down Debtor and appointment of the Plan Administrator and Wind-Down Debtor Oversight Committee; (4) the formation of any entities pursuant to and the implementation of the Plan and performance of all actions and transactions contemplated hereby

and thereby; (5) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (6) all other acts or actions contemplated by the Plan, Definitive Documents, and Asset Purchase Agreement or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions (including effectuating the Restructuring Transactions Memorandum and the Customer Onboarding Protocol) (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan, Definitive Documents, and Asset Purchase Agreement involving the corporate structure of the Debtors or the Wind-Down Debtor, as applicable, and any corporate action required by the Debtors or the Wind-Down Debtor, as applicable, in connection with the Plan shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Wind-Down Debtor, as applicable. On or, as applicable, prior to the Effective Date, the appropriate officers of the Debtors or the Wind-Down Debtor, as applicable, shall be authorized and, as applicable, directed to issue, execute, and deliver the agreements, documents, Securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtor, and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.K shall be effective notwithstanding any requirements under non-bankruptcy law.

## L.     Vesting of Assets in the Wind-Down Debtor

Except as otherwise provided in the Plan, or in any agreement, instrument, or other document incorporated in the Plan, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, on the Effective Date, all property constituting Wind-Down Debtor Assets, including all Vested Causes of Action of the Debtors (unless otherwise released, waived, compromised, settled, transferred, or discharged pursuant to the Plan), and any property acquired by any of the Debtors under the Plan shall vest in the Wind-Down Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.

## M.     Cancellation of Notes, Instruments, Certificates, and Other Documents

On the later of the Effective Date and the date on which distributions are made pursuant to the Plan (if not made on the Effective Date), except for the purpose of evidencing a right to and allowing Holders of Claims and Interests to receive a distribution under the Plan or to the extent otherwise specifically provided for in the Plan, the Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan or the Restructuring Transactions (including, without limitation, the Definitive Documents and the Asset Purchase Agreement), all notes, bonds, indentures, certificates, Securities, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors, giving rise to any Claims against or Interests in the Debtors or to any rights or obligations relating to any Claims against or Interests in the Debtors shall be deemed cancelled without any need for a Holder to take further action with respect thereto.

## N.     Effectuating Documents; Further Transactions

On and after the Effective Date, the Debtors, and its directors, managers, partners, officers, authorized persons, and members thereof, and the Wind-Down Debtor and Plan Administrator are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, Definitive Documents,

and Asset Purchase Agreement, in the name of and on behalf of the Debtors and Wind-Down Debtor, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

**O.    Section 1146(a) Exemption**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Wind-Down Debtor, the Purchaser, or to any other Entity) of property under the Plan, Definitive Documents, and Asset Purchase Agreement or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Wind-Down Debtor; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, including the Asset Purchase Agreement, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**P.    Preservation of Rights of Action**

In accordance with section 1123(b) of the Bankruptcy Code, the Wind-Down Debtor shall succeed to all rights to commence and pursue any and all Vested Causes of Action of the Debtors, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action other than Causes of Action released, waived, settled, compromised, or transferred.  Such rights shall be preserved by the Debtors and Wind-Down Debtor and shall vest in the Wind-Down Debtor, with the Wind-Down Debtor's rights to commence, prosecute, or settle such Causes of Action preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action expressly released, waived, settled, compromised, or transferred by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan or pursuant to the Asset Purchase Agreement, which shall be deemed released and waived by the Debtors and Wind-Down Debtor as of the Effective Date.

The Wind-Down Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the beneficiaries of the Wind-Down Debtor and in accordance with the Plan Administrator Agreement and the Plan.  **No Entity may rely on the absence of a specific reference in the Schedules of Assets and Liabilities or Statement of Financial Affairs, the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Debtors or the Wind-Down Debtor, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.  The Wind-Down Debtor, on behalf of the Debtors and the Wind-Down Debtor, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including Article VIII of the**

**Plan.** Unless any Cause of Action of the Debtors is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Wind-Down Debtor, on behalf of the Debtors and Wind-Down Debtor and in accordance with the Plan Administrator Agreement, expressly reserves all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

The Wind-Down Debtor, on behalf of the Debtors, reserves and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Debtor, except as otherwise provided in the Plan, including Article VIII of the Plan. The Wind-Down Debtor, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Wind-Down Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court in accordance with the Plan.

**Q.      Election to Contribute Third-Party Claims**

Because aggregating all Contributed Third-Party Claims may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner, each Holder of a Claim or Interest may agree, by electing on its ballot or opt-in form, to contribute its Contributed Third-Party Claims to the Wind-Down Debtor. By electing such option on its ballot or opt-in form, each Contributing Claimant agrees that, subject to the occurrence of the Effective Date and the formation of the Wind-Down Debtor, it will be deemed, without further action, (i) to have irrevocably contributed its Contributed Third-Party Claims to the Wind-Down Debtor, and (ii) to have agreed to execute any documents reasonably requested by the Debtors or the Wind-Down Debtor to memorialize and effectuate such contribution.

**R.      Contribution of Contributed Third-Party Claims**

On the Effective Date, all Contributed Third-Party Claims will be irrevocably contributed to the Wind-Down Debtor and shall thereafter be Wind-Down Debtor Assets for all purposes. No Person may rely on the absence of a specific reference in the Plan, the Disclosure Statement, the Confirmation Order, the Plan Administrator Agreement, the Plan Supplement, or any other document as any indication that the Wind-Down Debtor will or will not pursue any and all available Contributed Third-Party Claims against such Person. The Wind-Down Debtor shall have, retain, reserve, and be entitled to assert all Contributed Third-Party Claims fully to the same extent that the Contributing Claimants could have asserted such claims prior to the Effective Date. For the avoidance of doubt, the Contributed Third-Party Claims shall not include the rights of any of the Contributing Claimants to receive the distributions under the Plan on account of their Claims or Interests.

**S.      Closing the Chapter 11 Cases**

On and after the Effective Date, the Wind-Down Debtor shall be permitted to classify all of the Chapter 11 Cases of the Debtors except for the Chapter 11 Case of Voyager Digital, LLC, or any other Debtor identified in the Restructuring Transactions Memorandum as having its Chapter 11 Case remain open following the Effective Date, as closed, and all contested matters relating to any of the Debtors, including objections to Claims or Interests and any adversary proceedings, may be administered and heard

in the Chapter 11 Case of Voyager Digital, LLC, or any other Debtor identified in the Restructuring Transactions Memorandum as having its Chapter 11 Case remain open following the Effective Date, irrespective of whether such Claims or Interests were Filed or such adversary proceeding was commenced against a Debtor whose Chapter 11 Case was closed.

## ARTICLE V.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.    Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the Sale Transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (5) is a D&O Liability Insurance Policy other than the Side-A Policy. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

**B.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Wind-Down Debtor, as applicable, under such Executory Contract or Unexpired Lease. Without limiting the general nature of the foregoing, and notwithstanding any non-bankruptcy law to the contrary, the Debtors and Wind-Down Debtor expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to any rejected Executory Contract or Unexpired Lease.

**C.    Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Counterparties to Executory Contracts or Unexpired Leases listed subject to rejection under the Plan shall be served with a notice of rejection of Executory Contracts and Unexpired Leases with the Plan Supplement. Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Claims, Noticing, and Solicitation Agent and served on the Debtors or Wind-Down Debtor, as applicable, no later than thirty days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, or the Wind-Down Debtor, the Estates, or their property without the need for any objection by the Wind-Down Debtor or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the**

**rejection of the Executory Contract or Unexpired Lease shall be deemed released, and be subject to the permanent injunction set forth in Article VIII.D of the Plan, including any Claims against any Debtor listed on the Debtors' schedules as unliquidated, contingent, or disputed.** All Allowed Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease shall be treated as General Unsecured Claims in accordance with Article III.C of the Plan.

### D.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed

The Debtors, the Wind-Down Debtor, or the Purchaser, as applicable pursuant to the Asset Purchase Agreement, shall pay Cures, if any, on the Effective Date.  The Debtors shall provide notice of the amount and timing of payment of any such Cure to the parties to the applicable assumed Executory Contracts or Unexpired Leases as part of the Plan Supplement.  Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the ordinary course amounts paid or proposed to be paid by the Debtors, the Wind-Down Debtor, or the Purchaser shall be dealt with in the ordinary course of business and, if needed, shall be Filed with the Claims, Noticing, and Solicitation Agent on or before thirty days after the Effective Date.  **If any counterparty to an Executory Contract or Unexpired Lease does not receive a notice of assumption and applicable cure amount, such counterparty shall have until on or before thirty days after the Effective Date to bring forth and File a request for payment of Cure.**  Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or the Wind-Down Debtor, without the need for any objection by the Wind-Down Debtor or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied and released upon payment by the Debtors or the Wind-Down Debtor or the Purchaser of the Cure in the ordinary course of business or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty); *provided*, *however*, that nothing herein shall prevent the Wind-Down Debtor or the Purchaser, as applicable, from paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure. The Wind-Down Debtor or the Purchaser may also settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court.  In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before thirty days after the Effective Date.  Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' first scheduled omnibus hearing for which such objection is timely Filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

In the event of a dispute regarding:  (1) the amount of any Cure Claim, (2) the ability of the Debtors, the Wind-Down Debtor, Purchaser, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed (or assumed and assigned, as applicable), or (3) any other matter pertaining to assumption or assignment, then any disputed Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made as soon as reasonably practicable following, and in accordance with, the entry of a Final Order of the Bankruptcy Court resolving such dispute or as may be agreed upon by the Debtors, the Wind-Down Debtor, or Purchaser, as applicable, and the counterparty to the Executory Contract or Unexpired Lease, and any such unresolved dispute shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise or assignment of any Executory Contract or Unexpired Lease to the Purchaser and full payment of any applicable Cure pursuant to this Article V.D, or upon and in accordance with any resolution of a Cure

dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty), shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assumed and assigned in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Article V.D, in the amount and at the time in the ordinary course of business or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty), shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, in the event that any counterparty to an Executory Contract or Unexpired Lease receives a notice of assumption and applicable proposed Cure amount, and disputes the Debtors' proposed Cure amount, such party shall not be required to File a Proof of Claim with respect to such dispute. Any counterparty to an Executory Contract or Unexpired Lease that does not receive a notice or applicable proposed Cure amount, and believes a Cure amount is owed, shall have thirty days after the Effective Date to File a Proof of Claim with respect to such alleged Cure amount, which Claim shall not be expunged until such Cure dispute is resolved.**

E. **Insurance Policies**

Each D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) other than the Side-A Policy shall be assumed, in their entirety, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date, pursuant to sections 105 and 365 of the Bankruptcy Code with the Wind-Down Debtor being authorized to pursue any proceeds thereof on behalf of the Debtors or the Wind-Down Debtor. The Side-A Policy shall ride through these Chapter 11 Cases with the Debtors, and the Wind-Down Debtor preserves all avoidance and other actions in connection with the premium paid thereunder. All beneficiaries under the D&O Insurance Policies reserve their rights under such D&O Insurance Policies subject to the limitations set forth in this Plan.

The Debtors or the Wind-Down Debtor, as applicable, shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) in effect prior to the Effective Date, and any current and former directors, officers, managers, and employees of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy subject to the terms thereof regardless of whether such directors, officers, managers, and employees remain in such positions after the Effective Date. Notwithstanding anything to the contrary in the Plan, the Debtors or the Wind-Down Debtor shall retain the ability to supplement such D&O Liability Insurance Policy as the Debtors or Wind-Down Debtor may deem necessary, subject to the prior written consent of the Wind-Down Debtor. Notwithstanding anything to the contrary contained in the Plan, the Wind-Down Debtor shall be entitled to pursue avoidance of the premium paid for the XL Specialty Insurance Company Cornerstone A-Side Management Liability Insurance Policy No. ELU184179-22, and nothing in this Plan shall be deemed a waiver or abrogation of any such rights.

The Debtors shall continue to satisfy their obligations under their insurance policies in full and continue such policies in the ordinary course of business. Each of the Debtors' insurance policies, and any agreements, documents, or instruments relating thereto shall be treated as Executory Contracts under the Plan. On the Effective Date: (a) the Debtors shall be deemed to have assumed all such insurance policies

and any agreements, documents, and instruments relating thereto in their entirety; and (b) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the applicable Debtors or the Wind-Down Debtor unaltered.

**F.      Reservation of Rights**

Nothing contained in the Plan or the Plan Supplement (unless otherwise explicitly provided) shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or the Wind-Down Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Wind-Down Debtor, as applicable, shall have forty-five days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease effective as of the Confirmation Date.

**G.      Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

**H.      Contracts and Leases Entered into After the Petition Date**

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under section 365 of the Bankruptcy Code, will be performed by the applicable Debtor or Wind-Down Debtor liable thereunder in the ordinary course of its business.  Such contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.

## PROVISIONS GOVERNING DISTRIBUTIONS

**A.      Timing and Calculation of Amounts to Be Distributed**

Except (1) as otherwise provided herein, (2) upon a Final Order, or (3) as otherwise agreed to by the Debtors, the Purchaser, or the Wind-Down Debtor, as the case may be, and the Holder of the applicable Claim, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the next Distribution Date after such Claim becomes, as applicable, an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of distributions that the Plan provides for Allowed Claims in the applicable Class from the Distribution Agent.  In the event that any payment or distribution under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  Except as specifically provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

## B. Rights and Powers of Distribution Agent

### 1. Powers of the Distribution Agent

The Distribution Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties and exercise its rights under the Plan; (b) make all distributions contemplated under the Plan; (c) employ professionals to represent it with respect to its responsibilities and powers; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan.

From and after the Effective Date, the Distribution Agent, solely in its capacity as Distribution Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against and Interests in the Debtors and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Distribution Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Distribution Agent. No holder of a Claim or Interest or other party in interest shall have or pursue any Claim or Cause of Action vested in a Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by such Distribution Agent to be necessary and proper to implement the provisions hereof.

### 2. Expenses Incurred on or after the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date and any reasonable compensation and expense reimbursement claims (including reasonable attorney and/or other professional fees and expenses) made by such Distribution Agent shall be paid in Cash by the Wind-Down Debtor.

## C. Delivery of Distributions and Undeliverable or Unclaimed Distributions

### 1. Distributions Generally

Except as otherwise provided in the Plan (including in paragraph 8 below), the Distribution Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the applicable register or in the Debtors' records as of the date of any such distribution (as applicable), including the address set forth in any Proof of Claim filed by that Holder.

### 2. Distributions on Account of Obligations of Multiple Debtors

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan. Any such Claims shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code.

### 3. Record Date of Distributions

On the Distribution Record Date, the various transfer registers for each Class of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further

changes in the record Holders of any Claims or Interests. The Distribution Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date. In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount.

4.    Special Rules for Distributions to Holders of Disputed Claims and Interests

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the Wind-Down Debtor, on the one hand, and the Holder of a Disputed Claim or Interest, on the other hand, or as set forth in a Final Order, no partial payments and no partial distributions shall be made with respect to a Disputed Claim or Interest until all of the Disputed Claim or Interest has become an Allowed Claim or Interest or has otherwise been resolved by settlement or Final Order; *provided* that, if the Wind-Down Debtor does not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim or Interest, the Distribution Agent may make a partial distribution on account of that portion of such Claim or Interest that is not Disputed at the time and in the manner that the Distribution Agent makes distributions to similarly situated Holders of Allowed Claims or Interests pursuant to the Plan. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims or Interests, as applicable, in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim or Interest, as applicable, in such Class that becomes an Allowed Claim or Interest after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims or Interests in such Class.

5.    De Minimis Distributions; Minimum Distributions

The Distribution Agent shall not make any Cash distributions to any Holder of an Allowed Claim or Interest pursuant to Article III.C.1-11 of this Plan on account of such Allowed Claim or Interest if such distribution is valued, in the reasonable discretion of the Distribution Agent, at less than $1.00, and each Holder of an Allowed Claim or Interest to which this limitation applies shall not be entitled to any distributions under the Plan. Notwithstanding anything to the contrary in this Plan, there shall be no minimum distribution threshold on account of distributions of any Cryptocurrency to Holders of Allowed Account Holder Claims and Allowed OpCo General Unsecured Claims.

6.    Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable and/or otherwise remains unclaimed, the Plan Administrator shall use reasonable efforts to contact such Holder; *provided* that no further distributions to such Holder shall be made unless and until the Plan Administrator has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided, further,* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the applicable Distribution Date. After such date, all unclaimed property or interests in property shall revert to the Wind-Down Debtor automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder to such property or interest in property shall not be entitled to any distributions under the Plan.

A distribution shall be deemed unclaimed if a Holder has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Wind-Down Debtor of an intent to accept a particular distribution; (c) responded to the Wind-Down Debtor's requests

for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

7.     Manner of Payment Pursuant to the Plan

At the option of the Distribution Agent, any Cash payment to be made hereunder may be made by check, wire transfer, automated clearing house, credit card, or as otherwise provided in applicable agreements.

8.     Distributions of Net Owed Coins; Additional Bankruptcy Distributions

As a general matter, the Purchaser will allocate each Account Holder's Net Owed Coins to its account on the Binance.US Platform, and each Holder of OpCo General Unsecured Claim's Pro Rata share of the Distributable Cryptocurrency (in Cash) to its account on the Binance.US Platform in accordance with, and subject to, the provisions of Section 6.12 of the Asset Purchase Agreement.

Subject to the terms of the Asset Purchase Agreement, the Purchaser may make Additional Bankruptcy Distributions to Transferred Creditors, including Distributable OpCo Cash and/or other Wind-Down Debtor Assets, corresponding to their Pro Rata shares of such Additional Bankruptcy Distribution (if such Additional Bankruptcy Distribution is in Cryptocurrency, based on the Transferred Cryptocurrency Value of the Cryptocurrency included in such Additional Bankruptcy Distribution), all in accordance with any applicable Post-Bankruptcy Statement (as defined in the Asset Purchase Agreement).

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim does not become a Transferred Creditor prior to the date that is three (3) months following the later of the Closing Date or the date on which the terms and conditions for the Binance.US Platform are made available for such Person to accept (as provided in the Customer Onboarding Protocol), then Purchaser shall convert any Cryptocurrency allocable to such Person into U.S. Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such U.S. Dollars, together with any cash or others assets in respect of such Persons, to the Debtors within five (5) Business Days, for further distribution by the Debtors in accordance with this Plan and the Customer Onboarding Protocol.

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim is located in an Unsupported Jurisdiction (as defined in the Asset Purchase Agreement), then the Net Owed Coins, Distributable Cryptocurrency (in Cash) and Additional Bankruptcy Distributions, if applicable, allocable to such Person shall be handled pursuant to Section 6.12(b) or, if applicable, Section 6.14(d) of the Asset Purchase Agreement.  Notwithstanding anything to the contrary in the Asset Purchase Agreement, this Plan, or any Definitive Document, if any Account Holder or Holder of an Allowed OpCo General Unsecured Claim in an Unsupported Jurisdiction elects to not become a Transferred Creditor prior to the date that is three (3) months following the later of the Closing Date or the date on which the terms and conditions for the Binance.US Platform are made available for such Person to accept (as provided in the Customer Onboarding Protocol), then Purchaser shall on the date that is three (3) months following the later of the Closing Date or the date which the terms and conditions for the Binance.US Platform are made available for such person to accept, convert any Cryptocurrency allocable to such Person into U.S. Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such U.S. Dollars, together with any cash or others assets in respect of such Persons, to the Debtors within five (5) Business Days, for further distribution by the Debtors in accordance with this Plan and the Customer Onboarding Protocol.

Purchaser shall have no responsibility to make any distributions other than as contemplated by Sections 6.12 and 6.14 of the Asset Purchase Agreement.

**D.  Compliance Matters**

In connection with the Plan, to the extent applicable, the Debtors, the Wind-Down Debtor, any Distribution Agent, and any other applicable withholding and reporting agents shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors, the Wind-Down Debtor, the Distribution Agent, and any other applicable withholding and reporting agents shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including wind-down a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms that are reasonable and appropriate; *provided* that the Wind-Down Debtor and the Distribution Agent, as applicable, shall request appropriate documentation from the applicable distributees and allow such distributees a reasonable amount of time to respond. The Debtors, the Wind-Down Debtor, the Distribution Agent, and any other applicable withholding and reporting agents reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

**E.  Foreign Currency Exchange Rate**

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim, asserted in government issued currency (for the avoidance of doubt, not including any Cryptocurrency) other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

**F.  Claims Paid or Payable by Third Parties**

1.  Claims Paid by Third Parties

The Debtors or the Wind-Down Debtor, as applicable, shall reduce a Claim or Interest, and such Claim or Interest (or portion thereof) shall be disallowed without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim or Interest receives a payment on account of such Claim or Interest from a party that is not a Debtor or Wind-Down Debtor (or other Distribution Agent), as applicable, including any payments made in connection with the Sale Transaction. To the extent a Holder of a Claim or Interest receives a distribution on account of such Claim or Interest and receives payment from a party that is not a Debtor or a Wind-Down Debtor (or other Distribution Agent), including payments made in connection with the Sale Transaction, as applicable, on account of such Claim or Interest, such Holder shall, within ten Business Days of receipt thereof, repay, return, or deliver any distribution held by or transferred to the Holder to the applicable Wind-Down Debtor to the extent the Holder's total recovery on account of such Claim or Interest from the third party and under the Plan exceeds the amount of such Claim or Interest as of the date of any such distribution under the Plan. The failure of such Holder to timely repay, return, or deliver such distribution shall result in the Holder owing the applicable Wind-Down Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the ten-Business Day grace period specified above until the amount is repaid.

2.  Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim or Interest that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim or

Interest has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim or Interest (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such payment, such Claim or Interest may be expunged or reduced on the Claims Register by the Claims, Noticing, and Solicitation Agent to the extent of any such payment without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

    3.    <u>Applicability of Insurance Policies</u>

Except as otherwise provided herein, payments to Holders of Claims or Interests shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any rights, defenses, or Cause of Action that the Debtors, the Wind-Down Debtor or any other Entity may hold against any other Entity, including insurers, under any policies of insurance, agreements related thereto, or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers under the applicable insurance policies, agreements related thereto, and applicable non-bankruptcy law.

**G.    Setoffs and Recoupment**

Except as otherwise expressly provided for herein, each Debtor, the Wind-Down Debtor, or such Entity's designee as instructed by such Debtor, the Wind-Down Debtor, as applicable, may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, set off against or recoup from an Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature whatsoever that the Debtor or the Wind-Down Debtor, as applicable, may have against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised, settled, or released on or prior to the Effective Date (whether pursuant to the Plan or otherwise). Notwithstanding the foregoing, except as expressly stated in Article VIII of this Plan, neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtors or the Wind-Down Debtor of any such Claims, rights, or Causes of Action the Debtors or the Wind-Down Debtor may possess against such Holder.

**H.    Allocation between Principal and Accrued Interest**

Except as otherwise provided herein, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof and as determined for federal income tax purposes) and second, to the extent the consideration exceeds the principal amount of the Allowed Claims, to the remaining portion of such Allowed Claim if any.

## ARTICLE VII.

### PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS AND INTERESTS

**A.    Disputed Claims Process**

After the Effective Date, the Debtors, the Wind-Down Debtor, and any party-in-interest, shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim or Interest immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in

the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim or Interest. If a Holder of a Claim or Interest in Class disputes the amount of their Claim or Interest as listed in the Schedules, the Holder should notify the Debtors or the Wind-Down Debtor of such dispute. If the Debtors and the Holder agree to an amended Claim amount prior to the Effective Date, the Debtors shall file amended Schedules prior to the Effective Date. If between the Confirmation Date and the Effective Date, the dispute cannot be consensually resolved, the Holder may seek (by letter to the Court) to have the claim or interest dispute resolved before the Bankruptcy Court (and, with the consent of the Debtors, before any other court or tribunal with jurisdiction over the parties). After the Effective Date, the creditor may seek to have the claim dispute resolved before the Bankruptcy Court or any other court or tribunal with jurisdiction over the parties.

Notwithstanding anything in this Plan to the contrary: (1) all Claims against the Debtors that result from the Debtors' rejection of an Executory Contract or Unexpired Lease; (2) Claims filed to dispute the amount of any proposed Cure pursuant to section 365 of the Bankruptcy Code; and (3) Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court, if not otherwise resolved through settlement with the applicable claimant.

On the Effective Date, the Debtors or Plan Administrator, as applicable, may establish one or more accounts or funds to hold and dispose of certain assets, pursue certain litigation (including the Causes of Action preserved under the Plan or otherwise vesting in the Wind-Down Debtor), and/or satisfy certain Claims (including Claims that are contingent or have not yet been Allowed). For any such account or fund, the Debtors or the Plan Administrator, as applicable, may take the position that grantor trust treatment applies in whole or in part. To the extent such treatment applies to any such account or fund, for all U.S. federal income tax purposes, the beneficiaries of any such account or fund would be treated as grantors and owners thereof, and it is intended, to the extent reasonably practicable, that any such account or fund would be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations. Alternatively, any such account or fund may be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9. If such rules apply, such assets would be subject to entity-level taxation, and the Debtors and the Wind-Down Debtor would be required to comply with the relevant rules.

## B.   Objections to Claims or Interests

Except as otherwise specifically provided in the Plan, after the Effective Date, the Wind-Down Debtor shall have the sole authority on behalf of the Debtors to: (1) File, withdraw, or litigate to judgment, any objections to Claims or Interests; and (2) settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, the Wind-Down Debtor shall have and retain any and all rights and defenses each such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.P of the Plan. In the event that the Wind-Down Debtor settles or otherwise compromises the Signatory Governmental Claims (as defined in the Governmental Claimant Stipulation) asserted against TopCo, any other Claim Filed or asserted by a Governmental Unit against TopCo, or any other Claim Filed or asserted against TopCo in an amount greater than $100,000, any such proposed settlement or compromise shall require approval of the Bankruptcy Court after notice and a hearing.

Any objections to Claims or Interests shall be Filed on or before the Claims Objection Bar Date. For the avoidance of doubt, any party may object to any Claims or Interests prior to the Claims Objection Bar Date. Further, the Bankruptcy Court may extend the time period to object to Claims or Interests set

forth in this paragraph at any time, including before or after the expiration of one hundred eighty days after the Effective Date, in its discretion or upon request by the Debtors or any party in interest.

## C.     Estimation of Claims

Before or after the Effective Date, the Debtors or the Wind-Down Debtor, as applicable, may (but are not required to), at any time, request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code, for any reason, regardless of whether any party previously has objected to such Disputed Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under sections 157 and 1334 of the Judicial Code to estimate any such Disputed Claim or Interest, including during the litigation of any objection to any Disputed Claim or Interest or during the pendency of any appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Disputed Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions) and may be used as evidence in any supplemental proceedings, and the Debtors or the Wind-Down Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Disputed Claim or Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before fourteen days after the date on which such Disputed Claim or Interest is estimated.

## D.     No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only a portion of a Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

## E.     Distributions After Allowance

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court Allowing any Disputed Claim or Interest becomes a Final Order, the Distribution Agent shall provide to the Holder of such Allowed Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Allowed Claim or Interest unless required under applicable bankruptcy law.

## F.     No Interest

Unless otherwise specifically provided for herein or by Final Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim

with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

**G.      Adjustment to Claims and Interests without Objection**

Any Claim or Interest that has been paid, satisfied, amended, superseded, cancelled, or otherwise expunged (including pursuant to the Plan) may be adjusted or expunged on the Claims Register at the direction of the Wind-Down Debtor without the Wind-Down Debtor having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.   Additionally, any Claim or Interest that is duplicative or redundant with another Claim or Interest against the same Debtor may be adjusted or expunged on the Claims Register at the direction of the Wind-Down Debtor without the Wind-Down Debtor having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

**H.      Time to File Objections to Claims**

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

**I.      Disallowance of Claims or Interests**

Any Claims or Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Wind-Down Debtor, as applicable.

**Except as otherwise provided herein or as agreed to by the Debtors or the Wind-Down Debtor, any and all Proofs of Claim Filed after the Bar Date shall be deemed disallowed and expunged as of the Effective Date subject to the approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

**J.      Amendments to Proofs of Claim**

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Proof of Claim or Proof of Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Wind-Down Debtor, and any such new or amended Proof of Claim or Proof of Interest Filed shall be deemed disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.

# ARTICLE VIII.

## EFFECT OF CONFIRMATION OF THE PLAN

**A.    Releases by the Debtors**

Notwithstanding anything contained in the Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtor, and their Estates, and in each case on behalf of themselves and their respective successors, assigns, and representatives, who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors would have been legally entitled to assert (whether individually or collectively) based on, relating to, or arising from the Investigated Matters,  the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, or the administration and implementation of the Restructuring Transactions.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in this Article VIII.A by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.A is:   (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Debtors or Wind-Down Debtor or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

Notwithstanding anything to the contrary contained herein, nothing in this Plan shall release, waive, or otherwise limit the (i) rights, duties, or obligations of the Purchaser under the Asset Purchase Agreement or the Definitive Documents and (ii) the Non-Released D&O Claims, but such Non-Released D&O Claims shall remain subject to the limitations contained in Article IV.E and Article IV.F of this Plan.

**B.    Releases by Holders of Claims and Interests**

Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law,

equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, *provided* that nothing in this Article VIII.B shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.B, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.B is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.F and Article IV.G of the Plan, a bar to any of the Releasing Parties or the Debtors or the Wind-Down Debtor or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

C.      Exculpation

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from any criminal or civil liability or claim arising in whole or in part from any act or omission based on the negotiation, execution, and implementation of any transaction or act approved by the Bankruptcy Court in the Chapter 11 Cases, including the Disclosure Statement, the Asset Purchase Agreement, the order approving entry into the Asset Purchase Agreement, the Plan, the Plan Supplement, including the Plan Administrator Agreement, the D&O Settlement, the Confirmation Order, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the Plan Supplement or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Asset Purchase Agreement, the order approving entry into the Asset Purchase Agreement, the Plan, the Plan Supplement, including the Plan Administrator Agreement, the D&O Settlement, the Confirmation Order, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, including the Plan Administrator Agreement, and the implementation of the

Restructuring Transactions contemplated by the Plan, except for Causes of Action related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan; *provided* that nothing in the Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

D.    Injunction

The assets of the Debtors and of the Wind-Down Debtor shall be used for the satisfaction of expense obligations and the payment of Claims and Interests only in the manner set forth in this Plan and shall not be available for any other purpose. All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Debtor, or the Debtors' Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan.

In addition, as of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in this Plan or the Confirmation Order, all Persons and Entities who have held, hold, or may hold Claims or Interests that are fully satisfied pursuant to the Plan or any Claim or Interest that is subject to the releases and exculpations set forth in Article VIII.B and Article VIII.C of this Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claims or Interests, except for the receipt of the payments or distributions that are contemplated by this Plan.

E.    Release of Liens

Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan or Confirmation Order on the Effective Date, and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors shall automatically revert to the applicable Debtor or the Wind-Down Debtor, as applicable, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as requested by the Debtors or Wind-Down Debtor to evidence the release of such Lien, including the execution, delivery, and filing or recording of such documents evidencing such releases. The presentation or filing of the Confirmation Order to or with any local, state, federal, or foreign agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

## F.    OSC and SEC

Notwithstanding any language to the contrary herein, no provision shall (a) preclude the OSC or the SEC from enforcing its police or regulatory powers; or (b) enjoin, limit, impair or delay the OSC or SEC from commencing or continuing any claims, causes of action, proceeding, or investigations against any non-Debtor person or non-Debtor Entity in any forum.

## G.    Protection against Discriminatory Treatment

As provided by section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Entity, including Governmental Units, shall discriminate against any Debtor or the Wind-Down Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, any Debtor or the Wind-Down Debtor, or any Entity with which a Debtor or the Wind-Down Debtor has been or is associated, solely because such Debtor or the Wind-Down Debtor was a debtor under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

## H.    Document Retention

Upon the occurrence of the Effective Date, the Debtors' books and records shall be transferred to the Wind-Down Debtor, which shall continue to preserve all financial books and records, emails, and other financial documents relating to the Debtors' business that are currently in the Debtors' possession. The Wind-Down Debtor shall not destroy or otherwise abandon any such documents or records without providing advance notice to the U.S. Securities and Exchange Commission (c/o Therese Scheuer, U.S. Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549, ScheuerT@SEC.GOV) and seeking further authorization from this Bankruptcy Court.  Nothing in this Plan or the Confirmation Order shall affect the obligations of the pre-Effective Date Debtors, the Wind-Down Debtor, and/or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

## I.    Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## J.    Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  **All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

## ARTICLE IX.

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

**A.   Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.B of the Plan:

1.   The Bankruptcy Court shall have entered the Confirmation Order, which shall be in a form and substance reasonably satisfactory to the Debtors and the Committee, and subject to the consent rights of Purchaser under the Asset Purchase Agreement, and such order shall be a Final Order and in full force and effect.

2.   The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, Definitive Documents, and the Asset Purchase Agreement.

3.   Each Definitive Document and each other document contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications or supplements thereto or other documents contained therein, shall have been executed or Filed, as applicable, in form and substance consistent in all respects with the Plan, and subject to the Purchaser's consent rights under the Asset Purchase Agreement, and shall not have been modified in a manner inconsistent therewith;

4.   The Professional Fee Escrow Account shall have been established and funded with Cash in accordance with Article II.B.2 of the Plan.

5.   The Wind-Down Reserve shall have been established and funded with Cash in accordance with the Plan.

6.   If prior to the Outside Date, the Asset Purchase Agreement shall be in full force and effect and the Sale Transaction shall have been consummated.

7.   The Restructuring Transactions shall have been consummated or shall be anticipated to be consummated concurrently with the occurrence of the Effective Date in a manner consistent with the Plan, the Customer Onboarding Protocol, the other Definitive Documents, and the Asset Purchase Agreement, and the Plan shall have been substantially consummated or shall be anticipated to be substantially consummated concurrently with the occurrence of the Effective Date.

**B.   Waiver of Conditions Precedent**

The Debtors, with the consent of the Committee and, solely to the extent related to the Asset Purchase Agreement and the Sale Transaction, prior to the Outside Date, the consent of Purchaser, may waive any of the conditions to the Effective Date set forth in Article IX.A of the Plan at any time, without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan.

C.      **Effect of Non-Occurrence of Conditions to Consummation**

If the Effective Date does not occur within 120 days after the Confirmation Date, then the Plan will be null and void in all respects, any and all compromises or settlements not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including with respect to the fixing, limiting, or treatment of any Claim or Interest, including, without limitation, the Alameda Loan Facility Claims), shall be deemed null and void, and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action held by any Debtor or any other Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity in any respect.

## ARTICLE X.

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      **Modification of Plan**

Subject to the limitations and terms contained in the Plan and Purchaser's consent rights under the Asset Purchase Agreement, the Debtors, with the consent of the Committee, reserve the right to (1) amend or modify the Plan before the entry of the Confirmation Order, in accordance with the Bankruptcy Code and the Bankruptcy Rules and (2) after the entry of the Confirmation Order, the Debtors or the Wind-Down Debtor, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, to remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.

B.      **Effect of Confirmation on Modifications**

Entry of the Confirmation Order shall constitute approval of all modifications or amendments to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      **Revocation or Withdrawal of Plan**

The Debtors reserve the right, with the consent of the Committee, to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to File subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Classes of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effectuated under the Plan, and any document or agreement executed pursuant to the Plan will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE XI.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Claims or other Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.      ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor or the Estates that may be pending on the Effective Date;

6.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, and other agreements or documents created in connection with the Plan; *provided* that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court;

7.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10.     hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including:  (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or an Interest for amounts not timely repaid pursuant to Article VI of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) anything that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan and the Confirmation Order; or (d) related to section 1141 of the Bankruptcy Code;

11.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.     adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

13.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

14.     enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases with respect to any Entity, and resolve any cases, controversies, suits, or disputes that may arise in connection with any Entity's rights arising from or obligations incurred in connection with the Plan;

15.     hear and determine matters concerning local, state, federal, and foreign taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

16.     enter an order or Final Decree concluding or closing the Chapter 11 Cases;

17.     enforce all orders previously entered by the Bankruptcy Court; and

18.     hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or the Judicial Code.

Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, or the Disclosure Statement, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Article XI, the provisions of this Article XI shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose prior to the Effective Date.

# ARTICLE XII.

## MISCELLANEOUS PROVISIONS

**A.      Immediate Binding Effect**

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind-Down Debtor, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, exculpations, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims against and Interests in the Debtors shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

**B.      Additional Documents**

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors, the Wind-Down Debtor, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**C.      Payment of Statutory Fees**

All fees and applicable interest payable pursuant to section 1930 of the Judicial Code and 31 U.S.C. § 3717, as applicable, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Debtors or the Wind-Down Debtor (or the Distribution Agent on behalf of the Wind-Down Debtor) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

**D.      Dissolution of Statutory Committees**

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided*, however, that such committees will remain in existence for the limited purposes of (a) pursuing, supporting, or otherwise participating in, any outstanding appeals in the Chapter 11 Cases; and (b) filing, objecting, or otherwise participating in, any final fee applications of Professionals.

**E.      Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests, unless and until the Effective Date has occurred.

## F.    Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each such Entity.

## G.    Service of Documents

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or the Wind-Down Debtor shall be served on:

| | |
|---|---|
| Debtors | **Voyager Digital Holdings, Inc.**<br>33 Irving Place<br>New York, New York 10003<br>Attention:  David Brosgol<br>General Counsel,<br>E-mail address:  dbrosgol@investvoyager.com |
| | with copies for information only (which shall not constitute notice) to: |
| Counsel to the Debtors | **Kirkland & Ellis LLP<br>Kirkland & Ellis International LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Attention:  Joshua A. Sussberg, P.C., Christopher Marcus, P.C., Christine A. Okike, P.C., and Allyson B. Smith |
| Counsel to the Committee | **McDermott Will & Emery LLP**<br>One Vanderbilt Avenue<br>New York, New York 10017<br>Attention: Darren Azman |

## H.    Entire Agreement; Controlling Document

Except as otherwise indicated, on the Effective Date, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations with respect to the subject matter of the Plan, all of which will have become merged and integrated into the Plan; *provided, however*, that notwithstanding the foregoing or anything to the contrary herein, to the extent there is any conflict between the Plan and the Confirmation Order, on the one hand, and the Asset Purchase Agreement, on the other hand, the Asset Purchase Agreement shall govern solely in the event the Sale Transaction is consummated.  Except as set forth in the Plan, in the event that any provision of the Disclosure Statement, the Plan Supplement, or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

I.    **Plan Supplement**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Claims, Noticing, and Solicitation Agent at https://cases.stretto.com/Voyager or the Bankruptcy Court's website at http://www.nysb.uscourts.gov. Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

J.    **Non-Severability**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, subject to the Purchaser's consent rights under the Asset Purchase Agreement prior to the Outside Date, shall have the power to alter and interpret such term or provision to make it valid or enforceable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent, consistent with the terms set forth herein; and (3) non-severable and mutually dependent.

K.    **Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and solely to the extent permitted by section 1125(e) of the Bankruptcy Code, the Debtors, and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties nor individuals or the Debtors or the Wind-Down Debtor will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

L.    **Waiver or Estoppel**

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed prior to the Confirmation Date.

Dated: March 8, 2023

VOYAGER DIGITAL HOLDINGS, INC.
on behalf of itself and all other Debtors

_/s/ Stephen Ehrlich_

Stephen Ehrlich
Co-Founder and Chief Executive Officer
Voyager Digital Holdings, Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **VOYAGER DIGITAL HOLDINGS, INC., et al.,** | : | **Case No. 22-10943 (MEW)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |
| | : | |

------------------------------------------------------------------------

**DECISION REGARDING (1) APPROVAL OF THE DEBTORS'**
**DISCLOSURE STATEMENT, (2) CONFIRMATION OF THE DEBTORS'**
**PLAN OF REORGANIZATION, (3) MOTIONS SEEKING THE APPOINTMENT**
**OF A TRUSTEE, (4) MOTIONS REQUESTING FULL CUSTOMER ACCESS TO**
**ACCOUNT HOLDINGS, AND (5) RELATED MATTERS**

A P P E A R A N C E S :

KIRKLAND & ELLIS LLP
New York, New York
*Attorneys for Debtors*
    By: Joshua Sussberg, Esq.
        Christine Okike, Esq.
        Michael Slade, Esq.
        Allyson Smith, Esq.

QUINN EMANUEL URQUHART SULLIVAN LLP
New York, New York
*Attorneys for the Special Committee of the Board of Directors*
    By: Susheel Kirpalani, Esq.
        Katherine Scherling, Esq.

McDERMOTT WILL & EMERY LLP
New York, New York; Dallas, Texas; and Atlanta, Georgia
*Attorneys for the Official Committee of Unsecured Creditors*
    By: Darren T. Azman, Esq.
        Joseph B. Evans, Esq.
        John J. Calandra, Esq.

LATHAM & WATKINS LLP
New York, New York
*Attorneys for BAM Trading Services Inc.*
*d/b/a Binance.US*
    By: Adam J. Goldberg, Esq.
        Robert Malioneck, Esq.
        Nacif Taousse, Esq.

1

OFFICE OF THE UNITED STATES TRUSTEE
New York, New Yori
    By: Richard C. Morrissey, Esq.
        Mark Bruh, Esq.

U.S. SECURITIES AND EXCHANGE COMMISSION
Atlanta, Georgia and Washington, D.C.
    By: William M. Uptegrove, Esq.
        Therese Scheuer, Esq.

U.S. DEPARTMENT OF JUSTICE
New York, New York
*Attorneys for United States of America*
    By: Jean-David Barnea, Esq.
        Peter Aronoff, Esq.

FEDERAL TRADE COMMISSION
Washington, DC
    By: Katherine Johnson, Esq.

TEXAS STATE SECURITIES BOARD &
TEXAS DEPARTMENT OF BANKING
Austin, Texas
    By: Abigail Ryan, Esq.

NEW JERSEY BUREAU OF SECURITIES
Newark, New Jersey 07102
    By: Virginia Shea, Esq.

NEW YORK STATE DEPARTMENT OF
FINANCIAL SERVICES
New York, New York
    By: Jason David St. John, Esq.

VERMONT DEPARTMENT OF
FINANCIAL REGULATION
Montpelier, VT
    By: Jennifer Rood, Esq.

NATIONAL ASSOCIATION OF
ATTORNEYS GENERAL
Washington, DC
    By: Karen Cordry, Esq.

2

KILPATRICK TOWNSEND & STOCKTON LLP
New York, New York
   By: David M. Posner, Esq.
       Kelly E. Moynihan

TENNESSEE DEPARTMENT OF COMMERCE
AND INSURANCE
Nashville, TN 37202
   By: Marvin Clements, Esq.

DC DEPARTMENT OF INSURANCE,
SECURITIES AND BANKING
Washington, DC 20002
   By: David P. O'Brien, Esq.

Lisa Dagnoli
*Pro Se* Creditor

Gina DiResta
*Pro Se* Creditor

Michelle DiVita, Esq.
*Pro Se* Creditor

Tracey Hendershott
*Pro Se* Creditor

SJ Jones
*Pro Se* Creditor

Dan Newsom
*Pro Se* Creditor

Lisa Provino
*Pro Se* Creditor

Jon Warren
*Pro Se* Creditor

**HONORABLE MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

     This Decision addresses the Debtors' request for final approval of the Disclosure

Statement that the Debtors distributed in January 2023, the proposed confirmation of the

3

Debtors' plan of reorganization, and some other motions that were filed by creditors. The proposed plan contemplates a sale transaction that is subject to some strict deadlines, and I dictated my findings and conclusions into the record at the end of the hearing on March 7, 2023 so that a confirmation order could be entered without unintentionally triggering any termination rights on the part of the proposed purchaser. However, I indicated that we would review a transcript of my rulings and would correct spelling, omitted citations, inadvertent errors, and places where I had been less clear than I would have liked during the course of my dictation, and that a corrected and final decision would then be issued. We have received the transcript and we have made corrections, added citations and re-ordered some points for clarity, but have not changed the substance of the decision as it was announced in open Court. This written Decision represents the actual and final Decision of the Court.

We held a lengthy hearing that began on Thursday, March 2 and continued through Tuesday, March 7. There were many participants in the hearing, including a large number of *pro se* parties who are Voyager account holders. I want to thank the *pro se* parties for their participation and for the unusual amount of work and energy that they put into this case. I appreciate that they are not attorneys and that they have labored under some significant disadvantages as a result. I tried wherever possible during the course of the hearing to give the *pro se* parties the chance to ask questions, even if at times we may have strayed somewhat from the issues that are presently before the Court. Unfortunately, I had to exclude one *pro se* party who refused to abide by my instructions and who was disrespectful in his conduct. However, the other *pro se* participants clearly made a significant effort to be helpful and to abide by the rules as I explained them, and I greatly appreciate the fact that they did so.

The primary issue before me in this hearing is the Debtors' request for final approval of their Disclosure Statement and confirmation of their proposed plan of reorganization. The plan, as I said, provides for a sale of customer accounts to BAM Trading Services Inc. (which does business as Binance.US), though account holders can elect not to become customers of Binance.US. The plan also includes a backup option in the event that the proposed deal with Binance.US does not close.

The Debtors have argued that the proposed deal with Binance.US will maximize their ability to make distributions to account holders in the form of cryptocurrencies rather than cash. This may have tax benefits for the account holders, though the tax issues apparently are not completely clear and nobody has presented evidence or made legal submissions to me about the tax issues or the tax benefits. The Debtors have also argued that the proposed deal with Binance.US would permit more cryptocurrencies to be distributed "in kind" than would be permitted by any of the available alternatives. They have further argued that the Binance.US deal would limit the amounts of cryptocurrency sales that the Debtors would have to make, and thereby would reduce the extent to which sales by the Debtors might adversely affect market prices, particularly in the case of cryptocurrencies where normal trading volumes are relatively low.

The objections have focused on many things. Some objections have raised relatively common bankruptcy issues, such as objections to some of the releases that the Debtors have proposed. Other objections are focused more specifically on regulatory issues or on the wisdom of potential dealings with Binance.US.

Let me say at the outset, and as background to my rulings, that I cannot think of another case I have had that comes before me in a setting quite like this one does.

5

I am aware that there are some people who question the very concept of cryptocurrencies and the whole idea of cryptocurrency investment and trading.  I note that no party in this case has taken such a position, and it is not for me to decide whether particular investments are good ideas or not.  But it certainly provides an unusual backdrop to this bankruptcy case.

I also am aware that Voyager operated, and Binance.US currently operates, in a regulatory environment that at best can be described as highly uncertain.  There are firms that operate as cryptocurrency brokers or exchanges, and have done so for several years, without being subject to clear and well-defined regulatory requirements.  Regulators themselves cannot seem to agree as to whether cryptocurrencies are commodities that may be subject to regulation by the CFTC, or whether they are securities that are subject to securities laws, or neither, or even on what criteria should be applied in making the decision.  This uncertainty has persisted despite the fact that cryptocurrency exchanges have been around for a number of years.

If the current regulatory environment can be characterized as uncertain, the future regulatory environment can only be characterized, in my mind, as virtually unknowable.  There have been differing proposals in Congress to adopt different types of regulatory regimes for cryptocurrency trading.  Meanwhile, the SEC has filed some actions against particular firms with regard to particular cryptocurrencies, and those actions suggest that a wider regulatory assault may be forthcoming.  The CFTC seems to have taken some positions that are at odds with the SEC's views.  Just how this will all sort itself out, how the pending actions relating to cryptocurrencies will be decided, and just what issues might be raised in future regulatory actions, and how they will affect individual firms or the industry as a whole, is unknown.

Complicating things further is the fact that Voyager operated, and Binance.US continues to operate, in an industry that also has been the subject of severe financial shocks over the past

year.  Many firms were adversely affected by the loan defaults of Three Arrows, including

Voyager itself.  The Three Arrows defaults led to several bankruptcy filings across the country.

The more recent and sudden collapse of FTX has reverberated even more throughout the industry

and has also led to some financial problems at other firms.

Perhaps the most worrisome, for me, are revelations of apparent misbehavior and misuse

of customer assets at some firms.  I certainly do not have all of the evidence as to what happened

at FTX, and we will all have to wait until judgments can be entered in that case before we are

sure exactly what happened.  However, public statements by the persons currently handling the

bankruptcy of FTX have indicated that there was an enormous disparity between the way that

FTX actually operated, and the way it actually used customer assets, as opposed to what it had

represented to its customers.

I am also aware of the examiner's report about the conduct of business at Celsius, and

how the custody of customer assets at that firm may have differed from public statements as to

how customer assets were being treated.  Once again, I certainly do not have all the evidence as

to what actually happened at Celsius, and we will have to see what further developments there

are in that case.  But the examiner's report certainly raised the prospect of a disparity between

the way that particular firm actually operated and the representations it made to its customers

about how assets were handled.

In this particular case, some account holders and some other parties have referred me to

newspaper or magazine articles, or to a recent letter sent by a group of US Senators, all raising

questions about how Binance.US does business and perhaps more questions about how its

affiliated companies do business.  Despite the questions that have been raised, however, I must

note that I have been offered absolutely no actual, admissible evidence – I mean literally zero

admissible evidence – that would support an accusation that Binance.US is misusing customer assets or is engaged in misbehavior of any kind at all. Instead, I am in the unenviable position of having to make a ruling about the proposed transaction in the face of hearsay accusations of potential wrongdoing, in an industry where other firms have apparently engaged in real wrongdoing, while having absolutely no evidence indicating that there is any good basis for the questions about Binance.US that have been raised.

With those observations to put things into context, let me turn to some of the actual objections that have been filed. The first one that I will address is the objection filed by the Securities and Exchange Commission.

The SEC argued in its written objection that the Debtors cannot prove the feasibility of their proposed plan, for two reasons. First, the SEC argued that in its view the Debtors had the burden to prove that the rebalancing of the Debtors' cryptocurrency portfolios (in preparation for plan distributions) would not involve illegal purchases and sales of securities. The objection did not take the position that any particular cryptocurrencies are securities, or otherwise explain how or why the Debtors' rebalancing activities might be illegal, although it did contain a vague footnote suggesting that the VGX token was one as to which some unspecified issue might exist.

The SEC also suggested that the Debtors should be required to prove that Binance.US is not operating as a securities broker without registering as such. Once again, the SEC did not actually take the position that Binance.US *is* operating as an unregistered and unlicensed securities broker. Instead, it just suggested that the Debtors had the burden to prove the negative, without offering any evidence or even any reason to think that Binance.US actually is doing anything for which it requires further SEC registrations.

I questioned the SEC about these objections at the outset of this hearing, and to some

extent I rebuked the SEC attorneys for the vagueness of their submission, though in fairness to

the SEC attorneys I think they were just the messengers and not the architects of the message

that they were sent to deliver to me.  Although the SEC contended that the Debtors somehow had

to prove a negative – *i.e.*, that the Debtors were not violating securities laws and that Binance.US

is not violating registration requirements for brokers – the SEC had not even affirmatively

contended that the Debtors were doing anything wrong, or that Binance.US was doing anything

wrong.  Nor had the SEC offered any guidance at all as to just what it was that the Debtors

allegedly were supposed to prove on these issues, or how the Debtors possibly could prove what

the SEC wanted them to prove without receiving any explanation at all from SEC as to just why

the Debtors' operations, or Binance.US's operations, might raise legal issues.

Near the end of the hearing on Friday the SEC asked to provide clarification of the SEC's

legal position.  The SEC initially asked if it could state its position only to me on an *in camera*

basis, but I denied that request and ruled that to the extent the SEC wanted to say something

further about its objection, it ought to be stated in the public forum, where all other interested

parties could hear and understand the SEC's position.  The SEC representatives then said two

things on the record.  First, I was told that the SEC staff believes that the VGX token has aspects

of a security, but that the Commission itself has not taken any position on that subject.  Second, I

was told that the SEC staff believes that Binance.US is operating as a securities exchange

without registering as such, though once again the Commission itself has not taken any position

on that subject.  Although the SEC offered these clarifications as to what the SEC staff

apparently believes, the SEC emphasized that only the Commission itself could take a formal

position on behalf of the SEC, and that these views of the staff did not constitute the official

views of the SEC.  Furthermore, although the SEC had obtained clearance to reveal the staff's

beliefs, the SEC confirmed that it was not authorized, and did not intend, to present any evidence

on these issues, or even any further explanation as to the bases for whatever beliefs the SEC staff

may have.

      To the extent that the SEC contends that these issues are bars to the confirmation of the

Debtors' plan, I must disagree.  In the first place, I reject the contention that the Court, and the

Debtors, somehow were supposed to figure out for themselves just what "aspects" of the VGX

token might be considered to be aspects of a "security," or just what particular activities of

Binance.US allegedly could raise registration issues, and then somehow to offer evidence and

legal argument on those points.

      This bankruptcy case has been pending since July 2022.  Customers and creditors have

been denied access to their assets for many months, and they deserve to have a resolution of the

case.  Bankruptcy cases are very expensive, and each and every delay means that administrative

expenses eat away at the recoveries that creditors may receive.  I have a proposed plan of

reorganization before me, and I have an obligation to make a ruling – now – as to whether it can

be confirmed.  I cannot simply put the entire case into an indeterminate and expensive deep

freeze while regulators figure out whether they do or do not think there is any problem with the

transactions that are being proposed.

      As I said at the outset of the hearing, if a regulator believes there is a legal issue with

respect to something that is proposed before me, I am more than anxious to hear an explanation

and to consider the issue.  But if there is a problem, I expect a regulator to tell me that it has an

actual objection (as opposed to saying that there "might" be an issue), and also to tell me what

the issue is and *why* it is an issue, so that other parties may address it and so that I may make a proper and well-considered ruling.

Here, I do not know how any party could possibly be expected to address the SEC's comments with the limited guidance that the SEC has provided. The SEC did not explain why the VGX token should be regarded as a security, for example, leaving me only to guess as to what the arguments might have been. Similarly, the SEC did not explain why it thought Binance.US might be operating as a securities broker. I do not know, for example, if there is one specific cryptocurrency token that may have been traded by Binance.US and that the SEC thinks was a security (for which the relevant remedy might simply be to stop trading in that token), or whether the SEC has different theories. If we were to try to address the issues, we would have to guess what the issues were, and would have no idea if we were even discussing the right points.

I understand and appreciate that the SEC is limited in what it can say about potential enforcement actions. But I cannot conclude from this record that an enforcement action is even likely, let alone whether it would be meritorious or even what arguments would be made. I also cannot determine, even if an enforcement action were brought, whether it would affect the transactions that I am being asked to approve. On this very point, for example, I asked the SEC's counsel at the outset of this hearing to explain what the consequences would be if Binance.US were to be found to have been acting as an unregistered broker dealer. I asked if that would just mean that Binance.US might have to stop certain activities while it pursued a license, or if it would mean that Binance.US would have to shut down all of its activities. The SEC said it could not answer that question. Notwithstanding that statement, the SEC took the position during argument on March 6 that the Debtors' Disclosure Statement allegedly was deficient because it did not more specifically describe what the results of a regulatory action

against Binance.US would be.  As I said then, I do not know how the Debtors could have been

expected to be more specific about that question when the SEC attorneys themselves told me that

they could not answer the question.

In addition, the SEC's argument on these points has all been phrased in terms of whether

the Debtors can prove the "feasibility" of their proposed plan.  "Feasibility," in bankruptcy

parlance, is a shorthand reference to the provisions of section 1129(a)(11) of the Bankruptcy

Code, which states that in order to confirm a plan the court must find that the confirmation "is

not likely to be followed by the liquidation, or the need for further financial reorganization, of

the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization

is proposed in the plan."  11 U.S.C. § 1129(a)(11).  Here, the only issues the SEC has raised are

(a) whether one specific token (VGX) is a security, and (b) whether Binance.US needs to register

as a securities broker.  There is no reason why these issues affect "feasibility" of the kind

discussed in section 1129(a)(11).

The SEC has been aware of the VGX token for some time and has not even reached a

conclusion as to whether it is a security, let alone taken any action to stop trading in the token.

In addition, even if there are problems with the sale or distribution of VGX, there is no reason to

my knowledge why that would or should impede or affect the remainder of what the Debtors are

proposing.  Similarly, even if Binance.US were to be told to stop its business entirely, the

Debtors' plan in this case provides a so-called "toggle" option under which the Binance.US deal

would be stopped and the Debtors would instead make distributions, to the extent they could,

without using Binance.US.  There would have to be some practical changes as a result, and the

recoveries that account holders would receive would likely diminish, but the plan itself includes

the toggle option, and so there is no reason to think that the issues the SEC has raised as to

Binance.US would mean that we would need a further "liquidation" or "reorganization" of a kind that is not already provided for in the plan.

For these reasons, the issues raised by the SEC do not really go to the "feasibility" of the Plan as that term is used in section 1129(a)(11) of the Bankruptcy Code. I appreciate that the SEC made some effort to tell me something about what the staff is thinking, but in the end it did not support the highly conditional objection that the SEC filed.

One of the requirements for confirmation of a Plan is that the plan has been proposed in good faith and not by any means forbidden by law. *See* 11 U.S.C. § 1129(a)(3). Voyager's case is a high-profile one, and the facts that Voyager has been attempting to sell itself to another firm, and to make "in kind" distributions of cryptocurrencies to account holders, has been known for many months. The SEC and all other government agencies have had a full and fair opportunity to object if they believe that the rebalancing transactions that I have previously approved and that are contemplated by the plan are illegal in any way, or if they believe that the distributions of cryptocurrencies and cash that are contemplated by the plan are violative in any way of any applicable statute, rule or regulation. I have no desire or intention to approve anything that runs afoul of legal limits, just as I have no desire to approve anything that will put customers at risk. The plain fact is, however, that the SEC has not actually made any objection. It has only vaguely hinted at possible issues that have not even been described in a manner that would permit the Court or the parties to address them.

This is a Court. In the end I have to make decisions based on actual, admissible evidence and, where legal issues are involved, based on cogent legal arguments. I have no actual evidence or cogent legal argument, from the SEC or from any other regulator or party, that could support a contention that the plan would require Voyager to purchase or sell any token that should be

13

considered to be a security, or that Binance.US is engaged in any activity for which it is required

to register as a broker or dealer.  I therefore am compelled by the evidence and arguments before

me to reject and overrule any contention that the transactions contemplated by the Plan would be

illegal, and any suggestion that for regulatory reasons the Debtors would be unable to complete

their proposed liquidation.  The Debtors have offered evidence that Binance.US has the

operational and financial capability to perform its obligations, and I have not been given any

evidence to suggest that Binance.US could not legally perform those obligations.

For similar reasons, I reject the contentions by the SEC and others to the effect that the

Debtors allegedly did not offer sufficient disclosure about potential regulatory risks.  The

Disclosure Statement that was distributed included specific disclosures about regulatory issues

faced in so-called "Unsupported Jurisdictions" where Binance.US does not have certain

regulatory licenses.  *See* Disclosure Statement (ECF No. 863) at pp. 79-80.  It also included

detailed statements to the effect that:

- The Debtors could not predict whether regulators would take the position that
  additional regulatory approvals are required for the completion of the
  contemplated transactions (*id.* at 21-22), and that therefore there could be no
  guaranty that there would not be regulatory issues;

- The Debtors' business is subject to "an extensive and highly evolving regulatory
  landscape" that involves significant uncertainties, and that it is possible that
  governmental bodies might disagree as to whether particular laws or regulations
  are applicable to the Debtors or to the contemplated transactions (*id.* at 74-76);

- The Wind-Down Debtors could be adversely affected by potential litigation or
  regulatory actions (*id*. at 76); and

14

A-143

- Consummation of the proposed restructuring transactions might require approvals of governmental units and the failures to obtain such approvals "could prevent or impose limitations or restrictions on Consummation of the Restructuring Transaction and Confirmation of the Plan." *Id.* at 76.

Voyager also disclosed all of the regulatory inquiries that it had received from federal and state authorities (*id.* at 76-79), and nobody has contended to the contrary, although I note that none of those inquiries appeared to relate to the characteristics of the VGX token or to the activities of Binance.US. The Disclosure Statement stated that Voyager had received a subpoena from the SEC dated January 5, 2022 that explored (a) whether the Rewards Program that Voyager was offering at that time constituted a securities offering, and (b) whether Voyager needed to register as an investment company. *Id.* at 80. It further revealed that on July 15, 2022 the SEC had asked for certain financial statement information and other internal documentation, and that in August and September 2022 Voyager had received inquiries and a subpoena from the CFTC. *Id.* Other state and federal inquiries were also described. The inquiries show that the regulators raised many questions about Voyager's past activities, but frankly I did not see anything in them that would bar the transactions that are currently contemplated, and nobody has argued to the contrary here.

I do not believe that the Disclosure Statement, which was circulated in January 2023, needed to be any more specific than it was, particularly with regard to issues that the SEC itself did not identify until March 2023 and that the SEC itself has not been able to explain during this hearing in anything other than conclusory terms.

A number of questions have also been raised about the extent to which account holders would be protected if they were to become customers of Binance.US. These objections have

been posed by the SEC, the Office of the United States Trustee, the State of Texas and the State

of New York. Nobody has suggested that the Debtors had information that they were hiding

from anyone on these points. Similarly, nobody has contended that the Debtors made any

misrepresentations about the Debtors' own conclusions about Binance.US. Instead, various

parties have suggested that the Debtors should have obtained different or better assurances from

Binance.US as to how it handles customer assets, and that the prior disclosures supposedly were

inadequate to the extent they did not already anticipate or describe the results of the additional

assurances that the objecting parties think the Debtors should obtain.

Although these objections have been framed as complaints about the disclosures that

were included in the Disclosure Statement, I do not believe that is an accurate way to

characterize them. As I said during the hearing, it is more accurate to say that these are

substantive questions masquerading as disclosure issues. They are substantive complaints about

what the Debtors have done or should be doing to assure themselves of a lack of problems before

the transaction closes, rather than proper objections to the disclosures that the Debtors already

made.

The Debtors have made clear that their due diligence as to how Binance.US does

business is a constant, ongoing project and that the Debtors will continue to ask questions and to

seek assurances as issues are raised. We would all be shocked if the Debtors did not do so. It is

simply wrong for various parties to suggest that the January 2023 Disclosure Statement was

somehow inadequate just because it did not describe follow-up conversations that had not yet

taken place and follow-up assurances that had not yet been received. If I were to impose such a

standard it would mean, in effect, that the Debtors would have had to stop their due diligence

inquiries once a Disclosure Statement had been approved, for fear that any further discussion

would immediately mean that the prior disclosures were deficient and that the entire expensive process would have to start all over again so that materials could be updated. That would be an absurd result.

I do not find anything deficient in what the Disclosure Statement actually said, and the evidence of the Debtors' further due diligence investigations just supported what the Debtors had already said in the Disclosure Statement, rather than suggesting any need for revised disclosures.

The Disclosure Statement revealed that cryptocurrencies would be transferred to Binance.US only as and when they were to be distributed to customers, and that until such time as the distributions were completed Binance.US would receive and hold the cryptocurrencies "solely in a custodial capacity in trust and solely for the benefit of Account Holders who each open an account on the Binance.US Platform." *Id.* at 7, 35. Pages 34-36 of the Disclosure Statement also revealed that the Debtors had sought and obtained various assurances from Binance.US that:

- Binance.US had the financial resources to complete the proposed transaction;

- Binance.US "maintains 100% reserves for all its customers' digital assets" and would have "substantial capital remaining" even if all customers were to withdraw all of their digital assets;

- Binance.US "does not lend any of its customers' assets or offer margin products on its platform;"

- Customer assets transferred to Binance.US would be held by Binance.US "pursuant to its standard digital asset wallet infrastructure which is stored on Amazon Web Services (AWS) servers located in Northern Virginia and Tokyo;" and

A-146

- Binance.US "has various security protocols in place to ensure the safe storage of customer assets" and that those security protocols "have achieved various third-party expert certifications" attesting to their compliance with industry standards.

During the hearing, the Debtors also described other requests for information that they had made and other assurances they had sought. The evidence included testimony that Binance.US had been asked to provide, and had provided, a sworn statement as to certain of its business practices. At my request the Debtors obtained the consent of Binance.US to offer that sworn certificate as evidence of the diligence the Debtors had conducted and as evidence of the bases for the conclusions the Debtors had reached. The certificate was admitted into evidence and filed on the docket so that all parties could see it. (ECF No. 1137-2.) It is dated February 28, 2023 and it states:

- Binance.US holds digital assets deposited by its customers "solely in a custodial capacity and on a one-to-one reserve basis;"

- Binance.US "segregates the Customer Assets from the Company's digital assets on its general ledger;"

- Only employees of Binance.US are able to move or withdraw Customer Assets;

- Binance.US does not lend or rehypothecate Customer Assets; and

- Binance.US maintains security protocols and procedures that are reviewed by independent parties and that comply with various applicable standards.

These results of the Debtors' further due diligence just reinforced what the Debtors had already said in the Disclosure Statement. The fact that these inquiries were made did not mean that the original disclosures were deficient in any way.

The evidence does not satisfy everyone. I am sure there are some people who are worried about news reports and who would prefer to have nothing to do with Binance.US. During cross-examination, more than a few objectors pointed out that FTX had also made representations to the Debtors and that those statements had turned out to be false, though in fairness the witnesses have testified that they have ramped up their investigations and increased the information and assurances they have sought from Binance.US in light of what happened with FTX.

I do not mean to cast aspersions on Binance.US when I say this, but it is of course true that in the end we can never be one hundred percent sure that a representation is true and correct, even when it is made under oath. At the same time, however, we do not usually presume that people are lying or that buyers are dishonest, particularly in the absence of any evidence suggesting that they actually are.

My role, as the Bankruptcy Judge, is in the first instance to determine whether the proposed plan complies with the provisions of the Bankruptcy Code itself. As to the business details and the business wisdom of the arrangement, however, and as to the selection of the proposed counterparty, my role here is more limited. So long as the provisions of a plan comply with Bankruptcy Code requirements and applicable laws, my authority is limited to a determination of whether the Debtors' desire to do this transaction is within the scope of the Debtors' reasonable business judgment. *See In re Borders Group, Inc.,* 453 B.R. 477, 482 (Bankr. S.D.N.Y. 2011), and cases cited therein. Furthermore, in considering that issue I am required to make decisions based on the evidence that is submitted to me.

I understand the point of view of the skeptics here. Given what has happened in this industry I cannot help but be worried myself about how any firm in this industry might handle

customer assets.  But the plain fact of the matter is that I have been given absolutely no

admissible evidence – literally none – that would support a conclusion that Binance.US will

misuse customer assets or that Binance.US cannot be trusted.  Any party in interest who wished

to object to a transaction with Binance.US was entitled to take relevant discovery and was

entitled to present evidence of any problems that were discovered, but no party did so.  The

evidence that is actually before me requires me to conclude that the Debtors are exercising

reasonable business judgment in electing to proceed with the transaction.

That does not mean that I think that every detail of the proposed transaction was

necessary or even appropriate.  During the course of the hearing I asked the Debtors and

Binance.US to consider certain changes to the terms of their proposed arrangement that I

believed would not affect the primary business terms but that would help to address other

concerns and questions that had been raised.

First, after our hearing in January the Binance.US deal was clarified to say (and my Order

entered in January clearly says) that from the time when assets are transferred to Binance.US,

until the time they are distributed to account holders, Binance.US would be acting as a

distribution agent for Voyager.  Accordingly, during that time Binance.US would be only a

nominal owner of the assets.  Binance.US would not have any beneficial interest in the assets

during that distribution period.  Instead, the assets would be held by Binance.US strictly in trust

for (and in custody for) either the Debtors or the account holders, respectively.

Binance.US has also previously confirmed that customers may immediately withdraw

assets from Binance.US if they choose to do so.  During the hearing I suggested that it would

make sense if what I have just referred to as the "distribution period" – i.e., the period during

which Binance.US is deemed to have no beneficial interest in the assets – were to continue for a

sufficient amount of time after a customer's account is credited so that customers who wish to make immediate withdrawals can do so without sacrificing any of the protections that my order might provide to them. Binance.US has not only agreed to that suggested change, it has gone further. It has agreed with the Debtors to the inclusion of language in the Plan documents and in my order to the effect that the assets transferred to Binance.US by Voyager will *always* be held in strict trust and in custody for customers, and that Binance.US will not have beneficial interests in those assets. That language now appears in Article IV, section C of the plan.

Second, I asked that the parties consider a change to the proposed treatment of account holders who live in what the parties have called "Unsupported Jurisdictions," which are four States in which Binance.US does not currently have the licenses necessary to distribute cryptocurrencies to customers. I understand (and will address below) the issues that have been raised regarding the fact that customers in most states will be able to receive distributions in the form of cryptocurrencies, whereas customers in the Unsupported Jurisdictions will have to wait six months to see if Binance.US can obtain the needed approvals, and will receive cash distributions at the end of six months if Binance.US cannot obtain such approvals. The question that I raised with the parties, however, is as to account holders in Unsupported Jurisdictions who do not want to become Binance.US customers and who would prefer to take a cash distribution. Under the proposed plan, customers in most States who do not become customers of Binance.US, or who just would prefer cash distributions for other reasons, will be given cash distributions at the end of a three-month period. Since customers in most states can get such cash distributions after three months, I raised the question as to why customers in Unsupported Jurisdictions should not have that same right. I suggested that this opportunity could be made available by giving customers a simple "opt-out" form by which they would elect to take cash

distributions and would thereby be entitled to them at the completion of the same three-month period.  Binance.US has agreed to this proposed change and the change has been incorporated in the plan and related documents.

Third, I noted that the parties' agreement includes provisions requiring the transfer of customer data from Voyager to Binance.US.  Voyager has argued that its customer agreements permit the transfer of that data, and no party has offered me any contrary evidence or contention.  Under the parties' agreement, as I understand it, the only customer data that has been transferred so far is as to customers who have already made elections to be customers of Binance.US.  However, if there is approval of the transaction, there would be a wholesale transfer to Binance.US of all remaining customer data, which would mean that Binance.US would receive all customer data for all Voyager customers, even if those customers elect not to do business with Binance.US.  I raised the question of whether these terms could be modified.  I recognize that one of the things that Binance.US is "buying" here is the right to market itself to Voyager's customers.  I asked, however, whether the transfer of customer data to Binance.US could be limited as much as possible in the first instance (which would enable Binance.US to do such marketing), but with a deferral where possible of the transfer of other, more sensitive customer information (about bank account information, for example) to such time as a particular customer actually elects to be a Binance.US customer.  The parties have agreed, in response, to allow customers to "opt out" of the transfer of certain kinds of information, including photo IDs and bank account information, until such time as they actually become customers of Binance.US.  The final agreement incorporates this limit, which complies with the terms of Voyager's customer agreements and is a reasonable accommodation of the points the Court raised.

A-151

I think that these proposed modifications address some of the objections and issues that came up during the hearing. However, there are other issues that I will now discuss.

The Office of the United States Trustee has asserted additional objections to the Disclosure Statement. One such objection is the U.S. Trustee's contention that the Disclosure Statement was not clear as to who would hold cryptocurrencies and in what capacities: I believe the Disclosure Statement already said, as a I noted above, that cryptocurrencies would only be transferred to Binance.US as and when they were to be distributed to account holders; that until the distributions were completed Binance.US would have only a nominal and not a beneficial interest in the assets to be transferred; and that all such assets would be held in custody and in trust either for the Debtors or for account holders, as applicable. I believe those disclosures were sufficient, and as I have described the parties have agreed to additional language to try to provide further protections to customers.

The SEC has complained that the Debtors did not disclose whether there are meaningful economic benefits to the Binance.US transaction apart from the $20 million that Binance.US would pay in excess of the market valued of cryptocurrencies. I am going to overrule this objection. The Liquidation Analysis that was attached to the Disclosure Statement included projections as to what creditors' recoveries would be under the Binance.US transaction, under the alternative "toggle" proposal, and under a chapter 7 liquidation. It stated that for various reasons (which were explained in footnotes) that the Binance.US proposal would result in approximately $90 million more being available for distribution, resulting in approximately 5% greater recoveries for creditors when compared to the toggle option and about a 14% increase when compared to a possible chapter 7 liquidation. I think those calculations were sufficient to disclose what the Debtors believed as to the value of the Binance.US transaction.

During the hearing there were many questions about these calculations. The Debtors testified that their current estimates are that the Binance.US deal will produce approximately $100 million more in distributable assets than the so-called "toggle" plan would provide. I found the Debtors' explanations and testimony about these points to be reasonable and credible, and I note that no contrary evidence was presented.

The State of Texas has contended that the Disclosure Statement was insufficient because it allegedly did not make sufficient disclosures about certain features of the Binance.US "terms of use" for customers. However, I note that the Disclosure Statement contains many direct links to those terms of use, and all of the arguments about provisions that Texas thinks customers should know are taken directly from the terms of use to which customers were directed. This is not an argument about actual disclosures, and about actual information available to customers, so much as it is a contention (made in hindsight) that the Debtors should have put greater emphasis on specific provisions that Texas thinks are important, instead of just referring customers to the places where the terms could be found. I do not find this to be a proper or reasonable objection. I note that the State of Texas reviewed the Disclosure Statement before this Court's preliminary approval and filed its own objections in January (ECF No. 814), and that in its January objection Texas did not ask for any further disclosures about the Binance.US terms of use. That just supports my conclusion that this is not really a complaint that there was a failure to disclose material information, so much as it is a belated complaint by one party that the Disclosure Statement did not give as much emphasis to particular information as the complaining party would have preferred.

Texas has also complained that the Disclosure Statement allegedly did not disclose the potential effects that a preference lawsuit by Alameda could have on creditor recoveries.

However, the figures quoted in the Texas objection (as to how much recoveries would be affected) were taken from Exhibit C to the Disclosure Statement itself. *See* Disclosure Statement (ECF No. 863) at page 198 of 420. Texas contended, during argument at the end of the confirmation hearing, that the information was too hard to find. However, the information was added to the Disclosure Statement after there was discussion of the point in January 2023. At that time I approved the addition of the information at the place where it ultimately appears, and to my recollection no party complained that it should have been placed elsewhere.

Texas has also complained that the disclosures as to what creditors' recoveries would be somehow shows that the recoveries under the Plan would be less than they would be in a chapter 7 liquidation. I do not think Texas is continuing to press this objection but for completeness I will address it. The problem with the objection is that it was based on an "apples to oranges" comparison. More specifically, Texas compared (a) what the recoveries under the Binance.US deal would be if Alameda *does* have a valid and large administrative claim against the Debtors, versus (b) what the chapter 7 recoveries would be if Alameda does *not* have such a claim. The plain truth, however, is that if Alameda has a large administrative claim it would have that same claim regardless of whether a plan is confirmed or the Debtors are liquidated in chapter 7, and the administrative claim would have the same impact on recoveries in all of the possible scenarios. An Alameda claim therefore would not affect the Debtors' conclusion that recoveries under the proposed plan will exceed what recoveries would be in a chapter 7 liquidation.

A number of parties have also objected to the releases of creditors' claims that have been proposed in the plan. Many of these objections seem to be based on misconceptions as to exactly how the releases work. Just to be clear: the Debtors have proposed to release some claims that the Debtors themselves would otherwise be able to pursue, or that the estate would otherwise be

25

A-154

able to pursue. Some other parties (Binance.US itself, for example, and the Debtors' officers and directors) have agreed to release claims that they might own against the Debtors and a long list of other parties. In addition, creditors were given the opportunity to elect to grant releases – or in bankruptcy terms, to "opt into" releases – if they chose to do so. However, the forms that were sent to creditors made clear that nobody was obligated to opt in and that the choice was strictly voluntary. Many bankruptcy plans provide that an affirmative vote in favor of a plan is itself a consent to the grant of releases, but the plan in this case does not do so. Instead, the plan here provides that no creditor or shareholder has released any claims belonging to that person or entity unless that person has affirmatively done so by executing the "opt in" release form.

I believe that this disposes of the objection filed by the Federal Trade Commission and portions of the objections posed by the United States Trustee and by certain customers, including Mr. Newsom, Mr. Warren, Mr. Hendershott, Mr. Jones and Mr. Brucker. They objected to the approval of nonconsensual third-party releases, but there are no nonconsensual third-party releases here. There is a separate issue regarding the proposed "exculpation" provisions of the Plan and confirmation order, but I will address those provisions in a moment.

There are also challenges to some of the settlements and releases of the Debtors' own claims that are included in the Plan. The United States Trustee filed an objection stating that the "Released Party" and "Releasing Party" definitions should not include the Wind-Down Debtors. That change has been made, and my understanding is that this particular objection is moot.

The Debtors also have proposed a settlement of claims against the Debtors' CEO (Mr. Ehrlich) and former Chief Financial Officer (Mr. Psaropoulos). The Debtors offered evidence that two independent directors were in charge of a Special Committee that investigated possible claims against officers and directors; that the Special Committee hired outside counsel (the

26

A-155

Quinn Emmanuel firm) to assist in that investigation; that the Special Committee had concluded

that the only claims against insiders that were worth pursuing were claims against Mr. Ehrlich

and Mr. Psaropolous relating to the Three Arrows loans; that the Special Committee further

concluded that those claims would be subject to various defenses and that the claims were not

"slam dunks;" that the Special Committee had investigated the officers' resources and that the

proposed settlements would provide for payments that represent a significant percentage of the

officers' available assets; that the Debtors would release other claims against the two officers but

would not actually release claims relating to the Three Arrows loans, and instead would only

agree that any further recoveries on the Debtors' claims as to the Three Arrows loans would

come from insurance proceeds and not from the individual assets of the settling parties. The

Debtors also reserved their rights to seek to undo a transaction by which Voyager allegedly paid

as much as $10 million, just before its bankruptcy filing, for an additional $10 million of director

and officer liability coverage.

When considering a settlement such as this, the applicable Second Circuit authorities

make clear that my role is to determine whether the Debtors' decision to settle is a reasonable

one, after considering a number of factors. In this case, consistent with the applicable case law, I

have considered the nature of the claims that would have been asserted; the legal defenses that

could have been asserted (including the business judgment defense); the testimony about

additional defenses that could have been asserted under the terms of certain exculpatory

language in the Debtors' by-laws or other governing documents; the benefits of the proposed

settlement; the testimony that the settlement was the result of arm's-length bargaining; the

testimony about the size of the settlement payments in relation to the settling parties' resources;

the fact that the settlements preserve the Debtors' rights to pursue the Three Arrows claim

further, though further recoveries on such claims would be limited to insurance proceeds; the

competency and experience of the counsel retained by the Special Committee; and the support

for the settlement by the Official Committee of Unsecured Creditors.  *See Iridium Operating*

*LLC v. Official Committee of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452,

462 (2d Cir. 2007) (citations omitted).  I conclude after considering the relevant factors that the

settlement with Mr. Ehrlich and Mr. Psaropolous is a reasonable one and should be approved.

I understand that this settlement is disappointing to some of the *pro se* parties who have

appeared, a number of whom expressed a strong resentment towards the two settling parties and

who expressed a strong desire to pursue them more vigorously and to demand a higher

percentage of their net worth before settling.  I sympathize with these parties' frustrations, but

the only actual evidence that I have on the relevant points is the evidence submitted by the

Debtors, and I conclude from that evidence that the settlement is a reasonable one.

The releases that the Debtors proposed to give as to their own claims were not limited to

the releases to be granted as part of the settlement with Mr. Ehrlich and Mr. Psaropolous.

Instead, the Debtors also proposed to grant broad releases of claims that the Debtors might have

against a number of other parties.  The parties who would have been the beneficiaries of such

releases included the Official Committee of Unsecured Creditors and its members, a long list of

"Released Professionals" (which apparently includes all of the law firms and other advisors in

these cases), plus all "Released Voyager Employees."  "Released Voyager Employees" was

defined as "all directors, officers, and Persons employed by each of the Debtors and their

Affiliates serving in such capacity on or after the Petition Date but before the Effective Date."

The scope of the releases that the Debtors proposed to give to such persons was

extremely broad.  The releases proposed to free all Released Parties from all Causes of Action,

whether known or unknown, that the Debtors could have asserted in their own right "or on behalf of the Holder of any Claim . . ." I really did not understand this latter phrase at all. If it was somehow intended to mean that a third party's own claim would be released (on a theory that the Debtors somehow could have asserted it in some kind of representative capacity) it is both too vague and excessive, and I will not approve it.

The plan also proposed to release all of the Released Parties from any claim of any kind that the Debtors might have against those Released Parties "based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtor's out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor . . . or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date," but with an exclusion for actual fraud, willful misconduct, or gross negligence. The evidence before me, however, did not suggest that the Debtors had done any investigation, or made any careful consideration, of all of the types of claims that would be covered by this sweeping language. Mr. Kirpalani, the counsel to the Special Committee, acknowledged that much during oral argument.

As I said during oral argument, this is not a release that is tailored to claims that have actually been reviewed and assessed by the Debtors. Instead, it is a release that is deliberately as broad and all-encompassing as possible, untethered to any actual review of many of the claims that would be subject to the release. I therefore do not believe that the evidence before me

justified and warranted the full scope of the Debtors' releases as they were proposed. The Debtors have since modified the terms of these proposed releases so that they will be limited to matters that the Special Committee actually investigated. I have approved those modified releases in the confirmation order that I have entered.

I want to pause to re-emphasize a point that came up several times during the hearing. A number of account holders and/or shareholders complained during the hearing that they felt they had been misled as to Voyager's financial condition. If a customer or shareholder believes he or she was misled by statements about Voyager's financial condition, and that he or she took actions that he or she otherwise would not have taken and suffered damages as a result, any claims based on such injuries would belong to the customers or shareholders, and not to the Debtors or the estate. The Debtors' proposed releases may release claims that the Debtors themselves were injured due to mismanagement or bad decisions by officers and employees. However, claims for injuries directly suffered by customers or shareholders (*i.e.*, injuries that are not just derivative of injuries suffered directly by the Debtors) are not affected.

The Office of the United States Trustee also objected to the scope of the exculpation provisions that the Debtors sought to include in the Plan. Broadly speaking, the proposed exculpation provision stated that certain parties would not have liability for certain transactions and actions that occurred during the courts of the bankruptcy case or that will occur in the implementation of a confirmed bankruptcy plan. It is routine that bankruptcy plans contain provisions that state that fiduciaries and other parties do not incur liabilities by having engaged in transactions that the Court has approved, or by taking actions that the Court has directed them to take.

In this case, the version of the plan that was circulated to creditors and other parties in interest in January (ECF No. 852) included a proposed exculpation provision that was fairly broad.  It stated in relevant part as follows:

> Effective as of the Effective Date, to the fullest extent permissible under applicable law . . . no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement . . . except for Causes of Action related to any act or omission that is determined by a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence . . .

It further stated:

> The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

I have previously issued a decision as to what I regard as the proper scope of an exculpation provision and some of the legal justifications for it.  *See In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717 (Bankr. S.D.N.Y. 2019).  As I noted in *Aegean*, "exculpation" provisions are to some extent based on the theory that court-supervised fiduciaries are entitled to a qualified immunity for discretionary actions that they take in their official capacities.  However, a proper exculpation provision is also a protection for court-supervised and court-approved transactions.  As I noted there, parties should not be liable for doing things that

31

A-160

the Court authorizes them to do and that in many instances a court may direct them to do.  *See,
e.g., Airadigm Commc'ns., Inc. v. FCC (In re Airadigm Communs., Inc.)*, 519 F.3d 640, 655-57
(7th Cir. 2008) (approving a plan provision that exculpated an entity that funded a plan from
liability arising out of or in connection with the confirmation of a Plan, except for willful
misconduct); *In re GraniteB Broad Corp.*, 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007) (approving
exculpation provision that was limited to conduct during the bankruptcy case and noting that the
effect of the provision is to require 'that any claims in connection with the bankruptcy case be
raised in the case and not saved for future litigation.").

My reasoning in the *Aegean* case has been approved and adopted by other courts in other
cases.  *See, e.g., In re LATAM Airlines Grp. S.A.*, 2022 Bankr. LEXIS 1725, at *159 (Bankr.
S.D.N.Y. June 18, 2022) ; *In re Murray Metallurgical Coal Holdings, LLC*, 623 B.R. 444, 504
(Bankr. S.D. Ohio 2021).  Such provisions are proper to protect those who are authorized – in
fact, directed – by the confirmation of a plan to carry out the terms of the plan.  *See In re Ditech
Holding Corp.*, 2021 Bankr. LEXIS 2274, at *25-26 (Bankr. S.D.N.Y. Aug 20, 2021).  My
conclusion that parties generally should be protected from liabilities for having done what a
Court has specifically authorized (and especially for having done what a Court has directed them
to do) is also consistent with a long line of authority, as discussed further below.

In this case, the Debtors and the United States Trustee apparently had discussions, and
my understanding is that they had tentatively agreed that the proposed exculpation language in
the Plan and confirmation order would be equivalent to what I had ordered in *Aegean* – namely,
it would make clear that exculpated parties would not have liability for having done things that I
had approved or for making doing what a confirmed Plan would require them to do.  This
became a much bigger issue, however, at the end of the first week in March, when the Debtors

filed revisions to their proposed confirmation order that included paragraphs that could have

been read as barring all federal and state governmental entities and other parties from ever

making any assertion of any kind that the Debtors, Binance.US or their representatives were

doing anything that violated any federal or state law or regulation.  It was not my attention to

approve anything so broad, and I said so as soon as the issue came up during argument on March

6.  As we discussed the issue during oral argument, however, the SEC, the US Trustee and the

US Government circled back to the proposed exculpation provisions, and took the position that

no exculpation provision could be granted at all insofar as it would relate to any federal or state

statute or regulation.  As somebody put it during argument, any officers or directors or entities

who would implement the confirmed plan would just have to "take their chances" as to whether

the Government might contend that their conduct was illegal, and as to whether the Government

might seek to punish them for doing what I had authorized and directed them to do.

Frankly, I think this position by the Government is unreasonable and wrong.  It is based

on a serious misunderstanding of just what it means when a court confirms a plan of

reorganization.

The approval of a plan of reorganization does not just give a debtor an option to proceed

with what the plan provides.  Instead, section 1142(a) of the Bankruptcy Code states that "the

debtor and any entity organized or to be organized for the purpose of carrying out the plan shall

carry out the plan and shall comply with any orders of the court."  11 U.S.C. § 1142(a).  Section

1142 thereby imposes an affirmative, statutory obligation on the debtors, other entities and their

personnel to do what the plan contemplates.  In effect, the confirmation order acts as a court

order that the plan be carried out.

In this case, confirmation of the Plan will require the Debtors and their respective personnel and representatives (including Binance.US in its capacity as the Debtors' distribution agent) to complete the rebalancing transactions that the Plan contemplates and to make the distributions of cryptocurrencies that the Plan contemplates. Once I confirm the Plan, the relevant parties will have no choice but to do so.

All of the relevant governmental entities have been on notice of what the plan proposes. They had every opportunity to tell me if they believed that anything contemplated by the Plan would violate any applicable statute, rule or regulation. Four States have taken the position that Binance.US cannot open customer accounts in those States without additional approvals, and the Plan specifically takes account of that fact. No other regulator has contended during the confirmation hearing that there is anything illegal in what the plan contemplates. As noted above, the SEC has hinted vaguely that it thinks there "might" be issues with the Debtors' sales of VGX and/or with some unspecified aspect of Binance.US's business, but it has explicitly stopped short of contending that anything actually is illegal, and has repeatedly declined to offer evidence or to take a firm position on these points.

In short, what the Government is requesting is that I enter a confirmation order that will have the effect, under section 1142 of the Code, of compelling employees, officers, professionals and entities to do the rebalancing transactions that the Plan contemplates and to make the distributions of cryptocurrencies that the Plan requires, while in the view of the Government those same people and entities might then be liable for fines, sanctions, damages or other liabilities just for doing what my confirmation order affirmatively obligates them to do. And the Government contends that this daunting prospect of future liability should hang over the heads of the parties and their personnel even though the Government itself has had every opportunity to

34

identify any legal issues that are posed by the transactions and is not prepared to say today that there is anything wrongful about what we are currently contemplating.

I think the Government's position is absurd. I note that the Government has conceded, in the supplemental papers that it filed, that many courts have considered participants in bankruptcy proceedings to be protected by a species of qualified immunity. However, while "qualified immunity" is a similar doctrine, it is not entirely accurate as a description of the authority that I have in mind for the exculpation provision. "Qualified immunity" is a doctrine that is applied to people who have discretion to perform specific functions in quasi-official roles but without having obtained specific court approval or acting pursuant to an explicit court direction. Many of the same decisions that discuss such a "qualified" immunity, however, also make clear that there is a broader immunity for actions that are specifically approved by a court and/or that have been explicitly required to be taken by court order, particularly where government officials or other parties had the opportunity to object to the court's approval of an action and did not do so. *See, e.g., Bradford Audio Corp. v. Pious*, 392 F.2d 67, 72-73 (2d Cir. 1968) (receiver was immune from liability for having done what a court order approved and directed the receiver to do); *Dana Commercial Credit Corp. v. Center Teleproductions, Inc. (In re Center Teleproductions, Inc.),* 112 B.R. 567, 577-78 (Bankr. S.D.N.Y. 1990) (trustee granted absolute immunity from action brought by an entity with a security interest in property where trustee acted pursuant to court order); *see also Boullion v. McClanahan,* 639 F.2d 213, 214 (5th Cir. 1981) (holding that where a bankruptcy trustee sought and obtained court approval for his actions he was entitled to absolute immunity); *T& W Inv. Co. v. Kurtz*, 588 F.2d 801, 802 (10th Cir. 1978) (finding immunity appropriate when "every action by [the receiver] objected to in this suit was known to and approved by the state court judge supervising the receiver," the plaintiff

"had an opportunity to and did object throughout the state court proceedings" and "the receiver was in fact following the orders of the court and complying therewith**")**; *Phoenician Mediterranean Villa, LLC v. Swope (In re J&S Props., LLC)*, 545 B.R. 91, 103 (Bankr. W.D. Pa 2015) (where a bankruptcy trustee acts pursuant to an order of court, a bankruptcy trustee is generally afforded absolute immunity*); In re XRX, Inc.*, 77 B.R. 797, 798 (Bankr. D. Nev. 1987) (a trustee acting pursuant to a court order in making a disbursement is not subject to personal liability).  As the Court held in *Bradford Audio*, the persons who act under my authority and direction should not be placed in the position of being guarantors of the correctness of my decisions.  *Bradford Audio*, 392 F.2d at 73.

Exculpation for doing what a confirmation order requires is entirely proper under these authorities.  In a chapter 11 bankruptcy case, the debtors in possession have the responsibilities and duties that a trustee otherwise would have.  *See* 11 U.S.C. § 1107(a).  Under the plan in this case, the Debtors and entities to be created by the plan (the Wind-down Debtor, under direction of Plan Administrator) must complete rebalancing and make distributions.  The plan further contemplates that Binance.US will act as the "distribution agent" of the Debtors; until cryptocurrency distributions are completed, and in that capacity Binance.US will hold assets in trust for either the Debtors or customers, as applicable.  The persons and entities who will carry out specific activities that are not only approved by my confirmation order, but also are required by that Order by virtue of section 1142 of the Bankruptcy Code, are entitled to know that they will not incur liability just for doing what I have approved and required, particularly when the SEC and all other Government agencies have had a full and fair opportunity to argue to me that the proposed transactions are illegal in any way and have not made any such contentions.

36

A-165

I do agree that a modification of the original exculpation provision is appropriate, and I

have approved a modified exculpation provision that provides as follows:

> Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from, any liability for damages based on the negotiation, execution and implementation of any transactions or actions approved by the Bankruptcy Court in the Chapter 11 Cases, except for Causes of Action related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence; *provided* that nothing in the Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

> The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes.

> In addition, the Plan contemplates certain rebalancing transactions and the completion of distributions of cryptocurrencies to creditors. The Exculpated Parties shall have no liability for, and are exculpated from, any claim for fines, penalties, damages, or other liabilities based on their execution and completion of the rebalancing transactions and the distribution of cryptocurrencies to creditors in the manner provided in the Plan.

> For the avoidance of doubt, the foregoing paragraph reflects the fact that Confirmation of the Plan requires the Exculpated Parties to engage in certain rebalancing transactions and distributions of cryptocurrencies and the fact that no regulatory authority has taken the position during the Combined Hearing that such conduct would violate applicable laws or regulations. Nothing in this provision shall limit in any way the powers of any Governmental Unit to contend that any rebalancing transaction should be stopped or prevented, or that any other action contemplated by the Plan should be enjoined or prevented from proceeding further. Nor does anything in this provision limit the enforcement of any future regulatory or court order that requires that such activities either cease or be modified, or limit the penalties that may be applicable if such a future regulatory or court order is issued and is violated. Similarly, nothing herein shall limit the authority of the Committee on Foreign Investment of the United States to bar any of the contemplated transactions. Nor does anything in this provision alter the terms of the Plan regarding the compliance of the Purchaser with applicable laws in the Unsupported

Jurisdictions before distributions of cryptocurrency occur in those Unsupported Jurisdictions.

My order does not purport to limit any contention regarding things that the Debtors may have done in the past that I did not specifically authorize or approve. It does not bar the Government from trying to stop transactions from occurring, and does not bar any regulatory contention in that regard. If the SEC or any other party believes tomorrow that it has grounds to go to court to enjoin further steps in the completion of the contemplated transactions, it is entitled to do so. I am not barring any such thing. I am simply saying that if we get six weeks down the road and then the SEC decides to take action, the people who have spent six weeks doing what I have ordered them to do will not be held liable on an *ex post facto* basis for having followed my order in the interim.

Where the Government has declined to argue that the rebalancing transactions that the plan contemplates are illegal in any way, and where the Government has declined to argue that the distributions of cryptocurrencies to creditors that the Plan contemplates (either through Binance.US or by Voyager if the so-called "Toggle" plan is pursued) are illegal in any way, then the individuals and entities who will be required by my confirmation order to engage in those activities are entitled to know that they have not been sentenced by me to incur statutory or regulatory liabilities just for doing what I have ordered. That is consistent with ordinary practice in bankruptcy cases, with the authorities that I have cited above, and with basic principles of equity and estoppel. It is a fair and proper consequence of the Government's own unwillingness or inability to challenge the legality of the contemplated transactions and of the fact that I am entering an order that not only approves those transactions but actually requires them to be carried out.

38

A-167

If the Government really wants to litigate the legality of the proposed transactions, it has

been free to do so.  Similarly, if the Government truly wishes for me to make a decision today as

to whether the transactions are legal, then I will do so.  Based on the evidence that has actually

been offered to me, if I were to make that determination today I would have no choice but to

conclude that the transactions are perfectly legal.  No contrary evidence or argument has been

offered to me.  However, we have not attempted to foreclose future arguments by the

Government, or the Government's assertion of changing or evolving regulatory views.  We are

simply protecting those persons who in the interim will be engaging in transactions that the

Government has failed to challenge and that must be carried out under the authority of this

Court's order.

The Government has argued that even an exculpation provision of this kind somehow

amounts to a third-party release that offends the principles set forth in Judge McMahon's

decision in *In re Purdue Pharma, L.P.*, 635 B.R. 26 (S.D.N.Y. 2021), or that it otherwise

represents an action that is beyond my jurisdiction.  I do not believe that is accurate at all.  *See*

*Blixseth v. Credit Suisse*, 961 F.3d 1074, 1081-83 (9th Cir. 2020) (distinguishing exculpation

provisions from third party releases).  I plainly have jurisdiction over the confirmation of the

plan, over the actions that must be taken to confirm the plan, and therefore as to the effects that

my Order may have on the liabilities of persons who will be required to do the things that the

plan requires.  The arguments in the Government's papers are mostly straw men, taking issue

with purported legal justifications for the exculpation provisions that are not the real

justifications for those provisions, and failing to discuss any of the authorities that are actually

relevant.  The Government's position that exculpation is entirely unauthorized and in excess of

my authority also is belied by the Government's failure to object to similar provisions that have

routinely been included in thousands of confirmed bankruptcy plans, and the by failure of most

of the Government entities in this case (with the sole exception of the U.S. Trustee) to object to

the original exculpation provision, which I believe was broader than the one that I have

approved. Even the U.S. Trustee's objection just asked for a more tailored version of the

exculpation provision, and not the wholesale deletion that other Governmental entities belatedly

have requested.

The Government has also suggested that I should just leave it for future courts to decide

whether or not my confirmation order has immunized any particular conduct. I do not see how

that makes any sense at all. I am the judge who has jurisdiction over the parties and who is

confirming the plan, and therefore I am the one who by doing so will require that particular

actions should be taken. If it is my Order that is to provide the source of any future immunity,

then I should be the one who specifies what it is that the confirmation order has the effect of

requiring the parties to do, so that any future court can properly assess the scope of the

exculpation that has properly been granted. Asking other courts to guess as to the scope of the

intended exculpation, or to second-guess my intentions as to whether particular actions needed to

be taken or should have been taken, would be inappropriate and would be unfair to the parties.

Once again, I am not by any means preventing the enforcement of any law or regulation.

I am not stopping any regulatory body from stepping in and attempting to enjoin any act or

transaction on any applicable regulatory ground. I am simply saying that until such time as some

regulatory or court order says that the parties should stop what they are doing, the parties who do

what the confirmation order requires them to do should not be held liable for having done so.

I also have an objection by the State of New York to the effect that the Plan allegedly

provides for an "unfair discrimination" in the treatment of New York customers as opposed to

customers in other states.  The State of Texas has made a similar objection.  It appears, though, that the Debtors and Binance.US have resolved a similar issue as to Vermont and possibly as to Hawaii.  In any event, the State of Hawaii has not pressed any objection before me during this hearing.

The gist of the New York objection is that customers in 48 states where Binance.US has the required licenses may receive cryptocurrency distributions relatively quickly, but that Binance.US and the Debtors cannot legally do the same thing in New York.  Accordingly, customers in New York would have to wait until such time as Binance.US may obtain the necessary approvals in New York.  Under the Plan, if such approvals are not obtained within six months, the New York customers will receive cash distributions instead of distributions that include cryptocurrencies.

Curiously, although the State of New York has filed an objection, no New York account holder filed an objection on this ground.  This perhaps raises a standing issue, but I do not believe I need to address that question, because I believe that in any event the objection does not have merit.

New York has argued that the plan unfairly discriminates between customers in New York and other states.  "Unfair discrimination," though, is not really the right way to describe the objection.  Section 1129(b) provides that a plan may be confirmed even if not all classes have voted to accept it, so long as certain conditions are met.  One of those conditions is that the plan does not "discriminate unfairly" with respect to "each class of claims or interests that is impaired under, and has not accepted, the plan . . ."  Here, the relevant class of creditors is class 3, which is made up of account holders.  That class has overwhelmingly voted to accept the plan, not to reject it.

41

I think that what the state regulators really mean to argue is that the Plan does not provide the same treatment to all members of class 3, as is required by section 1123(a)(4) of the Bankruptcy Code. I think there was a basis for this objection insofar as it related to the treatment of account holders who chose not to receive cryptocurrencies from Binance.US and who instead wished to take cash distributions. The Plan, as proposed, would have allowed most customers to receive cash once three months had passed and they had not affirmatively elected to be customers of Binance.US. Customers in the Unsupported Jurisdictions, however, would have had to wait six months while Binance.US tried to work things out with regulators – even if the relevant customers did not want to be customers of Binance.US, and even if they wanted cash. I could not understand any basis for this different treatment, and as described above Binance.US and the Debtors have agreed to changes that address this issue.

I do not otherwise believe that the objection is correct. It is quite clear that the Debtors and Binance.US would like to make "in kind" distributions to all customers in all states. It is not the terms of the plan that prevent the Debtors and Binance.US from doing so. Instead, it is the different regulatory requirements and licenses in the different states that account for any different treatment that may occur. To put it another way: the plan provides, in essence, that the Debtors will make in kind distributions to customers as soon as they become customers of Binance.US and as soon as the applicable rules and regulations in a given state permit such distributions. However, we are not free to ignore the fact that in certain states that cannot be accomplished as readily as in others. That does not mean that the plan is providing for different treatment of different customers. It just means that the plan itself does not have the power to sweep away the different regulations that apply in different states, and does not have the power to grant licenses to Voyager and/or Binance.US that they do not already have.

A-171

Every customer's initial distribution rights will be determined on the same date. The different regulatory regimes in different states may mean that some customers receive distributions on different dates or even in different forms, but the Debtors cannot do anything about that. The only solution to the problem that New York has raised would be to force everyone in the entire country to delay their distributions just because the necessary approvals are not in place to make such distributions to New York customers. That would not make any sense, and New York acknowledged during argument that it is not requesting such a result and that the Bankruptcy Code does not compel such a result.

At one point, papers submitted on behalf of one of the States in the Unsupported Jurisdictions argued that cryptocurrency prices may vary over time, so that the consideration that customers receive may have different values when it is actually received. However, that often happens under bankruptcy plans. In the American Airlines case, for example, creditors were entitled to receive stock as distributions on their allowed claims. There were many disputed claims, however, and the people who held those claims only received stock as and when their claims were allowed. In the meantime the stock price changed, sometimes very significantly. But there was no way for the debtors in that case to control for those price changes, and no practical way for them to ensure that the stock that was reserved and later distributed would have the same value on every single distribution date. The creditors received the same amounts of stock, which is all that the Bankruptcy Code requires and, as a practical matter, the only thing that the Bankruptcy Code could require when property other than cash is being distributed.

Similarly here, the Debtors cannot "solve" for the fact that cryptocurrency prices inevitably will fluctuate. The distributions that are calculated for creditors will be done on the same day and on the same basis. However, some creditors will have disputed claims and will not

43

receive distributions until disputes are resolved.  Other creditors may face delays due to regulatory issues, or simply due to delays in the submission and processing of the paperwork needed to open a Binance.US account.  It is inevitable that some customers will actually receive distributions on different dates and that market values may fluctuate, but that does not amount to an "unequal treatment" proposed by the plan.

I therefore overrule the objections as to the Plan's treatment of customers in "Unsupported Jurisdictions."

Some owners of the VGX token have argued that they are being unfairly discriminated against.  This is based primarily on the fact that there is no guaranty that the VGX token will continue to be traded in a meaningful way, and therefore no assurance that the VGX token will continue to have much, if any, value.  I note that under the terms of the Plan the amounts of the allowed *claims* that customers have, based on their VGX holdings, will be based on the value that VGX had on the date these cases were commenced.  To the extent that some of a customer's distributions will be in the form of VGX, however, the values of those distributions will be based on the updated value that VGX has on a specified date in advance of the actual distributions. The goal is to try, if possible, to make some "in kind" distributions if they can be made, thereby possibly reducing tax consequences, though we have no guarantee that will work.

I do not believe the Debtors are in a position to guaranty that VGX will continue to be traded, any more than the Debtors could guaranty that any of the other coins that will be distributed will continue to be traded.  Similarly, the Debtors can make no guarantees as to what will happen to the future values of any of the coins.  Those are all things that will depend on market forces.  Customers who elect to receive in-kind distributions instead of cash distributions

44

will receive VGX only because they previously owned VGX. I find that this does not amount to a differential treatment or an improper discrimination in violation of any Code requirements.

Some suggestion was made to the effect that the Plan distributions will treat VGX as having a certain value, whereas that value might actually be illusory. Ordinarily the market price of an asset represents the market's assessment of the potential risk and rewards. Even when a stock or other marketable asset may appear to have little future prospect it may nevertheless carry an "option" value based on the possibility that circumstances will change; that is why "out-of-the-money" warrants often have actual market value. Such values are real values in the absence of proof to the contrary, and I have no such contrary proof here. I appreciate that there is perhaps more uncertainty as to the value of VGX, but that does not mean that VGX has absolutely no actual value, or that the provisions of the plan are improper in their treatment of VGX.

There were also objections that were filed as to the identity of the proposed Plan Administrator, Mr. Paul Hage. Many of the objections suggested that the job should not go to anyone associated with the Official Committee of Unsecured Creditors or their individual members, apparently because a number of account holders are not happy with the Committee's decisions and work. Mr. Hage testified about his qualifications and answered questions about his work in the case and as to whether he has any conflicts of interest that would prevent him from serving as the Plan Administrator. He testified that he was the personal attorney to an individual who was a member of the UCC and that at the outset of the case he also gave some advice to UCC members as to how they could organize the process by which they selected a firm to act as counsel to the Committee.

A number of customers postulated that the individual whom Mr. Hage represented was a close friend of Mr. Ehrlich and that this had improperly influenced the Committee member in considering the settlement with Mr. Ehrlich that is embodied in the plan. However, Mr. Hage testified credibly that the relevant Committee member was a large customer of Voyager whose friendly relationship with Mr. Ehrlich ended when Voyager closed down its platform. He further testified that the relevant Committee member actually spoke out against the proposed settlement when it was presented for the Committee's review, and that he ultimately abstained from voting after the votes of other committee members had already made clear that the Committee approved of the settlement terms.

I do not believe that Mr. Hage's limited connections to this Committee member give rise to conflicts of interest or that in the real world they would affect his work.

Some account holders objected on the ground that Mr. Hage has never been a Plan Administrator before. However, a person who has had as much extensive experience in the bankruptcy world as Mr. Hage has had, and who has represented debtors, creditors and other parties, is well qualified to do the work that a Plan Administrator will be required to do in these cases. There were also expressions of concern by some account holders as to whether Mr. Hage would effectively and aggressively pursue claims that the estate might have, but I believe he will do so.

Some other objections have been resolved that I do not need to discuss in detail here. The amended plan has deleted a provision deeming all claims to be objected to. The amended plan has changed a provision that previously stated that that the Wind-Down Debtor "shall have the sole authority on behalf of the Debtors" to object to claims. The parties have also changed a

provision saying that late-filed claims would be deemed disallowed, and the documents now say that late claims are disallowed subject to my approval.

Alameda/FTX at one point objected to the proposed treatment of claims based on loans that Alameda made to Voyager, but that objection has not been pursued. The treatment of the Alameda loan claim also is the subject of a separate stipulation to be presented at a future date. Essentially the plan now provides that the loan claim will be treated in the manner specified in the stipulation; or, if the stipulation is not approved, it will be subordinated; or, if the stipulation is not approved and the court does not order subordination, it will be treated as a claim in the class in which it properly falls.

An Ad Hoc Group of Equity Security Holders objected to the way the Plan described the treatment of Intercompany Claims, but the parties agreed to language that has been included in the plan documents and in the Confirmation Order to address their concerns. I was under the impression that this had resolved this objection until near the end of the hearing, when counsel to the Ad Hoc Group asked that I direct that a separate Plan Administrator be appointed for the ultimate holding company of the Debtors. I will not address that point in detail because the Debtors agreed that each Debtor will have an independent director who will have the right to appear and to be heard on any issue as to which the Debtors' interests are in conflict with each other. The identities of the independent directors have been disclosed, and the Ad Hoc Group of Equity Holders has agreed that these changes resolve the objections.

The Bank of New York filed a curious objection based on property in which it has a mortgage interest. Apparently the owner of the property recently purported to transfer the property to Voyager. My impression is that this came as a surprise to everyone. In any event,

A-176

language has been included in the Confirmation Order that resolves the issue and that makes clear that Voyager does not have any interest in that property.

Finally, one party objected to the plan on the ground that it does not provide for a recovery for the holders of equity at the ultimate holding company level. Actually, the plan makes clear that those equity holders will be entitled to distributions if the ultimate holding company has assets once it pays its own creditors in full, though the current predictions are that there will not be any.

There were two other points in the proposed plan and in the proposed Plan Administrator Agreement that I required to be changed and that have been changed. First, the prior versions stated that the Debtors and the Plan Administrator would have no responsibility to try to locate any person for whom a check or other communication is returned as undeliverable. These provisions are often proposed, but I do not believe that I personally have ever approved them. Instead, I require that reasonable efforts be made to locate the relevant person(s) before any distribution may be treated as having been forfeited.

Second, the proposed plan stated that professionals only needed to comply with the relevant Bankruptcy Code provisions regarding their retentions, and only needed approvals of their fees, until the "Confirmation Date," even though it is anticipated that this plan may only take effect on a future "Effective Date." Section 1129(a)(4) requires, I believe, that the application of the relevant Code provisions, and the Court's authority to review the reasonableness of professionals' compensation, continue up to and including the Effective Date. That change has been made.

Some other motions were addressed during the same hearing at which we considered the confirmation of the plan. Several *pro se* parties asked the Court to appoint a trustee, to disband

the Official Committee of Unsecured Creditors and to remove the advisors to the Official Committee of Unsecured Creditors.  (ECF Nos. 843, 941, 1059, 1061, 1076, 1077.)  The Bankruptcy Code provides that I may appoint a Trustee at any time before confirmation of a plan, and it gives me considerable discretion in deciding whether "cause" exists to do so.  *See In re Adelphia Comm'ns Corp.*, 336 B.R. 610, 656 (Bankr. S.D.N.Y. 2006), *aff'd*, 342 B.R. 122 (S.D.N.Y.); 7 COLLIER ON BANKRUPTCY ¶ 1104.02[3].  Here, the motion for appointment of a trustee was argued just prior to the confirmation of a plan.  As I noted during the hearing, there would have been no way, even if I had felt that circumstances called for the appointment of a trustee, that a trustee would have been in place before confirmation took effect and rendered the whole concept moot.  I know that is frustrating for the account holders who filed the motions, and I also note that the motions make a lot of accusations that have not really been answered by the Debtors.  However, at this late stage in the cases, the issues that were raised did not provide "cause" to interrupt the confirmation process and to throw everything into disarray.

Two *pro se* parties also asked that they be allowed to withdraw the assets that were listed in their accounts, rather than receiving merely *pro rata* distributions.  (ECF Nos. 854, 947.)  I simply cannot allow that.  If one customer were to withdraw everything that had been listed in that customer's account, it would just mean that the next customer would get less.  The whole point of the Bankruptcy Code is to make sure that everybody gets equal distributions.  Since there is not enough to pay all claims in full, no customer can get a complete recovery of what was listed in his or her account.  That is simply a basic matter of bankruptcy.

For the foregoing reasons, I will approve the Disclosure Statement and confirm the Debtors' plan of reorganization, and the confirmation order that I have entered will reflect those

rulings.  I will also issue separate orders denying the motions seeking appointment of a trustee

and the other motions discussed above.

Dated:  New York, New York
        March 11, 2023


                                    /s/ **Michael E. Wiles**
                                    Honorable Michael E. Wiles
                                    United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **VOYAGER DIGITAL HOLDINGS, INC., et al.,** | : | **Case No. 22-10943 (MEW)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

_____

## DECISION AND ORDER DENYING THE GOVERNMENT'S MOTION FOR A STAY OF THE CONFIRMATION ORDER PENDING APPEAL

A P P E A R A N C E S :

OFFICE OF THE UNITED STATES ATTORNEY,
SOUTHERN DISTRICT OF NEW YORK
New York, New Yori
  By:  Lawrence H. Fogelman, Esq.
       Jean-David Barnea, Esq.
       Peter Aronoff, Esq.

OFFICE OF THE UNITED STATES TRUSTEE
New York, New York
  By:  Linda A. Riffkin, Esq.;
       Richard C. Morrissey, Esq.
       Mark Bruh, Esq.

KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
New York, New York and Chicago, Illinois
*Attorneys for Debtors*
  By: Joshua Sussberg, Esq.
      Christopher Marcus, Esq.
      Christine Okike, Esq.
      Michael Slade, Esq.
      Allyson Smith, Esq.
      Richard U.S. Howell, Esq.

McDERMOTT WILL & EMERY LLP
New York, New York; Dallas, Texas; and Miami, Florida
*Attorneys for the Official Committee of Unsecured Creditors*
  By:  Darren T. Azman, Esq.
       Joseph B. Evans, Esq.
       Charles R. Gibbs, Esq.
       Gregg Steinman, Esq.

I entered an order confirming the Debtor's plan of reorganization in these cases on March 8, 2023 (ECF No. 1157), and the corrected and operative version of the order was entered on March 10, 2023 (the "**Confirmation Order**") (ECF No. 1166.)  I had previously dictated a decision into the record on March 7, 2023, and the corrected and final version of my decision (the "**Decision**") was entered on the docket on Saturday, March 11, 2023 (ECF No. 1170), with some typographical errors corrected in a further Order entered March 13, 2023 (ECF No. 1173). The United States Government, through the Office of the United States Trustee and the Office of the United States Attorney for the Southern District of New York, has moved for a stay of the Confirmation Order pending an appeal, or in the alternative for a stay of the "exculpation" provisions that are included in the Confirmation Order and in the underlying plan of reorganization.  The Government has submitted a memorandum in support of its motion (the "**Govt. Mem.**," ECF No.1182) and the Debtors have submitted a memorandum in opposition to the motion (the "**Debtors' Mem.**," ECF No.1186), as has the Official Committee of Unsecured Creditors (the "**UCC Mem**.," ECF No. 1187).  The Court heard argument on the motion on March 15, 2023.

### Discussion

Rule 8007 of the Federal Rules of Bankruptcy Procedure provides that a party seeking a stay pending appeal must apply in the first instance to the bankruptcy court.  Fed. R. Bankr. P. 8007(a)(1)(A).  The decision to deny a stay is within the discretion of the bankruptcy court.  *In re Overmyer*, 53 B.R. 952, 955 (Bankr. S.D.N.Y. 1985).  The relevant criteria have been worded somewhat differently in different cases, but as a general matter the court must consider: (1) whether the movant has made a "strong showing" that it is likely to succeed on appeal, (2) whether the movant will suffer irreparable injury absent a stay, (3) whether another party will

suffer substantial injury if a stay is issued, and (4) how public interests may be affected. *See 461 7th Ave. Mkt., Inc. v. Delshah 461 Seventh Ave., LLC (In re 461 7th Ave. Market, Inc.)*, No. 20-3555, 2021 U.S. App. LEXIS 36995, at \*1 (2d Cir. Dec. 15, 2021).

I conclude based on these factors that the Government is not entitled to a stay. However, at the Court's request the parties have agreed (and the Court has ordered) that a stay will remain in effect through Monday, March 20, 2023. This modest extension of the current stay is made in recognition of the likelihood that a stay application will be made to the District Court, and to afford the District Court a reasonable opportunity to read the relevant papers and to make its own ruling.

1.      **Likelihood/Possibility of Success on Appeal**

The Government contends that it is likely to succeed on appeal. However, if one were to read the Government's papers without having first read my Decision, one would have little to no idea of what I had actually ordered, or the bases on which I had done so. The Government has not even discussed the actual theory upon which I relied in support of the exculpation provision that I approved. Nor has it even discussed the many court decisions (including Second Circuit authorities) that I cited in support of the relief that I ordered.

I explained in the Decision that my order will have the effect, under section 1142(a) of the Bankruptcy Code, of requiring the Debtors to engage in the purchase and sales of cryptocurrencies in order to "rebalance" the Debtors' cryptocurrency portfolios, and will require the Debtors, the Wind-Down Debtors, the Plan Administrator and Binance.US (acting as the Debtors' distribution agent and as a trustee for that purpose) to distribute cryptocurrencies to customers. *Id.* at 34-35. I explained further that I believed that under a long line of authority parties should not be liable for doing things that my order will require them to do, particularly

where the Government (during the confirmation hearing) has not actually contended that any of these activities would be illegal. *Id.* I cited some decisions on this point when I announced my original decision in open court,[1] and when I issued my final decision I cited additional Second Circuit and other authorities that are directly on point.[2] The Debtors have cited many additional authorities in the memorandum they filed today. *See* Debtors' Mem. at 14-17. The Government contends that it will likely win on appeal, but in making its arguments the Government has not even discussed any of the authorities that I cited, or the actual theory on which I relied.

Instead, the Government's papers exaggerate and in some places mischaracterize what I have done and the authorities on which I have relied, and in other instances rely on hyperbole or on "straw man" arguments.

---

[1] *See* Decision at 31-32, *citing Airadigm Commc'ns., Inc. v. FCC (In re Airadigm Communs., Inc.)*, 519 F.3d 640, 655-57 (7th Cir. 2008); *In re Granite Broad Corp*., 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007);*In re LATAM Airlines Grp. S.A.*, 2022 Bankr. LEXIS 1725, at *159 (Bankr. S.D.N.Y. June 18, 2022) ; *In re Murray Metallurgical Coal Holdings, LLC*, 623 B.R. 444, 504 (Bankr. S.D. Ohio 2021); *In re Ditech Holding Corp.*, 2021 Bankr. LEXIS 2274, at *25-26 (Bankr. S.D.N.Y. Aug 20, 2021).

[2] *See* Decision at 35-36, *citing Bradford Audio Corp. v. Pious*, 392 F.2d 67, 72-73 (2d Cir. 1968) (receiver was immune from liability for having done what a court order approved and directed the receiver to do); *Dana Commercial Credit Corp. v. Center Teleproductions, Inc. (In re Center Teleproductions, Inc.),* 112 B.R. 567, 577-78 (Bankr. S.D.N.Y. 1990) (trustee granted absolute immunity from action brought by an entity with a security interest in property where trustee acted pursuant to court order); *see also Boullion v. McClanahan,* 639 F.2d 213, 214 (5th Cir. 1981) (holding that where a bankruptcy trustee sought and obtained court approval for his actions he was entitled to absolute immunity); *T& W Inv. Co. v. Kurtz*, 588 F.2d 801, 802 (10th Cir. 1978) (finding immunity appropriate when "every action by [the receiver] objected to in this suit was known to and approved by the state court judge supervising the receiver," the plaintiff "had an opportunity to and did object throughout the state court proceedings" and "the receiver was in fact following the orders of the court and complying therewith"); *Phoenician Mediterranean Villa, LLC v. Swope (In re J&S Props., LLC)*, 545 B.R. 91, 103 (Bankr. W.D. Pa 2015) (where a bankruptcy trustee acts pursuant to an order of court, a bankruptcy trustee is generally afforded absolute immunity*); In re XRX, Inc.*, 77 B.R. 797, 798 (Bankr. D. Nev. 1987) (a trustee acting pursuant to a court order in making a disbursement is not subject to personal liability.)

4

(a)     **Jurisdiction**

The Government argues that I overstepped my jurisdictional authority, contending that
that I did not have the power to do anything in these chapter 11 cases other than to resolve pre-
petition claims.  (Govt. Mem. at 21-22.)  However, one of the things that must be resolved in
every chapter 11 plan, and in a confirmation order with respect to a plan, is what will happen to a
debtor's assets – *i.e.,* whether they will be sold, retained or distributed.  *See* 11 U.S.C. §
1123(a)(5).  In this case, the Debtors' assets consist primarily of cryptocurrencies.  The plan
requires the purchase and sale of cryptocurrencies (as part of rebalancing efforts in preparation
for distributions) and it requires the distribution of cryptocurrencies to account holders.  Indeed,
it would be impossible to have a liquidation of the Voyager Debtors without some or both of
those activities.

The Debtors proposed a plan of reorganization, and I was required to make a ruling as to
whether it could be confirmed.  Where regulatory issues were actually identified (such as with
respect to distributions of cryptocurrencies in "Unsupported Jurisdictions,") those issues were
accounted for in both the plan and in my Confirmation Order.  However, the federal authorities
made clear during the confirmation hearing that they do not actually contend that the
contemplated rebalancing activities or proposed distributions of cryptocurrencies would violate
any applicable laws.  As I explained in my Decision, the evidence and argument before me
during the confirmation hearing did not suggest there were any illegalities in what the plan
contemplated, and compelled a conclusion that the transactions could and should proceed.

No party has disputed my jurisdiction over these cases, or my jurisdiction and my power
to enter a confirmation order.  The effect of my order (under section 1142(a) of the Bankruptcy
Code) is that certain parties will be obligated to do what the plan calls for regarding the

rebalancing of the cryptocurrency portfolios and the distribution of cryptocurrencies to

customers.  I have left open the right of the Government to seek to stop the activities at any time

if the Government believes that they should be stopped.  All I have done – based on the

authorities I cited and which the Government has not even discussed – is to confirm that, in the

meantime, the people who are required to do things pursuant to my confirmation order will not

be held liable for having done what I have required.  So long as I have jurisdiction to issue the

confirmation order (which I plainly do), and so long has my order requires that certain actions be

taken (as it plainly does), then that ruling is proper under the authorities that I have cited.

    **(b)**      **Clarity of the Provision**

      The Government has argued that my Confirmation Order is not sufficiently clear as to

what conduct it purports to immunize and that it is subject to misinterpretation.  (Govt. Mem. at

22.)  The full text of the language that I approved is as follows:

> Effective as of the Effective Date, to the fullest extent permissible under
> applicable law and without affecting or limiting either the Debtor release or
> the third-party release, and except as otherwise specifically provided in the
> Plan, no Exculpated Party shall have or incur, and each Exculpated Party is
> hereby exculpated from, any liability for damages based on the negotiation,
> execution and implementation of any transactions or actions approved by the
> Bankruptcy Court in the Chapter 11 Cases, except for Causes of Action
> related to any act or omission that is determined in a Final Order to have
> constituted actual fraud, willful misconduct, or gross negligence; *provided*
> that nothing in the Plan shall limit the liability of professionals to their clients
> pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1)
> (2009).
>
> The Exculpated Parties have, and upon Consummation of the Plan shall be
> deemed to have, participated in good faith and in compliance with the
> applicable laws with regard to the solicitation of votes.
>
> In addition, the Plan contemplates certain rebalancing transactions and the
> completion of distributions of cryptocurrencies to creditors.  The Exculpated
> Parties shall have no liability for, and are exculpated from, any claim for
> fines, penalties, damages, or other liabilities based on their execution and

completion of the rebalancing transactions and the distribution of cryptocurrencies to creditors in the manner provided in the Plan.

For the avoidance of doubt, the foregoing paragraph reflects the fact that Confirmation of the Plan requires the Exculpated Parties to engage in certain rebalancing transactions and distributions of cryptocurrencies and the fact that no regulatory authority has taken the position during the Combined Hearing that such conduct would violate applicable laws or regulations. Nothing in this provision shall limit in any way the powers of any Governmental Unit to contend that any rebalancing transaction should be stopped or prevented, or that any other action contemplated by the Plan should be enjoined or prevented from proceeding further. Nor does anything in this provision limit the enforcement of any future regulatory or court order that requires that such activities either cease or be modified, or limit the penalties that may be applicable if such a future regulatory or court order is issued and is violated. Similarly, nothing herein shall limit the authority of the Committee on Foreign Investment of the United States to bar any of the contemplated transactions. Nor does anything in this provision alter the terms of the Plan regarding the compliance of the Purchaser with applicable laws in the Unsupported Jurisdictions before distributions of cryptocurrency occur in those Unsupported Jurisdictions.

The first paragraph of this exculpation provision states that parties are exculpated from liability for things that I authorized during the course of the bankruptcy case, with an explicit exclusion for fraud, willful misconduct or gross negligence. This language is much narrower than the provision that the Debtors had originally proposed. More importantly, the language describing the matters that are covered (*i.e.,* liability for damages based on the negotiation, execution and implementation of transactions or actions approved by the Bankruptcy Court) is precisely the modification that the United States Trustee suggested in the objection that it filed. As the Debtors have pointed out, the language also is comparable to (if anything, it is narrower than) the language that has been approved in countless other bankruptcy cases, usually without any objection by the Government and without any suggestion that it has been misinterpreted or misapplied. *See* Debtors' Mem. at 14-16, 17-18.

The second paragraph of the exculpation language just implements the terms of section 1125(e) of the Bankruptcy Code, and the Government does not challenge that provision.

The third and fourth paragraphs of the exculpation provisions that I approved are specifically limited to the fact that the parties must buy and sell cryptocurrencies as part of the portfolio rebalancing that the plan requires, and must distribute cryptocurrencies to customers. The point is to protect the parties from belated allegations that those very activities are somehow violative of law and that parties should be penalized just for doing what I have ordered them to do.  The Government nevertheless has strained to find potential ambiguities in these terms.  It theorizes, for example, that my Order might somehow be interpreted as immunizing fraud, or theft, or tax avoidance.  (Govt. Mem. at 27-28.)  Those contentions are red herrings; I do not believe that the Government actually thinks that my Order has such effect, or that anyone could reasonably contend that it has such effect.  The last two paragraphs make clear that they protect people for doing the things that they are required to do under the plan and under my order. Although the plan and the Confirmation Order require the parties to sell cryptocurrencies, they certainly do not require (or permit) anyone to commit fraud in the course of doing so, or to engage in theft in the course of doing so.  (Govt. Mem. at 27-28.)  Similarly, there is nothing in the plan that requires or permits the Debtors to evade their tax obligations, and there is nothing in my Order that reasonably could be construed to mean that the Debtors do not have to pay taxes. (Govt. Mem. at 26-7.)  Nor is there anything in the plan that requires or permits the parties to violate environmental laws, or that could be reasonably construed as having done so.

    **(c)**    **Third Party Release Arguments**

The Government continues to argue that I have granted "third party releases" and that the case authorities relating to "third party releases" would not authorize what I have done.  (Govt. Mem. at 22-23, 24.)  But I have repeatedly made clear that I am not relying on the authorities and

arguments that purportedly justify the "third party releases" that are at issue in the cases cited by the Government.

Cases that have approved "third party releases" rely on general contentions that a bankruptcy court may do what is "necessary" to the confirmation of a plan, coupled with contentions that releases of claims that third parties have against other third parties are necessary to secure settlements or other contributions to a plan. *See, e.g., In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 143 (2d Cir. 2005); *In re Purdue Pharma, L.P.*, 635 B.R. 26, 106 (S.D.N.Y. 2021). I have made it quite clear that I have not relied on any of those authorities or arguments in this case. In fact, I have previously expressed my own strong skepticism about third party releases that are granted on these theories. *See In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 726-27 (Bankr. S.D.N.Y. 2019).

The exculpation provision that I have approved is based on entirely different principles and authorities, as explained above and as also explained in my prior *Aegean* decision and in my Decision in this case. The Government's contention that every exculpation provision somehow should be treated as though it is an outgrowth of the "third party release" cases, and that all other legal theories in support of exculpation should just be ignored, is without merit.

**(d)** **Section 1142(a)**

The Government argues that section 1142(a) of the Code does not by its own terms refer to an exculpation of parties. (Govt. Mem. at 23-24.) But by focusing solely on the language of section 1142(a) the Government has focused on only part of the relevant equation. My confirmation order will have the effect, under section 1142(a), of affirmatively requiring that certain actions be taken. The proposed exculpation results from the theory that people who must

9

do what my confirmation order requires are entitled to protection. That protection derives from my confirmation order and from the many other authorities cited above.

### (e)    Whether Prospective Conduct Should Be Covered

The Government persists in characterizing what I have done as a "release," and having applied this label the Government then argues further that a "release" should only focus on past conduct. (Govt. Mem. at 22, 25, 27-8, 29.) Again, the argument is based on a false analogy and a false label, and just ignores the actual theory on which I approved the exculpation provision. The whole point, in this case, is that the confirmation order will require certain actions to be taken in the future. Parties who act under the direction of that Order are entitled to know that they are not being ordered (in effect) to incur liabilities for having done so. As the Debtors have pointed out, courts regularly have approved exculpation provisions that cover prospective conduct that will occur during the implementation of a plan. *See* Debtors' Mem. at 16-17. If anything, the language in this case regarding proposed rebalancing trades and cryptocurrency distributions is far narrower and far more specific than the terms that have been approved in other cases.

### (f)    Notice to the Government

The Government asserts that it did not receive fair notice of the proposed exculpation terms. (Govt. Mem. at 25-6.) However, the initial version of the Plan that was filed on December 22, 2022 (ECF No. 777) included a broad exculpation provision in Article VIII.C. That provision would have immunized the "Exculpated Parties" based on any act or omission arising on or after the Petition Date – whether I had approved it or not – with exceptions for fraud, willful misconduct or gross negligence. That would have been far broader than the first paragraph of the exculpation provisions that I approved. The Debtors' proposal also would have

deemed the Exculpated Parties to have acted "in compliance with the applicable laws" with

regard to the distributions contemplated by the plan, and proposed that the Exculpated Parties

"shall not be" liable "at any time" for the violation of any applicable law, rule, or regulation

governing such distributions.  This, too, was broader than the language that I eventually

approved, as it would have declared for all time that the Debtors' activities were deemed to be

lawful and presumably would have thereby barred any legal effort to stop them.

The Debtors' proposed language appeared in every amended version of the Plan that was

filed.  *See* ECF Nos. 830, 1117, 1125.  Notably, the SEC and the Office of the United States

Attorney did not object to any of those provisions.  The Office of the United States Trustee filed

an objection (ECF No. 1085), but that objection just asked that the proposed exculpation be

narrowed, not eliminated.

The first draft of the proposed confirmation order, submitted on February 28, 2023 (ECF

No. 1120) included a paragraph that would have exempted the Government from the proposed

exculpation provision.  *Id*. ¶ 141.  However, no such exemption was included in the plan itself,

and the draft of the proposed order was filed well after the objection period had already passed.

It appears that this language was included in the first draft of the confirmation order as a possible

resolution of a separate objection that the FTC had filed regarding the FTC's ability to pursue

claims based on pre-petition business activities of the Debtors and their personnel. In any event,

the Debtors removed this provision in the next version of the proposed confirmation order that

they filed.  (ECF No. 1130.)  The Government officials who currently object to the Confirmation

Order do not contend that had negotiated for the inclusion of such a term in the confirmation

order, or even that they were aware of it at the time.  What actually got the Government's

attention on March 2, 2023 was the Debtors' request to *expand* the previous exculpation

provision and to state explicitly that the Government would be barred from ever contending, in any context, that the relevant transactions violated any rule or regulation.

I agree that the extra and expanded language that the Debtors proposed on March 2, 2023 was overreaching and was made without adequate notice. At the same time, however, the Government should not be permitted to pretend that March 2, 2023 was the first time it received notice of the proposed exculpation provisions. The Government was on notice of those proposed exculpation terms since December 2022, and the relief that I ultimately granted was actually narrower than the relief that the plan sought.

### (g)    Coverage of Non-Fiduciaries

The Government argues that parties should not be the beneficiaries of exculpation unless they are "estate fiduciaries." (Govt. Mem. at 28-29.) As I explained in *Aegean*, however, the point of an exculpation provision is not only to protect court-supervised fiduciaries, but also to protect parties who engage in court-supervised and court-ordered transactions. *See Aegean,* 599 B.R. at 720-21. If parties are authorized (or directed) to do things under my Order, they deserve protection. *Id.* Other courts, based on similar reasoning, have extended exculpation provisions to persons who were not fiduciaries of the estate. *See* Debtors' Mem. at 16-17.

Furthermore, in this case, the Debtors plainly are fiduciaries, and the persons who implement the rebalancing trades and distributions on behalf of the Debtors will be acting under the authority I have granted to the Debtors. In addition, Binance.US will distribute cryptocurrencies to customers as a distribution agent of the Debtors, and in that capacity Binance.US will receive and distribute cryptocurrencies "in trust" for the Debtors.

The Office of the United States Trustee at one point contended that exculpation provisions in favor of Debtors or other fiduciaries should not extent to employees or other people

who act for the Debtors.  However, the Debtors are corporate entities; they can only act through

human beings.  It would make no sense to say that the Debtors themselves are exculpated from

liability, but that the human beings through which the Debtors act are not similarly protected.

**(h)    Other arguments**

I do not believe there is merit to the Government's other arguments.

I have not "enjoined" the Government's exercises of police and regulatory powers, I have

not "prospectively immunized" the parties from enforcement actions, and I have not barred

regulatory actions to stop the contemplated transactions.  (Govt. Mem. at 21-2.)  The

Government's arguments to the contrary are just hyperbole.  I have made it quite clear that the

Government can step in at any time if (due to changing or evolving regulatory views) the

Government thinks the rebalancing transactions or cryptocurrency distributions should be

stopped.  My order also made quite clear that I have not purported to limit the liability of any

person for anything they have done that I have not explicitly authorized and/or directed them to

do.  The Order that I have entered is narrow in scope and is limited to the protection of people

who, at least for now and in the absence of regulatory action, will have to do what my order

requires.

Notwithstanding the Government's argument (Govt. Mem. at 25), there plainly was a

"case or controversy" as to whether the parties who would be required to do certain things

following a plan confirmation would nevertheless potentially be subject to personal liability to

the Government for having done what a confirmation order requires.  As I explained in the

Decision, the Government did not actually contend that any of the transactions required by the

plan would be illegal in any way.  However, the SEC revealed cryptically at the close of the day

on March 3, 2023 that the staff of the SEC believed that the VGX token had "aspects" of a

security (without specifying what those aspects were) and that Binance.US was operating as an
unregistered securities dealer (without specifying why the staff thought so).  The SEC further
stated that the staff's views are not the views of the Commission itself; that the Commission
itself was not taking the position that the proposed transactions were illegal; and that the SEC did
not intend to offer any evidence or any further explanation as to exactly what the staff's concerns
were.  On the following Monday, March 6, 2023, the Government argued that the persons who
would implement the plan should just "take their chances" as to whether the Government might
later contend, after the fact, that the transactions were improper and that such persons were
subject to penalties or other liabilities – even though (as noted) the Government was not prepared
to oppose the confirmation of the plan, and even though the confirmation of the plan would
require people to engage in the very cryptocurrency trades and cryptocurrency distributions that
the Government wanted to reserve the right to penalize.  I am not quite sure just what could have
brought that particular issue into more direct focus.

     The Government continues to argue that any immunity that derives from a court's order
should just be an affirmative defense in future proceedings, and that the persons who may have
to assert such defenses (and the courts who need to rule on them) should be left without any
guidance, from me, as to what exactly it is that I think the confirmation order requires and what
activities parties will be conducting under the authority of my order.  (Govt. Mem. at  27.)  I have
already explained, in my Decision, why I do not think that makes sense.  I see no reason why a
future court should have to guess as to just what activities I have authorized and that I thereby
intend to be subject to the relevant immunities.

     Finally, the Government argues that in some bankruptcy cases exculpation provisions
have not covered claims that the Government may have.  (Govt. Mem. at 29-30.)  That is true,

but it certainly has not always been the case, and the fact remains that the Government has been

subject to countless court-approved exculpation provisions in other cases. *See, e.g.,* Debtors'

Mem. at 17-18.

**2.     Balance of Hardships/Equities**

The Government has not contended that it faces an "irreparable injury" in the absence of

a stay except for the risk that an appeal might be rendered equitably moot if a stay were not

granted.  It is not entirely clear to me that this would be the case.  For example, the Government

has criticized my Order as allegedly being unclear or overbroad in what it covers.  I believe, as

explained above, that the Government's arguments in that regard are red herrings, and I do not

believe there is any actual ambiguity in how the exculpation will be applied with respect to

cryptocurrency sales and distributions, or that further clarifications actually are required.

However, if the Government really thinks that my Order could be misinterpreted, and if the real

purpose of an appeal is to obtain further clarification (for example) that my Order does not

authorize the Debtors to commit fraud in their purchase or sales of cryptocurrencies, or that it

does not permit a theft of cryptocurrencies, or that it does not free the Debtors of any tax

liabilities, then I cannot imagine that appeals on such grounds would be barred based on

equitable mootness.  I do not believe that anybody contends or would ever contend that my

Order authorizes any of the kinds of fraud, theft, or tax avoidance that the Government has

identified, or that immunization from such misconduct somehow was an intended and

inextricable feature of the plan and confirmation order.

The real point of my order, of course, is to protect parties who must buy, sell and

distribute cryptocurrencies from being subjected to liability based on belated contentions that

those very actions might be contrary to the securities laws, commodities laws or other laws.  I

certainly could understand and agree that an appeal on that particular ground would be considered equitably moot at to transactions that had already been completed in reliance on the authority of my order.  Curiously, though, during argument today the Government stated that it would not likely seek to impose penalties upon people for things they had already done in reliance on my order, and that any suggestion to the contrary was merely hypothetical.  If that is so, then the Government's entire argument about the "equitable mootness" risk is merely hypothetical, because the Government cannot identify anything that it actually would want to do, or should be allowed to do, that would be rendered equitably moot in the absence of a stay.

The Government argues in its papers that I have somehow "tied its hands" in dealing with cryptocurrencies, and that my order will somehow stop the Government from addressing "fraud and abuse" in the cryptocurrency field generally or from addressing "[o]utright fraud, scams and theft in digital asset markets." (Govt. Mem. at 30-31.)  During argument today the Government similarly argued that my Order will somehow prevent the Government from taking action to protect the public health, safety and welfare.  These arguments are sheer hyperbole.  I could not have said any more clearly that the Government is free at any time to take action to stop the Debtors' cryptocurrency trades and/or cryptocurrency distributions if the Government decides that those activities should be stopped.  My Order just says that in the meantime the people and entities who do what my order requires will not themselves be liable for having done so.  I fail to see how that possibly threatens the public health, safety or welfare, or how it ties the Government's hands in any way.  If the Government has not already taken regulatory actions with respect to cryptocurrencies, or if it delays in taking any further regulatory actions, those delays will certainly not be attributable in any way to my order.

The Government also argues that a stay will not harm the Debtors because the proposed transaction with Binance.US may not close until later this month.  To the extent that what the Government wants is a reasonable time to seek a stay from the District Court, the parties have agreed to provide that by extending the stay through March 20, 2023 at 5:00 p.m.  However, the Government presumably does not contend that the entire appeal process could be resolved in the next few weeks.  The stay that the Government is actually seeking would extend long past the time when the Binance.US deal is scheduled to close.  A stay could threaten the availability of that transaction, and the uncontroverted evidence before me at the confirmation hearing is that a loss of the Binance.US transaction would lead to a reduction of approximately $100 million in the assets available for distribution to creditors.  The stay the Government seeks would also postpone the Debtors' ability to implement their "toggle" plan, and would further delay distributions to customers.

Every delay in these cases means that further administrative expenses will be incurred, which just further reduces creditor recoveries.  Delays themselves also are a massive issue for the Debtors' customers.  The automatic stay and other provisions of the Bankruptcy Code have had the effect of delaying customers' access to their investments since July 2022, and many of those customers invested significant portions of the life savings or retirement savings in cryptocurrencies held by the Debtors.  The harm that a stay would pose to the Debtors, and their constituents, is therefore quite significant and immediate.  I am compelled to conclude that the harm that the Debtors and their constituents would suffer if a stay were to be granted exceeds any harm that the Government might incur due to the absence of a stay.

3.     **Public Interest**

Finally, the public interest does not favor a stay.  Notwithstanding the Government's efforts to manufacture ambiguities or excesses, (a) the first paragraph of the modified exculpation provision that I approved is almost identical to what the U.S. Trustee requested in its written objection, and (b) the last two paragraphs make clear that they do not prohibit any regulatory action, including actions to stop the cryptocurrency sales and distributions that the plan contemplates.  The only thing my order does in that regard is to say that the parties who will engage in those activities under the authority and direction of my order – after the Government stated that it did not contend that the activities were illegal – should not in the interim be liable for doing what my order requires.  I cannot imagine any "public interest" or equitable consideration that would require a different result.

The public interest also favors the timely resolution of bankruptcy cases.  As noted above, a stay would adversely affect many thousands of customers.

<u>**Conclusion**</u>

As noted above, the parties have consented to a stay through 5:00 p.m. on March 20, 2023.  For the reasons stated above, the Government's request for a further stay pending appeal is denied.

Dated:  New York, New York
        March 15, 2023

/s/ **Michael E. Wiles**
Hon. Michael E. Wiles
United States Bankruptcy Judge

18

A-197

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: VOYAGER DIGITAL HOLDINGS, INC., *et al.*, | |
| Debtors. | |
| UNITED STATES OF AMERICA, *et al.*, | |
| Appellants, | 23 Civ. 02171 (JHR) |
| -v.- | ORDER |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*, | |
| Appellees. | |

JENNIFER H. REARDEN, District Judge:

On March 17, 2023, the United States of America and the United States Trustee for Region 2 (collectively, the "Government") filed an emergency application for a stay pending appeal of the Bankruptcy Court's confirmation order. (ECF No. 3) On March 20, 2023, Voyager Digital Holdings, Inc. and its affiliated debtors, and the Official Committee of Unsecured Creditors, filed papers opposing the Government's motion. (ECF Nos. 16, 19) On March 21, 2023, the Government filed a reply in further support of its motion. (ECF No. 29) The Court held conferences on March 19 and March 23, 2023, and oral argument on March 23, 2023.

Upon consideration of all parties' written submissions, as well as the conferences and oral argument held in this matter, the Government's emergency motion is hereby GRANTED. An opinion setting forth the reasons for this ruling will issue shortly.

The Clerk of Court is directed to terminate ECF No. 3.

SO ORDERED.

Dated: March 27, 2023
New York, New York

JENNIFER H. REARDEN
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| |
|---|
| In re: VOYAGER DIGITAL HOLDINGS, INC., *et al.*,<br><br>                              Debtors. |

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>                              Appellants,<br><br>                    -v.-<br><br>VOYAGER DIGITAL HOLDINGS, INC., *et al.*,<br><br>                              Appellees. | 23 Civ. 02171 (JHR)<br><br><u>OPINION & ORDER (CORRECTED)</u> |

JENNIFER H. REARDEN, District Judge:

Before the Court is the March 17, 2023 emergency motion of the United States of America and the United States Trustee for Region 2 (the "U.S. Trustee," collectively, the "Government") for a stay pending appeal of the Bankruptcy Court's confirmation order. *See* ECF No. 3.[1] Voyager Digital Holdings, Inc. and its affiliated debtors (collectively, the "Debtors")[2] and the Official Committee of Unsecured Creditors (the "Committee") oppose the Government's motion. *See* ECF Nos. 16, 19.

For the reasons set forth below, the Government's motion is GRANTED.

---

[1] "ECF No." refers to the docket numbers in the instant action. "Bankr. Dkt. No." refers to the docket numbers in the underlying bankruptcy proceedings, Case No. 22-B-10943 (MEW). Cited page numbers are to the ECF pagination at the top of the referenced document.

[2] The Debtors in this action are Voyager Digital Holdings, Inc.; Voyager Digital Ltd.; and Voyager Digital, LLC. ECF No. 12 at 1 n.1.

## I. BACKGROUND

### A. The Chapter 11 Cases and Sale Process

On July 5, 2022, each of the Debtors filed a voluntary petition for relief under chapter 11, title 11 of the United States Code (the "Bankruptcy Code"). The next day, the Debtors filed a plan of reorganization, in which they proposed to market their assets for sale. Bankr. Dkt. 17. On July 19, 2022, the U.S. Trustee appointed the Committee pursuant to Section 1102(a) of the Bankruptcy Code. Bankr. Dkt. No. 106.

In the ensuing months, the Debtors marketed their assets for sale through a Bankruptcy Court-ordered auction process. The now infamous crypto exchange FTX US ("FTX") won the auction. Bankr. Dkt. No. 472. On October 20, 2022, the Bankruptcy Court authorized the Debtors to enter into an asset purchase agreement with FTX, under which FTX would "acquire substantially all of the Debtors' assets, including substantially all of the cryptocurrency held by the Debtors and the Debtors' customer accounts." Bankr. Dkt. No. 476 ¶ 19; Bankr Dkt. No. 581. The asset purchase agreement contemplated that these transactions would be effectuated through a chapter 11 plan. Bankr Dkt. No. 581. Weeks later, however, FTX's "massive fraud" came to light, the company filed for bankruptcy, and the parties terminated the agreement. Bankr. Dkt. No. 849; *see, e.g.*, Bankr. Dkt. No. 1110 ¶ 2 ("FTX's new CEO publicly announced that the proposed purchaser was a fraud of historic proportions, sending shockwaves through the entire cryptocurrency industry. Senior FTX executives were charged with federal felonies and at least two have pled guilty, admitting that FTX and its affiliates defrauded many, including its own customers and commercial counterparties like the Debtors.").

After the collapse of FTX "derailed . . . the Debtors' journey to consummation" of their purchase agreement with that entity, the Debtors explored alternative options. Bankr. Dkt. No.

863 at 11.  On December 18, 2022, Voyager Digital, LLC entered into a new asset purchase agreement with cryptocurrency exchange BAM Trading Services Inc. d/b/a Binance.US ("Binance.US").  The agreement provides for the transfer of "substantially all of" the Debtors' cryptocurrency and certain other assets to Binance.US pursuant to a chapter 11 plan.  *See* ECF No. 12-5 ¶ 20.  The agreement further contemplates making in-kind distributions to creditors, such that each individual will receive a recovery in the type of cryptocurrency held in that person's account.  *Id.* ¶ 14.

On January 13, 2023, the Bankruptcy Court authorized the Debtors to enter into the agreement.  *See* Bankr. Dkt. No. 860.  The order further authorized the Debtors "to rebalance their cryptocurrency portfolio."  *Id.* § 860.  The then-extant version of the agreement provided for an outside effective date of May 8, 2023 for the closing of the sale to Binance.US, with a possible thirty-day extension.  Bankr. Dkt. No. 835 § 8.1(c).

### B.  The Plan and Confirmation Order

On December 22, 2022, the Debtors filed the original version of the Plan.[3]  *See* Bankr. Dkt. No. 777.  As relevant here, that version of the Plan contained an "Exculpation Provision" providing as follows:

> Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and **each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date** based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit

---

[3] Revised versions of the Plan were subsequently filed on January 10, 2023, February 28, 2023, March 1, 2023, and March 5, 2023.  *See* Bankr. Dkt. Nos. 852, 1117, 1125, 1138.

of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

*Id.* at 57 (emphasis added). The bolded language was later removed by the Debtors. The

original Plan further provided that:

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

*Id.* The "Exculpated Parties" includes key participants in these cases, including "(a) each of the

Debtors; (b) the Committee, and each of the members thereof, solely in their capacity as such; (c)

each of the Released Professionals; (d) each of the Released Voyager Employees; and (e) the

Distribution Agent." *Id.* at 8. The "Distribution Agent" is defined to include the purchaser,

Binance.US. *Id.* at 7, 12.

On February 22 and February 24, 2023, certain federal and state governmental agencies

filed objections to the Plan, including the United States Securities and Exchange Commission

and the U.S. Trustee. *See* Bankr. Dkt. Nos. 1047, 1085. The U.S. Trustee objected to the Plan's

Exculpation Provision, arguing that the non-debtor releases were unconstitutional, violated the

Bankruptcy Code, and were inconsistent with Second Circuit law. *See* Bankr. Dkt. No. 1085 at

3, 17-18.  The United States Attorney's Office did not object to the Exculpation Provision at this

juncture.

On February 28, 2023, the Debtors filed their first proposed order confirming the plan.

*See* Bankr. Dkt. No. 1120.  The proposed order included language that expressly carved the

Government out of any exculpation or releases in the Plan:

> Nothing in this Confirmation Order or the Plan shall effect a release of any claim
> by the United States or any of its agencies arising under the Internal Revenue Code,
> the environmental laws or any civil or criminal laws of the United States, or under
> any rules or regulations enforced by the United States or any of its agencies against
> the Released Parties, nor shall anything in the Confirmation Order or the Plan
> enjoin the United States from bringing any claim, suit, action or other proceedings
> against the Released Parties for any liability for any claim, suit or action arising
> under the Internal Revenue Code, the environmental laws or any civil or criminal
> laws of the United States, or under any rules or regulations enforced by the United
> States or any of its agencies, nor shall anything in the Confirmation Order or the
> Plan exculpate any such party from any liability to the United States or any of its
> agencies, arising under the Internal Revenue Code, the environmental laws or any
> civil or criminal laws of the United States, or under any rules or regulations
> enforced by the United States or any of its agencies; *provided*, however, that
> nothing in this Confirmation Order or the Plan shall modify in any respect the relief
> previously granted in the Bar Date Order and thus no person or entity, including
> the United States or any of its agencies, can seek or receive a direct or indirect
> distribution of any property of the Debtors' estates unless they filed a Proof of
> Claim prior to the Governmental Bar Date.

*Id.* at 64-65.  On March 2, 2023, however, the Debtors added language that, *inter alia*, would

effectively undo the Government carve-out they had previously proposed:

> Nothing in this Confirmation Order or the Plan shall effect a release by the United
> States, the States or any of their agencies of any claim arising under the Internal
> Revenue Code, the environmental laws or any civil or criminal laws of the United
> States or the States, or under any rules or regulations enforced by the United States,
> the States or any of their agencies against the Released Parties, nor shall anything
> in the Confirmation Order or the Plan enjoin the United States or the States from
> bringing any claim, suit, action or other proceedings against the Released Parties
> for any liability for any claim, suit or action arising under the Internal Revenue
> Code, the environmental laws or any civil or criminal laws of the United States or
> the States, or under any rules or regulations enforced by the United States, the States
> or any of their agencies, nor shall anything in the Confirmation Order or the Plan
> exculpate any such party from any liability to the United States, the States or any

A-203

> of their agencies, arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any rules or regulations enforced by the United States, the States or any of their agencies; *provided*, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order and thus no person or entity, including the United States, the States or any of their agencies, can seek or receive a direct or indirect distribution of any property of the Debtors' estates unless they filed a Proof of Claim prior to the Governmental Bar Date; ***provided, further, that the United States, the States, and their agencies may not, and will not, allege that the Restructuring Transactions are a violation of any rules or regulations enforced by the United States, the States or any of their agencies, nor will they bring any claim against any Person on account of or relating to the Restructuring Transactions.***

*See* Bankr. Dkt. No. 1130 at 65-66 (emphasis added).  The March 2 version of the Plan further qualified the carve-out as follows:

> **[N]o Governmental Unit will allege that the Restructuring Transactions are a violation of any rules or regulations enforced by the United States, the States or any of their agencies, nor will they bring any claim against any Person on account of or relating to the Restructuring Transactions.**

*Id.* (emphasis added).  "Restructuring Transactions" is defined, in turn, to include:

> those mergers, amalgamations, consolidations, reorganizations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors and the Committee jointly determine to be necessary to implement the transactions described in this Plan[.]

*See* Bankr. Dkt. No. 1138 at 13.  By definition, then, these Restructuring Transactions will occur until after the Plan's effective date.

On March 2, 2023, the United States Attorney's Office filed a letter objecting to the Debtors' change to the Exculpation Provision removing the governmental carve-out.  The United States Attorney's Office took the position that the exculpation language improperly barred the Government from enforcing its laws and regulations in the ordinary course against the Debtors and third parties in connection with the Restructuring Transactions.  *See* Bankr. Dkt. No. 1132. This objection was joined by the Federal Trade Commission and the New Jersey Bureau of

Securities.  *See* Bankr. Dkt. Nos. 1134, 1135.  On March 3, 2023, the Texas State Securities

Board and Texas Department of Banking filed their objection to the plan and disclosure

statement, arguing, *inter alia*, that the government should be excluded from the broad

exculpation language.  *See* Bankr. Dkt. No. 1136.

On March 6, 2023, the United States Attorney's Office submitted a brief objecting to the

latest iteration of the Exculpation Provision.  It again argued, *inter alia*, that the proposed

exculpation language improperly barred the Government from enforcing its laws and regulations

in the ordinary course against the Debtors and third parties in connection with the Restructuring

Transactions.  *See* Bankr. Dkt. No. 1144.

### C.  Confirmation Hearing

From March 2 through March 7, 2023, the Bankruptcy Court held a hearing to consider

final approval of the Amended Disclosure Statement and confirmation of the Third Amended

Joint Plan (the "Confirmation Hearing").  On March 6, the court held oral argument on the

Government's objection.  During argument, the Bankruptcy Court stated it would approve an

Exculpation Provision insulating Debtors and others from prospective governmental liability in

connection with their consummation of the transactions contemplated in the Plan and related

documents.  Along the way, the Bankruptcy Court expressly rejected the Government's

argument that the court did not have the authority to release criminal liability.[4]

---

[4] *See* ECF No. 5-4 at 25:12-26:2 ("[Government attorney]: It would certainly not be appropriate
for this Court to enjoin a criminal prosecution of any person for any reason.  THE COURT:
Well, if what you're saying is that having sat on the sidelines and said nothing to me to indicate
that there's anything illegal about what these people are going to do, that you want to reserve the
right to put somebody in jail for doing a rebalancing transaction that they will have no choice but
to do under the order that I entered, then I disagree with you.  I think the very suggestion offends
me to no end.  I can't believe that you would even take the position in front of me that you
should have that right. It's preposterous.  It's absolutely preposterous.  If you think something's

At the end of the Confirmation Hearing, the Court entered an Order Approving the Second Amended Disclosure Statement and Confirming the March 5 Plan (the "Confirmation Order").  It revised the Debtors' proposed Exculpation Provision by striking in its entirety the language from prior drafts and replacing it with the following:

> Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from, any liability for damages based on the negotiation, execution and implementation of any transactions or actions approved by the Bankruptcy Court in the Chapter 11 Cases, except for Causes of Action related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence; provided that nothing in the Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

> The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes.

> In addition, the Plan contemplates certain rebalancing transactions and the completion of distributions of cryptocurrencies to creditors.  The Exculpated Parties shall have no liability for, and are exculpated from, any claim for fines, penalties, damages, or other liabilities based on their execution and completion of the rebalancing transactions and the distribution of cryptocurrencies to creditors in the manner provided in the Plan.

> For the avoidance of doubt, the foregoing paragraph reflects the fact that Confirmation of the Plan requires the Exculpated Parties to engage in certain rebalancing transactions and distributions of cryptocurrencies and the fact that no regulatory authority has taken the position during the Combined Hearing that such conduct would violate applicable laws or regulations.  Nothing in this provision shall limit in any way the powers of any Governmental Unit to contend that any rebalancing transaction should be stopped or prevented, or that any other action contemplated by the Plan should be enjoined or prevented from proceeding further. Nor does anything in this provision limit the enforcement of any future regulatory or court order that requires that such activities either cease or be modified, or limit the penalties that may be applicable if such a future regulatory or court order is issued and is violated.  Similarly, nothing herein shall limit the authority of the

that illegal, speak up, but don't dare tell me that you kind of want to reserve that right to do that to somebody.").

Committee on Foreign Investment of the United States to bar any of the contemplated transactions. Nor does anything in this provision alter the terms of the Plan regarding the compliance of the Purchaser with applicable laws in the Unsupported Jurisdictions before distributions of cryptocurrency occur in those Unsupported Jurisdictions.

Bankr. Dkt. No. 1159 at 7-8. In addition, the Confirmation Order included the following

language regarding the Exculpation Provision:

> 101. **Governmental Units**. **Except as set forth in the Exculpation Provisions set forth in the Plan (including sections VI.B.1 and VIII.C of the Plan)** and in this Confirmation Order, nothing in this Confirmation Order or the Plan shall release or restrict any claim by the United States, the States or any of their agencies of any claim arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any rules or regulations enforced by the United States, the States or any of their agencies against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States or the States from bringing any claim, suit, action or other proceedings against the Released Parties for any liability for any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any 22-10943-mew Doc 1166 Filed 03/10/23 Entered 03/10/23 08:17:02 Main Document Pg 45 of 55 46 rules or regulations enforced by the United States, the States or any of their agencies, nor shall anything in the Confirmation Order or the Plan exculpate any such party from any liability to the United States, the States or any of their agencies, arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any rules or regulations enforced by the United States, the States or any of their agencies; provided, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order.

> 102. **Except as set forth in the Exculpation Provisions set forth in the Plan (including sections VI.B.1 and VIII.C of the Plan)** and in this Confirmation Order, nothing in this Confirmation Order, the Disclosure Statement, the Plan, or the Asset Purchase Agreement releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit") that is not a "claim" as defined in 11 U.S.C. § 101(5) ("Claim"); (ii) any Claim of a Governmental Unit arising on or after the Effective Date; or (iii) any liability to a Governmental Unit on the part of any non-Debtor (except to the extent set forth in paragraphs 49 and 56 herein); provided, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order.

*Id.* at 44-45 (emphases added).

The Confirmation Order also provided for a waiver of the Bankruptcy Code rule that the effect of confirmation orders is generally stayed for 14 days.  *See* Fed. R. Bankr. P. 3020(e). Specifically, in lieu of the automatic 14-day stay, the Order provided that, "[f]or good cause shown, the stay of this Confirmation Order provided by the Bankruptcy Rules shall terminate at the end of the day on March 13, 2023, and this Confirmation Order shall be effective and enforceable immediately thereafter."  Bankr. Dkt. No. 1159 at 53.

The Government objected to the proposed waiver.  *See* ECF No. 5-4 at 34:9-16 (noting that "the U.S. Trustee would oppose the waiver of the stay"); *see also id*. at 108:11-15, 109:14-21, 117:16-118:2.  The Bankruptcy Court overruled the objection and confirmed that the temporary stay until March 13 would remain in place.  *Id*. at 108:16-21.  The Bankruptcy Court later extended that time, upon an agreement between the parties, to March 15, 2023, at 5:00 pm. Bankr. Dkt. No. 1169 at 2.

### D.  Post-Confirmation Stay Efforts

On March 14, 2023, the Government filed a motion for a stay pending appeal in the Bankruptcy Court.  *See* Bankr. Dkt. No. 1182.  On March 15, 2023, the Debtors and the Committee each filed an opposition to the motion.  *See* Bankr. Dkt. Nos. 1186, 1187.  That same day, the Bankruptcy Court held a hearing on the motion.  The Government asserted that the Bankruptcy Court lacks statutory authority to exculpate anyone from future government enforcement.  *See* ECF No. 5-5 at 28.  Further, the Government noted that "the exculpation order is so broad and so capacious that it would include things" such as "if the distribution agent doesn't protect customer privacy information and disclose[s] it, or if the distribution agent negligently loses customer money, or if in the course of performing the 'restructuring transactions' there are tax violations which don't require actual fraud, willful misconduct, or

gross negligence," or "KYC [know your customer] violations" or "anti-money laundering violations." *Id.* at 27.

The Bankruptcy Court denied the Government's motion for a stay. *See* ECF No. 5-2. It rejected as a "red herring" the Government's argument that the Bankruptcy Court's exculpation order "might somehow be interpreted as immunizing fraud, or theft, or tax avoidance." *Id.* at 8. In so doing, the Bankruptcy Court did not attempt to clarify the broad language in the order that led to such a reading. As the supposed statutory basis for its exculpation authority, the Bankruptcy Court identified certain language in 11 U.S.C. § 1142(a), which requires certain specific parties to implement a confirmed plan but says nothing about exculpating them from future governmental liabilities. *Id.* at 9-10. On consent of the parties, the Bankruptcy Court further extended the stay through March 20, 2023 at 5:00 pm, to permit consideration of the Government's motion by this Court. *See* Bankr. Dkt. No. 1188 ¶ 1.

### E. The Appeal

On March 14, 2023, the Government filed a Notice of Appeal from the Bankruptcy Court's Confirmation Order. *See* ECF No. 1. At the close of business on Friday, March 17, 2023, the Government filed the present emergency motion to stay pending appeal of the Confirmation Order.

## II. STANDARD OF REVIEW

A district court "functions as an appellate court in reviewing judgments rendered by Bankruptcy Courts." *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 346 (S.D.N.Y. 2007) (citing *In re Sanshoe Worldwide Corp.*, 993 F.2d 300, 305 (2d Cir. 1993)); *see also* 28 U.S.C. § 158(a). Findings of fact are reviewed for clear error. *Id.* (citing Fed. R. Bankr. P. 8013); *accord In re Cody, Inc.*, 338 F.3d 89, 94 (2d Cir. 2003). A finding of fact is clearly erroneous if

the court is "left with the definite and firm conviction that a mistake has been committed." *In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1388 (2d Cir. 1990) (citation omitted). In contrast, a Bankruptcy Court's conclusions of law are reviewed de novo. *In re Adelphia Commc'ns Corp.*, 361 B.R. at 346 (citing *In re Cody, Inc.*, 338 F.3d at 94).

### III.  LEGAL STANDARD

The decision as to whether to stay an order pending appeal "lies within the sound discretion of the district court." *Id.* In exercising that discretion, four factors are considered: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure other parties interested in the proceeding; [and] (4) where the public interest lies." *Sailor v. Scully*, 666 F. Supp. 50, 51 (S.D.N.Y. 1987) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

"A number of lower courts within the Second Circuit have concluded that the failure of the movant to satisfy any one of the four factors on a motion for a stay pending appeal of a bankruptcy court order 'dooms the motion.'" *In re Adelphia Commc'ns Corp.*, 361 B.R. at 346-47 (citation omitted). However, the Second Circuit "has never articulated such a rigid rule of law." *Id.* at 347. To the contrary, "the Second Circuit has consistently treated the inquiry of whether to grant a stay pending appeal as a balancing of factors that must be weighed." *Id.* Accordingly, this Court "will follow the Second Circuit's practice of weighing the factors." *Id.*; *see, e.g., Antonyuk v. Hochul*, No. 22-2908, 2022 WL 18228317, at *1 (2d Cir. Dec. 7, 2022) (granting motion for stay pending appeal after "[h]aving weighed the applicable factors"); *Thapa v. Gonzales*, 460 F.3d 323, 334 (2d Cir. 2006) ("We have treated the[] criteria [governing applications to stay pending appeal] somewhat like a sliding scale[.]"). "Where the government

is a party, the injury and public interest factors merge." *In re Purdue Pharma L.P.*, 634 B.R. 240, 247 (S.D.N.Y. 2021).

## III. DISCUSSION

The Court concludes that a stay is warranted because the Government has demonstrated a substantial case on the merits and irreparable harm in the absence of a stay.[5]

## A. The Merits of the Appeal

In the Second Circuit, "the 'likelihood of success on the merits' that is required for . . . a stay can be satisfied if there are 'serious questions' going to the merits of the dispute and the applicant is able to establish that the balance of hardships tips decidedly in its favor." *In re A2P SMS Antitrust Litig.*, No. 12-CV-2656, 2014 WL 4247744, at *2 (S.D.N.Y. Aug. 27, 2014) (citing *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010)) (emphasis omitted).[6] The Government has satisfied that standard.

At bottom, the Government has raised substantial questions concerning the relationship between bankruptcy courts, on the one hand, and the Bankruptcy Code, the U.S. Constitution, and the Government's police and regulatory powers on the other. To begin with, the Government posits that the Bankruptcy Code "provides no basis" for courts to "prospectively immunize debtors and non-debtors from law enforcement and other actions undertaken by the

---

[5] In view of the time constraints in which this emergency application is being decided, the Court does not engage herein in an extensive analysis of the merits.

[6] To be sure, in recent years, some courts in this District "ha[ve] questioned whether the Second Circuit's 'sufficiently serious question going to the merits' rule can be relied on any longer." *In re Purdue Pharma L.P.*, 634 B.R. at 247 n.4. However, as a host of recent Second Circuit decisions underscore, "the Second Circuit has not seen fit to abandon its alternative standard." *Id.* Furthermore, "no party has questioned its applicability here." *Id.*; *see generally* Debtors' Br.; *see also* Committee Br. Accordingly, the Court will apply the "sufficiently serious question going to the merits" standard. *In re Purdue Pharma L.P.*, 634 B.R. at 247.

Government." Gov't Br. 18. It persuasively contends that the rationale underlying Exculpation

Provisions is to "allow the settling parties . . . to engage in the give-and-take *of the bankruptcy*

*proceeding* without fear of subsequent litigation over any potentially negligent actions in those

proceedings." *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1084 (9th Cir. 2020) (emphasis added).[7]

The Court is hard-pressed to see how that reasoning, which is rooted in the need to settle disputes

among different stakeholders engaged in a bankruptcy proceeding, applies to exculpation from

Government enforcement of the law following confirmation. This is particularly true given that

bankruptcy is meant to deal with "the relations between a[] . . . debtor[] and his creditors"—not

the relations between third-parties and non-stakeholder Government enforcers. *Wright v. Union*

*Cent. Life Ins. Co.*, 304 U.S. 502, 513-14 (1938). Of the appellate courts upholding exculpation

provisions, only the Seventh Circuit did so over a regulatory agency's objection, noting that,

unlike here, the clause was "subject to the other provisions of the plan, including one that

expressly preserve[d] the FCC's regulatory powers." *In re Airadigm Comm'ns, Inc.*, 519 F.3d

640, 657 (7th Cir. 2008).

Moreover, a bankruptcy court has limited, if any, jurisdiction over criminal cases. For

example, criminal prosecutions and Government enforcement actions are not subject to the

Bankruptcy Code's automatic stay. *See* 11 U.S.C. § 362(b)(1), (4). The Government's argument

that "an Article I bankruptcy court lacks any power over criminal matters," Gov't Br. 22-23

(emphasis omitted), has gone entirely unrebutted by the Debtor and the Committee, neither of

which has provided any authority for the proposition that a bankruptcy court can release criminal

---

[7] *See also In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2022 WL 2206829, *50 (Bankr. S.D.N.Y. June 18, 2022) ("Exculpation provisions are frequently included in chapter 11 plans, because stakeholders all too often blame others for failures to get the recoveries they desire; seek vengeance against other parties; or simply wish to second guess the decisionmakers in the chapter 11 case." (quoting *In re DBSD N. Am., Inc.*, 419 B.R. 178, 217 (Bankr. S.D.N.Y. 2009)).

liability. That "bankruptcy courts [have] routinely approve[d] exculpation provisions without a carve out for governmental entities, enforcement actions, or criminal sanctions," Committee Br. 36, fails to show that *this* Exculpation Provision is permissible. The concerns raised by the Government here had, until recently, not been considered. In any event, preventing Government enforcement actions is at odds with the general principle that "confirmation of a plan does not insulate debtors from prosecution for criminal activity, even if that activity is part of the plan itself." *Garvin v. Cook Investments NW, SPNWY, LLC*, 922 F.3d 1031, 1036 (9th Cir. 2019). And permitting exculpation against all Government action might require "[a]ll regulatory agencies (and there are thousands) . . . to participate in all chapter 11 cases, introducing extraordinary delay into the system and imposing an impossible burden on the agencies." *In re Food City, Inc.*, 110 B.R. 808, 812 (Bankr. W.D. Tex. 1990) (rejecting an interpretation of 11 U.S.C. § 1129(a)(3) that would require a plan itself, as opposed to the proposal of the plan, to comply with all laws).

The Bankruptcy Court relied on "basic principles of equity and estoppel," ECF No. 12-11 at 38, in concluding that those who take "actions that are specifically approved by a court and/or that have been explicitly required to be taken by court order," *id.* at 35, deserve immunity. It is not clear, however, at this stage of the litigation, that this precept applies against Government enforcement. At the very least, applying it here raises significant questions warranting additional briefing. *See Ofosu v. McElroy*, 98 F.3d 694, 701 (2d Cir. 1996) (granting motion to stay where "[plaintiff's] case d[id] not fit neatly into the" existing authority and where "case present[ed] a factual context in which thorough briefing and argument of the issue is warranted").

It does appear likely that some species of quasi-judicial immunity applies to at least some parties executing the rebalancing transactions. Here, the Debtor operates in much the same

capacity as a bankruptcy trustee would, *see* 11 U.S.C. § 1107(a), and "[b]ankruptcy trustees are generally immune to the extent that they are acting with the approval of the court," *Gross v. Rell*, 695 F.3d 211, 216 (2d Cir. 2012) (collecting cases). *See also Boullion v. McClanahan*, 639 F.2d 213, 214 (5th Cir. 1981) ("an arm of the Court [who] sought and obtained court approval of his actions . . . is entitled to derived immunity"). And judicial immunity would extend to other "court appointed officers who represent the estate." *See In re Crown Vantage, Inc.*, 421 F.3d 963, 973 (9th Cir. 2005) (citing *In re DeLorean Motor Co.*, 991 F.2d 1236, 1241 (6th Cir. 1993)). While judicial immunity "attaches to only those functions essential to the authoritative adjudication of private rights to the bankruptcy estate," *In re Castillo*, 297 F. 3d 940, 951 (9th Cir. 2002), "[t]here can be no dispute that a trustee's evaluation and acceptance or rejection of parties' offers to purchase estate assets involves discretionary judgment," *In re Cont'l Coin Corp.*, No. 00-BK-15821-GM, 2009 WL 2589635, at *4 (C.D. Cal. Aug. 21, 2009).

Nonetheless, the Exculpation Provision appears to go further than the quasi-judicial immunity doctrine allows. *Cf. Pierson v. Ray*, 386 U.S. 547, 553-54 (1967) ("Few doctrines were more solidly established at common law than the immunity of judges from liability *for damages* for acts committed within their judicial jurisdiction." (emphasis added)). Judicial immunity often does not, for example, bar injunctive relief. *See Pulliam v. Allen*, 466 U.S. 522, 541-42 (1984) ("We conclude that judicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity."). But the Exculpation Provision limits claims for "fines, penalties, damages, or other liabilities." Moreover, only a single federal appellate court has stated that judicial immunity can apply in the criminal context—and it did so in dicta, ultimately rejecting the doctrine as applied to that defendant. *See Braatelien v. United States*, 147 F.2d 888, 895 (8th Cir. 1945)*; see also In re Kendall*, 712 F.3d 814, 833-37 (3d Cir.

2013) (Roth, J., concurring) (arguing that judicial immunity should apply to criminal conduct). Even accepting *Braatelien* as correct, the Eighth Circuit would have applied the doctrine only to "erroneous judicial acts one [sic] in good faith."  147 F.2d at 895.  Yet a criminal act that was not done in good faith also might fall short of willful misconduct or gross negligence.  *See* Gov't Br. 32.  Prosecution of such an act would still be barred by the Exculpation Provision.

Finally, neither the Debtors nor the Committee has offered any authority rebutting the proposition that immunity must be raised as an affirmative defense, rather than granted preemptively before any action has even taken place.  *See, e.g.*, *Mordkofsky v. Calabresi*, 159 Fed. App'x 938, 939 (11th Cir. 2005) ("judicial immunity is an affirmative defense and does not divest the court of subject matter jurisdiction").  Using generic equity principles to enjoin a future criminal prosecution violates "the general rule that equity will not interfere with the criminal processes, by entertaining actions for injunction or declaratory relief in advance of criminal prosecution."  *Zemel v. Rusk*, 381 U.S. 1, 19 (1965).  That is not to mention the significant separation of powers concerns that arise when a Bankruptcy Court effectively rewrites statutes of limitations by preventing the Executive Branch from investigating acts and enforcing the law, requiring the Government instead to object to actions that have not yet been taken.

In sum, the Government's application "center[s] on [potentially] novel and 'admittedly difficult legal question[s]."  *Ctr. For Int'l Env't L. v. Off. of U.S. Trade Representative*, 240 F. Supp. 2d 21, 21–24 (D.D.C. 2003).  Thus, "[the Government] ha[s] made out a 'substantial case on the merits,'" and "the first factor, in turn, weighs in favor of a stay."  *See Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844-45 (D.C. Cir. 1977).

**B. Injury to the Movant, Injury to Other Parties & the Public Interest**

The Court next turns to the injury and public interest factors.  *See In re Purdue Pharma L.P.*, 634 B.R. at 247 (noting that these factors "merge" where the Government is a party).  The balance of these factors favors a stay.

The Debtors and Committee contend that they would face "inevitable and substantial" harms if a stay were imposed, noting that it would "postpone the relief due Voyager customers indefinitely—and may ultimately make any cryptocurrency distribution impossible."  Debtors' Br. 36.  They also represent that a stay will "require the[m] . . . to extend their retention of advisors and other third-party professionals to protect them during the pendency of these chapter 11 cases," with the upshot being that they are "burning more than $10 million per month," *id.* at 37.  For the Government's part, it identifies several harms that it allegedly would endure absent a stay: it would be "forbidden from enforcing federal law against parties for conduct that has not yet occurred"; the Bankruptcy Court would "infringe[] on the powers of the Executive Branch to enforce the law and the Legislative Branch to determine applicable statutes of limitation and liability standards"; and, "if Debtors equitably moot this appeal, it would substantially prejudice the Government's ability to vindicate its right to enforce the law."  Gov't Reply 9.

The Court concludes that, while all parties would face meaningful injury in the event that a stay were wrongly granted or denied, the balance of hardship lies with the Government.  There is a fundamentally strong public interest in the Executive Branch's enforcement of the democratically enacted laws of the United States.  As the Supreme Court has recognized in *Nken v. Holder*, a harm to the Government's legitimate functions is a harm to the public interest that satisfies the third and fourth factors for a stay.  *See* 556 U.S. 418, 435-36 (2009).  There, the Court specifically recognized a public interest in the "prompt execution of removal orders" and

the ongoing harm from the continuing violation of United States law that would arise from delayed execution.  *Id* at 436.  Other courts also have highlighted the "overriding sovereign interests in enforcing the penal laws and protecting the public."  *See, e.g.*, *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 27 (1st Cir. 2020).

Furthermore, a stay pending appeal would preserve the Government's—and the public's—right to meaningful appellate review of the Exculpation Provision and the significant issues raised here, as addressed above.  *See In re Adelphia Commc'ns Corp.*, 361 B.R. at 349.  If a stay pending appeal were denied, the Plan immediately would go into effect.  "Under the doctrine of mootness, when an unstayed bankruptcy plan becomes substantially consummated such that no assets remain out of which to satisfy the creditor's claim, the appeal becomes moot and the claim, however meritorious, is lost."  *In re Klein Sleep Prod., Inc.*, No. 93 CIV. 7599 (CSH), 1994 WL 652459, at *1 (S.D.N.Y. Nov. 18, 1994); *see also, e.g.*, *In re Chateguay Corp.*, 988 F.2d 322, 326 (2d Cir. 1993) (implementation of unstayed Bankruptcy Court order permitting distribution mooted appeal); *In re Revere Copper and Brass, Inc.*, 78 B.R. 17, 20 (S.D.N.Y.1987) (same).  "The inevitable result is that denial of a stay would moot the appeal"— a reality that "even the [Debtor] and the Committee acknowledge."  *In re Klein Sleep Prod.*, 1994 WL 652459, at *1.[8]  Thus, the risk of mootness in the absence of a stay satisfies this prong. *Id.* at *1-2.

---

[8] *See* ECF No. 17-2 at 34:16-35:1 ("For similar reasons that other confirmations have been -- appeals have been dismissed on equitable mootness grounds because parties are taking action and relies on the Court's order, that's a traditional ground for a finding of equitable mootness, and that's exactly the similar argument that we are going to be making.  And I wanted to be very clear in our brief, and I'm just going to say it now.  And our position is not wishy-washy at all. Our position is once Your Honor gives us authority to go forward with the transaction, we're going to do that.").

In sum, "while each side is threatened with unquantifiable and irreparable injury in the event a stay is wrongly granted or denied, the Court concludes that the balance of hardship lies with the government." *In re St. Johnsbury Trucking Co., Inc.*, 185 B.R. 687, 691 (S.D.N.Y. 1995); *cf. e.g.*, *id.* (holding that "[t]he loss of any opportunity to challenge on appeal a debatable [confirmation] order purporting to release parties from liability for future violations of the environmental and tax laws outweighs the consequences of a brief additional delay in long overdue wage distributions to former employees").

## IV. CONCLUSION

For the foregoing reasons, the Government's motion for a stay of the Confirmation Order pending appeal of the Confirmation Order is GRANTED. In order to minimize delay in consummating the Plan in the event that the Confirmation Order is affirmed, however, the Court will expedite briefing and determination of the appeal. Absent submission on or before April 4, 2023 of a stipulation proposing a different schedule, the Government shall file its brief no later than April 7, 2023.

The Debtors' and the Committee's brief[9] is due April 14, 2023. The Government's reply brief, if any, shall be filed no later than April 18, 2023.

The Clerk of Court is directed to strike ECF No. 51.

SO ORDERED.

Dated: April 1, 2023
New York, New York

_Jennifer H. Rearden_
JENNIFER H. REARDEN
United States District Judge

___

[9] The Debtors and the Committee may jointly brief the appeal, or they may submit individual briefs.

A-218

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| In re: VOYAGER DIGITAL HOLDINGS, INC., *et al.*, |
| *Debtors*. |
| UNITED STATES OF AMERICA, *et al.*, |
| *Appellants*, |
| v. |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*, |
| *Appellees*. |

No. 23 Civ. 02171 (JHR)

## <u>EMERGENCY NOTICE OF APPEAL</u>

Notice is hereby given that the Official Committee of Unsecured Creditors of Voyager Digital Holdings, Inc., appeals to the United States Court of Appeals for the Second Circuit from this Court's March 27, 2023 order granting a stay pending appeal (Dkt. 45), from the Court's March 31, 2023 written opinion (Dkt. 51), from the Court's April 1, 2023 corrected written opinion (Dkt. 53), and from any and all other orders and decisions that merge therein.

Dated   April 1, 2023
        New York, New York

**MᴄDᴇʀᴍᴏᴛᴛ Wɪʟʟ & Eᴍᴇʀʏ LLP**

*/s/ Darren Azman*
Darren Azman
Joseph B. Evans
One Vanderbilt Avenue
New York, NY 10017-3852
Telephone: (212) 547-5400
Facsimile: (212) 547-5444
E-mail: dazman@mwe.com
E-mail: jbevans@mwe.com

*Counsel to the Official Committee of*
*Unsecured Creditors*

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Michael B. Slade (admitted *pro hac vice*)
Richard U.S. Howell, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 N. LaSalle
Chicago, Illinois  60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*, | Case No. 23-cv-2171 |
| | 22-bk-10943 (MEW) |
| | |
| Debtors. | (Jointly Administered) |
| | |
| | ON APPEAL FROM THE UNITED |
| | STATES BANKRUPTCY COURT |
| | FOR THE SOUTHERN DISTRICT |
| | OF NEW YORK |

**DEBTORS' AMENDED EMERGENCY NOTICE OF APPEAL**

Voyager Digital Holdings, Inc. and its affiliated Debtors hereby appeal on an emergency basis to the United States Court of Appeals for the Second Circuit from this Court's March 27, 2023 Order (Dkt. 45) granting the United States' Emergency Motion for a Stay Pending Appeal and from this Court's April 1, 2023 Corrected Opinion and Order (Dkt. 53) issued in conjunction with the March 27 Order.[1]

Debtors intend to imminently file an emergency motion with the Second Circuit to vacate the Court's Order and Corrected Opinion and Order. Debtors therefore respectfully request that the Clerk expedite the processing of this Amended Notice of Appeal and the transmittal of the record and all necessary materials to the Second Circuit.

[1] Earlier today, Debtors filed an emergency notice of appeal (Dkt. 52) from the Court's March 31, 2023 Opinion (Dkt. 51); however, the Court struck its March 31, 2023 Opinion and issued the April 1, 2023 Corrected Opinion and Order, necessitating this amended emergency notice of appeal.

Dated:  April 1, 2023          /s/ Richard U.S. Howell
New York, New York          **KIRKLAND & ELLIS LLP**
                            **KIRKLAND & ELLIS INTERNATIONAL LLP**
                            Joshua A. Sussberg, P.C.
                            Christopher Marcus, P.C.
                            Christine A. Okike, P.C.
                            Allyson B. Smith (admitted *pro hac vice*)
                            601 Lexington Avenue
                            New York, New York 10022
                            Telephone:     (212) 446-4800
                            Facsimile:     (212) 446-4900
                            Email:         jsussberg@kirkland.com
                                           cmarcus@kirkland.com
                                           christine.okike@kirkland.com
                                           allyson.smith@kirkland.com


                            Michael B. Slade (admitted *pro hac vice*)
                            Richard U.S. Howell, P.C. (admitted *pro hac vice*)
                            300 N. LaSalle Drive
                            Chicago, IL 60654
                            Telephone:     (312) 862-2000
                            Fascimile:     (312) 862-2200
                            Email:         mslade@kirkland.com
                                           rhowell@kirkland.com


                            *Counsel to the Debtors and Debtors in Possession*